5

United States District Court
Southern District of Texas
FILED

NOV 04 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROSEMARY GUERRA INDIVIDUALLY | § | |
| AND AS NEXT FRIEND OF | § | |
| EDIBERTO GUERRA | § | |
| *and all those similarly situated* | § | |
| | § | |
| VS. | § | C. A. NO. B-02-207 |
| | § | |
| SOUTH TEXAS HIGH SCHOOL- | § | |
| SAN BENITO, SOUTH TEXAS | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| AND MARLA M. GUERRA | § | |

# RESPONSE TO PLAINTIFF'S MOTION TO EXTEND RESTRAINING ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

**SOUTH TEXAS INDEPENDENT SCHOOL DISTRICT** and **MARLA M. GUERRA, its Superintendent** file this response to the motion of **ROSEMARY GUERRA, Individually And As Next Friend of Ediberto Guerra:**

## Facts

1. **SOUTH TEXAS INDEPENDENT SCHOOL DISTRICT (hereinafter "STISD")** exists pursuant to special legislation found at Texas Education Code, Section 26.01 *et seq.*–App. This legislation allowed the creation of multi-county rehabilitation school districts originally dedicated to the education and training of handicapped persons under the age of twenty-two (22) years. As a result of this legislation, South Texas Independent School District was created by the voters of Cameron, Hidalgo and

Willacy Counties to include all of each of those counties. No other such district currently exists in the State of Texas.

2. At present, after amendment of the enabling statute, STISD operates three magnet schools located in Mercedes and Edinburg, Texas, known as The High School for Health Professions and The Science Academy in the former location and The Teacher Academy in the latter location. Additionally, STISD operates South Texas High School-San Benito for the purpose of educating handicapped persons. This campus in San Benito has been utilized by the twenty-eight (28) school districts in the three-county area to educate those children they have determined are suffering from handicaps which, for one reason or another, cannot be educated at their respective home districts.

**Legislation and Regulation**

3. Since the creation of STISD, the United States Congress has passed legislation known as Individuals with Disabilities Education Act (IDEA) (20 U.S.C. § 1400 *et seq.*) which authorizes the Department of Health, Education and Welfare to promulgate regulations governing this process. These regulations are codified at 34 C.F.R. 300.1 - 300.756 (A copy of the relevant portions of these regulations and an analysis by the Texas Education Agency are attached hereto as "Exhibit A"). The stated purposes of the regulations are:

> "(a) To ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living;

(b) To ensure that the rights of children with disabilities and their parents are protected;

(c) To assist states, localities, educational service agencies, and federal agencies to provide for the education of all children with disabilities; and

(d) To assess and ensure the effectiveness of efforts to educate children with disabilities." 34 C.F.R. 300.1. (See "Exhibit A").

**4.** The procedural requirements for admission of a handicapped child to STISD requires the child's home district to conduct an evaluation of the child's educational needs by determination of an Admission, Review and Dismissal Committee (commonly known as an ARD Committee). Once that determination is made, the child applies for admission to STISD which has in the past prescribed the child's Individual Educational Plan (IEP). Currently, the child's home district has the responsibility for the drafting of the IEP. (See "Exhibit B" for Texas Education Agency consultant letter of instructions). However, during the spring semester of school year 2001-2002, the ARD Committee of STISD prepared the IEP for Ediberto Guerra for school year 2002-2003.

**5.** An ARD Committee is required to contain an "IEP Team" consisting of (1) the parents of the child; (2) at least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment); (3) at least one special education teacher of the child; (4) a representative of the public agency who is qualified to provide or supervise the provision of instruction for the child; (5) an individual who can interpret the instructional implications of evaluation results; (6) if requested by the parents, other individuals who have knowledge

regarding the child; and (7) if appropriate, the child.   34 C.F.R. 300.344. ("Exhibit A").  An ARD meeting is required at least once a year for the purpose of developing, reviewing and revising the IEP of a child with a disability.  34 C.F.R. 343. Each member of the ARD Committee, including the child's parent(s), has the right to agree or disagree with the decisions of the committee and the IEP developed by the IEP team.  19 T.A.C. 89.1050(h).  On March 19, 2002, the ARD Committee of STISD met to consider and develop and IEP for Ediberto Guerra for the school year 2002-2003.  As a result of that meeting, an IEP was developed and was agreed to by all members, including Plaintiff Rosemary Guerra.  (A copy of that ARD Committee meeting minutes and IEP are attached hereto as "Exhibit C" in a sealed envelope for in-camera inspection).  As will be seen, the IEP for school year 2002-2003 provided for one-half (½) day attendance by the student at the STISD facility in San Benito and one-half (½) day attendance at the San Benito High School so as to place Ediberto Guerra in the least restrictive environment.

**6.**      The least restrictive environment requirement for handicapped students is set out at 20 U.S.C. § 1412(a)(5) and 34 C.F.R. 300.550(b) ("Exhibit A"). STISD is required by both federal and state regulations and statutes to make every effort to ensure that a child with disabilities is not segregated and is educated with children who are non-disabled.  The IEP of Ediberto Guerra for school year 2002-2003 was designed to do exactly that.  Ediberto Guerra was to be educated in the vocational training facilities of STISD for one-half (½) day and in the scholastic study facilities of his home district of San Benito for one-half (½) day.

7. Beginning the first day of school year 2002-2003, Ediberto Guerra's educational placement consisted of one-half (½) day either at San Benito High School or, at the parents' discretion, one-half (½) day of home schooling. The "stay-put" provisions of 34 C.F.R. 300.514(a) require that the educational placement of a disabled child not be changed during the pendency of an administrative or judicial proceeding regarding a complaint about a district's obligations to that student. This regulation is based upon similar provisions at 20 U.S.C. § 1415(j).

**Administrative Remedies**

8. Plaintiff also complains to this Court of errors and omissions made by STISD without first exhausting her administrative remedies established by both STISD ("Exhibit D") and by the Texas Education Agency ("Exhibit E") found at 19 T.A.C. § 89.1150 *et seq.* It is fundamental that, if administrative remedies are provided, a complainant must first exhaust those remedies before proceeding to seek judicial relief. 20 U.S.C. § 1415(i)2, (i)(3)(A) and 1415(l); 34 C.F.R. 300.512(d); *McCarthy v. Madigan*, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *Jones v. Dallas Independent School District*, 872 S.W.2d 294 (Tex. App–Dallas 1994, err denied). Plaintiff has failed to follow the orderly method of determining her rights and the child's rights and thereby seeking review and possible revision within the guidelines established by the school district and the State of Texas.

**Class Action**

9. Plaintiff attempts to bring this matter before the Court as a class action suit without complying with Rule 23, Federal Rules of Civil Procedure. The relevant

rule requires Plaintiff prove that (1) the class is numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Additionally, Plaintiff must prove that prosecution of separate actions would create a risk of inconsistent adjudications or that adjudication of this matter would be dispositive of the claims of other class members not parties and impair their ability to protect their interests. Plaintiff has not submitted nor even alleged a factual basis for this Court to find commonality and typicality.

Further, the class to which Plaintiff alludes is finite. Each student with disabilities in attendance in the entirety of STISD or only in South Texas High School-San Benito are known, and STISD has addresses, parents' names and telephone numbers. The total number of such students in all of STISD does not exceed one hundred eighty (180). The total number of such students at South Texas High School-San Benito does not exceed one hundred four (104). When the number of affected persons is finite, their identity and address are readily ascertainable and they all live in a compact geographical area, the class would fail to meet the first requirement of Rule 23(a). *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).

**Conclusion**

Plaintiff has failed to follow the orderly and lawful procedure of due process and hearing prior to complaining in a judicial setting. Plaintiff is seeking temporary relief contrary to the statutory and regulatory requirement that the educational placement

of a child not be changed during the pendency of an administrative or judicial proceeding. Plaintiff further is attempting to alter an IEP developed pursuant to regulation and to which she agreed in March 2002. STISD is attempting to follow the requirements promulgated by the United States Congress and by the Department of Health, Education and Welfare that disabled students be educated in the least restrictive environment. Plaintiff seeks to preclude that process yet complains that STISD is not preparing Ediberto Guerra for "successful transition to life outside in the public outside of their school system." (See page 4 of Plaintiff Rosemary Guerra's Original Petition and Application for Temporary Restraining Order and Temporary Injunction).

Further, Plaintiff is attempting to proceed in this matter as a class action without following the requirements of Rule 23, F.R.C.P. In actuality, only the named Plaintiff is a party to the litigation before this Court.

**Prayer**

Defendants STISD and Marla M. Guerra pray the Court deny Plaintiff's requested temporary injunction, abate this matter until Plaintiff has exhausted her administrative remedies and grant to Defendants other and further relief to which they may show themselves entitled.

DATED: November 4, 2002.

Respectfully submitted,

**FLEMING & HERNANDEZ, P.C.**
1650 Paredes Line Road, Suite 102
Brownsville, Texas 78521-1602
Telephone: (956) 982-4404
Telecopier: (956) 982-0943

by: [signature]
**Tom Fleming**
State Bar of Texas No. 07133000
Federal I. D. No. 1188

**Jeffrey G. Mathews**
State Bar of Texas No. 24013115
Federal I. D. No. 24499

**COUNSEL FOR DEFENDANTS:**
**SOUTH TEXAS HIGH SCHOOL - SAN BENITO;**
**SOUTH TEXAS INDEPENDENT SCHOOL DISTRICT;**
**and**
**MARLA M. GUERRA.**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing **RESPONSE TO PLAINTIFF'S MOTION TO EXTEND RESTRAINING ORDER** was served November 4, 2002 in the manner(s) indicated below upon the following Counsel-of-record:

**COUNSEL FOR PLAINTIFFS,**
**ROSEMARY GUERRA INDIVIDUALLY**
**AND AS NEXT FRIEND OF EDIBERTO GUERRA**
**and all those similarly situated:**
Ray R. Marchan
WATTS LAW FIRM, L.L.P.
1926 East Elizabeth Street
Brownsville, Texas 78520
***(PERSONAL DELIVERY)***

Tom Fleming

EXHIBIT NO. A

# IDEA

## (Individuals with Disabilities Education Act)

# FINAL REGULATIONS

**34 CFR PART 300**
**Assistance to States for the Education of Children with Disabilities**
**from the March 12, 1999 Federal Register**

**(including the Analysis of Comments and Changes, Appendix A, and Potential Benefit and Cost Analysis)**

**Texas Education Agency**
**Division of Special Education**
**March 1999**

This document is available in an electronic format on the TEA-Special Education Web Page at:
http://www.tea.state.tx.us/special.ed

# PART 300--ASSISTANCE TO STATES FOR THE EDUCATION OF CHILDREN WITH DISABILITIES

### Subpart A--General

#### Purposes, Applicability, and Regulations That Apply to This Program

300.1 Purposes ... 2
300.2 Applicability of this part to State, local, and private agencies ... 2

#### Definitions Used in This Part

300.3 Regulations that apply ... 3
300.4 Act ... 4
300.5 Assistive technology device ... 5
300.6 Assistive technology service ... 5
300.7 Child with a disability ... 6
300.8 Consent ... 11
300.9 Day; business day; school day ... 11
300.10 Educational service agency ... 12
300.11 Equipment ... 12
300.12 Evaluation ... 13
300.13 Free appropriate public education ... 13
300.14 Include ... 13
300.15 Individualized education program ... 13
300.16 Individualized education program team ... 14
300.17 Individualized family service plan ... 14
300.18 Local educational agency ... 14
300.19 Native language ... 15
300.20 Parent ... 16
300.21 Personally identifiable ... 16
300.22 Public agency ... 17
300.23 Qualified personnel ... 17
300.24 Related services ... 18
300.25 Secondary school ... 22
300.26 Special education ... 23
300.27 State ... 24
300.28 Supplementary aids and services ... 25
300.29 Transition services ... 25
300.30 Definitions in EDGAR ... 26

### Subpart B--State and Local Eligibility

#### State Eligibility--General

300.110 Condition of assistance ... 26
300.111 Exception for prior State policies and procedures on file with the Secretary ... 27
300.112 Amendments to State policies and procedures ... 27
300.113 Approval by the Secretary ... 28
300.114--300.120 [Reserved] ... 28

#### State Eligibility--Specific Conditions

300.121 Free appropriate public education (FAPE) ... 29
300.122 Exception to FAPE for certain ages ... 32
300.123 Full educational opportunity goal (FEOG) ... 33
300.124 FEOG--timetable ... 33
300.125 Child find ... 34
300.126 Procedures for evaluation and determination of eligibility ... 36
300.127 Confidentiality of personally identifiable information ... 36
300.128 Individualized education programs ... 36
300.129 Procedural safeguards ... 37
300.130 Least restrictive environment ... 37
300.131 [Reserved] ... 37
300.132 Transition of children from Part C to preschool programs ... 39
300.133 Children in private schools ... 40
300.134 [Reserved] ... 40
300.135 Comprehensive system of personnel development ... 40
300.136 Personnel standards ... 41
300.137 Performance goals and indicators ... 45
300.138 Participation in assessments ... 47
300.139 Reports relating to assessments ... 48
300.140 [Reserved] ... 49
300.141 SEA responsibility for general supervision ... 49
300.142 Methods of ensuring services ... 53
300.143 SEA implementation of procedural safeguards ... 57
300.144 Hearings relating to LEA eligibility ... 57
300.145 Recovery of funds for misclassified children ... 57
300.146 Suspension and expulsion rates ... 58
300.147 Additional information if SEA provides direct services ... 58
300.148 Public participation ... 59
300.149 [Reserved] ... 59
300.150 State advisory panel ... 59
300.151 [Reserved] ... 59
300.152 Prohibition against commingling ... 60
300.153 State-level nonsupplanting ... 60
300.154 Maintenance of State financial support ... 61
300.155 Policies and procedures for use of Part B funds ... 62
300.156 Annual description of use of Part B funds. LEA and State Agency Eligibility--General ... 62
300.180 Condition of assistance ... 62
300.181 Exception for prior LEA or State agency policies and procedures on file with the SEA ... 63
300.182 Amendments to LEA policies and procedures ... 63
300.183 [Reserved] ... 63
300.184 Excess cost requirement ... 64
300.185 Meeting the excess cost requirement ... 65
300.186--300.189 [Reserved] ... 65
300.190 Joint establishment of eligibility ... 65
300.191 [Reserved] ... 65

# PART 300--ASSISTANCE TO STATES FOR THE EDUCATION OF CHILDREN WITH DISABILITIES

### LEA and State Agency Eligibility--General

300 192 Requirements for establishing eligibility 66
300 193 [Reserved] 66
300 194 State agency eligibility 66
300 195 [Reserved] 67
300 196 Notification of LEA or State agency in case of ineligibility 67
300 197 LEA and State agency compliance 67

### LEA and State Agency Eligibility--Specific Conditions

300 220 Consistency with State policies 67
300 221 Implementation of CSPD 68
300 222--300 229 [Reserved] 68
300 230 Use of amounts 68
300 231 Maintenance of effort 69
300 232 Exception to maintenance of effort 70
300 233 Treatment of federal funds in certain fiscal years 71
300 234 Schoolwide programs under title I of the ESEA 71
300 235 Permissive use of funds 72
300 236--300 239 [Reserved] 72
300 240 Information for SEA 73
300 241 Treatment of charter schools and their students 73
300 242 Public information 73
300 243 [Reserved] 73
300 244 Coordinated services system 74

### School-Based Improvement Plan

300 245 School-based improvement plan 75
300 246 Plan requirements 76
300 247 Responsibilities of the LEA 76
300 248 Limitation 78
300 249 Additional requirements 78
300.250 Extension of plan 78

### Secretary of the Interior--Eligibility

300 260 Submission of information 79
300 261 Public participation 80
300 262 Use of Part B funds 80
300 263 Plan for coordination of services 81
300 264 Definitions 81
300 265 Establishment of advisory board 82
300 266 Annual report by advisory board 83
300 267 Applicable regulations 83

### Public Participation

300 280 Public hearings before adopting State policies and procedures 83
300 281 Notice 84
300 282 Opportunity to participate; comment period 84
300 283 Review of public comments before adopting policies and procedures 85
300 284 Publication and availability of approved policies and procedures 85

### Subpart C--Services

### Free Appropriate Public Education

300 300 Provision of FAPE 86
300 301 FAPE–methods and payments 88
300 302 Residential placement 88
300 303 Proper functioning of hearing aids 89
300 304 Full educational opportunity goal 89
300 305 Program options 89
300 306 Nonacademic services 90
300 307 Physical education 90
300 308 Assistive technology 91
300 309 Extended school year services 92
300 310 [Reserved] 92
300 311 FAPE requirements for students with disabilities in adult prisons 95
300 312 Children with disabilities in public charter schools 96
300 313 Children experiencing developmental delays 97

# PART 300--ASSISTANCE TO STATES FOR THE EDUCATION OF CHILDREN WITH DISABILITIES

**Evaluations and Reevaluations**

300 320 Initial evaluations ... 98
300 321 Reevaluations ... 98
300 322--300 324 [Reserved] ... 98

**Individualized Education Programs**

300 340 Definitions related to IEPs ... 100
300 341 Responsibility of SEA and other public agencies for IEPs ... 101
300 342 When IEPs must be in effect ... 103
300 343 IEP Meetings ... 105
300 344 IEP team ... 109
300 345 Parent participation ... 117
300 346 Development, review, and revision of IEP ... 121
300 347 Content of IEP ... 126
300 348 Agency responsibilities for transition services ... 140
300 349 Private school placements by public agencies ... 141
300 350 IEPs--accountability ... 143

**Direct Services by the SEA**

300 360 Use of LEA allocation for direct services ... 144
300 361 Nature and location of services ... 145
300 362--300 369 [Reserved] ... 145
300 370 Use of SEA allocations ... 145
300.371 [Reserved] ... 146
300.372 Nonapplicability of requirements that prohibit commingling and supplanting of funds ... 146

**Comprehensive System of Personnel Development (CSPD)**

300.380 General CSPD requirements ... 147
300 381 Adequate supply of qualified personnel ... 147
300.382 Improvement strategies ... 148
300.383--300 387 [Reserved] ... 149

**Subpart D--Children in Private Schools**

**Children With Disabilities in Private Schools Placed or Referred by Public Agencies**

300.400 Applicability of Secs. 300.400-300 402 ... 150
300.401 Responsibility of State educational agency ... 150
300.402 Implementation by State educational agency ... 151

**Children With Disabilities Enrolled by Their Parents in Private Schools**

**When FAPE Is at Issue**

300 403 Placement of children by parents if FAPE is at issue ... 152

**Children With Disabilities Enrolled by Their Parents in Private Schools**

300 450 Definition of "private school children with disabilities" ... 155
300 451 Child find for private school children with disabilities ... 155
300 452 Provision of services--basic requirement ... 155
300 453 Expenditures ... 156
300 454 Services determined ... 157
300 455 Services provided ... 158
300 456 Location of services; transportation ... 159
300 457 Complaints ... 159
300 458 Separate classes prohibited ... 160
300 459 Requirement that funds not benefit a private school ... 160
300 460 Use of public school personnel ... 160
300 461 Use of private school personnel ... 161
300 462 Requirements concerning property, equipment, and supplies for the benefit of private school children with disabilities ... 161

**Procedures for By-Pass**

300 480 By-pass--general ... 162
300 481 Provisions for services under a by-pass ... 162
300.482 Notice of intent to implement a by-pass ... 163
300 483 Request to show cause ... 164
300.484 Show cause hearing ... 164
300 485 Decision ... 165
300.486 Filing requirements ... 165
300.487 Judicial review ... 166

**Subpart E--Procedural Safeguards**

**Due Process Procedures for Parents and Children**

300 500 General responsibility of public agencies; definitions ... 166
300.501 Opportunity to examine records; parent participation in meetings ... 167
300 502 Independent educational evaluation ... 169
300 503 Prior notice by the public agency; content of notice ... 171
300 504 Procedural safeguards notice ... 172
300 505 Parental consent ... 174
300 506 Mediation ... 177
300 507 Impartial due process hearing; parent notice ... 179
300 508 Impartial hearing officer ... 180

# PART 300--ASSISTANCE TO STATES FOR THE EDUCATION OF CHILDREN WITH DISABILITIES

300 509 Hearing rights 181
300 510 *Finality of decision, appeal, impartial review* 182
300 511 Timelines and convenience of hearings and reviews 184
300 512 Civil action 184
300 513 Attorneys' fees 185
300 514 Child s status during proceedings 187
300 515 Surrogate parents 189
300 516 [Reserved] 190
300 517 Transfer of parental rights at age of majority 190

**Discipline Procedures**

300 519 Change of placement for disciplinary removals 199
300 520 Authority of school personnel 199
300 521 Authority of hearing officer 203
300 522 Determination of setting 204
300 523 Manifestation determination review 206
300 524 Determination that behavior was not manifestation of disability 209
300 525 Parent appeal 209
300 526 Placement during appeals 210
300 527 Protections for children not yet eligible for special education and related services 211
300 528 Expedited due process hearings 213
300 529 Referral to and action by law enforcement and judicial authorities 214

**Procedures for Evaluation and Determination of Eligibility**

300 530 General 216
300 531 Initial evaluation 216
300 532 *Evaluation procedures* 217
300 533 Determination of needed evaluation data 220
300.534 Determination of eligibility 222
300.535 Procedures for determining eligibility and placement 223
300.536 Reevaluation 223

**Additional Procedures for Evaluating Children With Specific Learning Disabilities**

300 540 Additional team members 224
300 541 Criteria for determining the existence of a specific learning disability 224
300 542 Observation 225
300 543 Written report 226

**Least Restrictive Environment (LRE)**

300 550 General LRE requirements 227
300 551 Continuum of alternative placements 228
300 552 Placements 229
300 553 Nonacademic settings 231
300 554 Children in public or private institutions 231
300 555 Technical assistance and training activities 232
300 556 Monitoring activities 232

***Confidentiality of Information***

300 560 Definitions 233
300 561 Notice to parents 233
300 562 Access rights 234
300 563 Record of access 235
300 564 Records on more than one child 236
300 565 List of types and locations of information 236
300 566 Fees 236
300 567 Amendment of records at parent's request 236
300 568 Opportunity for a hearing 237
300.569 Result of hearing 237
300 570 Hearing procedures 237
300 571 Consent 238
300 572 Safeguards 238
300 573 Destruction of information 239
300 574 Children's rights 239
300 575 Enforcement 240
300 576 Disciplinary information 240
300 577 Department use of personally identifiable information 240

**Department Procedures**

300 580 Determination by the Secretary that a State is eligible 241
300 581 Notice and hearing before determining that a State is not eligible 241
300.582 Hearing official or panel 242
300.583 Hearing procedures 242
300 584 Initial decision; final decision 246
300 585 Filing requirements 247
300 586 Judicial review 247
300 587 Enforcement 248
300 588 [Reserved] 249
300 589 Waiver of requirement regarding supplementing and not supplanting with Part B funds 250

# PART 300--ASSISTANCE TO STATES FOR THE EDUCATION OF CHILDREN WITH DISABILITIES

### Subpart F--State Administration

#### General

300 600 Responsibility for all educational programs ... 252
300 601 Relation of Part B to other Federal programs ... 253
300 602 State-level activities ... 253

#### Use of Funds

300 620 Use of funds for State administration ... 254
300 621 Allowable costs ... 254
300 622 Subgrants to LEAs for capacity-building and improvement ... 255
300 623 Amount required for subgrants to LEAs ... 256
300 624 State discretion in awarding subgrants ... 256

#### State Advisory Panel

300.650 Establishment of advisory panels ... 256
300 651 Membership ... 257
300.652 Advisory panel functions ... 258
300.653 Advisory panel procedures ... 259

#### State Complaint Procedures

300.660 Adoption of State complaint procedures ... 260
300.661 Minimum State complaint procedures ... 261
300.662 Filing a complaint ... 262

### Subpart G--Allocation of Funds; Reports

#### Allocations

300.700 Special definition of the term "State." ... 263
300.701 Grants to States ... 263
300.702 Definition ... 264
300.703 Allocations to States ... 264
300.704-300.705 [Reserved] ... 265
300.706 Permanent formula ... 265
300.707 Increase in funds ... 266
300.708 Limitation ... 266
300.709 Decrease in funds ... 268
300.710 Allocation for State in which by-pass is implemented for private school children with disabilities ... 268
300.711 Subgrants to LEAs ... 269
300 712 Allocations to LEAs ... 269
300.713 Former Chapter 1 State agencies ... 271
300 714 Reallocation of LEA funds ... 273
300 715 Payments to the Secretary of the Interior for the education of Indian children 273
300 716 Payments for education and services for Indian children with disabilities aged 3 through 5 ... 274
300 717 Outlying areas and freely associated States ... 275
300 718 Outlying area--definition ... 275
300 719 Limitation for freely associated States ... 276
300 720 Special rule ... 277
300 721 [Reserved] ... 277
300 722 Definition ... 277

#### Reports

300.750 Annual report of children served--report requirement ... 277
300 751 Annual report of children served--information required in the report ... 278
300 752 Annual report of children served--certification ... 279
300.753 Annual report of children served--criteria for counting children ... 279
300.754 Annual report of children served--other responsibilities of the SEA ... 280
300.755 Disproportionality ... 281
300.756 Acquisition of equipment; construction or alteration of facilities ... 281

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

## HOW TO USE THIS DOCUMENT

The purpose of this document is to assist educators, parents, and other stakeholders to better understand the Final IDEA 97 Regulations. This document contains the following sections from the March 12, 1999 Federal Register:

- Final IDEA 97 Regulations (Part 300);
- Potential Benefit and Cost Analysis (major sections of regulation ONLY);
- Analysis of Comments (Discussion and Changes ONLY);
- Appendix A Q&A (formally Appendix C); and
- Summary of Discipline Changes and Q&A (placed at the beginning of the discipline section).

The left column contains the Final IDEA 97 Regulations. The larger right column will contain excerpts from the Analysis of Comments (Discussion and Changes ONLY), excerpts from the Potential Benefit and Cost Analysis (major sections of regulation ONLY), Appendix A Q&A (formally Appendix C), and the Summary of Discipline Changes/Q&A. Our goal is to bring together related information to reduce search time and page flipping. The basic format consists of the regulation across from the discussion and changes related to that specific regulation. For major sections of the regulations, the benefit and cost analysis has been included. In addition, the Appendix A Q&A has been brought forward as close as possible to the section of regulation the specific Q&A addresses. The discipline section begins with an additional summary of key changes and commonly asked questions. We hope the format of this document is helpful in reviewing, understanding, and implementing the Final IDEA 97 Regulations.

This document is available in an electronic format on the TEA-Sped WEBPAGE at: http //www tea state tx.us/special.ed

### Summary of Potential Benefits and Costs (PB/C)

For the information of readers, the following is an analysis of the costs and benefits of the most significant statutory changes made by IDEA Amendments of 1997 that are incorporated into the Assistance to States for the Education of Children with Disabilities regulations In conducting this analysis, the Department examined the extent to which changes made by the IDEA Amendments of 1997 added to or reduced the costs for school districts and others in relation to the costs of implementing the IDEA prior to the enactment of the IDEA Amendments of 1997 Based on this analysis, the Secretary has concluded that the statutory changes included in this regulation will not, on net, impose significant costs in any one year, and may result in savings to State and local educational agencies

### *Discussion and Changes*

The following is an *analysis of the significant* issues raised by the public comments received on the NPRM published on October 22, 1997 (62 FR 55026), and a description of the changes made in the proposed regulations since publication of the NPRM

Except for relevant general comments relating to the overall NPRM, which are discussed at the beginning of this analysis, specific substantive issues are discussed under the subpart and section of the regulations to which they pertain References to subparts and section numbers in this attachment are to those contained in the final regulations

This analysis generally does not address—

(a) Minor changes, including technical changes, made to the language published in the NPRM,
(b) Suggested changes the Secretary is not legally authorized to make under applicable statutory authority;
(c) The organizational structure of these regulations and the extent to which statutory language is used; and
(d) Comments that express concerns of a general nature about the Department or other matters that are not directly relevant to these regulations, such as requests for information about innovative instructional methods or matters that lie within the purview of State and local decision-makers.

### Appendix A to Part 300--Notice of Interpretation

**Interpretation of IEP and Other selected Requirements under Part B of the Individuals with Disabilities Education Act (IDEA; Part B)**

**Introduction**

The IEP requirements under Part B of the IDEA emphasize the importance of three core concepts: (1) the involvement and progress of each child with a disability in the general curriculum including addressing the unique needs that arise out of the child's disability, (2) the involvement of parents and students, together with regular and special education personnel, in making individual decisions to support each student's (child's) educational success, and (3) the preparation of students with disabilities for employment and other post-school activities

The first three sections of this Appendix (I-III) provide guidance regarding the IEP requirements as they relate to the three core concepts described above Section IV addresses other questions regarding the development and content of IEPs, including questions about the timelines and responsibility for developing and implementing IEPs, participation in IEP meetings, and IEP content Section IV also addresses questions on other selected requirements under IDEA.

Texas Education Agency - Special Education March 1999 1

**Subpart A--General**

**Purposes, Applicability, and Regulations That Apply to This Program**

**Sec. 300.1 Purposes.**

The purposes of this part are—

(a) To ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living,

(b) To ensure that the rights of children with disabilities and their parents are protected;

(c) To assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities, and

(d) To assess and ensure the effectiveness of efforts to educate children with disabilities

(Authority. 20 U S C 1400 note)

**Discussion:** Section 300 1 includes the statutory purposes that are specifically related to the Assistance for Education of All Children with Disabilities Program under Part B of the Act and to these regulations, which are codified at 34 CFR Part 300 Therefore, the list of statutory purposes contained in Sec. 300 1 should be retained

Although statutory purposes relating to Part C have not been included in these regulations, these purposes were included as part of the regulations in 34 CFR Part 303 implementing Part C published in the Federal Register on April 14, 1998 (63 FR 18289) In addition, although the second purpose in section 601(d)(3) of the Act is relevant to the successful implementation of these regulations, (i e , ensuring that educators and parents have the tools necessary to improve educational results for children with disabilities) this statutory purpose is directed at the discretionary programs under Part D of the Act, and not to the requirements under Part B Independent living is an important concept in the education of children with disabilities, as set forth in Sec. 300 1(a) However, because the note goes beyond the stated purposes of these regulations and focuses on a provision from another law, it is confusing, and the note should be deleted

**Changes:** The note following Sec. 300 1 has been deleted. A discussion of independent living has been incorporated into Appendix A with respect to transition services

**Sec. 300.2 Applicability of this part to State, local, and private agencies.**

(a) States. This part applies to each State that receives payments under Part B of the Act

(b) Public agencies within the State. The provisions of this part—

(1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including—

(i) The State educational agency (SEA);

(ii) Local educational agencies (LEAs), educational service agencies (ESAs), and public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA

(iii) Other State agencies and schools (such as Departments of Mental Health and Welfare and State schools for children with deafness or children with blindness); and

**Discussion:** Because of the increasing attention that charter schools are receiving, it is appropriate to specifically clarify that under the statute public charter schools that are not otherwise already included as LEAs or ESAs and are not a school of an LEA or ESA in the list of political subdivisions that are subject to the requirements of these regulations Charter schools are also addressed in other sections of these regulations (see analysis of comments under Secs 300.18, 300 22, 300 241, and 300 312)

A change is not necessary to address responsibility of an agency other than an educational agency for services necessary for ensuring a free appropriate public education including mental health services Section 300 142 addresses interagency agreements and the requirements of section 612(a)(12) of the Act regarding methods of ensuring services See discussion of Sec 300 142 in this Analysis

In light of the general decision to remove all notes from these final regulations, the note following this section of the NPRM should be deleted. The substance of this note, regarding the applicability of these regulations to each public agency that has direct or delegated authority to provide special education and related services in a State receiving Part B funds, regardless of that agency's receipt of Part B funds, should be incorporated into the text of this regulation.

**Changes:** Section 300 2 has been amended by redesignating the existing paragraph (b) as paragraph (b)(1), by adding public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA to the list of entities to which these regulations apply, and by removing the note to this section of the NPRM and adding the substance of that note as paragraph (b)(2) of this section.

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(iv) State and local juvenile and adult correctional facilities, and

(2) Are binding on each public agency in the State that provides special education and related services to children with disabilities, regardless of whether that agency is receiving funds under Part B

(c) Private schools and facilities Each public agency in the State is responsible for ensuring that the rights and protections under Part B of the Act are given to children with disabilities—

(1) Referred to or placed in private schools and facilities by that public agency, or

(2) Placed in private schools by their parents under the provisions of Sec 300 403(c)

(Authority: 20 U S C 1412)

**Sec. 300.3 Regulations that apply.**

The following regulations apply to this program:

(a) 34 CFR part 76 (State-Administered Programs) except for Secs. 76.125-76 137 and 76 650-76 662.

(b) 34 CFR part 77 (Definitions).

(c) 34 CFR part 79 (Intergovernmental Review of Department of Education Programs and Activities).

(d) 34 CFR part 80 (Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments).

(e) 34 CFR part 81 (General Education Provisions Act--Enforcement).

(f) 34 CFR part 82 (New Restrictions on Lobbying).

(g) 34 CFR part 85 (Government-wide Debarment and Suspension (Nonprocurement) and Government-wide Requirements for Drug-Free Workplace (Grants)).

(h) The regulations in this part--34 CFR part 300 (Assistance for Education of Children with Disabilities).

(Authority: 20 U S.C 1221e-3(a)(1))

Texas Education Agency - Special Education March 1999 3

4

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Definitions Used In This Part**

**Sec. 300.4 Act.**

As used in this part, Act means the Individuals with Disabilities Education Act (IDEA), as amended

(Authority 20 U S C 1400(a))

**Discussion:** It would make the regulations more useful to parents and others by (1) Adding to Subpart A the definitions of terms of general applicability (e g , consent, evaluation, and personally identifiable) that are used in two or more subparts of these final regulations, and (2) adding to Sec 300 30, previously Sec 300 28 of the NPRM, relevant terms used in these regulations that are defined in EDGAR (e g , elementary school, secondary school, nonprofit, and State educational agency)

It also would make the regulations more useful to include an alphabetical master list of the definitions of terms used in this part, and the specific section in which each term is defined, including terms of general applicability (e g , FAPE and IEP), terms used in a single section or subpart (e g , "illegal drug" and "weapon"), and individual terms used in the definitions of "child with a disability," "related services," and "special education " These regulations should include an index that identifies the key terms used in the regulations and lists the specific section in which each term is used, and the master list of definitions of the terms should be included in the index

A definition of the term "parent training and information center" should not be added, but the statutory definition of that term in section 602(21) of the Act is referenced in the sections of these regulations that use the term (Sec 300 506(d)(1)(i) (relating to mediation) and Sec 300 589(c)(4) (relating to waiver of the nonsupplanting requirement)), and the term "parent training centers", which has been dropped from Sec 300 660(b), would be replaced by a reference to the statutory term

The disposition of the terms defined in Secs 300 142(e), 300.309, 300 455, and 300 501 of the NPRM is addressed in each of the pertinent sections of this attachment

With respect to the term "adversely affects educational performance," in order for a child to be eligible for services under Part B, the child must meet the two-pronged test established under Sec. 300.7(a), which reflects the statutory definition in section 602(3) of the Act This means that the child has one of the listed conditions that adversely affects educational performance, and who, because of that condition, needs special education and related services. Revising this language in the manner suggested by commenters could result in an unwarranted expansion of eligibility under Part B. It should be pointed out that a child who is academically gifted but who may not be progressing at the rate desired is not automatically eligible under Part B. Neither is the child automatically ineligible Rather, determinations as to a child's eligibility for services under Part B must be made on a case-by-case basis in accordance with applicable evaluation procedures

In light of the general decision to remove all notes from these final regulations, Notes 1 and 2 following the subheading "Definitions" and immediately preceding Sec 300 5 in the NPRM should be deleted

Note 1 listed the terms defined in specific sections of the NPRM. As stated earlier in this discussion, those terms should be included in a master list of definitions in a newly-created index to these final regulations Note 2 contained abbreviations of common terms used in these regulations (e g the use of "FAPE" for "free appropriate public education") In lieu of listing those abbreviations in a note, each term should be included parenthetically in the text of the regulations as that term appears; and, thereafter, either the abbreviation or the full term may be used interchangeably, depending on the context in which it is used

**Changes:** References to the terms defined in Sec. 300 500--"consent," "evaluation," and "personally identifiable"--have been added as Secs 300 6, 300 12, and 300.21 of these final regulations Relevant terms from EDGAR referenced throughout these regulations have been added to Sec 300 30 Notes 1 and 2 immediately preceding Sec 300 5 have been removed An index to these regulations have been added as a new Appendix B, and a master list of the definitions of all terms used in this part has been included in the index under the heading "Definitions of terms used under this part " The abbreviations listed in Note 2 have been included in the text of the regulations, as described in the above discussion

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.5 Assistive technology device.**

As used in this part, Assistive technology device means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability

(Authority 20 U S C 1401(1))

**Sec. 300.6 Assistive technology service.**

As used in this part, Assistive technology service means any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device

The term includes—

(a) The evaluation of the needs of a child with a disability, including a functional evaluation of the child in the child's customary environment;

(b) Purchasing, leasing, or otherwise providing for the acquisition of assistive technology devices by children with disabilities;

(c) Selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing assistive technology devices;

(c) Coordinating and using other therapies, interventions, or services with assistive technology devices, such as those associated with existing education and rehabilitation plans and programs;

(e) Training or technical assistance for a child with a disability or, if appropriate, that child's family; and

(f) Training or technical assistance for professionals (including individuals providing education or rehabilitation services), employers, or other individuals who provide services to, employ, or are otherwise substantially involved in the major life functions of that child

(Authority: 20 U.S.C. 1401(2))

**Discussion:** As stated in the note following Sec 300 6 of the NPRM, the definitions of "Assistive technology device" and "Assistive technology service" in sections 602(1) and 602(2) of the Act are substantially identical to the definitions of those terms used in the Technology-Related Assistance for Individuals with Disabilities Act of 1988, as amended (Tech Act) Since Sec Sec 300 5-300 6 essentially adopt the statutory definitions of these terms, no changes to these statutory definitions should be made in these final regulations However, consistent with Part B, the words "child with a disability" were substituted for the statutory reference to individual with a disability found in the definitions contained in the Tech Act In addition, in light of the general decision not to use notes in these final regulations, the note to Sec 300 6 of the NPRM should be removed

Section 300 308 of these regulations specifies that an assistive technology device or service is only required if it is determined, through the IEP process, to be (1) special education, as defined in Sec 300 26, (2) related services, as defined in Sec 300 24, or (3) supplementary aids and services, as defined in Sec 300 28 No further clarification should be provided, and references to Sec 300 308 should not be included in the definitions of "related services" under Sec 300 24 or "special education" under Sec 300 26 Section 300 308 is sufficient to explain how a determination about a child's need for an assistive technology device or service is made

As a general matter, public agencies are not responsible for providing personal devices, such as eyeglasses or hearing aids or braces, that a disabled child requires regardless of whether he or she is attending school However, if a child's IEP team specifies that a child requires a personal device in order to receive FAPE, the public agency must provide the device at no cost to the child's parents Consistent with section 612(a)(12) of the Act, public agencies that are otherwise obligated under Federal or State law or assigned responsibility under State policy or interagency agreement or other mechanisms to provide or pay for any services that are also considered special education or related services, including devices that are necessary for ensuring FAPE, must fulfill that obligation or responsibility, either directly or through contract or other arrangement.

Regarding responsibilities relative to medication under Sec. 300 5, medication is an excluded "medical service," and is not the responsibility of a public agency under these regulations, therefore, the change suggested by commenters is not warranted

Further examples of assistive technology are not necessary within these regulations. Because the definitions of assistive technology devices and services have been included in these regulations for over five years and have been included in the Tech Act since 1988, most public agencies should be informed about those devices and services for purposes of implementing these regulations Examples of assistive technology devices and services and other relevant information may be available through one of the technical assistance providers funded by the National Institute on Disability and Rehabilitation Research in the Office of Special Education and Rehabilitative Services (OSERS) or other technical assistance providers funded by OSERS.

**Changes:** The note following Sec. 300 6 has been removed.

**Discussion:** The provision of assistive technology devices and services is limited to those situations in which they are required in order for a disabled child to receive FAPE However, subject to this limitation, commenters are correct that (1) "assistive technology" encompasses both a disabled child's own personal needs for assistive technology devices (e g., electronic note-takers, cassette recorders, etc), as well as access to general technology devices used by all students, and (2) if an eligible child is unable, without a specific accommodation, to use a technology device used by all students, the agency must ensure that the necessary accommodation is provided Further, commenters are correct that LEAs must ensure that students, their teachers, and other personnel receive the necessary in-service instruction on the operation and maintenance of technology. Finally, Sec. 300 308 of these final regulations should be amended to clarify that, on a case-by-case basis, the use of school-purchased assistive technology devices in a child's home or in other settings is required if the child's IEP team determines that the child needs to have access to those devices in order to receive FAPE The assistive technology devices that are necessary to ensure FAPE must be provided at no cost to the parents, and the parents cannot be charged for normal use, and wear and tear However, while ownership of the device in these circumstances would remain with the public agency, State law, rather than Part B, generally would govern whether parents are liable for loss, theft, or damage due to negligence or misuse of publicly owned equipment used at home or in other settings in accordance with a child's IEP

**Changes:** No change has been made to this section in response to these comments However, Sec 300 308 has been amended, consistent with the above discussion

Texas Education Agency - Special Education March 1999 5

6

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.7 Child with a disability.**

(a) General (1) As used in this part, the term child with a disability means a child evaluated in accordance with Secs 300 530-300 536 as having mental retardation, a hearing impairment including deafness, a speech or language impairment, a visual impairment including blindness, serious emotional disturbance (hereafter referred to as emotional disturbance), an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services

(2)(i) Subject to paragraph (a)(2)(ii) of this section, if it is determined, through an appropriate evaluation under Secs 300 530-300 536, that a child has one of the disabilities identified in paragraph (a)(1) of this section, but only needs a related service and not special education, the child is not a child with a disability under this part

(ii) If, consistent with Sec 300 26(a)(2), the related service required by the child is considered special education rather than a related service under State standards, the child would be determined to be a child with a disability under paragraph (a)(1) of this section.

(b) Children aged 3 through 9 experiencing developmental delays. The term child with a disability for children aged 3 through 9 may, at the discretion of the State and LEA and in accordance with Sec. 300 313, include a child–

(1) Who is experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in one or more of the following areas: physical development, cognitive development, communication development, social or emotional development, or adaptive development; and

(2) Who, by reason thereof, needs special education and related services

**Discussion:** The term "developmental delay" is a statutory term that is included in both Parts B and C of the Act A definition of developmental delay, substantially similar to the definition in Sec. 300 7(a)(2) of the NPRM, should be retained in these final regulations Because of the numerous questions raised by commenters about the application of this definition, it is determined that a new paragraph describing requirements governing the use of the developmental delay designation should be added to these final regulations as Sec 300 313 In light of these changes, the definition of "developmental delay" would be placed in paragraph (b) of Sec 300 7 of these final regulations, and paragraph (b) of this section of the NPRM would be redesignated as a new paragraph (c)

Also, in light of the general decision not to use notes in these final regulations, Notes 2 and 3 following this section of the NPRM should be removed, and the substance of these notes would be incorporated into the new Sec 300 313 This new section will (1) set out the requirements for States and LEAs in using the developmental delay designation, (2) clarify that States and LEAs may use the developmental delay designation for any child who has an identifiable disability, provided all of the child's identified needs are addressed, and (3) clarify that a State may, but is not required to, adopt a common definition of developmental delay for Parts B and C

States electing to adopt the term developmental delay are not prohibited from also continuing to use the disability categories in Sec 300 7(a) and (c) for those children who have been evaluated in accordance with Secs 300 530-300 536 as having one of the listed disabilities and who because of that disability need special education and related services Although States traditionally have had the authority to require LEAs to adopt State policies, new section 602(3)(B) of the Act, unlike the provision in prior law, provides that implementation of the provision related to serving children under the developmental delay designation is at the discretion of both the State and the LEA New Sec 300 313 reflects this statutory change.

Under the statute, States also have the discretion to apply the term developmental delay to children who have an identified sensory disability (such as deafness or blindness) or any other permanent condition (such as a significant cognitive disability), or to use the specific categories However, States must ensure that children with sensory impairments or other permanent conditions are evaluated in all areas of suspected disability, and that the educational and other disability-related needs of these children identified through applicable evaluation procedures are appropriately addressed.

It is important to ensure that the broad definition of developmental delay is not used to deny children proper evaluations In all cases, evaluations must be sufficiently comprehensive to ensure that children's needs are appropriately identified The provisions in Secs 300 530-300.536 of these regulations should ensure that evaluations of children in States and LEAs that use the developmental delay designation are sufficiently comprehensive to address the full range of these children's needs. It would not be appropriate to require public agencies to justify why a child is identified as developmental delay rather than under one of the other disability designations in these regulations

**Changes:** Section 300.7 has been amended by adding a new paragraph (a)(2) to clarify that if a child has one of the disabilities listed in paragraph (a) of this section but only needs a related service and not special education that child is not a child with a disability under this part, unless the related service is considered special education rather than a related service under State standards Paragraph (a)(2) of the NPRM has been redesignated as paragraph (b) of these final regulations, entitled "children aged three through nine experiencing developmental delays," which incorporates the definition in Sec. 300.7(a)(2)(i) and (ii) of the NPRM; and a new Sec 300 313 has been added that clarifies the circumstances under which the DD designation is used, reflecting the substance of proposed Sec 300 7(a)(2)(iii) and Notes 2 and 3 to this section of the NPRM Notes 2 and 3 to this section of the NPRM have been deleted Paragraph (b) of the NPRM has been redesignated as paragraph (c) in these final regulations.

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| (c) Definitions of disability terms The terms used in this *definition* are defined as follows<br><br>(1)(i) Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences The term does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in paragraph (b)(4) of this section<br><br>(ii) A child who manifests the characteristics of "autism" after age 3 could be diagnosed as having "autism" if the criteria in *paragraph* (c)(1)(i) of this section are satisfied<br><br>(2) Deaf-blindness means concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for children with deafness or children with blindness.<br><br>(3) Deafness means a hearing impairment that is so severe that the child is *impaired in* processing linguistic information through hearing, with or without amplification, that adversely affects a child's educational performance. | **Discussion:** In light of the general decision not to use *notes* in these final regulations, Note 1 to this section of the NPRM should be removed While the characteristics of "autism" are generally evident before age three, a child who manifests characteristics of the category "autism" after age three still can be evaluated as having autism, if the criteria in the *definition* are satisfied Because of the importance of this clarification, the definition of autism in Sec 300 7(c)(1) should be amended to incorporate the substance of Note 1 to this section of the NPRM While there is merit to many of the proposed changes to definitions and terms, modifications to the substance of existing definitions should be subject to further review and discussion before changes are proposed For example, as indicated in the preamble to the NPRM (62 FR 55026-55048 (Oct 22, 1997)), the Department plans to carefully review research findings, expert opinion, and practical knowledge over the next several years to determine whether changes should be proposed to the procedures for evaluating children suspected of having specific learning disabilities Any changes to the definition of this term should also be considered in light of that review<br><br>As indicated in the NPRM, no substantive changes are made to the definition of the term "emotional disturbance" in Sec 300 7(c)(4) With respect to the use of the term "emotional disturbance" instead of "serious emotional disturbance," the Senate and House committee reports on Pub L No 105-17 include the following statement:<br><br>*The Committee wants to make clear that changing the terminology from "serious emotional disturbance" to "serious emotional disturbance (hereinafter referred to as 'emotional disturbance')" in the definition of a "child with a disability" is intended to have no substantive or legal significance It is intended strictly to eliminate the pejorative connotation of the term "serious " It should in no circumstances be construed to change the existing meaning of the term under 34 CFR Sec. 300 7(b)(9) as promulgated September 29, 1992 (S Rep No 105-17, p 7, H R Rep No 105-95, p 86 (1997) )*<br><br>In light of the general decision not to use notes in these *final* regulations, Note 4 to this section of the NPRM should be removed In response to suggestions of commenters, the definitions of deaf-blindness and multiple disability should be revised to eliminate the negative connotation of the language in the current definitions, and the word "needs" should replace the word "problems " However, these changes, in no way, are intended to alter which children are considered eligible under these categories<br><br>**Changes:** Note 1 to this section of the NPRM has been removed, and the definition of "autism" in Sec 300 7(c)(1) of these final regulations has been amended to specify that if a child manifests characteristics of "autism" after age three, the child could be diagnosed as having "autism" if the criteria in the definition of "autism" are satisfied. The definitions of deaf-blindness and multiple disability have been revised to replace "problems" with "needs "<br><br>Note 4 to this section of the NPRM has been removed, and the substance of Note 4 is reflected in the above discussion<br><br>**Discussion:** Note 5 following Sec. 300.7 was included in the NPRM to reflect the Department's longstanding policy memorandum relating to the eligibility of children with ADD/ADHD. However, although some of the commenters who favor deleting Note 5 indicate that some children with ADD/ADHD are receiving services under these regulations, experience and the numerous comments received have demonstrated that the Department's policy is not being fully and effectively implemented<br><br>It is important to take steps to ensure that children with ADD/ADHD who meet the criteria under Part B receive special education and related services in the same timely manner as other children with disabilities Therefore, the definition of "other health impairment" at Sec 300 7(c)(9) of these final regulations should be amended to add ADD/ADHD to the list of conditions that could render a child eligible under this definition, and the list of conditions in Sec. 300 7(c)(9) should be rearranged in alphabetical order. Following the phrase "limited strength, vitality or alertness," and prior to the phrase, "that adversely affects educational performance," the words "including a child's heightened alertness to environmental stimuli that results in limited alertness with respect to the educational environment" should be added |

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| (4) Emotional disturbance is defined as follows<br><br>(i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance<br><br>(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors<br><br>(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers<br><br>(C) Inappropriate types of behavior or feelings under normal circumstances<br><br>(D) A general pervasive mood of unhappiness or depression<br><br>(E) A tendency to develop physical symptoms or fears associated with personal or school problems<br><br>(ii) The term includes schizophrenia The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance<br><br>(5) Hearing impairment means an impairment in hearing, whether permanent or fluctuating, that adversely affects a child's educational performance but that is not included under the definition of deafness in this section.<br><br>(6) Mental retardation means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance.<br><br>(7) Multiple disabilities means concomitant impairments (such as mental retardation-blindness, mental retardation-orthopedic impairment, etc ), the combination of which causes such severe educational needs that they cannot be accommodated in special education programs solely for one of the impairments The term does not include deaf-blindness | These changes are needed to clarify the applicability of the "other health impairment" definition to children with ADD/ADHD The clarification with respect to "limited strength, vitality, or alertness" is essential because many children with ADD/ADHD actually experience heightened alertness to environmental stimuli, which results in limited alertness with respect to their educational environment In light of these regulatory changes, Note 5 to this section of the NPRM should be removed as a note, and other portions of Note 5 are reflected in the following discussion A child with ADD/ADHD may be eligible under Part B if the child's condition meets one of the disability categories described in Sec 300 7, and because of that disability, the child needs special education and related services Children with ADD/ADHD are a very diverse group, some children with ADD/ADHD who are eligible under Part B meet the criteria for "other health impairments " Those children would be classified as eligible for services under the "other health impairments" category if (1) the<br><br>ADD/ADHD is determined to be a chronic health problem that results in limited alertness, that adversely affects educational performance, and (2) special education and related services are needed because of the ADD/ADHD All children with ADD/ADHD clearly are not eligible to receive special education and related services under these regulations, just as all children who have one of the other conditions listed under the other health impairment category are not necessarily eligible (e g , children with a heart condition, asthma, diabetes, and rheumatic fever)<br><br>Some children with ADD/ADHD may be eligible under other categories, such as "emotional disturbance" (Sec 300 7(c)(4)) or "specific learning disability" (Sec 300 7(c)(10)) if they meet the criteria under those categories Regardless of what disability designation is attached, children with ADD/ADHD meeting the criteria for any of the listed disabilities under these regulations must receive the specialized instruction and related services designed to address their individualized needs arising from the ADD/ADHD No child is eligible for services under the Act merely because the child is identified as being in a particular disability category Children identified as ADD/ADHD are no different, and are eligible for services only if they meet the criteria of one of the disability categories in Part B, and because of their impairment, need special education and related services.<br><br>Other children with ADD/ADHD may have a diagnosed medical condition (and need medication) but may not require any special education or otherwise be eligible under these regulations. These children may be covered by the requirements of section 504 of the Rehabilitation Act of 1973 (Section 504) and its implementing regulation in 34 CFR Part 104<br><br>With respect to commenters' suggestions that the diagnosis of ADD/ADHD does not require a medical evaluation if the disability is diagnosed by a school or licensed psychologist, a change is not needed in these regulations Also, it would not be appropriate to make a change to respond to commenters' suggestion that a medical evaluation is required for a child with ADD/ADHD to establish eligibility under the other health impairment category. Part B does not require that a particular type of evaluation be conducted to establish any child's eligibility under these regulations; rather, the evaluation requirements in Secs. 300 530-300 536 are sufficiently comprehensive to support individualized evaluations on a case-by-case basis, including the use of professional staff appropriately qualified to conduct the evaluations deemed necessary for each child.<br><br>In accordance with these procedures, if a determination is made that a medical evaluation is required in order to determine whether a child with ADD/ADHD is eligible for services under Part B, such an evaluation must be conducted at no cost to the parents In all instances, as is true for all children who may be eligible for services under Part B, each child with ADD/ADHD who is suspected of having a disability must be assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities (Sec 300 532(g))<br><br>There is no requirement under these regulations that a medical evaluation be conducted to accomplish these assessments Even if a State requires that a medical evaluation be included as part of all evaluations to determine eligibility for the other health impairment category, it must also ensure that any necessary evaluations by other professionals, such as psychologists, are conducted and considered as part of the eligibility determination process. Whether or not public agencies will be required to conduct an additional evaluation for a child with ADD/ADHD under other health impairment once the child has been evaluated and has qualified under another disability category will depend on whether sufficient evaluation information exists to enable school district officials to ensure, consistent with Sec 300 532(g), that each child is assessed in all areas of suspected disability |

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
| --- | --- |
| (8) Orthopedic impairment means a severe orthopedic impairment that adversely affects a child's educational performance. The term includes impairments caused by congenital anomaly (e g , clubfoot, absence of some member, etc ), impairments caused by disease (e g , poliomyelitis, bone tuberculosis, etc ), and impairments from other causes (e g , cerebral palsy, amputations, and fractures or burns that cause contractures)<br><br>(9) Other health impairment means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that--<br><br>(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and<br><br>(ii) Adversely affects a child's educational performance.<br><br>(10) Specific learning disability is defined as follows.<br><br>(i) General The term means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.<br><br>(ii) Disorders not included. The term does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.<br><br>(11) Speech or language impairment means a communication disorder, such as stuttering, impaired articulation, a language impairment, or a voice impairment, that adversely affects a child's educational performance | Because these determinations will necessarily depend on the individual needs of the child and the circumstances surrounding the evaluation, a change is not needed<br><br>With respect to the concern of commenters that the most damaging potential abuse from the definition will be the over-identification of poor and minority children, there is no indication that children from minority backgrounds have been disproportionately identified as ADD/ADHD even as the numbers of children in this category have increased Further, the definition of ADD/ADHD is not so loose that it could result in the largest expansion of eligible children in IDEA history As previously stated, many children with ADD/ADHD are not eligible under Part B If appropriate evaluations are conducted in accordance with Secs. 300 530-300 536, the result of the evaluations should be the inclusion of only those children with ADD/ADHD who are eligible for, and have an entitlement to, special education and related services under Part B<br><br>**Changes:** The definition of "other health impairment" at Sec 300.7(c)(9) has been amended to add ADD/ADHD to the list of conditions that could render a child eligible under this definition, and the list of conditions in Sec. 300.7(c)(9) has been rearranged in alphabetical order Following the phrase "limited strength, vitality, or alertness," and prior to the phrase, "that adversely affects educational performance," the words "including a child's heightened alertness to environmental stimuli that results in limited alertness with respect to the educational environment" have been added to clarify the applicability of the other health impairment definition to children with ADD/ADHD Note 5 to this section of the NPRM has been removed |

10

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(12) Traumatic brain injury means an acquired injury to the brain caused by an external physical force, resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects a child's educational performance The term applies to open or closed head injuries resulting in impairments in one or more areas, such as cognition; language; memory; attention, reasoning; abstract thinking; judgment; problem-solving, sensory, perceptual, and motor abilities; psychosocial behavior; physical functions; information processing; and speech. The term does not apply to brain injuries that are congenital or degenerative, or to brain injuries induced by birth trauma.

(13) Visual impairment including blindness means an impairment in vision that, even with correction, adversely affects a child's educational performance The term includes both partial sight and blindness.

(Authority: 20 U.S.C 1401(3)(A) and (B); 1401(26))

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.8 Consent.**

As used in this part, the term consent has the meaning given that term in Sec 300 500(b)(1)

(Authority 20 U S C 1415(a))

**Sec. 300.9 Day; business day; school day.**

As used in this part, the term--

(a) Day means calendar day unless otherwise indicated as business day or school day,

(b) Business day means Monday through Friday, except for Federal and State holidays (unless holidays are specifically included in the designation of business day, as in Sec 300 403(d)(1)(ii)), and

(c)(1) School day means any day, including a partial day, that children are in attendance at school for instructional purposes

(2) The term school day has the same meaning for all children in school, including children with and without disabilities.

(Authority 20 U S C 1221e-3)

**Discussion:** It is necessary, to avoid confusion and ensure clarity, to amend the definition of "day" to include definitions of both "school day" and "business day " Both "school day" and "business day" are used to implement new provisions added by Pub L 105-17 The term "school day" is used only with respect to discipline procedures and appears in Secs 300 121(c)(1) and (c)(2), and 300 520(a)(1) and (c) The term "business day" is used in Secs. 300 509(b) (Additional disclosure of information requirement), 300 520(b) (Authority of school personnel), and 300 528(a)(1) (Expedited due process hearing). In addition, the phrase "business days (including holidays that fall on a business day)" is used in Sec 300 403(d)(1)(ii) (Placement of children by parents in a private school or facility if FAPE is at issue )

"School day" means any day that children are in attendance at school for instructional purposes If children attend school for only part of a school day and are released early (e g , on the last day before Christmas or summer vacation) that day would be considered to be a school day However, it is expected that the term "school day," including partial school day, has the same meaning for all children in school, including children with and without disabilities.

The term "business day" is used in the statute and regulations in relation to actions by school personnel and parents While school personnel could reasonably be expected to know when administrative staff are working, very often this information is not readily available to parents, nor is it likely to be consistent from one LEA to another, or from the SEA to an LEA If "business day" were interpreted to be days when school offices are open and administrative staff are working, it could actually be impossible for parents to know with any certainty the date in advance of a due process hearing on which they would have to share evidence to be introduced at the hearing with the other party to the hearing (see Sec. 300 509) Therefore, this term is interpreted to be a commonly understood measure of time, Monday through Friday except for Federal and State holidays, unless holidays are specifically included, as in Sec 300 403(d)(1)(ii)

Including definitions of "school day" and "business day" will reduce confusion about the meaning of these terms and should facilitate meeting the various timelines in the Act and regulations

The definition of "day," while that term was not previously defined in the regulations, represents the Department's longstanding interpretation that the term "day" means calendar day. (See, e.g., NPRM published August 4, 1982, 47 FR 33836-33840 describing the 30-day time line from determination of eligibility to initial IEP meeting as "30 calendar days.") This interpretation is consistent with generally-recognized authority on statutory interpretation. (See Sutherland Stat. Const. Sec. 33.12 (5th Ed.)). In addition, the statute itself uses three different terms, "day," "business day," and "school day," so it would be inappropriate to interpret "day" to be the same as either "business day" or "school day."

Finally, altering the interpretation of "day" from the longstanding interpretation as "calendar day" would raise significant concerns about compliance with the terms of section 607(b) of the Act, especially as to timelines that affect the rights of parents and children with disabilities such as (1) the timeline in Sec 300.343 (relating to holding an initial IEP meeting for a child), and (2) the procedural safeguards in Subpart E, including Sec 300 509(a)(3) (hearing rights--timeline for disclosure of evidence), Sec 300 511(a) and (b) (timelines for hearings and reviews), and Sec 300 562(a) (access rights relating to records)

There also are other provisions in these regulations that include timelines that have always been interpreted to be calendar day timelines--including the (1) 30-day public comment period in Sec. 300 282, (2) by-pass procedures under Subpart D, (3) notice and hearing procedures in Secs 300 581-300 586 that the Department uses before determining that a State is not eligible under Part B, and (4) 60-day timeline under the State complaint procedures in Sec 300 661. The majority of those timelines have been in effect since 1977, and, in light of the clear distinction in the IDEA Amendments of 1997 between days, school days, and business days, there is no basis for changing other timelines in the regulations

**Changes:** The name of the section in the NPRM has been changed to "Day, business day, school day" in these final regulations Definitions of "school day" and "business day" have been added to reflect the above discussion

Texas Education Agency - Special Education March 1999 11

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
| --- | --- |
| **Sec. 300.10 Educational service agency.**<br><br>As used in this part, the term educational service agency--<br><br>(a) Means a regional public multiservice agency--<br><br>(1) Authorized by State law to develop, manage, and provide services or programs to LEAs; and<br><br>(2) Recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary and secondary schools of the State;<br><br>(b) Includes any other public institution or agency having administrative control and direction over a public elementary or secondary school; and<br><br>(c) Includes entities that meet the definition of intermediate educational unit in section 602(23) of IDEA as in effect prior to June 4, 1997.<br><br>(Authority: 20 U S C. 1401(4)) | **Discussion:** The definition of "educational service agency" in Sec 300 10 of these final regulations adopts the statutory definition of this term in section 602(4) of the Act This definition replaces the definition of the term "intermediate educational unit" (IEU) in Sec 300 8 of the current regulations The use of the term "educational service agency" was not intended to exclude those entities that were considered IEUs under prior law This interpretation is supported by the legislative history, which makes explicit that most definitions in prior law have been retained, and, where appropriate, updated S Rep No. 105-17 at 6, and H R Rep No 105-95 at 86 With respect to "educational service agency," the Reports explain that this definition has been updated "to reflect the more contemporary understanding of the broad and varied functions of such agencies " Id.<br><br>Although there were no comments regarding this definition, the application of the term "educational service agency" to entities covered under the definition of IEU in prior law has been questioned The definition of IEU did not refer explicitly to public elementary and secondary schools However, the definition of "educational service agency" makes specific references to an entity's administrative control over public elementary and secondary school This definition could be misinterpreted as excluding from the educational service agency definition those entities in States that serve preschool-aged children with disabilities but do not have administrative control and direction over a public elementary or secondary school Therefore, to avoid any confusion about the use of this new terminology, a statement should be added to the definition to clarify that the term "educational service agency" includes entities that meet the definition of IEU in section 602(23) of IDEA as in effect prior to June 4, 1997.<br><br>**Changes:** Consistent with the above discussion, a statement has been added at the end of the definition to clarify that the definition of "educational service agency" includes entities that meet the definition of IEU in section 602(23) of IDEA as in effect prior to June 4, 1997 |
| **Sec. 300.11 Equipment.**<br><br>As used in this part, the term equipment means--<br><br>(a) Machinery, utilities, and built-in equipment and any necessary enclosures or structures to house the machinery, utilities, or equipment; and<br><br>(b) All other items necessary for the functioning of a particular facility as a facility for the provision of educational services, including items such as instructional equipment and necessary furniture; printed, published and audio-visual instructional materials; telecommunications, sensory, and other technological aids and devices; and books, periodicals, documents, and other related materials.<br><br>(Authority: 20 U.S.C. 1401(6)) | **Discussion:** The definition of "equipment" is a standard statutory definition that is used in most elementary and secondary education programs funded by the Department Therefore, efficient administration of Federal programs would not be served by revising the definition in the ways suggested by the commenters. In appropriate situations, public agencies are required by section 504 of the Rehabilitation Act of 1973 and title II of the Americans with Disabilities Act (ADA) to ensure that instructional or related materials are provided in accessible formats and that technological aids and services are accessible to students with disabilities or can be made accessible, to afford students with disabilities an equal opportunity to participate in their programs.<br><br>**Changes:** None. |

**Sec. 300.12 Evaluation.**

As used in this part, the term evaluation has the meaning given that term in Sec 300 500(b)(2)

(Authority 20 U S C 1415(a))

**Sec. 300.13 Free appropriate public education.**

As used in this part, the term free appropriate public education or FAPE means special education and related services that--

(a) Are provided at public expense, under public supervision and direction, and without charge,

(b) Meet the standards of the SEA, including the requirements of this part;

(c) Include preschool, elementary school, or secondary school education in the State; and

(d) Are provided in conformity with an individualized education program (IEP) that meets the requirements of Secs 300 340-300 350

(Authority: 20 U S C. 1401(8))

**Sec. 300.14 Include.**

As used in this part, the term include means that the items named are not all of the possible items that are covered, whether like or unlike the ones named.

(Authority: 20 U.S.C. 1221e-3)

**Sec. 300.15 Individualized education program.**

As used in this part, the term individualized education program or IEP has the meaning given the term in Sec. 300.340(a).

(Authority: 20 U.S.C. 1401(11))

**Sec. 300.16 Individualized education program team.**

As used in this part, the term individualized education program team or IEP team means a group of individuals described in Sec 300 344 that is responsible for developing, reviewing, or revising an IEP for a child with a disability

(Authority. 20 U S C 1221e-3)

**Sec. 300.17 Individualized family service plan.**

As used in this part, the term individualized family service plan or IFSP has the meaning given the term in 34 CFR 303 340(b)

(Authority: 20 U S C 1401(12))

**Discussion:** In light of the general decision not to use notes in these final regulations, the note following this section of the NPRM should be removed However, it is important to clarify that the IEP team may also serve as the placement team

**Changes:** The note following this section of the NPRM has been removed

**Sec. 300.18 Local educational agency.**

(a) As used in this part, the term local educational agency means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools

(b) The term includes–

(1) An educational service agency, as defined in Sec. 300 10;

(2) Any other public institution or agency having administrative control and direction of a public elementary or secondary school, including a public charter school that is established as an LEA under State law; and

(3) An elementary or secondary school funded by the Bureau of Indian Affairs, and not subject to the jurisdiction of any SEA other than the Bureau of Indian Affairs, but only to the extent that the inclusion makes the school eligible for programs for which specific eligibility is not provided to the school in another provision of law and the school does not have a student population that is smaller than the student population of the LEA receiving assistance under this Act with the smallest student population.

(Authority: 20 U S.C. 1401(15))

**Discussion:** In light of the general decision not to use notes in these final regulations, the note following Sec 300 17 of the NPRM should be removed However, it should be pointed out that the proposed note was inadequate and did not provide a full explanation of the responsibilities of public charter schools under these regulations

In light of concerns raised about how public charter schools could meet their obligations to disabled students under Part B and obtain access to Part B funds for disabled students enrolled in their schools, two important provisions were included in the IDEA Amendments of 1997 at section 613(a)(5) and (e)(1)(B).

Some public charter schools can be LEAs if, under State law, they meet the Part B definition of LEA As a result of section 613(e)(1)(B) of the Act, public charter schools that are LEAs may not be required to apply for Part B funds jointly with other LEAs, unless explicitly permitted to do so under the State charter school statute. However, in many instances, charter schools are schools within LEAs If this is so, section 613(a)(5) of the Act provides that the LEA of which the public charter school is a part must serve those disabled students attending public charter schools in the same manner as it serves students with disabilities in its other public schools and must provide Part B funds to charter schools in the same manner that it provides Part B funds to other public schools

Still, in other instances, due to the provisions in States' charter school statutes, some public charter schools are not considered LEAs or a school within an LEA In such instances, the SEA would have ultimate responsibility for ensuring that Part B requirements are met Regardless of whether a public charter school receives Part B funds, the requirements of Part B are fully applicable to disabled students attending those schools. The legislative history of the IDEA Amendments of 1997 makes explicit that Congress "expects that public charter schools will be in full compliance with Part B " See S. Rep. No. 105-17 at 17; H R. Rep No 105-95 at 97

Therefore, based on the concerns expressed by commenters and for the reasons clarified in the above discussion, it is determined that (1) the definition of LEA should be amended to clarify that the term "LEA" includes a public charter school established as an LEA under State law; (2) the provision in Sec. 300 241 (Treatment of charter schools and their students) should be retained in these final regulations, and (3) a new Sec 300 312, entitled "Children with disabilities in public charter schools," should be added to these final regulations

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
| --- | --- |
| | The new section makes clear that children with disabilities and their parents retain all rights under these regulations and that compliance with Part B is required regardless of whether a public charter school receives Part B funds Thus, charter school personnel, for example, may not ask parents to waive their disabled child's right to FAPE in order to enroll their child in the charter school This new section also would address the responsibilities of (1) public charter schools that are LEAs, (2) LEAs if a charter school is a school in the LEA, and (3) the SEA if a charter school is not an LEA or a school in an LEA<br><br>**Changes:** The note has been removed The definition of LEA has been amended by adding after "secondary school" the words "including a public charter school that is established as an LEA under State law." A new Sec 300 312 has been added to further address the treatment of charter schools |
| **Sec. 300.19 Native language.**<br><br>(a) As used in this part, the term *native language*, if used with reference to an individual of limited English proficiency, means the following:<br><br>(1) The language normally used by that individual, or, in the case of a child, the language normally used by the parents of the child, except as provided in paragraph (a)(2) of this section.<br><br>(2) In all direct contact with a child (including evaluation of the child), the language normally used by the child in the home or learning environment<br><br>(b) For an individual with deafness or blindness, or for an individual with no written language, the mode of communication is that normally used by the individual (such as sign language, braille, or oral communication).<br><br>(Authority: 20 U.S.C. 1401(16)) | **Discussion:** In light of the general decision not to use notes in these final regulations, the note following Sec 300 18 of the NPRM should be removed However, it is critical that public agencies take the necessary steps to ensure that the needs of disabled children with limited English proficiency (LEP) are adequately addressed The term "native language" is used in the prior notice, procedural safeguards notice, and evaluation sections: Secs 300 503(c), 300 504(c), and 300 532(a)(1)(ii)<br><br>In light of concerns of commenters and the need to ensure that the full range of the needs of children with disabilities whose native language is other than English is appropriately addressed, the definition of "native language" in the NPRM should be expanded in these final regulations to clarify that (1) in all direct contact with the child (including evaluation of the child), communication would be in the language normally used by the child and not that of the parents, if there is a difference between the two, and (2) for individuals with deafness or blindness, or for individuals with no written language, the mode of communication would be that normally used by the individual (such as sign language, Braille, or oral communication).<br><br>These changes to the regulatory definition of "native language" should enhance the chances of school personnel being able to communicate effectively with a LEP child in all direct contact with the child, including evaluation of the child<br><br>**Changes:** The definition of "native language" in the NPRM has been amended to reflect the concepts contained in the note following that definition, and the note has been removed. |

16

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.20 Parent.**

(a) *General* As used in this part, the term parent means--

(1) A natural or adoptive parent of a child,

(2) A guardian but not the State if the child is a ward of the State,

(3) A person acting in the place of a parent (such as a grandparent or stepparent with whom the child lives, or a person who is legally responsible for the child's welfare), or

(4) A surrogate parent who has been appointed in accordance with Sec 300 515

(b) *Foster parent* Unless State law prohibits a foster parent from acting as a parent, a State may allow a foster parent to act as a parent under Part B of the Act if--

(1) The natural parents' authority to make educational decisions on the child's behalf has been extinguished under State law; and

(2) The foster parent--

(i) Has an ongoing, long-term parental relationship with the child;

(ii) Is willing to make the educational decisions required of parents under the Act; and

(iii) Has no interest that would conflict with the interests of the child

(Authority: 20 U.S.C. 1401(19))

**Sec. 300.21 Personally identifiable**

As used in this part, the term personally identifiable has the meaning given that term in Sec 300 500(b)(3)

(Authority: 20 U S C 1415(a))

**Discussion:** States should not have to amend their laws relating to parents in order to treat "foster parents" as parents Therefore, conditional language in this regard is necessary if State law prohibits a foster parent from acting as a parent This change would accomplish the intended effect of the provision (i e , acknowledging that in some instances foster parents may be recognized as "parents" under the Act) without adding any burden to individual States whose State statutory provisions relating to parents expressly exclude foster parents

In light of the general decision not to use notes in these final regulations, the note following this section of the NPRM should be removed, but the substance of the note on foster parents should be added to the text of the regulations Under these regulations, the term "parent" is defined to include persons acting in the place of a parent, such as a grandparent or stepparent with whom the child lives, as well as persons who are legally responsible for a child's welfare, and, at the discretion of the State, a foster parent who meets the requirements in paragraph (b) of this section Commenters' concerns related to ensuring that the rights of natural parents are protected in a case in which a disabled child is living with a person acting as a parent, or providing that the parent retain authority even if a child is living with a grandparent, raise questions that the Department has traditionally held best to be left to each State to decide as a matter of family law

It is not necessary to add "legal" before the word "guardian" since the statute regarding the term "parent" at section 602(19)(A) merely notes that it includes a legal guardian. A legal guardian would be considered to meet the regulatory definition of "parent" The regulatory definition of "parent" has always included more than just the term identified in the statute An inclusive definition of parent benefits public agencies by reducing the instances in which the agency will have to bear the expense of providing and appointing a surrogate parent (see Sec 300 515) and benefits children with disabilities by enhancing the possibility that a person with ongoing day-to-day involvement in the life of the child and personal concerns for the child's interests and well-being will be able to act to advance the child's interests under the Act

Regarding the use of the reference to the child's parent, no change is needed since it is implicit that the rights under Part B are afforded to a child with a disability and his or her parents, as defined under these regulations

**Changes:** The note following the definition of "parent" in the NPRM has been removed, and the substance of the note has been reflected in the above discussion The definition of "Parent" in these final regulations has been amended to permit States in certain circumstances to use foster parents as parents under the Act without amending relevant State statutes

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| **Sec. 300.22 Public agency.**<br><br>As used in this part, the term public agency includes the SEA, LEAs, ESAs, public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA, and any other political subdivisions of the State that are responsible for providing education to children with disabilities<br><br>(Authority: 20 U S C 1412(a)(1)(A), (a)(11)) | **Discussion:** Public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA should be added to the definition of "public agencies" in order to ensure that all public entities responsible for providing education to children with disabilities are covered However, the definition of "public agency" should not be amended to address financial responsibility for assistive technology If another State agency is responsible for providing education to children with disabilities, it is already included in the definition of "public agency " Other State agencies, not responsible for educating children with disabilities, should not be held to the requirements imposed on public agencies by these regulations because they are not agencies with educational responsibilities<br><br>**Changes:** Public charter schools as discussed previously has been added to the list of examples of a "public agency" in Sec 300 22 |
| **Sec. 300.23 Qualified personnel.**<br><br>As used in this part, the term qualified personnel means personnel who have met SEA-approved or SEA-recognized certification, licensing, registration, or other comparable requirements that apply to the area in which the individuals are providing special education or related services<br><br>(Authority. 20 U S C 1221e-3) | **Discussion:** It is appropriate to change the title of this section of these final regulations to "qualified personnel " This change is consistent with the importance of ensuring that all providers of special education and related services, including interpreters, meet State standards and Part B requirements<br><br>In order for interpreters to provide appropriate instruction or services to children with disabilities who require an interpreter in order to receive FAPE, States must ensure that these individuals meet appropriate State qualification standards<br><br>It is not necessary to refer to Sec. 300.136, as the definition already specifies that the person must meet State-approved or recognized requirements Section 300 232 (exception to maintenance of effort), uses the term "qualified" in referring to the replacement of higher-salaried personnel by qualified lower-salaried personnel. Therefore it would be unnecessary and redundant to include a reference to that section.<br><br>The definition of "qualified personnel" is sufficiently broad to encompass the qualifications of bilingual specialists, and no further changes are required in this definition<br><br>**Changes:** The name of this section has been changed to "Qualified personnel," and a corresponding reference to "qualified personnel" has been included in the text of the definition. |

18

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.24 Related services.**

(a) General As used in this part, the term *related services* means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes The term also includes school health services, social work services in schools, and parent counseling and training

(b) *Individual terms defined*. The terms used in this definition are defined as follows:

(1) Audiology includes--

(i) Identification of children with hearing loss;

(ii) Determination of the range, nature, and degree of hearing loss, including referral for medical or other professional attention for the habilitation of hearing;

(iii) Provision of habilitative activities, such as language habilitation, auditory training, speech reading (lip-reading), hearing evaluation, and speech conservation;

(iv) Creation and administration of programs for prevention of hearing loss;

(v) Counseling and guidance of children, parents, and teachers regarding hearing loss; and

(vi) Determination of children's needs for group and individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification

(2) *Counseling services* means services provided by qualified social workers, psychologists, guidance counselors, or other qualified personnel.

(3) *Early identification and assessment of disabilities in children* means the implementation of a formal plan for identifying a disability as early as possible in a child's life

**Discussion:** In light of the general decision not to use notes in these final regulations, Note 1 following this section of the NPRM should be removed, but the substance of the note is reflected in the following discussion All related services may not be required for each individual child As under prior law, the list of related services is not exhaustive and may include other developmental, corrective, or supportive services (such as artistic and cultural programs, art, music, and dance therapy) if they are required to assist a child with a disability to benefit from special education in order for the child to receive FAPE Therefore, if it is determined through the Act's evaluation and IEP requirements that a child with a disability requires a particular supportive service in order to receive FAPE, regardless of whether that service is included in these regulations, that service can be considered a related service under these regulations, and must be provided at no cost to the parents

The IEP process in Secs. 300 340-300 350, and the evaluation requirements in Secs. 300 530-300 536, are designed to ensure that each eligible child under Part B receives only those related services that are necessary to assist the child to benefit from special education, and there is nothing in these regulations that would require every disabled child to receive all related services identified in the regulations, as suggested by some commenters

Commenters' suggestions that the second paragraph of Note 1 to this section of the NPRM is no longer needed should be addressed The statement in Note 1--that "psychological testing might be done by qualified psychological examiners, psychometrists, or psychologists depending on State standards"--should not be retained, since States must establish their own qualification standards for persons providing special education and related services. Therefore, State standards would govern which individuals should administer these tests consistent with Part B evaluation requirements.

As stated in the discussion under Secs. 300 5 and 300 6 of this analysis, assistive technology devices and services may already be considered a related service Therefore, it is not necessary to add assistive technology devices and services to the list of related services defined in this section. Second, because "school health services" is currently defined as services provided by a "qualified school nurse" or other qualified person, there is no reason to address further the issue of "school nurses" or school nursing services Third, although interpreter services for children with hearing impairments are not specifically mentioned in the definition of related services, those services have been provided under these regulations since the initial regulations for Part B were issued in 1977. (See also discussion under Qualified personnel).

Regarding commenters' suggestions that related services are required not only to ameliorate the disability but to provide preparation for employment, a change is not needed. The Act's transition services requirements are sufficiently broad to facilitate effective movement from school to post-school activities, and if deemed appropriate by the IEP team, these transition services could be identified as related services for an individual student.

**Changes:** Note 1 following the definition of "related services" in the NPRM has been removed.

**Discussion:** The definition of "audiology" should not be amended since the changes suggested by commenters are more than technical changes, and thus would require further study and regulatory review. However, in response to suggestions of commenters, it is appropriate to modify the definition of "occupational therapy" to make it clear that this term encompasses services provided by a qualified occupational therapist. This makes the definition generally consistent with the other related service definitions. It is not necessary to incorporate the term "certified occupational therapy assistant," because the option of using paraprofessionals and assistants to assist in the provision of services under these regulations is addressed in Sec. 300 136(f)

As stated by the commenters, some children with disabilities other than visual impairments need travel training if they are to safely and effectively move within and outside their school environment, but these students (e g , children with significant cognitive disabilities) do not need orientation and mobility services as that term is defined in these regulations "Orientation and mobility services" is a term of art that is expressly related to children with visual impairments, and includes services that must be provided by qualified personnel who are trained to work with those children. No further changes to the definition of "orientation and mobility services" are needed, since the definition as written does not conflict with the Act's least restrictive environment requirements

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(4) Medical services means services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services

(5) Occupational therapy--

(i) Means services provided by a qualified occupational therapist, and

(ii) Includes--

(A) Improving, developing or restoring functions impaired or lost through illness, injury, or deprivation,

(B) Improving ability to perform tasks for independent functioning if functions are impaired or lost, and

(C) Preventing, through early intervention, initial or further impairment or loss of function.

(6) Orientation and mobility services--

(i) Means services provided to blind or visually impaired students by qualified personnel to enable those students to attain systematic orientation to and safe movement within their environments in school, home, and community; and

(ii) Includes teaching students the following, as appropriate:

(A) Spatial and environmental concepts and use of information received by the senses (such as sound, temperature and vibrations) to establish, maintain, or regain orientation and line of travel (e g., using sound at a traffic light to cross the street);

(B) To use the long cane to supplement visual travel skills or as a tool for safely negotiating the environment for students with no available travel vision;

(C) To understand and use remaining vision and distance low vision aids; and

(D) Other concepts, techniques, and tools.

For some children with disabilities, such as children with significant cognitive disabilities, "travel training" is often an integral part of their special educational program in order for them to receive FAPE and be prepared for post-school activities such as employment and independent living Travel training is important to enable students to attain systematic orientation to and safe movement within their environment in school, home, at work and in the community. Therefore, the definition of "special education" should be amended to include a provision relating to the teaching of travel training, as appropriate, to children with significant cognitive disabilities, and any other disabled children who require such services. The regulations should not substitute the term "mobility training," since the legislative history (S Rep No 105-17, p 6, H R Rep No 105-95, p 86) recognizes that "orientation and mobility" services are generally recognized as for blind children while children with other disabilities may need travel training. In light of this regulatory change, Note 2 following this section of the NPRM should be removed

The definition of "parent counseling and training" should be changed to recognize the more active role acknowledged for parents under the IDEA Amendments of 1997 as participants in the education of their children Parents of children with disabilities are very important participants in the education process for their children Helping them gain the skills that will enable them to help their children meet the goals and objectives of their IEP or IFSP will be a positive change for parents, will assist in furthering the education of their children, and will aid the schools as it will create opportunities to build reinforcing relationships between each child's educational program and out-of-school learning

For these reasons, the definition of "parent counseling and training" should be changed to include helping parents to acquire the necessary skills that will allow them to support the implementation of their child's IEP or IFSP This change is in no way intended to diminish the services that were available to parents under the prior definition in these regulations

It is not necessary to modify the definition of "school health services" in the NPRM to add more specificity because the current definition requires provision of health services, including those addressed by the comments, if they can be provided by a qualified nurse or other qualified individual who is not a physician, and the IEP team determines that any or all of the services are necessary for a child with a disability to receive FAPE. The commenters' description of the holding in the Tatro decision is consistent with the Department's longstanding interpretation regarding school health services.

In any case, the list of examples of related services in Sec. 300.22 is not exhaustive, and other types of services not specifically mentioned may be required related services based on the needs of an individual child The only type of service specifically excluded from "related services" are medical services that are not for diagnostic and evaluation purposes "Medical services," has always been defined by the regulations as services provided by a physician The regulations already make clear that providers of school health services, as is the case for providers of special education and related services in general, must be qualified consistent with Secs 300 23 and 300 136 of these regulations.

**Changes:** Consistent with the above discussion, the definitions of "occupational therapy" at Sec 300.24(b)(5) of these final regulations and "parent counseling and training" at Sec. 300.24(b)(7) of these final regulations have been revised; Note 2 has been deleted; and a reference to travel training has been added under Sec. 300.26 (Special education)

Texas Education Agency - Special Education March 1999 19

20

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(7) Parent counseling and training means—

(i) Assisting parents in understanding the special needs of their child,

(ii) Providing parents with information about child development, and

(iii) Helping parents to acquire the necessary skills that will allow them to support the implementation of their child's IEP or IFSP.

(8) Physical therapy means services provided by a qualified physical therapist.

(9) Psychological services includes--

(i) Administering psychological and educational tests, and other assessment procedures;

(ii) Interpreting assessment results;

(iii) Obtaining, integrating, and interpreting information about child behavior and conditions relating to learning;

(iv) Consulting with other staff members in planning school programs to meet the special needs of children as indicated by psychological tests, interviews, and behavioral evaluations;

(v) Planning and managing a program of psychological services, including psychological counseling for children and parents; and

(vi) Assisting in developing positive behavioral intervention strategies.

(10) Recreation includes--

(i) Assessment of leisure function;

(ii) Therapeutic recreation services;

(iii) Recreation programs in schools and community agencies; and

(iv) Leisure education.

Texas Education Agency - Special Education

March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(11) Rehabilitation counseling services means services provided by qualified personnel in individual or group sessions that focus specifically on career development, employment preparation, achieving independence, and integration in the workplace and community of a student with a disability. The term also includes vocational rehabilitation services provided to a student with disabilities by vocational rehabilitation programs funded under the Rehabilitation Act of 1973, as amended.

(12) School health services means services provided by a qualified school nurse or other qualified person.

(13) Social work services in schools includes—

(i) Preparing a social or developmental history on a child with a disability;

(ii) Group and individual counseling with the child and family;

(iii) Working in partnership with parents and others on those problems in a child's living situation (home, school, and community) that affect the child's adjustment in school;

(iv) Mobilizing school and community resources to enable the child to learn as effectively as possible in his or her educational program; and

(v) Assisting in developing positive behavioral intervention strategies.

Texas Education Agency - Special Education March 1999 21

22

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(14) Speech-language pathology services includes--

(i) Identification of children with speech or language impairments,

(ii) Diagnosis and appraisal of specific speech or language impairments,

(iii) Referral for medical or other professional attention necessary for the habilitation of speech or language impairments;

(iv) Provision of speech and language services for the habilitation or prevention of communicative impairments; and

(v) Counseling and guidance of parents, children, and teachers regarding speech and language impairments

(15) Transportation includes--

(i) Travel to and from school and between schools;

(ii) Travel in and around school buildings; and

(iii) Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.

(Authority: 20 U S C. 1401(22))

**Sec. 300.25 Secondary school.**

As used in this part, the term secondary school means a nonprofit institutional day or residential school that provides secondary education, as determined under State law, except that it does not include any education beyond grade 12

(Authority: 20 U.S.C. 1401(23))

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.26 Special education.**

(a) General (1) As used in this part, the term special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including--

(i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings, and

(ii) Instruction in physical education

(2) The term includes each of the following, if it meets the requirements of paragraph (a)(1) of this section

(i) Speech-language pathology services, or any other related service, if the service is considered special education rather than a related service under State standards,

(ii) Travel training; and

(iii) Vocational education

(b) Individual terms defined The terms in this definition are defined as follows:

(1) At no cost means that all specially-designed instruction is provided without charge, but does not preclude incidental fees that are normally charged to nondisabled students or their parents as a part of the regular education program

(2) Physical education--

(i) Means the development of--

(A) Physical and motor fitness;

(B) Fundamental motor skills and patterns; and

(C) Skills in aquatics, dance, and individual and group games and sports (including intramural and lifetime sports), and

(ii) Includes special physical education, adapted physical education, movement education, and motor ...ment

**Discussion:** It is not necessary to revise the definition of "at no cost" under paragraph (b)(1) of this section, since that definition already addresses the comment relating to the cost of trips, phone calls, and other expenses incurred by parents of disabled children when those children are placed outside the school district by a public agency If the school district places the child, and the IEP team determines that the costs of phone calls and trips are relevant to the student's receipt of FAPE, the public agency placing the child would be expected to pay for such expenses

Paragraph (b)(2) concerning "physical education" should be amended to substitute the word "adapted" for the word "adaptive," since this is the term that was in the original regulations

With regard to the definition of "specially designed instruction," some changes should be made The committee reports to Pub L 105-17 make clear that specific day-to-day adjustments in instructional methods and approaches are not normally the sort of change that would require action by an IEP team Requiring an IEP to include such a level of detail would be overly-prescriptive, impose considerable unnecessary administrative burden, and quite possibly be seen as encouraging disputes and litigation about rather small and unimportant changes in instruction There is, however, a reasonable distinction to be drawn between a mode of instruction, such as cued speech, which would be the basis for the goals, objectives, and other elements of an individual student s IEP and should be reflected in that student's IEP and a day-to-day teaching approach, i e , a lesson plan, which would not be intended to be included in a student's IEP

Case law recognizes that instructional methodology can be an important consideration in the context of what constitutes an appropriate education for a child with a disability. At the same time, these courts have indicated that they will not substitute a parentally-preferred methodology for sound educational programs developed by school personnel in accordance with the procedural requirements of the IDEA to meet the educational needs of an individual child with a disability

In light of the legislative history and case law, it is clear that in developing an individualized education there are circumstances in which the particular teaching methodology that will be used is an integral part of what is "individualized" about a student's education and, in those circumstances will need to be discussed at the IEP meeting and incorporated into the student's IEP For example, for a child with a learning disability who has not learned to read using traditional instructional methods, an appropriate education may require some other instructional strategy

Other students' IEPs may not need to address the instructional method to be used because specificity about methodology is not necessary to enable those students to receive an appropriate education. There is nothing in the definition of "specially designed instruction" that would require instructional methodology to be addressed in the IEPs of students who do not need a particular instructional methodology in order to receive educational benefit In all cases, whether methodology would be addressed in an IEP would be an IEP team decision

Other changes to the definition of "specially designed instruction" are not needed. The distinction between accommodations that change the general curriculum and those that do not, as one commenter requests, would be difficult to make because of the individualized nature of these determinations. Regardless of the reasons for the accommodation or modification, it must be provided if necessary to address the special educational needs of an individual student.

The words "maximum extent appropriate" should not follow the reference to participation in the general curriculum, because such a qualification would conflict with the Act's IEP requirements and the unequivocal emphasis on involvement and progress of students with disabilities in the general curriculum, regardless of the nature or significance of the disability

The term "vocational education" in paragraph (b)(5) should not be amended to conform to the definition in the Carl D Perkins Vocational and Applied Technology Education Act The definition of "vocational education" in the proposed regulations should be retained in these final regulations since it reflects the definition of that term contained in the original regulations for this program published in 1977 While the regulatory definition includes all of the activities in the Perkins Act definition, the substitution of the definition from the Perkins Act would be too limiting since that definition would not encompass those activities included in the current definition The inclusion of "vocational education" in the definition of "special education" is needed to ensure that students with disabilities receive appropriate, individually-designed vocational educational services to facilitate transition from school to post-school activities

Texas Education Agency - Special Education March 1999 23

24

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(3) Specially-designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction--

(i) To address the unique needs of the child that result from the child's disability; and

(ii) To ensure access of the child to the general curriculum, so that he or she can meet the educational standards within the jurisdiction of the public agency that apply to all children.

(4) Travel training means providing instruction, as appropriate, to children with significant cognitive disabilities, and any other children with disabilities who require this instruction, to enable them to--

(i) Develop an awareness of the environment in which they live; and

(ii) Learn the skills necessary to move effectively and safely from place to place within that environment (e g , in school, in the home, at work, and in the community)

(5) Vocational education means organized educational programs that are directly related to the preparation of individuals for paid or unpaid employment, or for additional preparation for a career requiring other than a baccalaureate or advanced degree.

(Authority: 20 U.S C. 1401(25))

**Sec. 300.27 State.**

As used in this part, the term State means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas.

(Authority: 20 U.S.C. 1401(27))

In light of the general decision not to use notes in these final regulations, the note following this section of the NPRM should be removed The removal of this note, however, should not be construed as altering eligibility requirements under these regulations--namely (1) a child is an eligible child with a disability under Part B if the child has a covered impairment and requires special education by reason of the impairment, and (2) a child with a disability can receive a related service only if that service is required to assist the child to benefit from special education However, consistent with Sec. 300 26(a)(2), any related service that is considered special education rather than a related service under State standards may be considered as special education. A provision has been added under the definition of "child with a disability" to reflect this concept

**Changes:** Paragraph (a)(2) has been amended to add travel training to the elements contained in the definition of "special education," and a separate definition of travel training has been added to paragraph (b)(4) as discussed in this attachment under Sec 300 24 Paragraph (b)(2) concerning physical education has been revised to substitute the word "adapted" for the word "adaptive " Paragraph (b)(3) has been revised to make clear that adaptations to instruction, in the form of specially designed instruction, are made as appropriate to the needs of the child The note following this section of the NPRM has been removed, and the substance of the note is reflected in the above discussion

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.28 Supplementary aids and services.**

As used in this part, the term supplementary aids and services means, aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with Secs. 300.550-300 556.

(Authority: 20 U S C 1401(29))

**Discussion:** It is not necessary to define the terms used in this definition. As stated in the analysis of comments relating to Secs 300 5 and 300 6 (assistive technology devices and services), assistive technology devices and services are already recognized as supplementary aids and services Under IDEA, aids, supports and services would be considered during the IEP meeting and if determined appropriate by the IEP team would be integrated under the appropriate components of the IEP Further, with respect to the language about "related services," a change is not needed. If a disabled child requires a related service in the regular classroom, that related service must be provided, and there is no reason to identify that service as a supplementary aid or service.

**Changes:** None.

**Sec. 300.29 Transition services.**

(a) As used in this part, transition services means a coordinated set of activities for a student with a disability that--

(1) Is designed within an outcome-oriented process, that promotes movement from school to post-school activities, including postsecondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(2) Is based on the individual student's needs, taking into account the student's preferences and interests; and

(3) Includes--

(i) Instruction;

(ii) Related services;

(iii) Community experiences;

(iv) The development of employment and other post-school adult living objectives; and

(v) If appropriate, acquisition of daily living skills and functional vocational evaluation.

(b) Transition services for students with disabilities may be special education, if provided as specially designed instruction, or related services, if required to assist a student with a disability to benefit from special education.

(Authority: 20 U.S.C. 1401(30))

**Discussion:** The Act's "transition services" definition should be retained as written In light of the general decision not to use notes in these final regulations, the note following this section of the NPRM should be removed It is important to clarify that transition services for students with disabilities may be special education if they are provided as specially designed instruction, or related services, if they are required to assist a student with a disability to benefit from special education, and that the list of activities in the definition is not intended to be exhaustive.

Additional examples of transition services are not needed because the current definition is sufficiently broad to encompass these activities Nor is it necessary to amend the definition to reference the Perkins Act, since, under current law, students with disabilities, including those in middle schools, can participate in these Federally-funded programs, and must be provided necessary accommodations to ensure their meaningful participation.

Further, the definition of "transition services" should not be narrowed or expanded to include other transitions, because to do so could be inconsistent with congressional intent that public agencies provide students with disabilities the types of needed services to facilitate transition from school to post-school activities.

**Changes:** The note following this section of the NPRM has been removed, and the substance of the note has been added as a new paragraph (b).

Texas Education Agency - Special Education March 1999 25

100

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND . .ANGES (from the Analysis of Comments), APPENDIX A T( .RT 300,
DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

State-reported data for school year 1994-1995 indicates that about 3 9 million children with disabilities aged 3 through 21 spend at least 40 percent of their day in a regular classroom (children reported as placed in regular classes and resource rooms) The participation of the regular education teacher would be required for all of these children since these children are spending at least part of their day in the regular classroom.

State data also show that an additional 1.2 million children were served in separate classrooms A regular education teacher's participation will clearly be required for those children in separate classes who are spending part of their school day in regular classes (less than 40 percent of their day) Other children may be participating with nondisabled children in some activities in the same building. While a child's individual needs and prospects will determine whether a regular education teacher would need to attend a child's IEP meeting in those cases, some proportion of these children are children for whom participation in regular classrooms is a possibility, therefore requiring the participation of a regular education teacher.

Although the prior statute did not require the participation of a regular education teacher, it is not uncommon for States or school districts to require a child's regular education teacher to attend IEP meetings.

Based on all of this information, it is estimated that the participation of a regular education teacher may be required in an additional 3.9 to 5.3 million IEP meetings in the next school year.

While the opportunity costs of including a regular education teacher in these meetings will be significant because of the number of meetings involved, these costs will be more than justified by the benefits to be realized by teachers, schools, children, and families Involving the regular education teacher in the development of the IEP will not only provide the regular education teacher with needed information about the child's disability, performance, and educational needs, but will help ensure that a child receives the supports the child needs in the regular classroom, including services and modifications that will enable the child to progress in the general curriculum.

**Sec. 300.340 Definitions related to IEPs.**

(a) Individualized education program. As used in this part, the term individualized education program or IEP means a written statement for a child with a disability that is developed, reviewed, and revised in a meeting in accordance with Secs. 300.341-300.350.

(b) Participating agency. As used in Sec. 300.348, participating agency means a State or local agency, other than the public agency responsible for a student's education, that is financially and legally responsible for providing transition services to the student.

(Authority: 20 U.S.C 1401(11), 1412(a)(10)(B))

**Discussion:** To clarify that IEPs are developed, reviewed, and revised at IEP meetings, a change would be made to paragraph (a) of this section. However, as the Committee reports to the Act noted:

> *Specific day to day adjustments in instructional methods and approaches that are made by either a regular or special education teacher to assist a disabled child to achieve his or her annual goals would not normally require action by the child's IEP team. However, if changes are contemplated in the child's measurable annual goals, benchmarks, or short-term objectives, or in any of the services or program modifications, or other components described in the child's IEP, the LEA must ensure that the child's IEP team is reconvened in a timely manner to address those changes. (S. Rep. No. 105-17, p. 5 (1997); H. Rep. No. 105-95, pp. 100-101 (1997))*

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
|---|---|
| **Sec. 300.341 Responsibility of SEA and other public agencies for IEPs.**<br><br>(a) The SEA shall ensure that each public agency--<br><br>(1) Except as provided in Secs 300 450-300 462, develops and implements an IEP for each child with a disability served by that agency, and<br><br>(2) Ensures that an IEP is developed and implemented for each eligible child placed in or referred to a private school or facility by the public agency<br><br>(b) Paragraph (a) of this section applies to--<br><br>(1) The SEA, if it is involved in providing direct services to children with disabilities, in accordance with Sec 300 370(a) and (b)(1), and<br><br>(2) Except as provided in Sec 300 600(d), the other public agencies described in Sec 300 2, including LEAs and other State agencies that provide special education and related services either directly, by contract, or through other arrangements<br><br>(Authority 20 U S C 1412(a)(4), (a)(10)(B)) | **Discussion:** The language of this section, and especially the note, should be modified to ensure that the term "SEA" is used consistently, to avoid the confusion identified by the commenters This can best be accomplished, and the section strengthened, by moving the substance of the note into the text of the regulation The comment related to ensuring compliance with all provisions of IDEA is addressed by Sec 300 600, which provides that the SEA is responsible for ensuring such compliance<br><br>In drafting the NPRM the term "religiously-affiliated" was adopted instead of the statutory term "parochial," based on the assumption that Congress intended that all religious schools be included, not just those organized on a parish basis The intent was for the broadest possible coverage However, in light of the comment related to this matter, the term "religiously-affiliated" does not account for other religious schools that are not affiliated. The term should be replaced with the more comprehensive term "religious schools " That term will be used throughout these regulations to replace "religiously-affiliated."<br><br>Another term other than "IEP" should be used with respect to disabled children who are enrolled by their parents in private schools As noted by the commenters, (1) "IEP" is an inherent component of, and an explicit term used in, the statutory definition of "FAPE", and (2) the private school provisions in the IDEA Amendments of 1997 and Sec. 300 454(a) make it clear that these children have no *individual right to* receive some or all special education and related services that they would be entitled to if enrolled in a public school<br><br>Therefore, if it is determined, in accordance with Sec 300 454(b) (Consultation with representatives of private school children with disabilities), that a given child is to receive special education and related services under this part, the document used to denote those services should have a different name The term "services plan" has been adopted as an appropriate term for use with these children<br><br>Further, in light of the comments related to this section, and the discussion in the preceding paragraph, all provisions related to parentally-*placed children in religious or other private* schools (including the provisions in proposed Secs 300 341(b)(2) and 300 350) should be incorporated, in revised form, under Subpart D (Children in Private Schools)<br><br>The statute does not require a *private school to unilaterally develop an IEP* for each disabled child enrolled in the school, or to require a supplemental IEP for additional services that the LEA will provide.<br><br>**Changes:** The name of Sec 300 341 has been changed to "Responsibility of SEA and other public agencies for IEPs " The paragraph headings have been deleted, and Sec 300 341 has been revised consistent with provisions in Subpart D regarding parentally-placed children with disabilities in religious or other private schools A new paragraph (b) incorporates the substance of the note following Sec 300.341, to clarify that the provisions of the section (related to public agencies) also apply to the SEA, if the SEA provides direct services under Sec. 300 370(a) and (b)(1). The note has been deleted The section has been further revised by making other technical and conforming changes. A new paragraph has been added to Sec. 300 452(b) related to the SEA's responsibility for eligible children enrolled in religious schools. |

Case 1:02-cv-00207 Document 5 Filed in TXSD on 11/04/2002 Page 43 of 148

102

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND ..ANGES (from the Analysis of Comments), APPENDIX A TC .HT 300,
DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**15. Who is responsible for ensuring the development of IEPs for children with disabilities served by a public agency other than an LEA?**

The answer as to which public agency has direct responsibility for ensuring the development of IEPs for children with disabilities served by a public agency other than an LEA will vary from State to State, depending upon State law, policy, or practice The SEA is ultimately responsible for ensuring that all Part B requirements, including the IEP requirements, are met for eligible children within the State, including those children served by a public agency other than an LEA. *Thus, the SEA must ensure that every eligible child with a disability in the State* has FAPE available, regardless of which State or local agency is responsible for educating the child. (The only exception to this responsibility is that the SEA *is not responsible for ensuring* that FAPE is made available to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons, if the State has assigned that responsibility to a public agency other than the SEA (*See Sec. 300.600(d)*).

Although the SEA has flexibility in deciding the best means to meet this obligation (e.g., through interagency agreements), the SEA must ensure that no eligible child with a disability is denied FAPE due to jurisdictional disputes among agencies.

When an LEA is responsible for the education of a child with a disability, the LEA *remains responsible for developing the child's IEP*, regardless of the public or private school setting into which it places the child.

**31. Must the public agency ensure that all services specified in a child's IEP are provided?**

Yes. The public agency must ensure that all services set forth in the child's IEP are provided, consistent with the child's needs as identified in the IEP. The agency may provide each of those services directly, through its own staff resources; indirectly, by contracting with another public or private agency; or through other arrangements. In providing the services, the agency may use whatever State, local, Federal, and private sources of support are available for those purposes (see Sec. 300.301(a)); *but the services must be at no cost to the parents*, and the public agency remains responsible for ensuring that the IEP services are provided in a manner that appropriately meets the student's needs as specified in the IEP. *The SEA and responsible public agency may not allow the failure of another agency to provide service(s)* described in the child's IEP to deny or delay the provision of FAPE to the child. (See Sec. 300.142, Methods of ensuring services )

Texas Education Agency - Special Education March 1999

**Sec. 300.342 When IEPs must be in effect.**

(a) General At the beginning of each school year, each public agency shall have an IEP in effect for each child with a disability within its jurisdiction

(b) Implementation of IEPs Each public agency shall ensure that--

(1) An IEP--

(i) Is in effect before special education and related services are provided to an eligible child under this part, and

(ii) Is implemented as soon as possible following the meetings described under Sec 300 343,

(2) The child's IEP is accessible to each regular education teacher, special education teacher, related service provider, and other service provider who is responsible for its implementation, and

(3) Each teacher and provider described in paragraph (b)(2) of this section is informed of--

(i) His or her specific responsibilities related to implementing the child's IEP, and

(ii) The specific accommodations, modifications, and supports that must be provided for the child in accordance with the IEP

(c) IEP or IFSP for children aged 3 through 5 (1) In the case of a child with a disability aged 3 through 5 (or, at the discretion of the SEA a 2-year-old child with a disability who will turn age 3 during the school year), an IFSP that contains the material described in section 636 of the Act, and that is developed in accordance with Secs 300 341-300 346 and Secs 300.349-300.350, may serve as the IEP of the child if using that plan as the IEP is--

(i) Consistent with State policy; and

(ii) Agreed to by the agency and the child's parents.

**Discussion:** It would not be appropriate to add an outside timeline under Sec 300 342(b) for implementing IEPs, especially when there is not a specific statutory basis to do so However, with very limited exceptions, IEPs for most children with disabilities should be implemented without undue delay following the IEP meetings described in Sec 300.342(b)(2)

There may be exceptions in certain situations It may be appropriate to have a short delay (e g , (1) when the IEP meetings occur at the end of the school year or during the summer, and the IEP team determines that the child does not need special education and related services until the next school year begins), or (2) when there are circumstances that require a short delay in the provision of services (e g , finding a qualified service provider, or making transportation arrangements for the child)

If it is determined, through the monitoring efforts of the Department, that there is a pattern of practice within a given State of not making services available within a reasonable period of time (e g , within a week or two following the meetings described in Sec 300 343(b)), this could raise a question as to whether the State is in compliance with that provision, unless one of the exceptions noted above applies

**Changes:** Paragraph (b) of this section is amended (consistent with the discussion under Sec 300 344(a)(2) and (3) of this Analysis) to require that each public agency must ensure that (1) a child's IEP is accessible to each regular education teacher, special education teacher, related services provider and other service provider who is responsible for its implementation, and (2) each of the child's teachers and providers is informed of his or her specific responsibilities related to implementing the child's IEP, and of the specific accommodations, modifications, and supported that must be provided for the child in accordance with the IEP Note 1 has been deleted Note 2 (related to a 1997 date certain for certain requirements regarding students with disabilities incarcerated in adult prisons) also has been deleted Subject headings have been added to each paragraph in the section

**Discussion:** It is important to retain in these final regulations the general thrust of Sec 300 342(c) from the NPRM (related to requiring parental consent to using an IFSP in lieu of an IEP for a child who moves from the Early Intervention Program under Part C of the Act to preschool services under Part B of the Act) As a result of the IDEA Amendments of 1997, there have been significant changes in the statute, including an increased emphasis on the participation of children with disabilities in the general curriculum, and on ensuring better results for children with disabilities

Because of the importance of the IEP as the statutory vehicle for ensuring FAPE to a child with a disability, paragraph (c)(2) of this section provides that the parents' agreement to use an IFSP for the child instead of an IEP requires written informed consent by the parents that is based on an explanation of the differences between an IFSP and an IEP

As noted by at least one commenter, research has shown a significant positive difference in school readiness for kindergarten if children s "prekindergarten" programs included an educational component, compared to those who attend custodial day care without an educational component. In addition, the provisions related to the IFSP under Part C can generally be replicated under Part B Because of the definition of "FAPE," services that are determined necessary for a child to benefit from special education must be provided without fees and without cost to the parents

**Changes:** Note 3 has been deleted

**Discussion:** It is appropriate to amend Sec 300.342(d) to provide that IEPs developed, reviewed, or revised on or after July 1, 1998 must comply with the requirements in section 614(d) of the Act and Secs. 300 340-300 350 of these final regulations While we commend the many public agencies that began as soon as the IDEA Amendments of 1997 was enacted to implement the new statutory requirements and already have in place IEPs that meet these requirements, other public agencies argued compellingly that they simply did not have the wherewithal to ensure that, on July 1, 1998, all IEPs would fully comply with the new IEP requirements, and that a phase-in period should be adopted in which the anniversary date for each child's IEP meeting would be the basis for revising the child's IEP to comply with the new requirements

104

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND ..IANGES (from the Analysis of Comments), APPENDIX A TC .RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(2) In implementing the requirements of paragraph (c)(1) of this section, the public agency shall--

(i) Provide to the child's parents a detailed explanation of the differences between an IFSP and an IEP; and

(ii) If the parents choose an IFSP, obtain written informed consent from the parents.

(d) Effective date for new requirements. All IEPs developed, reviewed, or revised on or after July 1, 1998 must meet the requirements of Secs. 300.340-300.350.

(Authority: 20 U.S.C. 1414(d)(2)(A) and (B), Pub. L. 105-17, sec. 201(a)(2)(A), (C)

Requiring IEPs developed on or after July 1, 1998 to meet the new requirements should result in more meaningful IEPs that focus on effective implementation, consistent with the purposes of the IDEA Amendments of 1997. At the same time, public agencies are strongly encouraged to grant any reasonable requests from parents for an IEP meeting to address the new IEP provisions Public agencies are also encouraged to inform parents of the important changes resulting from the new IEP requirements so that they may be effective partners in the education of their children.

**Changes:** Section 300.342(d) has been revised to state that all IEPs developed, reviewed, or revised on or after July 1, 1998 must meet the requirements of Secs 300.340-300.350.

**14. *For a child with a disability receiving special education for the first time, when must an IEP be developed--before or after the child begins to receive special education and related services?***

Section 300.342(b)(1) requires that an IEP be "*in effect before* special education and related services are provided to an eligible child * * *" (italics added.)

The appropriate placement for a particular child with a disability *cannot be determined* until after decisions have been made about the child's needs and the services that the public agency will provide to meet those needs. These decisions must be made at the IEP meeting, and it would not be permissible first to place the child and then develop the IEP. Therefore, the IEP must be developed before placement (Further, the child's placement must be based, among other factors, on the child's IEP )

This requirement does not preclude temporarily placing an eligible child with a disability in a program as part of the evaluation process--before the IEP is finalized--to assist a public agency in determining the appropriate placement for the child However, *it is essential that the temporary placement not become the final placement before the IEP is finalized*. In order to ensure that this does not happen, the State might consider requiring LEAs to take the following actions:

a. Develop an interim IEP for the child that sets out the specific conditions and timelines for the trial placement. (See paragraph c, following.)

b. Ensure that the parents agree to the interim placement *before it is carried out*, and that they are involved throughout the process of developing, reviewing, and revising the child's IEP.

c. Set a specific timeline (e.g., 30 days) for completing the evaluation, finalizing the IEP, and determining the appropriate placement for the child.

d. Conduct an IEP meeting at the end of the trial period in order to finalize the child's IEP.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.343 IEP meetings.**

(a) General Each public agency is responsible for initiating and conducting meetings for the purpose of developing, reviewing, and revising the IEP of a child with a disability (or, if consistent with Sec 300 342(c), an IFSP)

(b) Initial IEPs, provision of services (1) Each public agency shall ensure that within a reasonable period of time following the agency's receipt of parent consent to an initial evaluation of a child--

(i) The child is evaluated, and

(ii) If determined eligible under this part, special education and related services are made available to the child in accordance with an IEP

(2) In meeting the requirement in paragraph (b)(1) of this section, a meeting to develop an IEP for the child must be conducted within 30-days of a determination that the child needs special education and related services

(c) Review and revision of IEPs Each public agency shall ensure that the IEP team--

(1) Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved, and

(2) Revises the IEP as appropriate to address--

(i) Any lack of expected progress toward the annual goals described in Sec 300 347(a), and in the general curriculum, if appropriate,

(ii) The results of any reevaluation conducted under Sec 300 536,

(iii) Information about the child provided to, or by, the parents, as described in Sec 300 533(a)(1);

(iv) The child's anticipated needs; or

(v) Other matters

(Authority 20 U S C 1413(a)(1), 1414(d)(4)(A))

**Discussion:** There is potential for confusion with the language in Sec 300.343(b)(1) of the NPRM regarding whether a child must be evaluated before the offer of services is made It also would be more appropriate to refer to "special education and related services" rather than referring simply to "services "

While the basic position taken in the NPRM with respect to Sec 300 343(b)(1) has been retained (i e , an offer of services will be made to parents within a reasonable period of time from the public agency's receipt of parent consent to initial evaluation), the concept of "making services available" to a child with a disability seems more relevant to these final regulations than "offer of services" in ensuring that FAPE is available to a child with a disability in a timely manner

Therefore, the regulations should be amended to clarify that, within a reasonable period of time following consent to an initial evaluation, the evaluation is conducted, and if the child is determined eligible under this part, special education and related services are made available to the child, in accordance with an IEP.

It would not be appropriate to change the reference to Sec. 300.343(b)(1) from "parent consent" to "referral" because informed consent of the parents is a necessary step in ensuring that the evaluation will be conducted

It also would not be appropriate to change the 30 day timeline in Sec 300 343(b)(2) to 30 "school days " That timeline is a long-standing provision that has been appropriately implemented since the inception of the regulations under this part, and there is no basis to make such a change

A provision is not necessary to clarify that public agencies will honor "reasonable" requests by parents for a meeting to review their child's IEP Public agencies are required under the statute and these final regulations to be responsive to parental requests for such reviews If a public agency believes that the frequency or nature of the parents' requests for such reviews is unreasonable, the agency may (consistent with the prior notice requirements in Sec. 300.503) refuse to conduct such a review, and inform the parents of their right to request a due process hearing under Sec. 300 507. It should be noted, however, that as a general matter, when a child is not making meaningful progress toward attaining goals and standards applicable to all children, it would be appropriate to reconvene the IEP team to review the progress

It is inappropriate and unnecessary to add "benchmarks or short-term objectives" to the statement on annual goals in Sec 300 343(c)(2)(i) The language in that paragraph, which incorporates the language from the statute, refers to "the annual goals described in Sec 300 347(a) " Section 300.347(a) states that each child's IEP must include "A statement of measurable annual goals, including benchmarks or short-term objectives * * *" Therefore, benchmarks or short-term objectives are inherent in Sec 300.343(c)(2)(i), and do not need to be repeated

It is not necessary to include a note encouraging public agencies to combine the eligibility and initial IEP meetings This is an individual State option that many States have unilaterally elected to follow in implementing Part B of the Act over the past 22 years, while other States have determined that the better course is to hold separate meetings.

**Changes:** The title of Sec 300 343(b) has been changed from "Timelines" to "Initial IEPs; provision of services " Paragraph (b)(1) has been amended to (1) clarify that, within a reasonable period of time from the agency's receipt of consent to an initial evaluation, "the evaluation is conducted", and (2) clarify the timing issue by replacing "offer of services * * * is made to parents" with "special education and related services are made available to the child * * *". Paragraph (b)(2) has been changed by replacing the phrase "In meeting the timeline in paragraph (b)(1)" with "In meeting the requirement in paragraph (b)(1) " In the title to Sec 300 343(c), the term "IEP" has been changed to "IEPs " Paragraph (c)(2)(ii) has been revised to correctly cite Sec 300.536 The authority cite has been changed from "1414(d)(3)" to "1414(d)(4)(A) "

**Discussion:** While it is critical that each public agency make FAPE available in accordance with an IEP within a reasonable period of time after the agency's receipt of parent consent to an initial evaluation, imposing specific timelines could result in the timelines being implemented only in a compliance sense, without regard to meeting the spirit of the requirement, and this may not always serve the best interests of the children involved

Moreover, as indicated by some of the commenters, most States are able to meet a timeline of 60 days The Department considers this to be reasonable, and will not make a finding of noncompliance when monitoring a State that is meeting the 60 day timeline for most children

Texas Education Agency - Special Education March 1999 105

It is recognized, however, that it may, for some children, take longer, and for some, it could be done in a shorter period of time Therefore, the note following Sec 300 343 should be deleted, and no timelines should be added to the final regulations relating to the concept of "within a reasonable period of time." Although no specific timeline is given, implementation should be done with all due haste

**Changes:** The note following Sec. 300.343 has been removed

**9. What is a public agency's responsibility if it is not possible to reach consensus on what services should be included in a child's IEP?**

The IEP meeting serves as a communication vehicle between parents and school personnel, and enables them, as equal participants, to *make joint, informed decisions regarding the* (1) *child's needs and appropriate goals;* (2) extent to which the child will be involved in the general curriculum and participate in the regular education environment and State and district-wide assessments; and (3) services needed to support that involvement and participation and to achieve agreed-upon goals. Parents are considered equal partners with school personnel in making these decisions, and the IEP team must consider the parents' concerns and the information that they provide regarding their child in developing, reviewing, and revising IEPs (Secs. 300.343(c)(iii) and 300.346(a)(1) and (b)).

The IEP team should work toward consensus, but the public agency has ultimate responsibility to ensure that the *IEP includes the services* that the child needs in order to receive FAPE. It is not appropriate to make IEP decisions based upon a majority "vote " If the team cannot reach consensus, the public agency must provide the parents with prior written notice of the agency's proposals or refusals, or both, regarding the child's educational program, and the parents have the right to seek resolution of any disagreements by initiating an impartial due process hearing.

Every effort should be made to resolve differences between parents and school staff through voluntary mediation or some other informal step, without resort to a due process hearing. However, mediation or other informal procedures may not be used to deny or delay a parent's right to a due process hearing, or to deny any other rights afforded under Part B.

***17. If a disabled child has been receiving special education from one public agency and transfers to another public agency in the same State, must the new public agency develop an IEP before the child can be placed in a special education program?***

If a child with a disability moves from one public agency to another in the same State, the State and its public agencies have an ongoing responsibility to ensure that FAPE is made available to that child. This means that if a child moves to another public agency the new agency is responsible for ensuring that the child has available special education and related services in conformity with an IEP.

The new public agency must ensure that the child has an IEP in effect before the agency can provide special education and related services The new public agency may meet this responsibility by either adopting the IEP the former public agency developed for the child or by developing a new IEP for the child. (The new public agency is strongly encouraged to continue implementing the IEP developed by the former public agency, if appropriate, especially if the parents believe their child was progressing appropriately under that IEP )

Before the child's IEP is finalized, the new public agency may provide interim services agreed to by both the parents and the new public agency. If the parents and the new public agency are unable to agree on an interim IEP and placement, the new public agency must implement the old IEP to the extent possible until a new IEP is developed and implemented.

In general, while the new public agency must conduct an IEP meeting, it would not be necessary if: (1) A copy of the child's current IEP is *available; (2) the parents indicate that they are satisfied with the current* IEP, and (3) the new public agency determines that the current IEP is appropriate and can be implemented as written.

If the child's current IEP is not available, or if either the new public agency or the parent believes that it is not appropriate, the new public agency must develop a new IEP through appropriate procedures within a short time after the child enrolls in the new public agency (normally, within one week).

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**18. What timelines apply to the development and implementation of an initial IEP for a child with a disability?**

Section 300 343(b) requires each public agency to ensure that within a reasonable period of time following the agency's receipt of parent consent to an initial evaluation of a child, the child is evaluated and, if determined eligible, special education and related services are made available to the child in accordance with an IEP The section further requires the agency to conduct a meeting to develop an IEP for the child within 30 days of determining that the child needs special education and related services

Section 300 342(b)(2) provides that an IEP must be implemented as soon as possible following the meeting in which the IEP is developed

**19. Must a public agency hold separate meetings to determine a child's eligibility for special education and related services, develop the child's IEP, and determine the child's placement, or may the agency meet all of these requirements in a single meeting?**

A public agency may, after a child is determined by "a group of qualified professionals and the parent" (see Sec 300 534(a)(1)) to be a child with a disability, continue in the same meeting to develop an IEP for the child and then to determine the child's placement However, the public agency must ensure that it meets. (1) the requirements of Sec 300 535 regarding eligibility decisions, (2) all of the Part B requirements regarding meetings to develop IEPs (including providing appropriate notification to the parents, consistent with the requirements of Secs 300 345, 300 503, and 300.504, and ensuring that all the required team members participate in the development of the IEP, consistent with the requirements of Sec. 300 344;) and (3) ensuring that the placement is made by the required individuals, including the parent, as required by Secs 300 552 and 300 501(c).

**20. How frequently must a public agency conduct meetings to review, and, if appropriate, revise the IEP for each child with a disability?**

A public agency must initiate and conduct meetings periodically, but at least once every twelve months, to review each child's IEP, in order to determine whether the annual goals for the child are being achieved, and to revise the IEP, as appropriate, to address (a) Any lack of expected progress toward the annual goals and in the general curriculum, if appropriate, (b) the results of any reevaluation, (c) information about the child provided to, or by, the parents; (d) the child's anticipated needs; or (e) other matters (Sec 300 343(c))

A public agency also must ensure that an IEP is in effect for each child at the beginning of each school year (Sec 300 342(a)) It may conduct IEP meetings at any time during the year. However, if the agency conducts the IEP meeting prior to the beginning of the next school year, it must ensure that the IEP contains the necessary special education and related services and supplementary aids and services to ensure that the student's IEP can be appropriately implemented during the next school year Otherwise, it would be necessary for the public agency to conduct another IEP meeting.

Although the public agency is responsible for determining when it is necessary to conduct an IEP meeting, the parents of a child with a disability have the right to request an IEP meeting at any time For example, if the parents believe that the child is not progressing satisfactorily or that there is a problem with the child's current IEP, it would be appropriate for the parents to request an IEP meeting

If a child's teacher feels that the child's IEP or placement is not appropriate for the child, the teacher should follow agency procedures with respect to: (1) calling or meeting with the parents or (2) requesting the agency to hold another IEP meeting to review the child's IEP

The legislative history of Public Law 94-142 makes it clear that there should be as many meetings a year as any one child may need (121 Cong. Rec S20428-29 (Nov 19, 1975) (remarks of Senator Stafford)) Public agencies should grant any reasonable parent request for an IEP meeting For example, if the parents question the adequacy of services that are provided while their child is suspended for short periods of time, it would be appropriate to convene an IEP meeting

In general, if either a parent or a public agency believes that a required component of the student's IEP should be changed, the public agency must conduct an IEP meeting if it believes that a change in the IEP may be necessary to ensure the provision of FAPE

Texas Education Agency - Special Education March 1999 107

108

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**32. Is it permissible for an agency to have the IEP completed before the IEP meeting begins?**

No. Agency staff may come to an IEP meeting prepared with evaluation findings and proposed recommendations regarding IEP content, but the agency must make it clear to the parents at the outset of the meeting that the services proposed by the agency are only recommendations for review and discussion with the parents. Parents have the right to bring questions, concerns, and recommendations to an IEP meeting as part of a full discussion, of the child's needs and the services to be provided to meet those needs before the IEP is finalized.

Public agencies must ensure that, if agency personnel bring drafts of some or all of the IEP content to the IEP meeting, there is a full discussion with the child's parents, before the child's IEP is finalized, regarding drafted content and the child's needs and the services to be provided to meet those needs.

If a parent requests an IEP meeting because the parent believes that a change is needed in the provision of FAPE to the child or the educational placement of the child, and the agency refuses to convene an IEP meeting to determine whether such a change is needed, the agency must provide written notice to the parents of the refusal, including an explanation of why the agency has determined that conducting the meeting is not necessary to ensure the provision of FAPE to the student.

Under Sec. 300.507(a), the parents or agency may initiate a due process hearing at any time regarding any proposal or refusal regarding the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child, and the public agency must inform parents about the availability of mediation.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.344 IEP team.**

(a) General The public agency shall ensure that the IEP team for each child with a disability includes--

(1) The parents of the child,

(2) At least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment),

(3) At least one special education teacher of the child, or if appropriate, at least one special education provider of the child;

(4) A representative of the public agency who--

(i) Is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities,

(ii) Is knowledgeable about the general curriculum; and

(iii) Is knowledgeable about the availability of resources of the public agency;

(5) An individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in paragraphs (a)(2) through (6) of this section;

(6) At the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(7) If appropriate, the child

**Discussion:** In response to commenters' recommendations and in light of the general decision not to use notes in these final regulations, the note following this section of the NPRM should be removed as a note However, substantive portions should be incorporated, as appropriate, into pertinent provisions of this section, reflected in questions and answers on IEP requirements that are contained in Appendix A to these regulations, or addressed in the discussion of comments regarding this section

No limitation on the number of individuals who can attend IEP meetings should be imposed, as requested by commenters, since these determinations are left to parents and public agencies, based on the requirements of this section These requirements are sufficient to ensure that membership on the IEP team is limited to individuals who have particular knowledge or expertise to bring to the meeting No clarification is needed here with regard to accommodations and modifications for all personnel who implement a child's IEP, since that requirement is addressed under Sec 300 346(d)(2) of these regulations.

**Changes:** The note following this section of the NPRM has been removed

**Discussion:** As numerous commenters emphasized, it is essential that parents are given the opportunity to participate meaningfully as members of their child's IEP team. In many situations, an IEP meeting can be a very intimidating experience for many parents, even if the LEA encourages their active participation. Frequently, as commenters have suggested, parents would be assisted greatly at their child's IEP meetings if another person could accompany them. It is important to point out that under IDEA and the original regulations for this program, parents always have been afforded the opportunity to bring a friend or neighbor to accompany them at their child's IEP meeting Question 26 in the Notice of Interpretation on IEP requirements, published as Appendix A to 34 CFR part 300, in 1981, stated in a note that, in some instances, parents might elect to bring another participant to the meeting, e g , a friend or neighbor, someone outside of the agency who is familiar with applicable laws and with the child's needs, or a specialist who conducted an independent evaluation of the child

Many parents traditionally have brought other individuals to accompany them to their child's IEP meeting as a way of ensuring their meaningful participation. Therefore, in response to commenters' suggestions and to ensure that meaningful parent participation at their child's IEP meeting is preserved, a new paragraph (c) should be added to this section

**Changes:** Section 300.344 has been amended by adding a new paragraph (c) to clarify that "[T]he determination of the knowledge or special expertise of any individual described in paragraph (a)(6) of this section shall be made by the party (the parents or the public agency) who invited the individual to be a member of the IEP team "

**Discussion:** Based on careful consideration of comments as well as applicable statutory requirements, Sec 300 344(a)(2) should be retained in these final regulations, but additional clarification should be provided in Appendix A and in Sec 300 342(b) of these regulations

Section 614(d)(1)(B)(ii) of the Act specifies that the IEP team must include "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)." This statutory provision therefore prescribes that for any child who is, or may be participating in the regular educational environment, that child's regular education teacher must be a member of the child's IEP team The child's regular education teacher's membership on the IEP team is particularly important to meeting the statutory requirement in section 614(d)(1)(A)(ii)(I) of the Act that the IEP explain how the child's needs will be met so that the child can be involved in and progress in the general curriculum.

In implementing the requirement for membership of a regular education teacher on the IEP team, the public agency will determine which teacher or teachers of the child will fulfill that function to ensure participation of at least one regular education teacher in the development, review, and revision of the child's IEP, to the extent appropriate, in accordance with section 614(d)(3)(C) of the Act (See discussion of Sec 300 346(d) of these regulations)

In addition, it would be highly beneficial to the education of children with disabilities to ensure that those regular education teachers and other service providers of the child who are not members of the child's IEP team are informed about the contents of a child's IEP to ensure that the IEP is appropriately implemented

Texas Education Agency - Special Education March 1999 109

(b) *Transition services participants.* (1) Under paragraph (a)(7) of this section, the public agency shall invite a student with a disability of any age to attend his or her IEP meeting if a purpose of the meeting will be the consideration of--

(i) The student's transition services needs under Sec. 300 347(b)(1),

(ii) The needed transition services for the student under Sec 300.347(b)(2); or

(iii) Both.

(2) If the student does not attend the IEP meeting, the public agency shall take other steps to ensure that the student's preferences and interests are considered.

(3)(i) In implementing the requirements of Sec. 300.347(b)(2), the public agency also shall invite a representative of any other agency that is likely to be responsible for providing or paying for transition services

(ii) If an agency invited to send a representative to a meeting does not do so, the public agency shall take other steps to obtain participation of the other agency in the planning of any transition services.

(c) Determination of knowledge and special expertise The determination of the knowledge or special expertise of any individual described in paragraph (a)(6) of this section shall be made by the party (parents or public agency) who invited the individual to be a member of the IEP.

(d) Designating a public agency representative. A public agency may designate another public agency member of the IEP team to also serve as the agency representative, if the criteria in paragraph (a)(4) of this section are satisfied.

(Authority: 20 U S.C 1401(30), 1414(d)(1)(A)(7), (B))

It is important to point out that the statute specifies that at least one regular education teacher of the child is a member of the IEP team Therefore, the suggestions of commenters that other individuals could participate in lieu of the child's regular education teacher as the regular education teacher member of the child's IEP team should not be adopted; however, as stated in the note to this section in the NPRM, the regular education teacher participating in a child's IEP meeting should be the teacher who is, or may be, responsible for implementing the IEP, so that the teacher can participate in discussions about how best to teach the child.

If the child has more than one regular education teacher, the LEA may designate which teacher or teachers of the child will participate on the IEP team. While all regular education teachers of the child need not attend the child's IEP meeting, their input should be sought, regardless of whether they attend. In addition, each public agency must ensure that (1) the child's IEP is accessible to each regular education teacher (and to each special education teacher, related services provider and other service provider) who is responsible for its implementation, and (2) each of the child's teachers and providers is informed of his or her specific responsibilities related to implementing the child's IEP, and of the specific accommodations, modifications, and supports that must be provided to the child in accordance with the IEP. This provision is necessary to ensure proper implementation of the child's IEP and the provision of FAPE to the child. However, the mechanism that the public agency uses to inform each teacher or provider of his or her responsibilities is left to the discretion of the agency.

It is expected that the circumstances will be rare in which a regular education teacher would not be required to be a member of the child's IEP team. However, there may be situations in which a child is placed in a separate school and participates only in meals, recess periods, transportation, and extracurricular activities with nondisabled children and is not otherwise participating in the regular educational environment, and no change in that degree of participation is anticipated during the next twelve months. In these instances, since there would be no current or anticipated regular education teacher for a child during the period of the IEP, it would not be necessary for a regular education teacher to be a member of the child's IEP team.

No further clarification should be provided in response to commenters' concerns about the potential for violation of requirements regarding confidentiality of information if copies of a child's IEP are distributed to regular education teachers or other school personnel who did not attend the IEP meeting These regulations contain confidentiality requirements at Secs. 300.560-300.577 that are modeled after those in the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. Sec. 1232(g), which also applies to this program.

While FERPA does not protect the confidentiality of information in general, it prohibits the improper disclosure of information from education records and generally protects parents' and students' privacy interests in "education records." Records regarding an individual student's disability maintained by an educational agency or institution or by a party acting for the agency or institution are education records under FERPA. Therefore, a child's IEP is an "education record" which is subject to FERPA.

Under FERPA and Part B, the prior written consent of the student's parent or of the eligible student must be obtained for disclosure of personally identifiable information in education records, unless one of the authorized exceptions to the prior written consent requirement is applicable. (34 CFR 99.30 and 300.571 (a)(2) and (b)).Under 34 CFR 99.31(a)(1), educational agencies or institutions, under certain circumstances, may disclose personally identifiable information in education records without prior written consent to school officials with legitimate educational interests. Each educational agency or institution must provide annual notification regarding how it meets the requirements of FERPA. This annual notification under FERPA must include a statement indicating that the parent or eligible student has a right to consent to disclosure of personally identifiable information, and the exception permitting nonconsensual disclosures to school officials with legitimate educational interests must be described.

The criteria for determining which parties are school officials and what the agency or institution considers to be a legitimate educational interest also must be specified in this annual notification. (34 CFR 99.7(a)(3)) Accordingly, an educational agency or institution may disclose information from education records to teachers and other school officials who meet the criteria set forth in the agency's or institution's notice and must restrict access by other school employees who do not fall within an exception, unless consent to the disclosures is obtained. Although regular education teachers who fall within this exception also may disclose education records to other school officials with legitimate educational interests, those officials are subject to the restrictions on redisclosure in 34 CFR 99 33

Public agencies also may find it practical to store education records in one central location to limit access to those individuals to whom the agency or institution is permitted to disclose personally identifiable information without prior consent

**Changes:** Section 300.342(b) has been amended, consistent with the above discussion.

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Discussion:** Section 300 344(a)(3) of these final regulations implements section 614(d)(1)(B)(iii) of the Act, which gives the public agency the flexibility to determine whether the child's special education teacher or special education provider should be a member of the child's IEP team The special education teacher or provider who is a member of the child's IEP team should be the person who is, or will be, responsible for implementing the IEP For example, if the child's disability is a speech impairment, the special education teacher or special education provider could be the speech-language pathologist

While there is no statutory requirement that public agencies inform parents of the qualifications of members of the IEP team, there is nothing in these regulations that would preclude public agencies from providing parents with this type of information Public agencies are encouraged to grant reasonable requests from parents for such information.

**Changes:** None

**Discussion:** The three criteria enumerated in the statute at section 614(d)(1)(B)(iv) describing the representative of the public agency who is a member of the IEP team are incorporated into Sec. 300 344(a)(4) of these final regulations. The statute should not be read to prohibit the public agency from designating another member of the IEP team to act as the public agency representative, if that individual meets the specified criteria for each role Therefore, a new paragraph (d) should be added to Sec 300.344 regarding a public agency's authority to designate another IEP team member as the public agency representative member of the IEP team, so long as the criteria in Sec 300 344(a)(4) are satisfied

**Changes:** Section 300 344 has been amended by adding a new paragraph (d), which authorizes a public agency to designate another IEP team member as the public agency representative, provided the criteria in Sec 300.344(a)(4) are satisfied

**Discussion:** Section 300.344(a)(5) essentially reflects the statutory requirement at section 614(d)(1)(B)(v), which requires the participation of an individual who is knowledgeable about the instructional implications of evaluation results, who may be another member of the IEP team. No further clarification should be provided since the statute specifically affords public agencies the flexibility to select another member of the IEP team to fulfill the requirement of Sec. 300.344(a)(5), provided that individual is knowledgeable about the instructional implications of evaluation results. Although commenters requested that the regulation be amended to require the participation of a member of the eligibility team who is knowledgeable about evaluation results to fulfill the requirement of Sec. 300.344(a)(5), there is no statutory authority to impose such a requirement, either for initial or subsequent IEP meetings However, it is expected that public agencies will find it helpful to have members of the eligibility team as IEP team members for initial and subsequent meetings to develop a child's IEP

**Changes:** None

**Discussion:** Section 300 344(a)(6) adopts verbatim the statutory language at section 614(d)(1)(B)(vi) of the Act Under this section, parents and public agencies have the discretion to bring to IEP meetings as IEP team members other individuals who have knowledge or special expertise regarding the child, including related services personnel, as appropriate. Under this statutory provision, the parent's and public agency's right to bring other individuals to the IEP meeting at their discretion must be exercised in a manner that ensures that all members of the IEP team have the knowledge or special expertise regarding the child to contribute meaningfully to the IEP team

Individuals with knowledge about the child could include neighbors or friends of the parents, or advocates, who, in the judgement of the parents, are able to advise or assist them at the meeting Individuals with special expertise could include professionals in evaluation or special education and related services who have been directly involved with the child, as well as those who do not know the child personally, but who have expertise in (for example) an instructional method or procedure, or in the provision of a related service that the parents or agency believe can be of assistance in developing an appropriate IEP for the child

There is no need to make the participation of school nurses on the IEP team mandatory, as requested by commenters As providers of the related service "school health services," their participation would be subject to the requirements of this section, and they could be members of the IEP team at the discretion of the parents or public agency, provided that they possess the requisite knowledge and special expertise regarding the child. The same is true of providers of speech-language and audiology services and individuals knowledgeable about the communication needs of students who are deaf or hard of hearing In the case of a child whose behavior impedes the learning of the child or that of others, the public agency is encouraged to have a person with special expertise in positive behavior interventions and strategies on the IEP team at the IEP meeting

Texas Education Agency - Special Education March 1999 111

Individuals such as representatives of PTIs may, at the parent's discretion, serve as members of the IEP team, provided they possess the requisite knowledge or expertise regarding the child.

Regarding attorneys participation at IEP meetings, it is important to note that a new statutory provision at section 615(i)(3)(D)(ii) provides that attorneys' fees may not be awarded for an IEP team meeting unless the meeting is convened as the result of an administrative proceeding or judicial action, or at the discretion of the State, for a mediation conducted prior to initiating a due process hearing under the Act. Issues raised related to attorneys' fees regarding IEP meetings are also addressed under Sec. 300 513 of this attachment and in Appendix A.

It is not necessary to require the participation of adults with disabilities on the IEP team. As is true of other related services personnel, as well as other individuals selected as IEP team members at the parent's or agency's discretion, an adult with a disability could be a member of an IEP team at the parent's or public agency's discretion if that individual possesses the requisite knowledge and expertise regarding the child

**Changes:** A new Sec. 300.344(c) has been added to clarify that "The determination of the knowledge or special expertise of any individual described in paragraph (a)(6) of this section shall be made by the parents or public agency who invited the individual to be a member of the IEP team."

**Discussion:** Section 300.344(a)(7) of these regulations adopts verbatim the statutory requirement at section 614(d)(1)(B)(vii) of the Act regarding the child's participation as a member of his or her IEP team, as appropriate. Consistent with this statutory requirement, public agencies must invite students to attend IEP meetings in appropriate situations.

No regulatory change deleting the reference to "if appropriate" should be made, as requested by commenters, since to do so would alter the explicit statutory provision limiting the student's participation in IEP meetings to appropriate situations. However, if a purpose of the meeting will be the consideration of a student's transition services needs or needed transition services or both, Sec. 300.344(b)(1) of these regulations would provide that the student must be invited to attend, because it is important to afford students an opportunity to participate and have a voice in planning for their transition from school to post-school activities, including postsecondary education and employment.

The change requested by commenters regarding the participation of a student over eighteen years of age as a member of their IEP team should not be made. Even if, under section 615(m) of the Act, all rights accorded parents under Part B transfer to students who have reached the age of majority under State law, ages of majority differ among States, and not all States regard age eighteen as the age at which parental rights transfer to children. In addition, under section 615(m) of the Act, there are circumstances in which parental rights accorded under Part B may not be transferred, even in a State that transfers rights at the State age of majority.

No change should be made regarding the commenters' concerns that students would be coerced into accepting instructional plans. It would be more appropriate to address these implementation issues at the State and local levels.

**Changes:** None

**Discussion:** Section 300.344(b)(1) of these regulations would require that a student of any age be invited to an IEP meeting if a purpose of the meeting is to meet a requirement of Sec. 300.347(b)(1) (transition services) of these regulations. If the student cannot attend, the public agency must take whatever steps are necessary to ensure that the student's preferences and interests are being considered. No further clarification should be provided since these steps necessarily will vary based on a variety of factors, including the needs of the student.

There is no need for clarification regarding interagency agreements, since Sec. 300.142 of these regulations already contains a requirement that agreements be in place between educational and noneducational public agencies to govern the provision and financing of all required services under these regulations, including transition services. There is no need to require the participation of advocates and transition coordinators at IEP meetings at which transition services needs or the statement of needed transition services is being discussed

**Changes:** None.

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300,
DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**3. What must public agencies do to meet the requirements at Secs. 300.344(a)(2) and 300.346(d) regarding the participation of a "regular education teacher" in the development, review, and revision of IEPs, for children aged 3 through 5 who are receiving preschool special education services?**

If a public agency provides "regular education" preschool services to non-disabled children, then the requirements of Secs 300 344(a)(2) and 300 346(d) apply as they do in the case of older children with disabilities If a public agency makes kindergarten available to nondisabled children, then a regular education kindergarten teacher could appropriately be the regular education teacher who would be a member of the IEP team, and, as appropriate, participate in IEP meetings, for a kindergarten-aged child who is, or may be, participating in the regular education environment

If a public agency does not provide *regular preschool education services to nondisabled children*, the agency could designate an individual who, under State standards, is qualified to serve nondisabled children of the same age.

Whether the child's regular education teacher must be physically present at an IEP meeting, and to what extent that individual must participate in all phases of the IEP process, are matters that must (1) be determined on a case-by-case basis by the public agency, the parents, and other members of the IEP team, and (2) be based on a variety of factors This issue is discussed in more detail in a question and answer contained in Appendix A to these final regulations. Since the statutory language is incorporated into this regulation verbatim, no changes should be made regarding the use of the term "regular education teacher," or the statutory language regarding the regular educational environment

***22. Who can serve as the representative of the public agency at an IEP meeting?***

The IEP team must include a representative of the public agency who: (a) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (b) is knowledgeable about the general curriculum, and (c) is knowledgeable about the availability of resources of the public agency (Sec. 300.344(a)(4)).

Each public agency may determine which specific staff member will serve as the agency representative in a particular IEP meeting, so long as the individual meets these requirements. It is important, however, that the agency representative have the authority to commit agency resources and be able to ensure that whatever services are set out in the IEP will actually be provided

A public agency may designate another public agency member of the IEP team to also serve as the agency representative, so long as that individual meets the requirements of Sec. 300 344(a)(4).

Texas Education Agency - Special Education March 1999 113

114

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**23. For a child with a disability being considered for initial provision of special education and related services, which teacher or teachers should attend the IEP meeting?**

A child's IEP team must include at least one of the child's regular education teachers (if the child is, or may be participating in the regular education environment) and at least one of the child's special education teachers, or, if appropriate, at least one of the child's special education providers (Sec. 300.344(a)(2) and (3)).

Each IEP must include a statement of the present levels of educational performance, including a statement of how the child's disability affects the child's involvement and progress in the general curriculum (Sec. 300 347(a)(1)). At least one regular education teacher is a required member of the IEP team of a child who is, or may be, participating in the regular educational environment, regardless of the extent of that participation.

The requirements of Sec. 300.344(a)(3) can be met by either: (1) a special education teacher of the child; or (2) another special education provider of the child, such as a speech pathologist, physical or occupational therapist, etc., if the related service consists of specially designed instruction and is considered special education under applicable State standards.

Sometimes more than one meeting is necessary in order to finalize a child's IEP. In this process, if the special education teacher or special education provider who will be working with the child is identified, it would be useful to have that teacher or provider participate in the meeting with the parents and other members of the IEP team in finalizing the IEP. If this is not possible, the public agency must ensure that the teacher or provider has access to the child's IEP as soon as possible after it is finalized and before beginning to work with the child.

Further, (consistent with Sec. 300.342(b)), the public agency must ensure that each regular education teacher, special education teacher, related services provider and other service provider of an eligible child under this part (1) has access to the child's IEP, and (2) is informed of his or her specific responsibilities related to implementing the IEP, and of the specific accommodations, modifications, and supports that must be provided to the child in accordance with the IEP. This requirement is crucial to ensuring that each child receives FAPE in accordance with his or her IEP, and that the IEP is appropriately and effectively implemented.

**24. What is the role of a regular education teacher in the development, review and revision of the IEP for a child who is, or may be, participating in the regular education environment?**

As required by Sec. 300.344(a)(2), the IEP team for a child with a disability must include at least one regular education teacher of the child if the child is, or may be, participating in the regular education environment. Section 300.346(d) further specifies that the regular education teacher of a child with a disability, as a member of the IEP team, must, to the extent appropriate, participate in the development, review, and revision of the child's IEP, including assisting in--(1) the determination of appropriate positive behavioral interventions and strategies for the child; and (2) the determination of supplementary aids and services, program modifications, and supports for school personnel that will be provided for the child, consistent with 300.347(a)(3) (Sec. 300.344(d)).

Thus, while a regular education teacher must be a member of the IEP team if the child is, or may be, participating in the regular education environment, the teacher need not (depending upon the child's needs and the purpose of the specific IEP team meeting) be required to participate in all decisions made as part of the meeting or to be present throughout the entire meeting or attend every meeting. For example, the regular education teacher who is a member of the IEP team must participate in discussions and decisions about how to modify the general curriculum in the regular classroom to ensure the child's involvement and progress in the general curriculum and participation in the regular education environment.

Depending upon the specific circumstances, however, it may not be necessary for the regular education teacher to participate in discussions and decisions regarding, for example, the physical therapy needs of the child, if the teacher is not responsible for implementing that portion of the child's IEP.

In determining the extent of the regular education teacher's participation at IEP meetings, public agencies and parents should discuss and try to reach agreement on whether the child's regular education teacher that is a member of the IEP team should be present at a particular IEP meeting and, if so, for what period of time. The extent to which it would be appropriate for the regular education teacher member of the IEP team to participate in IEP meetings must be decided on a case-by-case basis

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND ..IANGES (from the Analysis of Comments), APPENDIX A T( ,RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**25. If a child with a disability attends several regular classes, must all of the child's regular education teachers be members of the child's IEP team?**

No The IEP team need not include more than one regular education teacher of the child. If the participation of more than one regular education teacher would be beneficial to the child's success in school (e g., in terms of enhancing the child's participation in the general curriculum), it would be appropriate for them to attend the meeting

**26. How should a public agency determine which regular education teacher and special education teacher will be members of the IEP team for a particular child with a disability?**

The regular education teacher who serves as a member of a child's IEP team should be a teacher who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions about how best to teach the child

If the child has more than one regular education teacher responsible for carrying out a portion of the IEP, the LEA may designate which teacher or teachers will serve as IEP team member(s), taking into account the best interest of the child

In a situation in which not all of the child's regular education teachers are members of the child's IEP team, the LEA is strongly encouraged to seek input from the teachers who will not be attending In addition, (consistent with Sec. 300 342(b)), the LEA must ensure that each regular education teacher (as well as each special education teacher, related services provider, and other service provider) of an eligible child under this part (1) has access to the child's IEP, and (2) is informed of his or her specific responsibilities related to implementing the IEP, and of the specific accommodations, modifications and supports that must be provided to the child in accordance with the IEP

In the case of a child whose behavior impedes the learning of the child or others, the LEA is encouraged to have a regular education teacher or other person knowledgeable about positive behavior strategies at the IEP meeting. This is especially important if the regular education teacher is expected to carry out portions of the IEP.

Similarly, the special education teacher or provider of the child who is a member of the child's IEP team should be the person who is, or will be, responsible for implementing the IEP. If, for example, the child's disability is a speech impairment, the special education teacher on the IEP team could be the speech-language pathologist

**27. For a child whose primary disability is a speech impairment, may a public agency meet its responsibility under Sec. 300.344(a)(3) to ensure that the IEP team includes "at least one special education teacher, or, if appropriate, at least one special education provider of the child" by including a speech-language pathologist on the IEP team?**

Yes, if speech is considered special education under State standards. As with other children with disabilities, the IEP team must also include at least one of the child's regular education teachers if the child is, or may be, participating in the regular education environment

**28. Do parents and public agencies have the option of inviting any individual of their choice be participants on their child's IEP team?**

The IEP team may, at the discretion of the parent or the agency, include "other individuals who have knowledge or special expertise regarding the child * * *" (Sec. 300.344(a)(6), italics added). Under Sec. 300.344(a)(6), these individuals are members of the IEP team This is a change from prior law, which provided, without qualification, that parents or agencies could have other individuals as members of the IEP team at the discretion of the parents or agency.
Under Sec. 300 344(c), the determination as to whether an individual has knowledge or special expertise, within the meaning of Sec 300 344(a)(6), shall be made by the parent or public agency who has invited the individual to be a member of the IEP team

Part B does not provide for including individuals such as representatives of teacher organizations as part of an IEP team, unless they are included because of knowledge or special expertise regarding the child. (Because a representative of a teacher organization would generally be concerned with the interests of the teacher rather than the interests of the child, and generally would not possess knowledge or expertise regarding the child, it generally would be inappropriate for such an official to be a member of the IEP team or to otherwise participate in an IEP meeting.)

Texas Education Agency - Special Education March 1999 115

116

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**29. Can parents or public agencies bring their attorneys to IEP meetings, and, if so under what circumstances? Are attorney's fees available for parents' attorneys if the parents are prevailing parties in actions or proceedings brought under Part B?**

Section 300.344(a)(6) authorizes the addition to the IEP team of other individuals at the discretion of the parent or the public agency only if those other individuals have knowledge or special expertise regarding the child. The determination of whether an attorney possesses knowledge or special expertise regarding the child would have to be made on a case-by-case basis by the parent or public agency inviting the attorney to be a member of the team.

The presence of the agency's attorney could contribute to a potentially adversarial atmosphere at the meeting. The same is true with regard to the presence of an attorney accompanying the parents at the IEP meeting. Even if the attorney possessed knowledge or special expertise regarding the child (Sec. 300.344(a)(6)), an attorney's presence would have the potential for creating an adversarial atmosphere that would not necessarily be in the best interests of the child.

Therefore, the attendance of attorneys at IEP meetings should be strongly discouraged. Further, as specified in Section 615(i)(3)(D)(ii) of the Act and Sec. 300.513(c)(2)(ii), Attorneys' fees may not be awarded relating to any meeting of the IEP team unless the meeting is convened as a result of an administrative proceeding or judicial action, or, at the discretion of the State, for a mediation conducted prior to the request for a due process hearing.

**30. Must related services personnel attend IEP meetings?**

Although Part B does not expressly require that the IEP team include related services personnel as part of the IEP team (Sec. 300 344(a)), it is appropriate for those persons to be included if a particular related service is to be discussed as part of the IEP meeting. Section 300.344(a)(6) provides that the IEP team also includes "at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, *including related services personnel* as appropriate. * * *" (Italics added.)

Further, Sec. 300.344(a)(3) requires that the IEP team for each child with a disability include "at least one special education teacher, or, if appropriate, at least one special education provider of the child * * *" This requirement can be met by the participation of either (1) a special education teacher of the child, or (2) another special education provider such as a speech-language pathologist, physical or occupational therapist, etc., if the related service consists of specially designed instruction and is considered special education under the applicable State standard.

If a child with a disability has an identified need for related services, it would be appropriate for the related services personnel to attend the meeting or otherwise be involved in developing the IEP. As explained in the Committee Reports on the IDEA Amendments of 1997, "Related services personnel should be included on the team when a particular related service will be discussed at the request of the child's parents or the school." (H. Rep. No. 105-95, p. 103 (1997); S. Rep. No. 105-17, p. 23 (1997)). For example, if the child's evaluation indicates the need for a specific related service (e.g., physical therapy, occupational therapy, special transportation services, school social work services, school health services, or counseling), the agency should ensure that a qualified provider of that service either (1) attends the IEP meeting, or (2) provides a written recommendation concerning the nature, frequency, and amount of service to be provided to the child. This written recommendation could be a part of the evaluation report.

A public agency must ensure that all individuals who are necessary to develop an IEP that will meet the child's unique needs, and ensure the provision of FAPE to the child, participate in the child's IEP meeting.

**37. Can the IEP team also function as the group making the placement decision for a child with a disability?**

Yes, a public agency may use the IEP team to make the placement decision for a child, so long as the group making the placement decision meets the requirements of Secs. 300.552 and 300.501(c), which requires that the placement decision be made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options.

Texas Education Agency - Special Education March 1999

Case 1:02-cv-00207 Document 5 Filed in TXSD on 11/04/2002 Page 58 of 148

..:W IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND C. .IGES (from the Analysis of Comments), APPENDIX A TO F ; 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.345 Parent participation.**

(a) Public agency responsibility--general Each public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate, including--

(1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend, and

(2) Scheduling the meeting at a mutually agreed on time and place

(b) Information provided to parents. (1) The notice required under paragraph (a)(1) of this section must--

(i) Indicate the purpose, time, and location of the meeting and who will be in attendance; and

(ii) Inform the parents of the provisions in Sec 300 344(a)(6) and (c) (relating to the participation of other individuals on the IEP team who have knowledge or special expertise about the child).

(2) For a student with a disability beginning at age 14, or younger, if appropriate, the notice must also--

(i) Indicate that a purpose of the meeting will be the development of a statement of the transition services needs of the student required in Sec. 300 347(b)(1), and

(ii) Indicate that the agency will invite the student

(3) For a student with a disability beginning at age 16, or younger, if appropriate, the notice must--

(i) Indicate that a purpose of the meeting is the consideration of needed transition services for the student required in Sec. 300 347(b)(2),

(ii) Indicate that the agency will invite the student; and

(iii) Identify any other agency that will be invited to send a representative

**Discussion:** The "notice" requirement in Sec. 300 345(a) of these final regulations implements provisions under prior regulations that were not changed by the IDEA Amendments of 1997, and, therefore, does not need to be revised with respect to the comments received. This requirement is a long-standing provision that is intended mainly to inform parents about the IEP meeting and provide them with relevant information about it (e g , the purpose, time, and place of the meeting, and who will be in attendance). The requirement is not the same as the prior notice provision in Sec. 300 503 (which requires written notice to parents whenever the public agency proposes, or refuses, to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child)

In implementing Sec 300.345(a), some LEAs elect to contact parents by telephone or to send less formal notes about IEP meeting arrangements than would be required under Sec 300.503. These approaches are consistent with the long-standing regulatory requirement. With respect to Sec 300.345(a)(1) (i.e., notifying parents early enough of the meeting to ensure that they will have an opportunity to attend), there is no information to justify replacing the term "early enough" with a specified timeline. Because communicating with parents about IEP meeting arrangements is generally a less formal process than the procedures required by certain other provisions in this part, the use of timelines could have a negative effect.

The key factor in Sec. 300.345(a) is that public agencies effectively communicate with parents about the up-coming IEP meeting, and attempt to arrange a mutually agreed upon time and place for the meeting. This process should accommodate the parents' work schedules to ensure that one or both parents are afforded the opportunity to participate.

The commenter's request that the public agency provide parents with a copy of the IEP 10 days before the meeting is inconsistent with the requirements of this part, which requires that the IEP be developed at the IEP meeting. However, to the extent that preliminary information is available in the agency that may affect discussions and decisions at the meeting related to their child's IEP, it is expected that the information would be provided to the parents sufficiently in advance of the meeting so that they can participate meaningfully in those discussions and decisions on an equal footing with other members of the IEP team. It is not necessary to set out a specific timeline for this information to be provided

**Changes:** None.

**Discussion:** It is important for parents of children with disabilities to be aware that, under the provisions of Sec 300 344(a)(6) and (c), other individuals may be included on their child's IEP team, provided that the individuals have knowledge or special expertise regarding the child (see discussion under Sec. 300.344 of this analysis). To ensure that parents know about those provisions, public agencies should be required to include information about the provisions in the notice of IEP meetings specified under Sec. 300.345(a)(1) and (b)(1)(ii).

**Changes:** Section 300.345(b) has been amended to provide that the notice required under Sec. 300 345(b) must "inform the parents of the provisions in Sec. 300.344(a)(6) and (c) (relating to the participation of other individuals on the IEP team who have knowledge or special expertise about the child) "

**Discussion:** Section 300 345(d) is a longstanding provision that is intended to enable a public agency to proceed to conduct an IEP meeting if neither parent elects to attend, after repeated attempts by the public agency to ensure their participation. In administering and monitoring the provisions of this part over the past 22 years, few, if any, questions or concerns have been identified, or raised, with respect to the implementation of Sec. 300.345(d), and there is no information to justify amending the paragraph at this time, either with respect to the word "convince" or the reference to maintaining records of efforts to involve the parents.

The regulation makes it clear that paragraphs (d)(1) through (d)(3) of this section are examples of what a public agency "may do" to maintain a record of its attempts to arrange a mutually agreed on time and place for conducting an IEP meeting. Public agencies are not required to go to the parent's place of employment to attempt to seek the parents' involvement in their child's IEP; and it is expected that a public agency would pursue that option very judiciously However, there may be situations in which the agency believes that it is important to do so because it is otherwise unable to contact the parent. Implementation of this specific provision is left to the discretion of each public agency In any case in which the agency is unable to contact the parents or otherwise ensure their participation, Sec. 300 345(d) sets out options that the agency may elect to follow.

**Changes:** None

Texas Education Agency - Special Education March 1999 117

118

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(c) Other methods to ensure parent participation If neither parent can attend, the public agency shall use other methods to ensure parent participation, including individual or conference telephone calls

(d) Conducting an IEP meeting without a parent in attendance. A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend In this case the public agency must have a record of its attempts to arrange a mutually agreed on time and place, such as--

(1) Detailed records of telephone calls made or attempted and the results of those calls;

(2) Copies of correspondence sent to the parents and any responses received; and

(3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

(e) Use of interpreters or other action, as appropriate. The public agency shall take whatever action is necessary to ensure that the parent understands the proceedings at the IEP meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English.

(f) Parent copy of child's IEP. The public agency shall give the parent a copy of the child's IEP at no cost to the parent.

(Authority: 20 U.S.C. 1414(d)(1)(B)(i))

**Discussion:** The new statute has given parents a more active voice in the education of their children with disabilities than existed under prior law. Because of the role parents play in the development, review, and revision of their child's IEP, it is appropriate to amend the regulation to require that each public agency must give the parents a copy of their child's IEP at no cost to the parents

**Changes:** Section 300 345(f) has been amended consistent with the above discussion

**II. Involvement of Parents and Students**

The Congressional Committee Reports on the IDEA Amendments of 1997 express the view that the Amendments provide an opportunity for strengthening the role of parents, and emphasize that one of the purposes of the Amendments is to expand opportunities for parents and key public agency staff (e g , special education, related services, regular education, and early intervention service providers, and other personnel) to work in new partnerships at both the State and local levels (H. Rep 105-95, p 82 (1997), S Rep No 105-17, p 4 and 5 (1997)). Accordingly, the IDEA Amendments of 1997 require that parents have an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of FAPE to the child (Sec 300 501(a)(2)) Thus, parents must now be part of: (1) the group that determines what additional data are needed as part of an evaluation of their child (Sec 300.533(a)(1)); (2) the team that determines their child's eligibility (Sec. 300.534(a)(1)); and (3) the group that makes decisions on the educational placement of their child (Sec. 300.501(c)).

In addition, the concerns of parents and the information that they provide regarding their children must be considered in developing and reviewing their children's IEPs (Secs. 300.343(c)(iii) and 300.346(a)(1)(i) and (b)); and the requirements for keeping parents informed about the educational progress of their children, particularly as it relates to their progress in the general curriculum, have been strengthened (Sec 300.347(a)(7)).

The IDEA Amendments of 1997 also contain provisions that greatly strengthen the involvement of students with disabilities in decisions regarding their own futures, to facilitate movement from school to post-school activities. For example, those amendments (1) retained, essentially verbatim, the "transition services" requirements from the IDEA Amendments of 1990 (which provide that a statement of needed transition services must be in the IEP of each student with a disability, beginning no later than age 16); and (2) significantly expanded those provisions by adding a new annual requirement for the IEP to include "transition planning" activities for students beginning at age 14. (See section IV of this appendix for a description of the transition services requirements and definition )

With respect to student involvement in decisions regarding transition services, Sec. 300.344(b) provides that (1) "the public agency shall invite a student with a disability of any age to attend his or her IEP meeting if a purpose of the meeting will be the consideration of--(i) The student's transition services needs under Sec. 300.347(b)(1); or (ii) The needed transition services for the student under Sec. 300.347(b)(2); or (iii) Both;" and (2) "If the student does not attend the IEP meeting, the public agency shall take other steps to ensure that the student's preferences and interests are considered." (Sec. 300.344(b)(2)).

The IDEA Amendments of 1997 also give States the authority to elect to transfer the rights accorded to parents under Part B to each student with a disability upon reaching the age of majority under State law (if the student has not been determined incompetent under State law) (Sec. 300.517). (Part B requires that if the rights transfer to the student, the public agency must provide any notice required under Part B to both the student and the parents.) If the State elects to provide for the transfer of rights from the parents to the student at the age of majority, the IEP must, beginning at least one year before a student reaches the age of majority under State law, include a statement that the student has been informed of any rights that will transfer to him or her upon reaching the age of majority. (Sec. 300 347(c)).

The IDEA Amendments of 1997 also permit, but do not require, States to establish a procedure for appointing the parent, or another appropriate individual if the parent is not available, to represent the educational interests of a student with a disability who has reached the age of majority under State law and has not been determined to be incompetent, but who is determined not to have the ability to provide informed consent with respect to his or her educational program.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND .ANGES (from the Analysis of Comments), APPENDIX A T( .RT 300,
DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**5. What is the role of the parents, including surrogate parents, in decisions regarding the educational program of their children?**

The parents of a child with a disability are expected to be equal participants along with school personnel, in developing, reviewing, and revising the IEP for their child This is an active role in which the parents (1) provide critical information regarding the strengths of their child and express their concerns for enhancing the education of their child; (2) participate in discussions about the child's need for special education and related services and supplementary aids and services; and (3) join with the other participants in deciding how the child will be involved and progress in the general curriculum and participate in State and district-wide assessments, and what services the agency will provide to the child and in what setting

As previously noted in the Introduction to section II of this Appendix, Part B specifically provides that parents of children with disabilities--

- Have an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of their child, and the provision of FAPE to the child (including IEP meetings) (Secs. 300 501(b), 300 344(a)(1), and 300 517;
- Be part of the groups that determine what additional data are needed as part of an evaluation of their child (Sec. 300 533(a)(1)), and determine their child's eligibility (Sec. 300 534(a)(1)) and educational placement (Sec. 300.501(c)),
- Have their concerns and the information that they provide regarding their child considered in developing and reviewing their child's IEPs (Secs. 300 343(c)(iii) and 300 346(a)(1)(i) and (b)); and
- Be regularly informed (by such means as periodic report cards), as specified in their child's IEP, at least as often as parents are informed of their nondisabled children's progress, of their child's progress toward the annual goals in the IEP and the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year (Sec 300 347(a)(7))

A surrogate parent is a person appointed to represent the interests of a child with a disability in the educational decision-making process when no parent (as defined at Sec. 300.20) is known, the agency, after reasonable efforts, cannot locate the child's parents, or the child is a ward of the State under the laws of the State. A surrogate parent has all of the rights and responsibilities of a parent under Part B (Sec 300 515 )

**6. What are the Part B requirements regarding the participation of a student (child) with a disability in an IEP meeting?**

If a purpose of an IEP meeting for a student with a disability will be the consideration of the student's transition services needs or needed transition services under Sec. 300.347(b)(1) or (2), or both, the public agency must invite the student and, as part of the notification to the parents of the IEP meeting, inform the parents that the agency will invite the student to the IEP meeting If the student does not attend, the public agency must take other steps to ensure that the student's preferences and interests are considered (See Sec. 300 344(b)).

Section Sec 300.517 permits, but does not require, States to transfer procedural rights under Part B from the parents to students with disabilities who reach the age of majority under State law, if they have not been determined to be incompetent under State law If those rights are to be transferred from the parents to the student, the public agency would be required to ensure that the student has the right to participate in IEP meetings set forth for parents in Sec 300.345. However, at the discretion of the student or the public agency, the parents also could attend IEP meetings as "* * * individuals who have knowledge or special expertise regarding the child * * *" (see Sec 300 344(a)(6)).

In other circumstances, a child with a disability may attend "if appropriate " (Sec 300 344(a)(7)) Generally, a child with a disability should attend the IEP meeting if the parent decides that it is appropriate for the child to do so If possible, the agency and parents should discuss the appropriateness of the child's participation before a decision is made, in order to help the parents determine whether or not the child's attendance would be (1) helpful in developing the IEP or (2) directly beneficial to the child or both The agency should inform the parents before each IEP meeting--as part of notification under Sec 300 345(a)(1)–that they may invite their child to participate

Texas Education Agency - Special Education March 1999 119

120

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND C..ANGES (from the Analysis of Comments), APPENDIX A TC .RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**7. Must the public agency inform the parents of who will be at the IEP meeting?**

Yes. In notifying parents about the meeting, the agency "must indicate the purpose, time, and location of the meeting, and who will be in attendance " (Sec 300 345(b), italics added.) In addition, if a purpose of the IEP meeting will be the consideration of a student's transition services needs or needed transition services under Sec. 300.347(b)(1) or (2) or both, the notice must also inform the parents that the agency is inviting the student, and identify any other agency that will be invited to send a representative.

The public agency also must inform the parents of the right of the parents and the agency to invite other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate to be members of the IEP team (Sec. 300.345(b)(1)(ii).)

It also may be appropriate for the agency to ask the parents to inform the agency of any individuals the parents will be bringing to the meeting. Parents are encouraged to let the agency know whom they intend to bring. Such cooperation can facilitate arrangements for the meeting, and help ensure a productive, child-centered meeting.

**8. Do parents have the right to a copy of their child's IEP?**

Yes. Section 300.345(f) states that the public agency shall give the parent a copy of the IEP at no cost to the parent.

**21. May IEP meetings be audio- or video-tape-recorded?**

Part B does not address the use of audio or video recording devices at IEP meetings, and no other Federal statute either authorizes or prohibits the recording of an IEP meeting by either a parent or a school official. Therefore, an SEA or public agency has the option to require, prohibit, limit, or otherwise regulate the use of recording devices at IEP meetings.

If a public agency has a policy that prohibits or limits the use of recording devices at IEP meetings, that policy must provide for exceptions if they are necessary to ensure that the parent understands the IEP or the IEP process or to implement other parental rights guaranteed under Part B. An SEA or school district that adopts a rule regulating the tape recording of IEP meetings also should ensure that it is uniformly applied.

Any recording of an IEP meeting that is maintained by the public agency is an "education record," within the meaning of the Family Educational Rights and Privacy Act ("FERPA"; 20 U.S.C. 1232g), and would, therefore, be subject to the confidentiality requirements of the regulations under both FERPA (34 CFR part 99) and part B (Secs. 300.560-300.575).

Parents wishing to use audio or video recording devices at IEP meetings should consult State or local policies for further guidance

Texas Education Agency - Special Education March 1999

**Sec. 300.346 Development, review, and revision of IEP.**

(a) Development of IEP (1) General In developing each child's IEP, the IEP team, shall consider--

(i) The strengths of the child and the concerns of the parents for enhancing the education of their child,

(ii) The results of the initial or most recent evaluation of the child, and

(iii) As appropriate, the results of the child's performance on any general State or district-wide assessment programs

(2) Consideration of special factors The IEP team also shall--

(i) In the case of a child whose behavior impedes his or her learning or that of others, consider, if appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior,

(ii) In the case of a child with limited English proficiency, consider the language needs of the child as those needs relate to the child's IEP,

(iii) In the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the IEP team determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media (including an evaluation of the child's future needs for instruction in Braille or the use of Braille), that instruction in Braille or the use of Braille is not appropriate for the child;

(iv) Consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode, and

(v) Consider whether the child requires assistive technology devices and services

**Discussion:** Section 300 346(a)(1) adopts the statutory requirements related to considering the strengths of the child and the concerns of the parents No examples regarding this provision have been incorporated into these final regulations, since these determinations would differ for each student, based on a variety of unique factors in light of the abilities and needs of the parents and children involved Because the requirement to "consider" the strengths of the child and the concerns of the parent, as well as the special factors, is statutory, a word other than "consider" should not be substituted The requirements in paragraph (a)(1) and (a)(2) of this section impose an affirmative obligation on the IEP team to ensure that the child's IEP reflects those considerations

Paragraph (c) of this section also makes clear that if the IEP team determines, through consideration of special factors, that a child requires a particular service, intervention, or program modification, a statement to this effect must be included in the child's IEP Therefore, no further clarification is necessary Because the requirements in Sec. 300.346(a) are evident from the text of this regulation, there is no need to retain Note 1 to this section of the NPRM in these final regulations.

Section 300 346(a)(1)(ii) also requires consideration of the results of the initial or most recent evaluation of the child, and this consideration must include, as appropriate, a review of valid evaluation data and the observed needs of the child resulting from the evaluation process Because Pub L. 105-17 strengthens collaboration between the IEP and evaluation processes, it is expected that this consideration will occur, as appropriate, through examination of existing evaluation data. Therefore, the commenters' concern that separate or expansive evaluation procedures would be required is not warranted

The commenters' suggestion regarding the IEP team's consideration of the child's performance results on any State and district-wide assessment programs is consistent with the emphasis in the Act on the importance of ensuring that children with disabilities participate in the general curriculum and are expected to meet high achievement standards. Effective IEP development is central to helping these children meet these high standards Section 612(a)(17) of the Act and Sec 300 138 of these regulations require, as conditions for receipt of IDEA funds, that States ensure that children with disabilities are included in general State and district-wide assessment programs, with appropriate accommodations where necessary, and must report the performance results of these children on such assessments Therefore, Sec 300 346(a)(1) should be amended by adding paragraph (iii) to require that in considering the results of the initial or most recent evaluation of the child, the IEP team also consider, as appropriate, the results of the child's performance on any general State or district-wide assessment programs

**Changes:** Section 300 346(a)(1) has been amended by adding paragraph (iii) to provide that, in considering the child's initial or most recent evaluation, the IEP team also consider, as appropriate, the results of the child's performance on any general State or district-wide assessment programs Note 1 to this section of the NPRM has been removed.

**Discussion:** Paragraph (a)(2) of this section (relating to consideration of special factors) implements the new statutory requirement in section 614(d)(3)(B) of the Act. It should be emphasized that, under prior law, IEP teams were required to consider these special factors in situations where such consideration was necessary to ensure the provision of FAPE to a particular child with a disability Therefore, this new statutory provision makes explicit what was inherent in each child's entitlement to FAPE under prior law.

Paragraph (a)(2)(i) of this section adopts the statutory requirement at section 614(d)(3)(B)(i) of the Act, that, in the case of a child whose behavior impedes his or her learning or that of others, the IEP team consider, if appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior. The commenters' concern that the retention of the words "if appropriate" would mean that the provision would be applied only in situations where a child exhibited dangerous behavior seems to ignore that school officials have powerful incentives to implement positive behavioral interventions, strategies and supports whenever behavior interferes with the important teaching and learning activities of school. Since the word "strategies" is used two times in the statutory provision, contrary to commenters' suggestion, the word strategies should not be deleted the second time it appears in this section

Although the commenters' suggestions that behavior may be exhibited that impedes learning due to a frustration over lack of services and that the IEP team needs to examine in and out-of-school behavior to develop interventions to sustain learning are extremely important, no clarification should be provided in these regulations, to avoid overregulation in this area It would be more appropriate to provide technical assistance on Sec 300 346(a)(2)(i) on an as needed basis, instead of developing general rules to which numerous exceptions would most likely apply The Department funds a number of research efforts in this area, as well as technical assistance providers Of course, in appropriate cases it might be helpful to all parties for the IEP to identify the circumstances or behaviors of others that may result in inappropriate behaviors by the child.

122

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND ...ANGES (from the Analysis of Comments), APPENDIX A TC .RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(b) Review and Revision of IEP In conducting a meeting to review, and, if appropriate, revise a child's IEP, the IEP team shall consider the factors described in paragraph (a) of this section

(c) Statement in IEP If, in considering the special factors described in paragraphs (a)(1) and (2) of this section, the IEP team determines that a child needs a particular device or service (including an intervention, accommodation, or other program modification) in order for the child to receive FAPE, the IEP team must include a statement to that effect in the child's IEP

(d) Requirement with respect to regular education teacher. The regular education teacher of a child with a disability, as a member of the IEP team, must, to the extent appropriate, participate in the development, review, and revision of the child's IEP, including assisting in the determination of--

(1) Appropriate positive behavioral interventions and strategies for the child; and

(2) Supplementary aids and services, program modifications or supports for school personnel that will be provided for the child, consistent with Sec 300.347(a)(3).

(e) Construction. Nothing in this section shall be construed to require the IEP team to include information under one component of a child's IEP that is already contained under another component of the child's IEP

(Authority: 20 U S.C. 1414(d)(3) and (4)(B) and (e))

Regarding what behavioral interventions and strategies can be used, and whether the use of aversive behavioral management strategies is prohibited under these regulations, the needs of the individual child are of paramount importance in determining the behavioral management strategies that are appropriate for inclusion in the child's IEP. In making these determinations, the primary focus must be on ensuring that the behavioral management strategies in the child's IEP reflect the Act's requirement for the use of positive behavioral interventions and strategies to address the behavior that impedes the learning of the child or that of other children.

It would not be appropriate for these regulations to require a specific plan between the teacher and parent, as described by commenters, that would specify consequences for a student's failure to comply with a behavioral intervention plan. A child's need for this type of plan, and the specific elements of that plan, would vary depending on the child and the behavior involved. Of course, in appropriate circumstances, the IEP team which includes the child's parents, might agree upon a behavioral intervention plan that included specific regular or alternative disciplinary measures that would result from particular infractions of school rules.

Parents who disagree with the behavioral interventions and strategies included in their child's IEP can utilize the Act's procedural safeguard requirements, which afford them the right to request an impartial due process hearing under Sec. 300.507 and the option to use mediation under Sec. 300.506 of these regulations.

**Changes:** None.

**Discussion:** Section 300.346(a)(2)(ii) of these regulations adopts verbatim the statutory requirement at section 614(d)(3)(B)(ii) of the Act, that in the case of a child with limited English proficiency, the IEP team consider the language needs of the child as such needs relate to the child's IEP. Modifications to this paragraph that would involve changes to statutory language should not be made.

Issues such as the extent to which a LEP child with a disability receives instruction in English or the child's native language, the extent to which a LEP child with a disability can participate in the general curriculum, or whether English language tutoring is a service that must be included in a child's IEP, are determinations that must be made on an individual basis by the members of a child's IEP team.

In light of the general decision to remove all notes, Note 3 has been removed. However, in developing an IEP for a LEP child with a disability, it is particularly important that the IEP team consider how the child's level of English language proficiency affects the special education and related services that the child needs in order to receive FAPE, consistent with Sec. 300.346(a)(2)(ii) and (c). Under Title VI of the Civil Rights Act of 1964, school districts are required to provide LEP children with alternative language services to enable them to acquire proficiency in English and to provide them with meaningful access to the content of the educational curriculum that is available to all students, including special education and related services.

A LEP child with a disability may require special education and related services for those aspects of the educational program which address the development of English language skills and other aspects of the child's educational program. For a LEP child with a disability, under paragraph (c) of this section, the IEP must address whether the special education and related services that the child needs will be provided in a language other than English.

**Changes:** Note 3 has been removed.

**Discussion:** Section 300.346(a)(2)(iii) of these final regulations adopts verbatim the statutory language at section 614(d)(3)(B)(iii) of the Act. Under this requirement, in the case of a child who is blind or visually impaired, the IEP team must make provision for instruction in Braille and the use of Braille, unless the IEP team determines, after the evaluations described in the statutory provision, that instruction in Braille or the use of Braille is not appropriate for the child. Changes to statutory language requested by commenters should not be made.

Contrary to a suggestion of commenters, a regulatory provision making it mandatory for Braille to be taught to every child who is legally blind would contravene the individually-oriented focus of the Act, as well as the statutory requirement that the IEP team must make individual determinations for each child who is blind or visually impaired based on relevant evaluation data. As explained in OSEP Memorandum 96-4, Policy Guidance on Educating Blind and Visually Impaired Students, the IEP team's determination as to whether a child who is blind or visually impaired receives instruction in Braille or the use of Braille cannot be based on factors such as availability of alternative reading media, such as large print, recorded materials, or computers with speech output.

Texas Education Agency - Special Education

March 1999

Additionally, although these regulations do not specify that a child for whom Braille instruction is determined appropriate must receive Braille materials at the same time they are provided to their sighted peers, once the IEP team determines that a child requires instruction in Braille, such instruction, along with other aspects of the child's IEP, must be implemented as soon as possible following the child's IEP meeting, and in any case, without undue delay If there is disagreement between the parents and school district over what constitutes an appropriate program for a child who is blind or visually impaired, when the IEP team has determined that instruction in Braille would not be appropriate for the child, the parents of the child would have the right to request a due process hearing and mediation In addition, parents have available to them mediation and complaint resolution by which they can file a complaint with the SEA under the State complaint procedures in these regulations

Although the LEA would not be required to provide instruction in Braille while the dispute is being resolved, the LEA would be required, both by Part B and Section 504, to ensure that the child receives instructional materials in an alternative medium to enable the child to participate in the LEA's program

The OSEP Policy Guidance on Educating Blind and Visually Impaired students should not be included in these final regulations since many of the statutory and regulatory provisions cited in the policy guidance have been replaced by the requirements of Pub L 105-17 In some important respects, particularly with regard to consideration of instruction in Braille, Pub. L. 105-17 substantially revised the requirements of prior law It also should be pointed out that Note 2 to this section of the NPRM, which contained a reference to corresponding policy guidance regarding educating deaf students, is being removed as a note, and pertinent references to that policy guidance are incorporated into the discussion of Sec. 300 346(a)(2)(iv).

**Changes:** None

**Discussion:** Section 300 346(a)(2)(iv) of these regulations adopts verbatim the statutory requirement in section 614(d)(3)(B)(iv) of the Act that the IEP team consider the communication needs of the child, and, in the case of a child who is deaf or hard of hearing, those additional special factors relating to the child's language and communication needs. Additional guidance in the form of changes to the regulations requested by commenters should not be provided.

In the interest of not using notes in these final regulations, Note 2 to this section of the NPRM should be removed It is important to emphasize that this policy guidance on Deaf Students Educational Services merely interprets existing statutory and regulatory requirements, and does not impose new requirements on the public Nevertheless, LEAs are not relieved of their responsibilities to ensure that paragraph (a)(2)(iv) of this section is implemented consistent with the published policy guidance on Deaf Students Education Services, and that the full range of communication and related needs of deaf and hard of hearing students are appropriately addressed in evaluation, IEP, and placement decisions under these regulations

The Senate and House Committee Reports on Pub L. 105-17 reinforce this principle in their statements that "the IEP team should implement the [new statutory] provision in a manner consistent with the policy guidance entitled "Deaf Students Education Services" published in the Federal Register (57 FR 49274, October 30, 1992) by the Department." S Rep No 105-17, p 25., H R Rep No. 105-95, p 104 (1997) The Department fully expects LEAs to ensure that Sec. 300.346(a)(2)(iv) of these regulations is implemented consistent with these statements

**Changes:** Note 2 has been removed.

124

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Discussion:** Section 300.346(a)(2)(v) of these regulations adopts verbatim the new statutory requirement at section 614(d)(b)(3)(v) of the Act, making it mandatory for the IEP team to consider each child's AT needs. This statutory provision reinforces the requirement in Sec. 300 308 of these regulations that if an IEP team determines that a disabled child requires an AT device or service in order to receive FAPE, the required AT must be provided at no cost to the parents. In all instances, the IEP team must determine whether an individual disabled child should receive AT, and if so, the nature and extent of AT provided to the child.

Because in many situations, parents were reporting that LEAs were not properly considering their children's AT needs on an individual basis, this new provision should ensure that each child's IEP team considers the child's need for AT. Since IEP teams must consider each child's need for AT on an individual basis, determinations regarding the provision of AT must be made when the child's IEP for the upcoming school year is finalized so that the AT can be implemented with that IEP at the beginning of the next school year.

In the interest of not adding paperwork burdens to these regulations, there is no additional requirement that LEAs document that the IEP team considered a child's AT needs, or considered a child's AT needs and determined that AT not be provided to the child. It is not necessary to add the clarification regarding the importance of reflecting a child's AT needs in IEP goals and objectives or in issues relating to the child's participation in the general curriculum.

All of needs identified through consideration of the special factors contained in paragraph (a)(2) of this section must be reflected in the contents of the child's IEP, including, as appropriate, the instructional program and services provided to the child, the annual goals, and the child's involvement in and progress in the general curriculum. In addition, individual consideration of a child's AT needs is essential to ensuring that the child's unique needs arising from his or her disability are appropriately addressed so that the child can be involved in and progress in the general curriculum.

Issues regarding whether AT devices or services can be used at home, and issues regarding liability for family-owned AT devices used at school are addressed either in discussions of Secs. 300.5-300.6 or 300.308 of the attachment, and, as appropriate, are reflected in changes to those regulations.

**Changes:** None.

**Discussion:** While the concerns expressed by these commenters are extremely important, no regulatory changes should be made. Consideration of the five specific factors outlined in the statute and these regulations, of necessity, will require consideration of information from a variety of sources, and Sec. 300.346(c) of these regulations also requires that such consideration be reflected in the contents of a child's IEP. In addition, it is not necessary to add a provision to clarify that all children with disabilities must receive services listed in their IEPs. This requirement is already reflected in Sec. 300.350 of these regulations, which provides that each child with a disability must receive special education and related services in accordance with an IEP.

**Changes:** None.

**Discussion:** With respect to Sec. 300.346(d)(2), including the statement relating to supports for school personnel, it is critical that those determinations are "consistent with Sec. 300.347(a)(3)." Section 300.347(a)(3) makes clear that the focus of the supports is to assist the child to advance appropriately toward (for example) attaining the annual goals, and to be involved in and progress in the general education curriculum. Therefore, while certain supports for school staff may be provided (such as specific training in the effective integration of children with disabilities in regular classes), the ultimate focus of those supports to school personnel is to ensure the provision of FAPE to children with disabilities under Part B, their integration with nondisabled peers and their participation and involvement in the general curriculum, as appropriate. Consistent with the Act's emphasis on ensuring the provision of FAPE to children with disabilities, and, to the maximum extent appropriate, educating those children in regular classes with nondisabled children with appropriate supplementary aids and services, it is critical that at least one regular education teacher of the child be a member of the IEP team and provide input on appropriate supplementary aids and services, including program modifications and supports for school personnel. It also is essential that the child's teachers and other service providers who are not members of the IEP team are informed about the contents of the child's IEP, in whatever manner deemed appropriate by the public agency, so that the IEP is properly implemented by all school personnel

**Changes:** None.

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| | **36. Under what circumstances is a public agency required to permit a child with a disability to use a school-purchased assistive technology device in the child's home or in another setting?**<br><br>Each child's IEP team must consider the child's need for assistive technology (AT) in the development of the child's IEP (Sec 300 346(a)(2)(v)), and the nature and extent of the AT devices and services to be provided to the child must be reflected in the child's IEP (Sec 300 346(c))<br><br>A public agency must permit a child to use school-purchased assistive technology devices at home or in other settings, if the IEP team determines that the child needs access to those devices in nonschool settings in order to receive FAPE (to complete homework, for example)<br><br>Any assistive technology devices that are necessary to ensure FAPE must be provided at no cost to the parents, and the parents cannot be charged for normal use, wear and tear. However, while ownership of the devices in these circumstances would remain with the public agency, State law, *rather than Part B, generally would govern whether parents are liable* for loss, theft, or damage due to negligence or misuse of publicly owned equipment used at home or in other settings in accordance with a child's IEP |

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES |
|---|---|
| **Sec. 300.347 Content of IEP.**<br><br>(a) General The IEP for each child with a disability must include--<br><br>(1) A statement of the child's present levels of educational performance, including--<br><br>(i) How the child's disability affects the child's involvement and progress in the general curriculum (i.e., the same curriculum as for nondisabled children); or<br><br>(ii) *For preschool children*, as appropriate, how the disability affects the child's participation in appropriate activities;<br><br>(2) A statement of measurable annual goals, including benchmarks or short-term objectives, related to--<br><br>(i) *Meeting the child's needs that result from the child's* disability to enable the child to be involved in and progress in the general curriculum (i e., the same curriculum as for nondisabled children), or for preschool children, as appropriate, to participate in appropriate activities; and<br><br>(ii) Meeting each of the child's other educational needs that result from the child's disability;<br><br>(3) A statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child--<br><br>(i) To advance appropriately toward attaining the annual goals;<br><br>(ii) To be involved and progress in the general curriculum in accordance with paragraph (a)(1) of this section and to participate in extracurricular and other nonacademic activities; and<br><br>(iii) To be educated and participate with other children with disabilities and nondisabled children in the activities described in this section; | **Discussion:** The concept of "general curriculum" in these regulations plays a crucial role in meeting the requirements of the Act The IDEA Amendments of 1997 place significant emphasis on the participation of children with disabilities in the general curriculum as a key factor in ensuring better results for these children.<br><br>The definition in Sec 300.12 would not have imposed a national curriculum, but only clarified what the statutory term "*general curriculum*" means As the term is used throughout the Act and congressional report language, the clear implication is that, in each State or school district, there is a "general curriculum" that is applicable to *all children*. A *major focus of the Act--especially with respect to the new IEP provisions--is ensuring that children with disabilities are able to be involved in and progress in the "general curriculum." For example, the Senate and House committee *reports on Pub. L. No. 105-17 state that--<br><br>t]he new focus is intended to produce attention to the accommodations and adjustments necessary for disabled children to have access to the general education curriculum and the special services which may be necessary for appropriate participation in particular areas of the curriculum due to the nature of the disability. (S. Rep. No. 105-17, p. 20; H.R. Rep. No. 105-95, p. 100 (1997)).<br><br>Even as school systems offer more choices to students, there still is a common core of subjects and curriculum areas that is adopted by each LEA or schools within the LEA, or, where applicable, the SEA, *that applies to all children within each general age grouping from* preschool through secondary school Appropriate access to the general curriculum must be provided. The development and implementation *of IEPs for each child with a disability must be based on having high, not low, expectations for the child.*<br><br>In light of the concerns of the commenters and the principle of regulating only to the extent necessary, proposed Sec. 300.12 should be removed from the final regulations. Instead the regulations should emphasize the importance of the "general curriculum" concept in the IEP provision under which the term is used.<br><br>**Changes:** The definition of "general curriculum" in Sec. 300.12 of the NPRM and the note following that section of the NPRM have been deleted. The term is explained where it is used in Sec. 300.347 and in Appendix A regarding IEP *requirements*.<br><br>**Discussion:** *In developing these final regulations*, efforts have been made to ensure that the regulatory requirements related to the content of IEPs are consistent with the IDEA Amendments of 1997, and that no additional burden is added. The Department will explore the extent to which a sample IEP addressing the Federal requirements as part of a technical assistance effort, would be useful to parents and State and local administrators in developing IEPs that meet Federal, State, and local rules.<br><br>With respect to concerns about added burden, the provisions of Sec. 300.347 are drawn directly from the statute. While the statute did add some new requirements regarding content, it also gave the flexibility to use benchmarks of progress as opposed to short term objectives, and to determine how to regularly report on a child's progress *instead of the more burdensome objective criteria*, evaluation procedures and schedules required under prior law.<br><br>Except for including, essentially verbatim, the statutory content requirements in the regulations, the format and specific language used in developing IEPs are matters left to the discretion of individual States, and, to the extent consistent with State requirements, individual LEAs within the States. In providing such discretion, the assumption is that each State and LEA would attempt to make the format and language of the IEP as understandable and meaningful for parents as possible. Within this general framework, IEP teams develop the specific detail that is necessary to address each child's individual needs.<br><br>The importance of assistive technology devices and *services in meeting the special educational needs of children* with disabilities is addressed in several sections of these regulations (e.g , Secs. 300.5, 300.6, 300.308, and 300 346) The importance of ESY services and the *requirements related to addressing the need for those services* is included under Sec. 300 309. Therefore, no additional provisions are warranted in this section.<br><br>With respect to the comment regarding the role of the regular education teacher, the IDEA Amendments of 1997 require that at least one regular education teacher of the child be a member of the child's IEP team if the child is or may be participating in the regular education environment. |

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(4) An explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in paragraph (a)(3) of this section.

(5)(i) *A statement of any individual modifications in the* administration of State or district-wide assessments of student achievement that are needed in order for the child to participate in the assessment, and

(ii) If the IEP team determines that the child will not participate in a particular State or district-wide assessment of student achievement (or part of an assessment), a statement of--

(A) Why that assessment is not appropriate for the child; and

(B) How the child will be assessed.

(6) The projected date for the beginning of the services and modifications described in paragraph (a)(3) of this section, and the anticipated frequency, location, and duration of those services and modifications, and

(7) A statement of--

(i) How the child's progress toward the annual goals described in paragraph (a)(2) of this section will be measured, and

(ii) *How the child's parents will be regularly informed* (through such means as periodic report cards), at least as often as parents are informed of their nondisabled children's progress, of--

(A) Their child's progress toward the annual goals, and

(B) The extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year

The development of an interim IEP (or the use of a diagnostic placement, on a case-by-case basis) may be appropriate for an individual child with a disability if there is some question about the child's special education or related services needs However, it would not be consistent with the requirements of this part for an LEA to adopt an across-the-board policy of developing interim IEPs for all children with disabilities Clearly, in any case in which the IEP for a child with a disability does not seem to effectively address the needs of the child, the IEP team should be reconvened (at the request of the child's parent or teacher(s)) to reconsider the nature and scope of the IEP

**Changes:** None

**Discussion:** It is important that the statement of a child's present levels of educational performance be based on current, relevant information about the child, that is *obtained from a variety of sources*, including (1) *the most recent reevaluation of the child* under Sec 300 536, (2) assessment results from State and district-wide assessments, (3) inputs from the child's special and regular education teachers, and (4) information from the child's parents. (Sec. 300 346(a)(1)). If an independent educational evaluation has been conducted, the results of that evaluation also must be considered if it meets agency criteria for such evaluations (Sec 300.502(c)(1))

Consideration of all of the information described above is inherent in the requirement that the IEP include "a statement of the present levels of educational performance " Therefore, it is not necessary to amend the regulation to address this requirement

The provision in Sec 300 347(a)(1)(i) that requires a description of how a child's disability affects the child's involvement in the general curriculum (i e , the same curriculum as for nondisabled children) is a statutory requirement and cannot be deleted The requirement is important because it provides the basis for determining what accommodations the child needs in order to participate in the general *curriculum to the maximum extent appropriate*

A basic assumption made in both the statute and these final regulations is that the programming and services for each "individual" child would be tailored to address the child's unique needs that impede the child's ability to make meaningful progress in the general curriculum (As explained elsewhere in this attachment, the reference to the general curriculum in Sec. 300 347(a)(2) *has been modified to clarify* that the general curriculum is the same curriculum for nondisabled children.)

With respect to preschool-aged children, the term "appropriate activities," as used in Sec. 300 347(a)(1)(ii), includes activities that children of that chronological age engage in as part of a formal preschool program or in informal activities (e g , coloring, pre-reading activities, sharing-time, play time, and listening to stories told or read by the parent or pre-school teacher) In order to recognize that for some preschool-aged children appropriate goals will be related to participation in appropriate activities, as these children are not of an age for which there is not a *general curriculum for* nondisabled children, a change should be made to Sec. 300 347(a)(2).

A delineation and description of the difference between "benchmarks" and "short term objectives" is included in Appendix A.

Regarding the commenter's request that the LEA (1) *list obstacles to the child's full, effective participation in the general curriculum, and* (2) justify the use of a resource room instead of supports in the regular classroom, no further regulation will be provided Parents are equal members of their child's IEP team, and can participate in the discussion about whether there are any obstacles to ensuring the child's full and effective participation in the general curriculum. In any case in which the parents are not satisfied with the outcome of the IEP meeting, they have avenues available to them under both the Act and regulations for redressing their concerns

See comments and discussion in Sec. 300.550 related to children with significant cognitive disorders

**Changes:** Section 300 347(a)(2)(i) has been revised to clarify that "general curriculum" is the same curriculum as for nondisabled children and to recognize that a general curriculum is not available for all preschool-aged children

Texas Education Agency - Special Education March 1999 127

128

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(b) Transition services The IEP must include--

(1) For each student with a disability beginning at age 14 (or younger, if determined appropriate by the IEP team), and updated annually, a statement of the transition service needs of the student under the applicable components of the student's IEP that focuses on the student's courses of study (such as participation in advanced-placement courses or a vocational education program); and

(2) *For each student beginning at age 16 (or younger, if determined appropriate by the IEP team), a statement of needed transition services for the student, including, if appropriate, a statement of the interagency responsibilities or any needed linkages.*

(c) Transfer of rights. In a State that transfers rights at the age majority, beginning at least one year before a student reaches the age of majority under State law, the student's IEP must include a statement that the student has been informed of his or her rights under Part B of the Act, if any, that will transfer to the student on reaching the age of majority, consistent with Sec. 300.517

(d) Students with disabilities convicted as adults and incarcerated in adult prisons. Special rules concerning the content of IEPs for students with disabilities convicted as adults and incarcerated in adult prisons are contained in Sec 300.311(b) and (c)

(Authority: 20 U S C 1414(d)(1)(A) and (d)(6)(A)(ii))

**Discussion:** As used in Sec. 300.347(a)(3), the term "on behalf of the child" includes, among other things, services that are provided to the parents or teachers of a child with a disability to help them to more effectively work with the child For example, as used in the definition of "related services" under Sec. 300.24, the term " 'parent counseling and training' means (i) Assisting parents in understanding the special needs of their child * * * and (iii) Helping [them] to acquire the necessary skills that will allow them to support the implementation of their child's IEP or IFSP."

Supports for school personnel could also include special training for a child's teacher. However, in order for the training to meet the requirements of Sec. 300.347(a)(3), it would normally be targeted directly on assisting the teacher to meet a unique and specific need of the child, and not simply to participate in an inservice training program that is generally available within a public agency.

In order to ensure full access to the general curriculum, it is not necessary to amend Sec. 300.347(a)(3)(ii) to clarify that a child's involvement and progress in the general curriculum must be "to the maximum extent appropriate to needs of the child." The individualization of the IEP process, together with the new requirements related to the general curriculum, should ensure that such involvement and progress is "to the maximum extent appropriate to the needs of the child."

The provision in Sec. 300.347(a)(3)(ii) related to participation in "extracurricular and other nonacademic activities" is statutory.

The provision in Sec. 300.347(a)(4) (that requires a statement of the extent to which a child with disabilities will not participate with nondisabled children) is also a statutory requirement and cannot be deleted. The basic principle underlying this requirement is that children with disabilities will be educated in the regular education environment along with their nondisabled peers, and that these children are only removed from that environment if it is determined that they cannot be appropriately served in the regular education environment, even with the use of supplementary aids and services.

This new provision is designed to ensure that each IEP team carefully considers the extent to which a child can be educated with his or her nondisabled peers; and if the team determines that the child cannot participate full time with nondisabled children in the regular classroom and in the other activities described in Sec. 300.347(a)(3)(ii), the IEP must include a statement that explains why full participation is not possible.

If (for example) a child needs speech-language pathology services in a separate setting two to three times a week, but will otherwise spend full time with nondisabled children in the activities described in Sec. 300.347(a)(4), the "explanation" would require only the statement described in the preceding sentence. A similar explanation would be required for any other child with a disability who, in the judgement of the IEP team, will not participate on a full time basis with nondisabled children in the regular class. Thus, while the IEP needs to clearly address this situation, the required explanation does not have to be burdensome.

**Changes:** None.

**Discussion:** If the individual modifications necessary for a child to participate in the assessment are not known at the time of the IEP meeting, it would be necessary for a subsequent meeting to be conducted early enough to ensure that any necessary modifications are in place at the time the assessment is administered. It is not necessary, however, to add a regulation to address this matter

The IDEA Amendments of 1997 require that all children with disabilities be included in general State and district-wide assessment programs, with appropriate accommodations, where necessary. (Sec. 300.138). In some cases, alternate assessments may be necessary, depending on the needs of the child, and not the category or severity of the child's disability.

**Changes:** None

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Discussion:** Use of the term "anticipated" to diminish the agency's obligation to provide services would be inconsistent with the requirements of this part Moreover, a public agency could not alter the basic nature and scope of the child's IEP without reconvening the child's IEP team

The "location" of services in the context of an IEP generally refers to the type of environment that is the appropriate place for provision of the service For example, is the related service to be provided in the child's regular classroom or in a resource room?

**Changes:** None

**Discussion:** It is not appropriate or necessary to include a definition of "progress report" because that term is not used in either the statute or these final regulations. The provision in Sec. 300.347(a)(7)(ii) is incorporated verbatim from the statute No additional burden was added by the NPRM or these final regulations

Under the statute and regulations, the manner in which that requirement is implemented is left to the discretion of each State Therefore, a State could elect to ensure that report cards used for children with disabilities contain information about each child's progress toward meeting the child's IEP goals, as suggested by commenters, but would not be required to do so

With respect to the frequency of reporting, the statute and regulations are both clear that the parents of a child with a disability must be regularly informed of their child's progress at least as often as parents are informed of their nondisabled children's progress

Requiring a "detailed written narrative" of how a child is progressing toward meeting the IEP objectives, as suggested by a commenter, could add an unnecessary burden However, the commenter's concern about using a grade to designate a child's progress in meeting the IEP objectives in some cases may be valid because a grade does not always lend itself to sufficiently describing progress toward the annual goals The statute and regulations make clear that a written report is sufficient, although in some instances, an agency may decide that a meeting with the parents (which does not have to be an IEP meeting) would be a more effective means of communication.

The agency must ensure that whatever method, or combination of methods, is adopted provides sufficient information to enable parents to be informed of (1) their child's progress toward the annual goals, and (2) the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.

Generally, reports to parents are not expected to be lengthy or burdensome. The statement of the annual goals and short term objectives or benchmarks in the child's current IEP could serve as the base document for briefly describing the child's progress

**Changes:** None

**Discussion:** The IDEA Amendments of 1997 emphasize providing greater access by children with disabilities to the general curriculum and to educational reforms, as an effective means of ensuring better results for these children. Both the Senate and House Committee Reports on Pub L 105-17 state that.

*The Committee wishes to emphasize that, once a child has been identified as being eligible for special education, the connection between special education and related services and the child's opportunity to experience and benefit from the general education curriculum should be strengthened The majority of children identified as eligible for special education and related services are capable of participating in the general education curriculum to varying degrees with some adaptations and modifications This provision is intended to ensure that children's special education and related services are in addition to and are affected by the general education curriculum, not separate from it (S Rep No 105-17, p 20, H R Rep No 105-95, p 99 (1997))*

These are important principles to keep in mind when implementing the new IEP requirements However, in light of the general decision to remove notes from the final regulation, Note 2 would be removed

Texas Education Agency - Special Education March 1999 129

130

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND ..ANGES (from the Analysis of Comments), APPENDIX A TC .RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

The concepts in the committee reports cited in Note 3 also are valid. The new focus of the IEP is intended to address the accommodations and adjustments necessary to enable children with disabilities to be able to participate in the general curriculum to the maximum extent appropriate. Although the annual goals and short term objectives (and the service accommodations described above) would be basic components of the IEP, it would not be appropriate for the IEP to include specific details related to the general curriculum itself (and to daily lesson plans)

Generally, the overall length of the IEP should not be greatly affected by including relevant information about the accommodations and adjustments needed by the child, along with the other required information. But the IEP should provide sufficient information necessary to enable parents, regular education teachers, and all service providers to understand what is required to effectively implement its provisions. However, consistent with the general decision made with respect to notes, Notes 2 and 3 would be deleted.

Because Note 3 has been deleted, it is not necessary to replace the word "accessing" with "fully participating in" the general curriculum. Clearly, the intent of the IDEA is full participation of each child with a disability in the general curriculum to the maximum extent appropriate to the needs of child; and the IDEA Amendments of 1997, as reflected in these final regulations, have given greater emphasis to that intent.

It is not necessary to include a regulatory definition of the terms "adaptations," "modifications," "accommodations," and "adjustments." The terms are essentially self-explanatory, and may overlap to some extent.

Certain changes may need to be made in a regular education classroom to make it possible for a child with a disability to participate more fully and effectively in general curricular activities that take place in that room. These changes could involve (for example) providing a special seating arrangement for a child; using professional or student "tutors" to help the child; raising the level of a child's desk; allowing the child more time to complete a given assignment; working with the parents to help the child at home; and providing extra help to the child before or after the beginning of the school day.

"Modifications" or "accommodations" could involve providing a particular assistive technology device for the child, or modifying the child's desk in some manner that facilitates the child's ability to write or hold books, etc.

**Changes:** Notes 2 and 3 have been removed.

**Discussion:** In some cases, it may be appropriate to include teaching methods and approaches in a child's IEP. As used in the definition of "special education" under Sec. 300.26, the term "specially-designed instruction" means "adapting, as appropriate to each eligible child under this part, the content, methodology, or delivery of services * * * (i) to meet the unique needs of an eligible child under this part that result from the child's disability * * *"

In general, however, specific day-to-day adjustments in instructional methods and approaches that are made by either a regular or special education teacher to assist a disabled child to achieve his or her annual goals would not normally require action by the child's IEP team.

With respect to Note 5 (that the reporting provision in Sec. 300.347(a)(7)(ii) is intended to be in addition to regular reporting for all children), as addressed earlier in this attachment, the report described in Sec. 300.347(a)(7)(ii) may be incorporated in the regular reporting to all parents. Therefore, Note 5 is not needed.

**Changes:** Notes 4 and 5 have been deleted.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND ANGES (from the Analysis of Comments), APPENDIX A TC HT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Discussion:** The terms "a statement of the transition service needs" and "a statement of needed transition services" are incorporated verbatim from the statute The purpose of "a statement of the transition service needs" is to focus on the planning of a student's courses of study during the student's secondary school experience (e.g., whether the student will participate in advanced placement or vocational education courses)

With respect to a statement of needed transition services, the focus is on the student's need for such services as he or she moves from school to postschool experiences, and any linkages that may be needed. These statements, as with the other components of the IEP, must be individualized in accordance with the needs of the student.

The Department has invested considerable resources in providing technical assistance in the area of transition services, and has a number of technical assistance resources available to public agencies in implementing these statutory provisions.

**Changes:** None.

**Discussion:** It is appropriate to remove the provision in Sec. 300.347(b)(2) because, as stated by the commenters, the provision is not statutory and adds unnecessary paperwork.

That provision was based on the definition of "transition services" that was in effect prior to June 4, 1997, and did not account for the change in the definition of "transition services" that was made by the IDEA Amendments of 1997.

The "prior law" definition mandated the inclusion of specific components under the coordinated set of activities described in the definition In recognition that all students with disabilities may not require services in all of the mandated areas, the final regulations implementing that provision (published in 1992) included a statement that "if the IEP team determines that services are not needed in one or more of the areas specified in [the definition of transition services], the IEP must include a statement to that effect, and the basis upon which the determination was made " However, while the new definition of "transition services" added by Pub L. 105-17 includes the same components as in prior law, the provision requiring the inclusion of all components in a student's IEP was removed.

**Changes:** Sec. 300 347(b)(2) has been deleted.

**Discussion:** Consistent with the Department's decision to not include notes in the final regulations, the notes should be deleted

**Changes:** Notes 1, 6, and 7 have been deleted.

**Discussion:** The provision at Sec. 300.347(c) is statutory. Whether or not rights transfer at the age of majority depends on State law, and, consistent with Sec. 300.517, whether or not the student has been determined incompetent under State law. State law also determines what constitutes the age of majority in that jurisdiction. The discussion concerning Sec. 300.517 in this attachment provides a fuller explanation of the provision concerning the transfer of rights at the age of majority. Generally, a public agency will satisfy Sec. 300 347(c) if, at least one year before the student reaches the age of majority under State law, the agency informs the student of the rights that transfer at the age of majority (and includes a statement to that effect in the IEP). If the public agency receives notice of the student's legal incompetency, so that no rights transfer to the student at the age of majority, the IEP need not include this statement

The composition of the IEP team is discussed in Sec. 300 344. There is nothing in the regulation that would prevent a student to whom rights have been transferred at the age of majority from exercising his or her discretion under Sec 300 344(a)(6) to include in the IEP team a parent as an individual with knowledge regarding the child

**Changes:** None

Texas Education Agency - Special Education March 1999 131

132

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND ANGES (from the Analysis of Comments), APPENDIX A TC RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**I. Involvement and Progress of Each Child With a Disability in the General Curriculum**

In enacting the IDEA Amendments of 1997, the Congress found that research, demonstration, and practice over the past 20 years in special education and related disciplines have demonstrated that an effective educational system now and in the future must maintain high academic standards and clear performance goals for children with disabilities, consistent with the standards and expectations for all students in the educational system, and provide for appropriate and effective strategies and methods to ensure that students who are children with disabilities have maximum opportunities to achieve those standards and goals. [Section 651(a)(6)(A) of the Act ] Accordingly, the evaluation and IEP provisions of Part B place great emphasis on the involvement and progress of children with disabilities in the general curriculum. (The term "general curriculum," as used in these regulations, including this Appendix, refers to the curriculum that is used with nondisabled children.)

While the Act and regulations recognize that IEP teams must make individualized decisions about the special education and related services, and supplementary aids and services, provided to each child with a disability, they are driven by IDEA's strong preference that, to the maximum extent appropriate, children with disabilities be educated in regular classes with their nondisabled peers with appropriate supplementary aids and services.

In many cases, children with disabilities will need appropriate supports in order to successfully progress in the general curriculum, participate in State and district-wide assessment programs, achieve the measurable goals in their IEPs, and be educated together with their nondisabled peers. Accordingly, the Act requires the IEP team to determine, and the public agency to provide, the accommodations, modifications, supports, and supplementary aids and services, needed by each child with a disability to successfully be involved in and progress in the general curriculum achieve the goals of the IEP, and successfully demonstrate his or her competencies in State and district-wide assessments.

**1. What are the major Part B IEP requirements that govern the involvement and progress of children with disabilities in the general curriculum?**

***Present Levels of Educational Performance***

Section 300.347(a)(1) requires that the IEP for each child with a disability include "* * * a statement of the child's present levels of educational performance, including--(i) how the child's disability affects the child's involvement and progress in the general curriculum; or (ii) for preschool children, as appropriate, how the child's disability affects the child's participation in appropriate activities * * *" ("Appropriate activities" in this context refers to age-relevant developmental abilities or milestones that typically developing children of the same age would be performing or would have achieved.)

The IEP team's determination of how each child's disability affects the child's involvement and progress in the general curriculum is a primary consideration in the development of the child's IEP. In assessing children with disabilities, school districts may use a variety of assessment techniques to determine the extent to which these children can be involved and progress in the general curriculum, such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination of the above.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND .ANGES (from the Analysis of Comments), APPENDIX A T( ıRT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

The purpose of using these assessments is to determine the child's present levels of educational performance and areas of need arising from the child's disability so that approaches for ensuring the child's involvement and progress in the general curriculum and any needed adaptations or modifications to that curriculum can be identified.

***Measurable Annual Goals, Including Benchmarks or Short-term objectives***

Measurable annual goals, including benchmarks or short-term objectives, are critical to the strategic planning process used to develop and implement the IEP for each child with a disability Once the IEP team has developed measurable annual goals for a child, the team (1) can develop strategies that will be most effective in realizing those goals and (2) must develop either measurable, intermediate steps (short-term objectives) or major milestones (benchmarks) that will enable parents, students, and educators to monitor progress during the year, and, if appropriate, to revise the IEP consistent with the student's instructional needs

The strong emphasis in Part B on linking the educational program of children with disabilities to the general curriculum is reflected in Sec. 300 347(a)(2), which requires that the IEP include:

> a statement of measurable annual goals, including benchmarks or short-term objectives, related to--(i) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and (ii) meeting each of the child's other educational needs that result from the child's disability

As noted above, each annual goal must include either short-term objectives or benchmarks. The purpose of both is to enable a child's teacher(s), parents, and others involved in developing and implementing the child's IEP, to gauge, at intermediate times during the year, how well the child is progressing toward achievement of the annual goal. IEP teams may continue to develop short-term instructional objectives, that generally break the skills described in the annual goal down into discrete components. The revised statute and regulations also provide that, as an alternative, IEP teams may develop benchmarks, which can be thought of as describing the amount of progress the child is expected to make within specified segments of the year. Generally, benchmarks establish expected performance levels that allow for regular checks of progress that coincide with the reporting periods for informing parents of their child's progress toward achieving the annual goals An IEP team may use either short term objectives or benchmarks or a combination of the two depending on the nature of the annual goals and the needs of the child.

***Special Education and Related Services and Supplementary Aids and Services***

The requirements regarding services provided to address a child's present levels of educational performance and to make progress toward the identified goals reinforce the emphasis on progress in the general curriculum, as well as maximizing the extent to which children with disabilities are educated with nondisabled children. Section 300.347(a)(3) requires that the IEP include:

> a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child--(i) to advance appropriately toward attaining the annual goals; (ii) to be involved and progress in the general curriculum * * * and to participate in extracurricular and other nonacademic activities; and (iii) to be educated and participate with other children with disabilities and nondisabled children in [extracurricular and other nonacademic activities] * * * [italics added ]

Texas Education Agency - Special Education March 1999 133

134

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND ... ANGES (from the Analysis of Comments), APPENDIX A T... RT 300,
DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

***Extent to Which Child Will Participate With Nondisabled Children***

Section 300 347(a)(4) requires that each child's IEP include "An explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in [extracurricular and other nonacademic] activities * * *" This is consistent with the least restrictive environment (LRE) provisions at Secs. 300.550-300.553, which include requirements that:

(1) each child with a disability be educated with nondisabled children to the maximum extent appropriate (Sec 300 550(b)(1)).

(2) each child with a disability be removed from the regular educational environment only when the nature or severity of the child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily (Sec. 300.550(b)(1)); and

(3) to the maximum extent appropriate to the child's needs, each child with a disability participates with nondisabled children in nonacademic and extracurricular services and activities (Sec. 300.553).

All services and educational placements under Part B must be individually determined in light of each child's unique abilities and needs, to reasonably promote the child's educational success. Placing children with disabilities in this manner should enable each disabled child to meet high expectations in the future.

Although Part B requires that a child with a disability not be removed from the regular educational environment if the child's education can be achieved satisfactorily in regular classes with the use of supplementary aids and services, Part B's LRE principle is intended to ensure that a child with a disability is served in a setting where the child can be educated successfully. Even though IDEA does not mandate regular class placement for every disabled student, IDEA presumes that the first placement option considered for each disabled student by the student's placement team, which must include the parent, is the school the child would attend if not disabled, with appropriate supplementary aids and services to facilitate such placement. Thus, before a disabled child can be placed outside of the regular educational environment, the full range of supplementary aids and services that if provided would facilitate the student's placement in the regular classroom setting must be considered.

Following that consideration, if a determination is made that particular disabled student cannot be educated satisfactorily in the regular educational environment, even with the provision of appropriate supplementary aids and services, that student then could be placed in a setting other than the regular classroom. *Later, if it becomes apparent that the child's IEP can be carried out in a less restrictive setting,* with the provision of appropriate supplementary aids and services, if needed, Part B would require that the child's placement be changed from the more restrictive setting to a less restrictive setting. In all cases, placement decisions must be individually determined on the basis of each child's abilities and needs, and not solely on factors such as category of disability, significance of disability, availability of special education and related services, configuration of the service delivery system, availability of space, or administrative convenience. Rather, each student's IEP forms the basis for the placement decision.

Further, a student need not fail in the regular classroom before another placement can be considered Conversely, IDEA does not require that a student demonstrate achievement of a specific performance level as a prerequisite for placement into a regular classroom

***Participation in State or District-Wide Assessments of Student Achievement***

Consistent with Sec. 300.138(a), which sets forth a presumption that children with disabilities will be included in general State and district-wide assessment programs, and provided with appropriate accommodations if necessary, Sec. 300 347(a)(5) requires that the IEP for each student with a disability include: "(i) a statement of any individual modifications in the administration of State or district-wide assessments of student achievement that are needed in order for the child to participate in the assessment; and (ii) if the IEP team determines that the child will not participate in a particular State or district-wide assessment of student achievement (or part of an assessment of student achievement), a statement of–(A) Why that assessment is not appropriate for the child; and (B) How the child will be assessed "

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

***Regular Education Teacher Participation in the Development, Review, and Revision of IEPs***

Very often, regular education teachers play a central role in the education of children with disabilities (H Rep. No. 105-95, p. 103 (1997), S. Rep No 105-17, p 23 (1997)) and have important expertise regarding the general curriculum and the general education environment Further, with the emphasis on involvement and progress in the general curriculum added by the IDEA Amendments of 1997, regular education teachers have an increasingly critical role (together with special education and related services personnel) in implementing the program of FAPE for most children with disabilities, as described in their IEPs.

Accordingly, the IDEA Amendments of 1997 added a requirement that each child's IEP team must include at least one regular education teacher of the child, if the child is, or may be, participating in the regular education environment (see Sec 300.344(a)(2)) (See also Secs. 300 346(d) on the role of a regular education teacher in the development, review and revision of IEPs.)

**2. Must a child's IEP address his or her involvement in the general curriculum, regardless of the nature and severity of the child's disability and the setting in which the child is educated?**

Yes The IEP for each child with a disability (including children who are educated in separate classrooms or schools) must address how the child will be involved and progress in the general curriculum. However, the Part B regulations recognize that some children have other educational needs resulting from their disability that also must be met, even though those needs are not directly linked to participation in the general curriculum Accordingly, Sec. 300.347(a)(1)(2) requires that each child's IEP include·

> A statement of measurable annual goals, including benchmarks or short-term objectives related to--(i) Meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum, and (ii) meeting each of the child's other educational needs that result from the child's disability. [Italics added ]

Thus, the IEP team for each child with a disability must make an individualized determination regarding (1) how the child will be involved and progress in the general curriculum and what needs that result from the child's disability must be met to facilitate that participation; (2) whether the child has any other educational needs resulting from his or her disability that also must be met; and (3) what special education and other services and supports must be described in the child's IEP to address both sets of needs (consistent with Sec 300 347(a)) For example, if the IEP team determines that in order for a child who is deaf to participate in the general curriculum he or she needs sign language and materials which reflect his or her language development, those needs (relating to the child's participation in the general curriculum) must be addressed in the child's IEP In addition, if the team determines that the child also needs to expand his or her vocabulary in sign language that service must also be addressed in the applicable components of the child's IEP. The IEP team may also wish to consider whether there is a need for members of the child's family to receive training in sign language in order for the child to receive FAPE

Texas Education Agency - Special Education March 1999 135

136

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**4. Must the measurable annual goals in a child's IEP address all areas of the general curriculum, or only those areas in which the child's involvement and progress are affected by the child's disability?**

Section 300.347(a)(2) requires that each child's IEP include "A statement of measurable annual goals, including benchmarks or short-term objectives, related to--(i) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in *the general curriculum* * * *; and (ii) meeting each of the child's other educational needs that result from the child's disability. . . ." (Italics added).

Thus, a public agency is not required to include in an IEP annual goals that relate to areas of the general curriculum in which the child's disability does not affect the child's ability to be involved in and progress in the general curriculum. If a child with a disability needs only modifications or accommodations in order to progress in an area of the general curriculum, the IEP does not need to include a goal for that area; however, the IEP would need to specify those modifications or accommodations.

Public agencies often require all children, including children with disabilities, to demonstrate mastery in a given area of the general curriculum before allowing them to progress to the next level or grade in that area. Thus, in order to ensure that each child with a disability can effectively demonstrate competencies in an applicable area of the general curriculum, it is important for the IEP team to consider the accommodations and modifications that the child needs to assist him or her in demonstrating progress in that area.

**10. Does Part B require that public agencies inform parents regarding the educational progress of their children with disabilities?**

Yes. The Part B statute and regulations include a number of provisions to help ensure that parents are involved in decisions regarding, and are informed about, their child's educational progress, including the child's progress in the general curriculum. First, the parents will be informed regarding their child's present levels of educational performance through the development of the IEP. Section 300.347(a)(1) requires that each IEP include:

> * * * A statement of the child's present levels of educational performance, including--(i) how the child's disability affects the child's involvement and progress in the general curriculum; or (ii) for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities * * *

Further, Sec. 300.347(a)(7) sets forth new requirements for regularly informing parents about their child's educational progress, as regularly as parents of nondisabled children are informed of their child's progress. That section requires that the IEP include:

A statement of--(i) How the child's progress toward the annual goals * * * will be measured; and (ii) how the child's parents will be regularly informed (by such means as periodic report cards), at least as often as parents are informed of their nondisabled children's progress, of--(A) their child's progress toward the annual goals; and (B) the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.

One method that public agencies could use in meeting this requirement would be to provide periodic report cards to the parents of students with disabilities that include both (1) the grading information provided for all children in the agency at the same intervals; and (2) the specific information required by Sec. 300.347(a)(7)(ii)(A) and (B).

Finally, the parents, as part of the IEP team, will participate at least once every 12 months in a review of their child's educational progress. Section 300.343(c) requires that a public agency initiate and conduct a meeting, at which the IEP team:

* * * (1) Reviews the child's IEP periodically, but not less than annually to determine whether the annual goals for the child are being achieved; and (2) revises the IEP as appropriate to address--(i) any lack of expected progress toward the annual goals * * * and in the general curriculum, if appropriate; (ii) The results of any reevaluation * * *; (iii) Information about the child provided to, or by, the parents * * *; (iv) The child's anticipated needs; or (v) Other matters.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND ..IANGES (from the Analysis of Comments), APPENDIX A TL ART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**33. Must a public agency include transportation in a child's IEP as a related service?**

As with other related services, a public agency must provide transportation as a related service if it is required to assist the disabled child to benefit from special education. (This includes transporting a preschool-aged child to the site at which the public agency provides special education and related services to the child, if that site is different from the site at which the child receives other preschool or day care services )

In determining whether to include transportation in a child's IEP, and whether the child needs to receive transportation as a related service, it would be appropriate to have at the IEP meeting a person with expertise in that area. In making this determination, the IEP team must consider how the child's disability affects the child's need for transportation, including determining whether the child's disability prevents the child from using the same transportation provided to nondisabled children, or from getting to school in the same manner as nondisabled children.

The public agency must ensure that any transportation service included in a child's IEP as a related service is provided at public expense and at no cost to the parents, and that the child's IEP describes the transportation arrangement.

Even if a child's IEP team determines that the child does not require transportation as a related service, Section 504 of the Rehabilitation Act of 1973, as amended, requires that the child receive the same transportation provided to nondisabled children If a public agency transports nondisabled children, it must transport disabled children under the same terms and conditions However, if a child's IEP team determines that the child does not need transportation as a related service, and the public agency transports only those children whose IEPs specify transportation as a related service, and does not transport nondisabled children, the public agency would not be required to provide transportation to a disabled child.

It should be assumed that most children with disabilities receive the same transportation services as nondisabled children. For some children with disabilities, integrated transportation may be achieved by providing needed accommodations such as lifts and other equipment adaptations on regular school transportation vehicles.

**34. Must a public agency provide related services that are required to assist a child with a disability to benefit from special education, whether or not those services are included in the list of related services in Sec. 300.24?**

The list of related services is not exhaustive and may include other developmental, corrective, or supportive services if they are required to assist a child with a disability to benefit from special education. This could, depending upon the unique needs of a child, include such services as nutritional services or service coordination. These determinations must be made on an individual basis by each child's IEP team.

**35. Must the IEP specify the amount of services or may it simply list the services to be provided?**

The amount of services to be provided must be stated in the IEP, so that the level of the agency's commitment of resources will be clear to parents and other IEP team members (Sec. 300.347(a)(6)). The amount of time to be committed to each of the various services to be provided must be (1) appropriate to the specific service, and (2) stated in the IEP in a manner that is clear to all who are involved in both the development and implementation of the IEP.

The amount of a special education or related service to be provided to a child may be stated in the IEP as a range (e g , speech therapy to be provided three times per week for 30-45 minutes per session) only if the IEP team determines that stating the amount of services as a range is necessary to meet the unique needs of the child. For example, it would be appropriate for the IEP to specify, based upon the IEP team's determination of the student's unique needs, that particular services are needed only under specific circumstances, such as the occurrence of a seizure or of a particular behavior. A range may not be used because of personnel shortages or uncertainty regarding the availability of staff.

Texas Education Agency - Special Education March 1999 137

138

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION ANE ANGES (from the Analysis of Comments), APPENDIX A T( RT 300,
DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**III. Preparing Students With Disabilities for Employment and Other Post-School Experiences**

One of the primary purposes of the IDEA is to "* * * ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living * * *" (Sec. 300.1(a)). Section 701 of the Rehabilitation Act of 1973 describes the philosophy of independent living as including a philosophy of consumer control, peer support, self-help, self-determination, equal access, and individual and system advocacy, in order to maximize the leadership, empowerment, independence, and productivity of individuals with disabilities, and the integration and full inclusion of individuals with disabilities into the mainstream of American society. Because many students receiving services under IDEA will also receive services under the Rehabilitation Act, it is important, in planning for their future, to consider the impact of both statutes.

Similarly, one of the key purposes of the IDEA Amendments of 1997 was to "promote improved educational results for children with disabilities through early intervention, preschool, and educational experiences that prepare them for later educational challenges and employment." (H. Rep. No. 105-95, p. 82 (1997); S. Rep. No. 105-17, p. 4 (1997)).

Thus, throughout their preschool, elementary, and secondary education, the IEPs for children with disabilities must, to the extent appropriate for each individual child, focus on providing instruction and experiences that enable the child to prepare himself or herself for later educational experiences and for post-school activities, including formal education, if appropriate, employment, and independent living. Many students with disabilities will obtain services through State vocational rehabilitation programs to ensure that their educational goals are effectively implemented in post-school activities. Services available through rehabilitation programs are consistent with the underlying purpose of IDEA.

Although preparation for adult life is a key component of FAPE throughout the educational experiences of students with disabilities, Part B sets forth specific requirements related to transition planning and transition services that must be implemented no later than ages 14 and 16, respectively, and which require an intensified focus on that preparation as these students begin and prepare to complete their secondary education.

**11. What must the IEP team do to meet the requirements that the IEP include "a statement of * * * transition service needs" beginning at age 14 (Sec. 300.347(b)(1)(i))," and a statement of needed transition services" no later than age 16 (Sec. 300.347(b)(2)?**

Section 300.347(b)(1) requires that, beginning no later than age 14, each student's IEP include specific transition-related content, and, beginning no later than age 16, a statement of needed transition services:

> Beginning at age 14 and younger if appropriate, and updated annually, each student's IEP must include:
>
> "* * * a statement of the transition service needs of the student under the applicable components of the student's IEP that focuses on the student's courses of study (such as participation in advanced-placement courses or a vocational education program)" (Sec. 300.347(b)(1)(i)).
>
> Beginning at age 16 (or younger, if determined appropriate by the IEP team), each student's IEP must include:
>
> "* * * a statement of needed transition services for the student, including, if appropriate, a statement of the interagency responsibilities or any needed linkages." (Sec. 300.347(b)(2)).

The Committee Reports on the IDEA Amendments of 1997 make clear that the requirement added to the statute in 1997 that beginning at age 14, and updated annually, the IEP include "a statement of the transition service needs" is "* * * designed to augment, and not replace," the separate, preexisting requirement that the IEP include, "* * * beginning at age 16 (or younger, if determined appropriate by the IEP team), a statement of needed transition services * * *" (H. Rep. No. 105-95, p. 102 (1997); S. Rep No. 105-17, p 22 (1997)). As clarified by the Reports, "The purpose of [the requirement in Sec. 300.347(b)(1)(i)] is to focus attention on how the child's educational program can be planned to help the child make a successful transition to his or her goals for life after secondary school." (H Rep No 105-95, pp. 101-102 (1997); S. Rep. No. 105-17, p. 22 (1997)). The Reports further explain that "[F]or example, for a child whose transition goal is a job, a transition service could be teaching the child how to get to the job site on public transportation." (H. Rep No 105-95, p. 102 (1997); S. Rep No. 105-17, p. 22 (1997)).

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND .ANGES (from the Analysis of Comments), APPENDIX A TC .HT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

Thus, beginning at age 14, the IEP team, in determining appropriate measurable annual goals (including benchmarks or short-term objectives) and services for a student, must determine what instruction and educational experiences will assist the student to prepare for *transition from secondary education to post-secondary life.*

The statement of transition service needs should relate directly to the student's goals beyond secondary education, and show how planned studies are linked to these goals For example, a student interested in exploring a career in computer science may have a statement of transition services needs connected to technology course work, *while another student's statement of transition services needs could* describe why public bus transportation training is important for future independence in the community.

Although the focus of the transition planning process may shift as the student approaches graduation, the IEP team must discuss specific areas beginning at least at the age of 14 years and review these areas annually. As noted in the Committee Reports, a disproportionate number of students with disabilities drop out of school before they complete their secondary education: "Too many students with disabilities are failing courses and dropping out of school. Almost twice as many students with disabilities drop out as compared to students without *disabilities.*" (H. Rep. No. 105-95, p. 85 (1997), S. Rep. No. 105-17, p. 5 (1997) )

To help reduce the number of students with disabilities that drop out, it is important that the IEP team work with each student with a disability and the student's family to select courses of study that will be meaningful to the student's future and motivate the student to complete his or her education.

This requirement is distinct from the requirement, at Sec. 300.347(b)(2), that the IEP include:

> * * * beginning at age 16 (or younger, if determined appropriate by the IEP team), a statement of needed transition services for the child, including, if appropriate, a statement of the interagency responsibilities or any needed linkages

The term "transition services" is defined at Sec. 300.29 to mean:

> * * * a coordinated set of activities for a student with a disability that--(1) Is designed within an outcome-oriented process, that promotes movement from school to post-school activities, including postsecondary education, vocational training, integrated *employment (including supported employment)*, continuing and adult education, adult services, independent living, or community participation; (2) Is based on the individual student's needs, taking into account the student's preferences and interests; and (3) Includes--(i) Instruction; (ii) Related services; (iii) Community experiences; (iv) The development of employment and other post-school adult living objectives; and (v) If appropriate, acquisition of daily living skills and functional vocational evaluation.

Thus, while Sec. 300.347(b)(1) requires that the IEP team begin by age 14 to address the student's need for instruction that will assist the student to prepare for transition, the IEP must include by age 16 a statement of needed transition services under Sec. 300.347(b)(2) that includes a "coordinated set of activities * * *, designed within an outcome-oriented process, that promotes movement from school to post-school activities * * * " (Sec. 300.29) Section 300.344(b)(3) further requires that, in implementing Sec. 300.347(b)(1), public agencies (in addition to required participants for all IEP meetings), must also invite a representative of any other agency that is likely to be responsible for providing or paying for transition services. Thus, Sec. 300.347(b)(2) requires a broader focus on coordination of services across, and linkages between, agencies beyond the SEA and LEA.

Texas Education Agency - Special Education March 1999 139

140

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND . .ANGES (from the Analysis of Comments), APPENDIX A TC RT 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.348 Agency responsibilities for transition services.**

(a) If a participating agency, other than the public agency, fails to provide the transition services described in the IEP in accordance with Sec 300.347(b)(1), the public agency shall reconvene the IEP team to identify alternative strategies to meet the transition objectives for the student set out in the IEP.

(b) Nothing in this part relieves any participating agency, including a State vocational rehabilitation agency, of the responsibility to provide or pay for any transition service that the agency would otherwise provide to students with disabilities who meet the eligibility criteria of that agency

(Authority. 20 U S C 1414(d)(5), 1414(d)(1)(A)(vii))

**12. Must the IEP for each student with a disability, beginning no later than age 16, include all "needed transition services," as identified by the IEP team and consistent with the definition at Sec. 300.29, even if an agency other than the public agency will provide those services? What is the public agency's responsibility if another agency fails to provide agreed-upon transition services?**

Section 300.347(b)(2) requires that the IEP for each child with a disability, beginning no later than age 16, or younger if determined appropriate by the IEP team, include all "needed transition services," as identified by the IEP team and consistent with the definition at Sec 300 29, regardless of whether the public agency or some other agency will provide those services Section 300 347(b)(2) specifically requires that the statement of needed transition services include, "* * * if appropriate, a statement of the interagency responsibilities or any needed linkages."

Further, the IDEA Amendments of 1997 also permit an LEA to use up to five percent of the Part B funds it receives in any fiscal year in combination with other amounts, which must include amounts other than education funds, to develop and implement a coordinated services system. These funds may be used for activities such as: (1) linking IEPs under Part B and Individualized Family Service Plans (IFSPs) under Part C, with Individualized Service Plans developed under multiple Federal and State programs, such as Title I of the Rehabilitation Act; and (2) developing and implementing interagency financing strategies for the provision of services, including transition services under Part B

The need to include, as part of a student's IEP, transition services to be provided by agencies other than the public agency is contemplated by Sec. 300 348(a), which specifies what the public agency must do if another agency participating in the development of the statement of needed transition services fails to provide a needed transition service that it had agreed to provide.

If an agreed-upon service by another agency is not provided, the public agency responsible for the student's education must implement alternative strategies to meet the student's needs. This requires that the public agency provide the services, or convene an IEP meeting as soon as possible to identify alternative strategies to meet the transition services objectives, and to revise the IEP accordingly.

Alternative strategies might include the identification of another funding source, referral to another agency, the public agency's identification of other district-wide or community resources that it can use to meet the student's identified needs appropriately, or a combination of these strategies. As emphasized by Sec. 300.348(b), however:

Nothing in [Part B] relieves any participating agency, including a State vocational rehabilitation agency, of the responsibility to provide or pay for any transition service that the agency would otherwise provide to students with disabilities who meet the eligibility criteria of that agency.

However, the fact that an agency other than the public agency does not fulfill its responsibility does not relieve the public agency of its responsibility to ensure that FAPE is available to each student with a disability. (Section 300.142(b)(2) specifically requires that if an agency other than the LEA fails to provide or pay for a special education or related service (which could include a transition service), the LEA must, without delay, provide or pay for the service, and may then claim reimbursement from the agency that failed to provide or pay for the service.)

**13. Under what circumstances must a public agency invite representatives from other agencies to an IEP meeting at which a child's need for transition services will be considered?**

Section 300.344 requires that, "In implementing the requirements of [Sec. 300.347(b)(1)(ii) requiring a statement of needed transition services], the public agency shall also invite a representative of any other agency that is likely to be responsible for providing or paying for transition services " To meet this requirement, the public agency must identify all agencies that are "likely to be responsible for providing or paying for transition services" for each student addressed by Sec. 300.347(b)(1), and must invite each of those agencies to the IEP meeting; and if an agency invited to send a representative to a meeting does not do so, the public agency must take other steps to obtain the participation of that agency in the planning of any transition services.

If, during the course of an IEP meeting, the team identifies additional agencies that are "likely to be responsible for providing or paying for transition services" for the student, the public agency must determine how it will meet the requirements of Sec 300 344

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
|---|---|
| **Sec. 300.349 Private school placements by public agencies.**<br><br>(a) Developing IEPs (1) Before a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency shall initiate and conduct a meeting to develop an IEP for the child in accordance with Secs. 300.346 and 300.347<br><br>(2) The agency shall ensure that a representative of the private school or facility attends the meeting. If the representative cannot attend, the agency shall use other methods to ensure participation by the private school or facility, including individual or conference telephone calls.<br><br>(b) Reviewing and revising IEPs. (1) After a child with a disability enters a private school or facility, any meetings to review and revise the child's IEP may be initiated and conducted by the private school or facility at the discretion of the public agency.<br><br>(2) If the private school or facility initiates and conducts these meetings, the public agency shall ensure that the parents and an agency representative--<br><br>(i) Are involved in any decision about the child's IEP; and<br><br>(ii) Agree to any proposed changes in the IEP before those changes are implemented.<br><br>(c) Responsibility Even if a private school or facility implements a child's IEP, responsibility for compliance with this part remains with the public agency and the SEA<br><br>(Authority. 20 U S C 1412(a)(10)(B)) | **Discussion:** Section 612(a)(10)(B) of the Act makes clear that, as a condition of eligibility for receipt of Part B funds, States must ensure that children with disabilities placed in or referred to private schools or facilities by public agencies receive special education and related services, in accordance with an IEP, at no cost to their parents. This statutory requirement substantially reflects prior law in this area Section 300 401 also provides that IEPs for children with disabilities who are publicly placed at or referred to private schools must meet the requirements of Secs. 300.340-300 350.<br><br>Because these disabled children are publicly-placed or referred to private schools or facilities as a means of ensuring that they are provided FAPE, it would not be appropriate to change the regulatory language in the manner suggested by these commenters. The regulation gives public agencies and private schools and facilities some flexibility in the manner in which IEP meetings are conducted; however, there is no need to require additional meetings, since these meetings can be initiated by the public agency or requested by the private school or facility at any time.<br><br>Regarding concerns about participation of representatives of private schools at meetings to develop the child's IEP, Sec. 300.349(a)(2) provides that before a child with a disability is placed or referred to a private school or facility, a representative of that private school must be invited to the meeting to develop the student's IEP. However, if the private school representative is unable to attend in person, the public agency must use other methods to ensure that individual's participation at the meeting, including individual or conference telephone calls. Therefore, this regulation does not require participation of a private school representative if that individual is unable to attend the IEP meeting initiated by the public agency.<br><br>If a public agency initiates an IEP meeting in connection with a disabled child's placement at or referral to a private school or facility, the requirements of Sec. 300 344 regarding participants at meetings apply. However, after the disabled child enters the private school or facility, Sec. 300.349(b)(1) provides that the private school or facility, at the public agency's discretion, may initiate and conduct meetings for purposes of reviewing or revising the child's IEP. Section 300.344 applies to all IEP meetings for which a public agency is responsible, including those conducted by a private school or facility for a publicly-placed child with a disability.<br><br>If a public agency exercises its discretion under Sec. 300.349(b)(1) to permit the private school or facility to initiate and conduct certain IEP meetings, Sec. 300.349(b)(2) specifies that the public agency is still responsible for ensuring that the parents and a public agency representative are involved in those IEP decisions and agree to any changes in the child's program before they are implemented<br><br>Section 300.349(b) does not afford veto authority either to the parents and the public agency, or to the private school, if there is a disagreement about the IEP for the child to be implemented at the private school. This is equally true for IEPs developed for public placements of children with disabilities at private schools.<br><br>Further, Sec. 300.349(c) makes clear that the public agency is ultimately responsible for ensuring that the publicly-placed disabled student receives FAPE. Therefore, regardless of whether the public agency initiates meetings for the purpose of reviewing and revising IEPs of children with disabilities publicly-placed at private schools or facilities, the public agency must ensure that the child's IEP is reviewed at least once every twelve months, and that the child's placement at the private school or facility is in accordance with that child's IEP.<br><br>If the public agency disagrees with changes proposed by the private school, the public agency nevertheless remains responsible for ensuring that the student receives an appropriate program. If the private school or facility is unwilling to provide such a program, the public agency either must ensure that the student's IEP can be implemented at that or another private school or facility, or must develop an appropriate public placement for the child to address that child's needs. In all instances, the child's placement at the private school or facility must be based on the child's IEP, and that placement must be the LRE placement for the child.<br><br>The commenter's assumption that normal due process rights would apply is correct. The due process rights of Part B are available to parents and public educational agencies to resolve issues such as the appropriateness of the child's program at the private school, but representatives of private schools or facilities at which children with disabilities are publicly placed or referred do not have due process rights. |

142

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

| | |
|---|---|
| | Regarding a parent's right to reimbursement for costs associated with their child's private school placement, Sec. 300 401 reflects the statutory requirements of section 612(a)(10)(B) and requires that a disabled student's placement at a private school by a public agency must be at no cost to the child's parents, and public agencies must ensure that all of the rights guaranteed by Part B are afforded to publicly-placed children with disabilities and their parents. The "at no cost" requirements of the Act also would require public agencies to reimburse parents for transportation and other costs associated with their participation at IEP meetings conducted in a geographic area outside of the jurisdiction of the LEA, and such expenditures traditionally have been considered the responsibility of the public agency. See discussion under Sec. 300 24 of this attachment.<br><br>**Changes:** None. |
| ***Children with Disabilities in Religiously-Affiliated or Other Private School*** | **Discussion:** There is no statutory authority to require public agencies to develop IEPs for every child with a disability in their jurisdiction placed by their parents at a private school, regardless of whether that child receives services from the LEA. Section 612(a)(10)(A) of the Act requires States to make provision for the participation of private school children with disabilities in programs assisted or carried out under this part, through the provision of special education and related services, to the extent consistent with their number and location in the State.<br><br>Because private school children with disabilities do not have an individual entitlement to services under Part B, it would be inconsistent with the statute to require public agencies to develop service plans for those private school children with disabilities who do not receive services from the public agency. However, the commenter's suggestion that proposed Sec. 300.350 should be deleted and that a requirement for service plans for children with disabilities parentally-placed at private schools should be substituted and moved to Subpart D is reasonable.<br><br>Since private school children with disabilities are not entitled to receive FAPE in connection with their private school placements (See Sec. 300.403(a)), it is misleading to use the term IEP to refer to the plans that are developed to serve them. IEPs must contain, among other elements, the full range of special education and related services provided to children with disabilities under these regulations<br><br>By contrast, Sec. 300.455(b) makes clear that a private school child with a disability receives only those services that an LEA determines it will provide that child, in light of the services that the LEA has determined, through the requirements of Secs. 300 453-300.454, it will make available to private school children with disabilities.<br><br>Therefore, proposed Sec. 300.350 should be deleted and its content incorporated in Sec. 300.454 with appropriate revisions, and Sec. 300.455(b) should be revised to reflect a new requirement for service plans for those private school children with disabilities in the LEA's jurisdiction that the LEA has elected to serve in light of the services it makes available to its private school children with disabilities in accordance with the requirements of Secs. 300.453-300.454.<br><br>**Changes:** Proposed Sec. 300.350 has been deleted, and a new Sec. 300.454(c) has been added to specify LEA responsibilities regarding development of service plans for private school children. Section 300.455(b) has been changed to reflect the new provision regarding service plans for private school children with disabilities. |
| | **16. For a child placed out of State by an educational or non-educational State or local agency, is the placing or receiving State responsible for the child's IEP?**<br><br>Regardless of the reason for the placement, the "placing" State is responsible for ensuring that the child's IEP is developed and that it is implemented. The determination of the specific agency in the placing State that is responsible for the child's IEP would be based on State law, policy, or practice. However, the SEA in the placing State is ultimately responsible for ensuring that the child has FAPE available |

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TC . ART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.350 IEP--accountability.**

(a) Provision of services. Subject to paragraph (b) of this section, each public agency must--

(1) Provide special education and related services to a child with a disability in accordance with the child's IEP; and

(2) Make a good faith effort to assist the child to achieve the goals and objectives or benchmarks listed in the IEP.

(b) Accountability. Part B of the Act does not require that any agency, teacher, or other person be held accountable if a child does not achieve the growth projected in the annual goals and benchmarks or objectives. However, the Act does not prohibit a State or public agency from establishing its own accountability systems regarding teacher, school, or agency performance.

(c) Construction--parent rights. Nothing in this section limits a parent's right to ask for revisions of the child's IEP or to invoke due process procedures if the parent feels that the efforts required in paragraph (a) of this section are not being made.

(Authority: 20 U.S.C. 1414(d)); Cong Rec. at H7152 (daily ed., July 21, 1975))

**Discussion:** Section 300.351 has been included in the IEP provisions of the Part B regulations since those regulations first were issued in 1977. It continues to be necessary to make clear that the IEP is not a performance contract and does not constitute a guarantee by the public agency and the teacher that a child will progress at a specified rate. Despite this, public agencies and teachers have continuing obligations to make good faith efforts to assist the child in achieving the goals and objectives or benchmarks listed in the IEP, including those related to transition services.

In addition, it should be noted that teachers and other personnel who must carry out portions of a child's IEP must be informed about the content of the IEP and their responsibility regarding its implementation. Because the clarification of this issue that was previously included in the note to this section is essential to the proper implementation of the Act's IEP requirements, a statement regarding the responsibilities of public agencies and teachers to make good faith efforts to ensure that a child achieves the growth projected in his or her IEP has been included at the conclusion of this section.

In order to meet the new emphasis in the Act that children with disabilities be involved in and progress in the general curriculum and be held to high achievement standards, the IEP provisions must be effectively utilized to ensure that appropriate adjustments can be made to address performance issues as early as possible in the process.

This section does not limit a parent's right to complain and ask for revisions of the child's IEP or to invoke due process procedures if the parent feels that these efforts are not being made. Further, this section does not prohibit a state or public agency from establishing its own accountability systems regarding teacher, school or agency performance if children do not achieve the growth projected in their IEPs.

**Changes:** The note to this section has been removed. Section 300.351 is redesignated as Sec. 300.350 of these final regulations, and the substance of the note has been added to this section.

Texas Education Agency - Special Education March 1999 143

166

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.487 Judicial review.**

If dissatisfied with the Secretary's final action, the SEA may, within 60 days after notice of that action, file a petition for review with the United States Court of Appeals for the circuit in which the State is located. The procedures for judicial review are described in section 612(f)(3)(B)-(D) of the Act.

(Authority: 20 U S.C. 1412(f)(3)(B)-(D))

**Subpart E--Procedural Safeguards**

**Due Process Procedures for Parents and Children**

**Sec. 300.500 General responsibility of public agencies; definitions.**

(a) Responsibility of SEA and other public agencies. Each SEA shall ensure that each public agency establishes, maintains, and implements procedural safeguards that meet the requirements of Secs. 300 500-300.529.

(b) Definitions of "consent," "evaluation," and "personally identifiable." As used in this part --

(1) Consent means that --

(i) The parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or other mode of communication;

(ii) The parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought, and the consent describes that activity and lists the records (if any) that will be released and to whom; and

(iii)(A) The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at anytime.

(B) If a parent revokes consent, that revocation is not retroactive (i.e., it does not negate an action that has occurred after the consent was given and before the consent was revoked).

(2) Evaluation means procedures used in accordance with Secs. 300 530-300.536 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs; and

**Discussion:** The statutory changes to the evaluation procedures that are reflected in Secs. 300.530-300 536 make clear that an "evaluation" will include review of existing data, which may include results on tests or other procedures that are based on the general curriculum and may be used with all children in a grade, school, or class. The definition of "evaluation" in the NPRM at proposed Sec. 300.500(b)(2) had not been updated to recognize this change in the statute. Therefore, a change has been made to eliminate the last sentence in the proposed definition of "evaluation" so that it does not imply that an evaluation may not include a review of a child's performance on a test or procedure used with all children in a grade, school or class. This change does not mean that a public agency must obtain parental consent before administering a test used with all children unless otherwise required. (See Sec. 300.505(a)(3)). Section 300.532 sets forth the procedures required to individually evaluate a child. Section 300.533 addresses the use of existing evaluation data which can include information available on the results of tests and procedures used for all children in a school, grade or class.

To distinguish an initial evaluation from a reevaluation, an initial evaluation of a child is the first completed assessment of a child to determine if he or she has a disability under IDEA, and the nature and extent of special education and related services required. Once a child has been fully evaluated the first time in a State, a decision has been rendered that a child is eligible under IDEA, and the required services have been determined, any subsequent evaluation of a child would constitute a reevaluation.

Regarding revocation of parental consent, parents cannot be forced to consent to decisions related to their child's education. However, it would be impractical to allow a parent to retroactively apply a revocation of consent where parental consent is required. Thus, once a parent consents to an educational decision concerning their child, be it an evaluation or provision of service(s), any revocation of their consent once the action to which they initially consented has been carried out will not affect the validity of the action. Since the non-retroactivity of a parent's revocation of consent is based on the Department's interpretation of the statute, and is important to make clear to all parties, it should be set forth in the regulation itself.

The educational placement of a child focuses on the implementation of a child's IEP and cannot be defined generally given that each child has different educational needs. Section 300.552 addresses the meaning of educational placement by describing the factors involved in making a placement decision and explains the concept in the context of the least restrictive environment. There is no additional benefit to defining further the term educational placement at Sec. 300.500.

**Changes:** The note following this section has been deleted and Sec. 300.500(b)(1)(iii) has been amended by adding language to clarify that a revocation of consent does not have retroactive effect if the action consented to has already occurred. Section Sec. 300.500(b)(2) has been amended by removing the last sentence of that paragraph.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(3) Personally identifiable means that information includes--

(i) The name of the child, the child's parent, or other family member;

(ii) The address of the child;

(iii) A personal identifier, such as the child's social security number or student number; or

(iv) A list of personal characteristics or other information that would make it possible to identify the child with reasonable certainty.

(Authority: 20 U.S.C. 1415(a))

**Sec. 300.501 Opportunity to examine records; parent participation in meetings.**

(a) General The parents of a child with a disability must be afforded, in accordance with the procedures of Secs. 300.562-300.569, an opportunity to--

(1) Inspect and review all education records with respect to--

(i) The identification, evaluation, and educational placement of the child; and

(ii) The provision of FAPE to the child; and

(2) Participate in meetings with respect to --

(i) The identification, evaluation, and educational placement of the child; and

(ii) The provision of FAPE to the child.

(b) Parent participation in meetings. (1) Each public agency shall provide notice consistent with Sec. 300.345(a)(1) and (b)(1) to ensure that parents of children with disabilities have the opportunity to participate in meetings described in paragraph (a)(2) of this section.

**Discussion:** The statute specifically states that parents have the right to participate in meetings regarding identification, evaluation, placement or FAPE. Paragraph (b)(2) describes the types of discussions that do not fall within this requirement The term "all" should be deleted to be consistent with the statutory language.

The term "all education records" is from the statutory reference to "all records relating to such child" at section 615(b)(1) of the Act The Department has always interpreted the term to mean all of the child's education records to be consistent with the purpose of IDEA and the applicable confidentiality provisions of the General Education Provisions Act at 20 U.S.C. 1232g, also known as the Family Educational Rights and Privacy Act of 1974 (FERPA) *as directed by section 617(c) of the Act.*

Education records are defined at Sec. 300.560 by reference to the definition of education records in 34 CFR part 99 (the regulations implementing FERPA). The term means those records that are directly related to a student and are maintained by an educational agency or institution or by a party acting for the agency or institution. Given the definition, it follows that tests taken by a child are included in the education records available for review by a parent. The discussion following Sec. 300.562 in the attachment further discusses what is considered an education record of a child and the timelines for parental inspection and review of education records.

Regarding the definition of "meetings," the proposed definition was intended to make clear that parents have the right to be notified of and attend meetings which, generally, are scheduled in advance, and in which public agency personnel are to come together at the same time, whether face-to-face or via conference calls or video-conferencing, to discuss, and potentially resolve, any of the issues described in *paragraph* (b)(2).

Informal discussions among teachers and administrators, which may or may not be pre-arranged, are not meetings for which parents must receive notice and the opportunity to attend. Whether or not a meeting is prearranged is not the deciding factor in determining whether parents would have the right to attend; rather, the fact that the meeting is to discuss and potentially resolve one or more of the issues identified in paragraph (b)(2) triggers the parents' right to be involved.

In practical terms, this means that meetings to which the child's parents must be afforded the opportunity to attend cannot be convened without providing parents with reasonable notice. However, in the interest of regulating only where necessary, the first sentence of paragraph (b)(2) would be removed and no specific timeline regarding parental notice of meetings would be added.

The right of parents to participate in meetings where the provision of FAPE to their child is being discussed is statutory. The point of the provision is to ensure parents have the opportunity to participate in discussions where substantive decisions regarding their child's education are made--a key principle of the IDEA Amendments of 1997. Eligibility determinations are the focus of the identification process and are already part of Sec. 300.501(a)(2). A parent's role in the eligibility determination also is addressed under Sec. 300.534 of these regulations.

Texas Education Agency - *Special Education* March 1999 167

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES |
|---|---|
| (2) A meeting does not include informal or unscheduled conversations involving public agency personnel and conversations on issues such as teaching methodology, lesson plans, or coordination of service provision if those issues are not addressed in the child's IEP. A meeting also does not include preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting.<br><br>(c) Parent involvement in placement decisions. (1) Each public agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child.<br><br>(2) In implementing the requirements of paragraph (c)(1) of this section, the public agency shall use procedures consistent with the procedures described in Sec. 300.345(a) through (b)(1).<br><br>(3) If neither parent can participate in a meeting in which a decision is to be made relating to the educational placement of their child, the public agency shall use other methods to ensure their participation, including individual or conference telephone calls, or video conferencing.<br><br>(4) A placement decision may be made by a group without the involvement of the parents, if the public agency is unable to obtain the parents' participation in the decision. In this case, the public agency must have a record of its attempt to ensure their involvement, including information that is consistent with the requirements of Sec. 300.345(d).<br><br>(5) The public agency shall make reasonable efforts to ensure that the parents understand, and are able to participate in, any group discussions relating to the educational placement of their child, including arranging for an interpreter for parents with deafness, or whose native language is other than English.<br><br>(Authority: 20 U.S.C. 1414(f), 1415(b)(1)) | With respect to placement, if parents are to be meaningfully involved in the placement decision for their child it is necessary that they understand the various placement options. It is implicit in the requirement that parents be ensured the opportunity to be members of any group making the placement decision, that whatever placement options are available to a child will be fully discussed and analyzed at placement meetings, allowing input from all the participants.<br><br>Relocating the language at Sec. 300.501(c)(1) in the IEE section of the regulations does not make sense since the purpose of Sec 300.501(c) is placement and that of IEE's is evaluation.<br><br>Whether or not video-conferencing, as well as other methods for enabling full participation in meetings by those with a right to attend, are used is dependent on the particular circumstances, and no one method is mandated. If one effective option would be more costly in a particular situation than another, there is no mandate that the more costly alternative be chosen.<br><br>Section 300.501(c)(4) explains that placement decisions may be made by public agencies without the parents if the agency is unable to obtain the parents' participation in the decision and documents its attempts to ensure their involvement. Once a parent makes clear that he or she will be involved in the placement decision-making process, Sec. 300.501(c)(5) requires that the agency ensure that the parent is actually able to participate in, which includes understanding, the process. However, it is possible that even if an agency makes reasonable efforts, consistent with Sec. 300.501(c)(5), to ensure a parent's participation, the parent is still not able to meaningfully participate. Thus, it appears useful to clarify the regulation.<br><br>**Changes:** Section 300.501(a)(2) has been amended to delete the word "all"; Sec. 300.501(b)(2) (definitions of "meetings") has been amended by replacing "a prearranged event in which" with "when;" and deleting "and place;" and Sec. 300 501(c)(5) has been revised to refer to reasonable efforts to ensure parent participation. |

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.502 Independent educational evaluation.**

(a) General. (1) The parents of a child with a disability have the right under this part to obtain an independent educational evaluation of the child, subject to paragraphs (b) through (e) of this section.

(2) Each public agency shall provide to parents, upon request for an independent educational evaluation, information about where an independent educational evaluation may be obtained, and the agency criteria applicable for independent educational evaluations as set forth in paragraph (e) of this section.

(3) For the purposes of this part--

(i) Independent educational evaluation means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question; and

(ii) Public expense means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent, consistent with Sec. 300.301.

(b) Parent right to evaluation at public expense. (1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency.

(2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either--

(i) Initiate a hearing under Sec. 300.507 to show that its evaluation is appropriate; or

(ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing under Sec. 300.507 that the evaluation obtained by the parent did not meet agency criteria.

(3) If the public agency initiates a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.

**Discussion:** The purpose of requiring the public agency to either initiate a due process hearing if it wishes to challenge a parent's request for an IEE, or otherwise provide an IEE at public expense, is to require public agencies to respond to IEE requests and to ensure parents are able to obtain an IEE as set forth in section 615(b)(1) of the Act. There is no corresponding need to specify that a parent also has the right to initiate a due process hearing since if a public agency does not do so it must provide the IEE at public expense

IEEs would be only one element in the eligibility determination since the evaluation team reviews the existing evaluation data and then determines what additional data are needed to determine whether the child has or continues to have a covered disability, the child's present levels of performance and whether the child needs or continues to need special education and related services (see Sec 300 533(a) and (b)). Methods in addition to IEEs are to be used to determine whether a child is eligible under IDEA. Therefore, the results of IEEs cannot be the sole determining factor for eligibility.

Under IDEA, it is the public agency's responsibility to establish eligibility. If parents are willing to assume the responsibility, on behalf of the public agency, for having the assessment of their child under IDEA done, they should be reimbursed for the assessment methods agreed upon by the public agency and parents. The agreement between the parents and public agency would depend on their special circumstances so regulating on this issue would not be helpful. However, this procedure would not be an IEE

Since Sec. 300.502(e)(1) states that IEEs at public expense are to be conducted pursuant to the same criteria that apply to evaluations conducted by public agencies, it follows that the requirements at Secs. 300.530-300.536 would apply to the IEEs. Note also that for an IEE obtained by a parent either at public or private expense to be considered by the public agency, such IEE must meet agency criteria Therefore, the parents must be able to have access to the relevant agency criteria To that end, Note 2 should be deleted and, in modified form, included in the text of the regulation at Secs. 300.502(a)(2), 300.502(c)(1), and 300.502(e)(1).

There is nothing in the regulations with respect to IEEs, or evaluations in general, that would prevent reasonable travel for necessary services not available in the community.

Since public agencies must provide parents with information about where IEEs may be obtained, provided the options are consistent with Secs. 300.530-300.536, public agencies have some discretion in the cost if it is at public expense. Further, evaluations of children under IDEA are to cover all areas of suspected disability, which may include medical examinations for purposes of determining the child's disability. There may be situations in which a child's educational needs are intertwined with a child's health needs, therefore, stating that the types of evaluations conducted are only those regarding educational need does not add any useful clarity.

The right of a parent to obtain an IEE is triggered if the parent disagrees with a public initiated evaluation. Therefore, if a parent refuses to consent to a proposed public evaluation in the first place, then an IEE at public expense would not be available since there would be no public evaluation with which the parent can disagree. If the parent believes the proposed public evaluation is inappropriate, he or she may pursue an appropriate publicly-funded evaluation via the mediation or due process procedures under Secs. 300.506-300.509.

With respect to Note 1, while it would be helpful for parents to explain their disagreement over a public evaluation, there is nothing in the statute which prevents parents from obtaining an IEE if they did not express their concerns first. Therefore, Note 1 would be deleted and the regulation changed to state that the public agency may request an explanation from the parents regarding their concerns when the parent files a request for an IEE at public expense. However, such an explanation may not be required of the parents and the provision of an IEE, or initiation of a due process hearing to defend the public evaluation, may not be delayed unreasonably regardless of whether or not the parent explains his or her concerns to the public agency.

Since the necessity or reasonableness of a delay is case specific, no definition of these terms has been added.

**Changes:** Note 2 has been deleted and Sec. 300.502(a)(2) and (e)(1) have been amended to provide that on request for an IEE, parents are provided with information about where an IEE may be obtained and the agency criteria applicable to IEEs and that those criteria are consistent with the parent's right to an IEE.

Note 1 has been deleted and Sec. 300.502(b) has been revised to explain that an explanation of parent disagreement with an agency evaluation may not be required and the public agency may not delay either providing the IEE at public expense or, alternatively, initiating a due process hearing.

Texas Education Agency - Special Education March 1999 169

170

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(4) If a parent requests an independent educational evaluation, the public agency may ask for the parent's reason why he or she objects to the public evaluation. However, the explanation by the parent may not be required and the public agency may not unreasonably delay either providing the independent educational evaluation at public expense or initiating a due process hearing to defend the public evaluation.

(c) Parent-initiated evaluations. If the parent obtains an independent educational evaluation at private expense, the results of the evaluation–

(1) Must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child; and

(2) May be presented as evidence at a hearing under this subpart regarding that child.

(d) Requests for evaluations by hearing officers. If a hearing officer requests an independent educational evaluation as part of a hearing, the cost of the evaluation must be at public expense.

(e) Agency criteria. (1) If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an independent educational evaluation.

(2) Except for the criteria described in paragraph (e)(1) of this section, a public agency may not impose conditions or timelines related to obtaining an independent educational evaluation at public expense.

(Authority: 20 U.S.C. 1415(b)(1))

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.503 Prior notice by the public agency; content of notice.**

(a) *Notice* (1) Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency--

(i) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or

(ii) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

(2) If the notice described under paragraph (a)(1) of this section relates to an action proposed by the public agency that also requires parental consent under Sec. 300 505, the agency may give notice at the same time it requests parent consent.

(b) Content of notice. The notice required under paragraph (a) of this section must include--

(1) A description of the action proposed or refused by the agency;

(2) An explanation of why the agency proposes or refuses to take the action;

(3) A description of any other options that the agency considered and the reasons why those options were rejected;

(4) A description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action;

(5) A description of any other factors that are relevant to the agency's proposal or refusal;

(6) A statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained; and

(7) Sources for parents to contact to obtain assistance in understanding the provisions of this part.

**Discussion:** Section 300.503(b)(8) was proposed to enhance the awareness of parents of low cost and less adversarial mechanisms for resolving disputes with school districts. Therefore, it makes sense to require State complaint procedures to be explained along with due process and mediation rather than in this notice. Since Sec. 300.503(b)(6) requires that parents be advised of the existence of procedural safeguards and, if the written notice is not part of an initial referral for an evaluation, be told how a copy of the procedural safeguards notice can be obtained, it would be useful and appropriate to add a specific requirement for an explanation of the State complaint process in Sec. 300.504(b).

Procedural safeguard notices must be given to the parents, at a minimum, upon the four events set forth at Sec. 300.504(a); between those events and the statement mandated at Sec. 300.503(b)(6), agencies should have ample instances in which they must provide parents with effective notice of the various processes for challenging proposed action. Therefore, Sec. 300.503(b)(8) should be deleted and moved to Sec. 300.504(b).

The types of organizations which exist to help parents understand IDEA are varied and depend on the particular State. Therefore, a list of such organizations in the regulations would not be feasible.

The regulation is already clear on when the prior written notice must be given: a reasonable time before the public agency proposes or refuses to initiate or change the child's identification, evaluation, educational placement or provision of FAPE If parental consent is required for the proposed action, the notice may be given when parental consent is requested. Further, the notice is required at times other than only before implementing a child's IEP so the title should not be changed.

Section 300.503(b)(6) is taken directly from the statute. In addition, it is difficult to understand when it would not be feasible to add the statement required by Sec. 300.503(b)(6).

It is not necessary to add a note requiring an agency to document its efforts to translate or interpret the notice pursuant to Sec. 300.503(c)(2)(i) and (ii) since Sec. 300.503(c)(2)(iii) requires that the agency can show that Sec 300 503(c)(2)(i) and (ii) have been met.

**Changes:** Section 300.503(b)(8) has been deleted and moved to Sec. 300.504(b).

Texas Education Agency - Special Education March 1999 171

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.503 Prior notice by the public agency; content of notice.**

(a) Notice. (1) Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency--

(i) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or

(ii) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

(2) If the notice described under paragraph (a)(1) of this section relates to an action proposed by the public agency that also requires parental consent under Sec. 300.505, the agency may give notice at the same time it requests parent consent.

(b) Content of notice. The notice required under paragraph (a) of this section must include--

(1) A description of the action proposed or refused by the agency;

(2) An explanation of why the agency proposes or refuses to take the action,

(3) A description of any other options that the agency considered and the reasons why those options were rejected;

(4) A description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action;

(5) A description of any other factors that are relevant to the agency's proposal or refusal;

(6) A statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained; and

(7) Sources for parents to contact to obtain assistance in understanding the provisions of this part.

**Discussion:** Section 300.503(b)(8) was proposed to enhance the awareness of parents of low cost and less adversarial mechanisms for resolving disputes with school districts. Therefore, it makes sense to require State complaint procedures to be explained along with due process and mediation rather than in this notice. Since Sec. 300.503(b)(6) requires that parents be advised of the existence of procedural safeguards and, if the written notice is not part of an initial referral for an evaluation, be told how a copy of the procedural safeguards notice can be obtained, it would be useful and appropriate to add a specific requirement for an explanation of the State complaint process in Sec. 300.504(b).

Procedural safeguard notices must be given to the parents, at a minimum, upon the four events set forth at Sec 300.504(a); between those events and the statement mandated at Sec. 300.503(b)(6), agencies should have ample instances in which they must provide parents with effective notice of the various processes for challenging proposed action. Therefore, Sec. 300.503(b)(8) should be deleted and moved to Sec. 300.504(b).

The types of organizations which exist to help parents understand IDEA are varied and depend on the particular State. Therefore, a list of such organizations in the regulations would not be feasible.

The regulation is already clear on when the prior written notice must be given: a reasonable time before the public agency proposes or refuses to initiate or change the child's identification, evaluation, educational placement or provision of FAPE If parental consent is required for the proposed action, the notice may be given when parental consent is requested. Further, the notice is required at times other than only before implementing a child's IEP so the title should not be changed.

Section 300.503(b)(6) is taken directly from the statute. In addition, it is difficult to understand when it would not be feasible to add the statement required by Sec. 300.503(b)(6).

It is not necessary to add a note requiring an agency to document its efforts to translate or interpret the notice pursuant to Sec. 300.503(c)(2)(i) and (ii) since Sec. 300.503(c)(2)(iii) requires that the agency can show that Sec. 300 503(c)(2)(i) and (ii) have been met.

**Changes:** Section 300.503(b)(8) has been deleted and moved to Sec. 300.504(b).

Texas Education Agency - Special Education March 1999 171

172

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(c) Notice in understandable language (1) The notice required under paragraph (a) of this section must be--

(i) Written in language understandable to the general public; and

(ii) Provided in the native language of the parent or other mode of communication used by the parent, unless it is clearly not feasible to do so.

(2) If the native language or other mode of communication of the parent is not a written language, the public agency shall take steps to ensure--

(i) That the notice is translated orally or by other means to the parent in his or her native language or other mode of communication;

(ii) That the parent understands the content of the notice; and

(iii) That there is written evidence that the requirements in paragraphs (c)(2) (i) and (ii) of this section have been met.

(Authority: 20 U.S.C 1415(b)(3), (4) and (c), 1414(b)(1))

**Sec. 300.504 Procedural safeguards notice.**

(a) General. A copy of the procedural safeguards available to the parents of a child with a disability must be given to the parents, at a minimum--

(1) Upon initial referral for evaluation;

(2) Upon each notification of an IEP meeting;

(3) Upon reevaluation of the child; and

(4) Upon receipt of a request for due process under Sec. 300.507.

**Discussion:** The minimum times the procedural safeguards notice must be given to parents is set forth in the statute at section 615(d)(1). The fourth requirement, that the notice be given upon receipt of request for a due process hearing, comes from the requirement at section 615(d)(1)(C) that the notice be given upon registration of a complaint under section 615(b)(6)

The longstanding interpretation of the statutory mandate at section 615(b)(6) that parents have the opportunity to present complaints relating to their child's identification, evaluation, educational placement and provision of FAPE, is that they have an opportunity to request a due process hearing. Therefore, Sec. 300.504(b)(5) should be modified to make clear that the opportunity to be explained is that of presenting complaints to initiate due process hearings pursuant to Sec. 300.507. Section 300.504(b)(10) as stated is then clearer in that it refers to an explanation of the actual due process hearing procedures. Also, in adding Sec. 300.504(b)(14), a corresponding change to the first paragraph of Sec. 300.504(b) must be made to reference State complaint process.

Sections 300.504(a)(2) and (b)(7) are required by the statute. The provision in Sec 300.504(c)(2)(iii) has been in the regulations since 1977 and there is no basis for changing the requirement given that purpose is to ensure that parents receive assistance in understanding the notice.

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(b) Contents The procedural safeguards notice must include a full explanation of all of the procedural safeguards available under Secs. 300 403, 300 500-300 529, and 300 560-300.577, and the State complaint procedures available under Secs 300 660-300 662 relating to--

(1) Independent educational evaluation;

(2) Prior written notice;

(3) Parental consent;

(4) Access to educational records;

(5) Opportunity to present complaints to initiate due process hearings;

(6) The child's placement during pendency of due process proceedings;

(7) Procedures for students who are subject to placement in an interim alternative educational setting;

(8) Requirements for unilateral placement by parents of children in private schools at public expense;

(9) Mediation;

(10) Due process hearings, including requirements for disclosure of evaluation results and recommendations;

(11) State-level appeals (if applicable in that State);

(12) Civil actions;

(13) Attorneys' fees; and

(14) The State complaint procedures under Secs. 300.660-300.662, including a description of how to file a complaint and the timelines under those procedures.

(c) Notice in understandable language. The notice required under paragraph (a) of this section must meet the requirements of Sec. 300.503(c).

(Authority: 20 U.S.C. 1415(d))

Regarding the several suggested additions to the timing and contents of the procedural safeguards: (1) Sec. 300 504(b)(7) as written addresses situations where children are disciplined and placed in interim alternative educational placements; (2) Sec 300 504(b)(8) as written addresses situations resulting in reduction of reimbursement of private school tuition; (3) Sec 300 347(c) requires that at least one year before the student reaches the age of majority under State law the parents and the student will receive notice of the projected transfer of rights through the IEP; (4) Sec. 300.142(e) specifies that private insurance can only be used with informed parent consent and that public insurance can only be used if it will not result in a cost to parents; (5) Sec. 300.503(b)(7) already includes sources for parents to use to help in understanding their rights; and (6) Sec. 300.504(b)(9) already requires that the mediation process, which includes parental rights therein, be fully explained.

The information on the content and timing of the procedural safeguards notice is not included in the statutory description of the contents of this notice.

**Changes:** As discussed under Sec. 300.503, a new Sec. 300.504(b)(14) has been added to address State complaint procedures. The first paragraph of Sec. 300.504(b) is amended to recognize this change. Section 300.504(b)(5) is amended to refer to presenting complaints to initiate due process hearings.

Texas Education Agency - Special Education March 1999 173

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
|---|---|
| **Sec. 300.505 Parental consent.**<br><br>(a) General (1) Subject to paragraphs (a)(3), (b) and (c) of this section, informed parent consent must be obtained before--<br><br>(i) Conducting an initial evaluation or reevaluation; and<br><br>(ii) *Initial provision of special education and related* services to a child with a disability.<br><br>(2) Consent for initial evaluation may not be construed as consent for initial placement described in paragraph (a)(1)(ii) of this section.<br><br>(3) Parental consent is not required before--<br><br>(i) Reviewing existing data as part of an evaluation or a reevaluation; or<br><br>(ii) Administering a test or other evaluation that is administered to all children unless, before administration of that test or evaluation, consent is required of parents of all children.<br><br>(b) Refusal. *If the parents of a child with a disability refuse consent* for initial evaluation or a reevaluation, the agency may continue to pursue those evaluations by using the due process procedures under Secs. *300.507-300.509*, or the mediation procedures under Sec. 300.506 if appropriate, except to the extent inconsistent with State law relating to parental consent.<br><br>(c) Failure to respond to request for reevaluation. (1) Informed parental consent need not be obtained for reevaluation if the public agency can demonstrate that it has taken reasonable measures to obtain that consent, and the child's parent has failed to respond<br><br>(2) To meet the reasonable measures requirement in *paragraph* (c)(1) of this section, the public agency must use procedures consistent with those in Sec. 300.345(d).<br><br>(d) *Additional State consent requirements.* In addition to the parental consent requirements described in paragraph (a) of this section, a State may require parental consent for other services and activities under this part *if it ensures that each* public agency in the State establishes and implements effective procedures to ensure that a parent's refusal to consent does not result in a failure to provide the child with FAPE. | **Discussion:** Parental consent must be informed to be consistent with the statute and meaningful. Further, adding the word "informed" at Sec. 300.505(a)(1) is consistent with the definition, in Sec. 300.500(b)(1), of consent.<br><br>In order for children to receive FAPE, the IDEA Amendments of 1997 emphasized the importance of parent involvement in their children's evaluation and placement The statute requires informed parental consent prior to a child's initial evaluation for special education and related services, as well as any reevaluations. The intent of this statutory change was not to require school districts to obtain parental consent before reviewing existing data about the child and the child's performance, an activity that school districts, as a matter of good practice, should be engaged in as an on-going practice.<br><br>To require parental consent for collection of this type of information would impose a significant burden on school districts with little *discernable benefit to the children served under these regulations.* The statute provides that in some instances, an evaluation team may determine that additional data are not needed for an evaluation or reevaluation. In all instances, parents have the opportunity to be part of the team which makes that determination. Therefore, no parental consent is necessary if no additional data are needed to conduct the evaluation or reevaluation.<br><br>To make this clear and to respond to commenters who believed that requiring parental consent only when conducting a new test as part of the reevaluation was too narrow, the regulation should be revised to specify that parental consent *must be obtained before conducting* an evaluation or reevaluation, to delete proposed paragraph (a)(1)(iii) and add a new provision to state that parental consent need not be obtained before reviewing existing data as a part of an evaluation or reevaluation or before administering a test or other evaluation that is administered to all children unless consent is required of all parents.<br><br>Parental consent would be necessary if a test is conducted as a part of an evaluation or reevaluation, and when any assessment instrument is administered as part of an evaluation or reevaluation. However, schools would not be required by these regulations to obtain parental consent for teacher and related service provider observations, ongoing classroom evaluation, or the administration of or review of the results *of adapted or modified assessments* that are administered to all children in a class, grade, or school.<br><br>If a child is about to graduate or otherwise stop receiving special education and related services, Sec. 300.503's prior notice requirements *would be triggered. Section 300.503 requires* that written notice must be sent to the parents before a proposed change in identification, evaluation, placement, or the provision of FAPE is effective, thereby allowing the parent the opportunity to object to the proposal. It is not appropriate to regulate further on this issue here.<br><br>Paragraph (b) of this section addresses the procedures an agency can use if it wants to pursue an evaluation or reevaluation, but the parents have refused consent. The agency may seek to do the evaluation or reevaluation by using the due process or mediation procedures under Part B of the Act unless doing so *would be inconsistent with State law relating to parent consent. Proposed Notes 1 and 3, and the* second part of proposed Note 2 were attempts to clarify the interplay between the Federal requirement to provide FAPE and any State laws and policies which may not permit educational agencies to override refusals of parents to consent to evaluations and reevaluations<br><br>In practical terms, if a State does not allow the agency to override a parent's refusal for an initial evaluation or reevaluation which the agency deems necessary in order to provide FAPE, the agency, under paragraph (b), must follow the requirements of State law In cases where the evaluation or reevaluation is necessary in order to determine that the child is or continues to be a child with a disability under Part B of the Act, and State law prohibits an agency from overriding a parental refusal to consent, the agency may have no recourse but to not provide, or not continue to provide, services under the Act to the child.<br><br>On the other hand, if State law does not prohibit the agency from overriding a parental refusal to consent to an evaluation or reevaluation, and the agency believes that an evaluation or reevaluation is necessary in order to provide FAPE, the agency would have to take appropriate action.<br><br>If State law provided a mechanism different than due process or mediation under Part B *as the means to override a parent refusal of* consent, and the agency deems the evaluation or reevaluation necessary in order to provide FAPE, the agency would use the State mechanism to pursue the evaluation. If State law permits agencies to override a parental refusal to consent to an evaluation or reevaluation, but does not specify the procedures to use, and the agency determines that the evaluation or reevaluation was necessary in order to provide FAPE to the child, the agency would use the due process and mediation procedures under Part B of the Act. |

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(e) Limitation. A public agency may not use a parent's refusal to consent to one service or activity under paragraphs (a) and (d) of this section to deny the parent or child any other service, benefit, or activity of the public agency, except as required by this part.

(Authority: 20 U S.C. 1415(b)(3); 1414(a)(1)(C) and (c)(3))

Of course, if an agency proposed an evaluation or reevaluation and the parent refused consent, the agency could reconsider whether its proposed evaluation or reevaluation was necessary, if the circumstances warrant. However, in light of the general decision to remove all notes from the regulations implementing Part B of the Act, the notes should be removed.

Paragraph (c) of this section addresses situations in which an agency seeks parental consent for a reevaluation, but the parent fails to respond. Given the importance of parental involvement, the procedures a public agency must use to demonstrate that it has taken reasonable measures to obtain parental consent pursuant to Sec. 300.505(d) should be consistent with the procedures in Sec 300.345(d) that a public agency must use to inform and encourage parents to attend IEP meetings. The methods described in Sec 300 345(d) are examples of how to attempt and document the steps that the public agency has taken to obtain parental participation in an IEP meeting, and are applicable to a public agency's attempts to obtain parental consent pursuant to 34 CFR 300.505

Section 300.345(d) does not require a public agency to take all of the steps mentioned before conducting the meeting A public agency may use a method which is different from the ones listed at Sec. 300.345(d) to demonstrate that it has attempted to obtain parental consent as long as it can demonstrate that its methods were appropriate. Therefore, the language concerning the use of the Sec. 300 345(d) procedures to meet the reasonable measure requirement of Sec. 300.505(c) should be retained.

Under paragraph (d) of this section if a State adopts consent requirements in addition to those required in Sec. 300 505(a)(1), public agencies are not excused from their obligation to provide FAPE because a parent refuses to consent unless the public agency has taken the steps necessary to resolve the matter. In order to resolve the disagreement with the parent, it is appropriate for the public agency to use informal means initially, such as a parent conference. However, if these informal means prove unsuccessful, the public agency must use its override procedures if it continues to believe that the disputed service or activity is needed in order for the child to receive FAPE

Paragraph (e) of this section contained a typographical error because it should have referred to consent required under paragraphs (a) and (d), consistent with the prior regulations. With regard to paragraph (e), it is important to recognize that except for the service or activity for which consent is required under paragraphs (a) and (d), parent refusal to consent to one service or benefit may not be used to deny the parent or child any other service or benefit available to them. For example, if a State requires parental consent to the provision of all services identified in the IEP, and the parent refuses to consent to physical therapy services included in the IEP, the agency is not relieved of its obligation to implement those portions of the IEP to which the parent consents. Similarly, a parent refusal to consent to a reevaluation may not be used to deny a child the right to participate in a class trip. A parent refusal to consent to the collection of additional data that a public agency believes is needed as a part of a reevaluation may not be used to deny the child the services that are not in dispute. In addition, a parent refusal to consent to the collection of additional data that the agency thinks necessary to determine whether the child continues to be a child with a disability may not result in the exclusion of the child from special education and related services because Sec 300 534(c)(1), which reflects the statutory requirements of section 614(c)(5), requires a full evaluation before determining that a child is no longer a child with a disability. To make this point more clearly, paragraph (e) would be revised.

**Changes:** Section 300.505(a)(1) has been amended to refer to "informed parent consent," and to delete the unnecessary reference to programs providing special education and related services. A reference to reevaluation has been added to paragraph (a)(1)(i), paragraph (a)(1)(iii) has been deleted, and a new paragraph (a)(3) added to specify that parental consent is not required before reviewing existing evaluation data as a part of an evaluation or reevaluation or for administering a test used with all children unless consent is required of all parents. Paragraph (e) has been revised to provide that a public agency may not use a parental refusal to consent to one service or benefit under paragraphs (a) and (d) to deny the parent or child another service, benefit, or activity, except as may be required by these regulations. The notes following this section have been removed.

Texas Education Agency - Special Education March 1999 175

176

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

<table>
<tr><td>Mediation</td><td>PB/C Section 300.506 reflects the new statutory provisions in section 615(e) of IDEA, which require States to establish and implement mediation procedures that would make mediation available to the parties whenever a due process hearing is requested IDEA specifies how mediation is to be conducted.<br><br>The impact of this change will depend on the following factors: the number of due process hearings that will be requested, the extent to which the parties to those hearings will agree to participate in mediation, the cost of mediation, the extent to which mediation would have been used in the absence of this requirement to resolve complaints, and the extent to which mediation obviates the need for a due process hearing.<br><br>Data for previous years suggests one can expect about one complaint for every 1000 children served or about 6,000 requests for due process hearings during this school year. This projection probably overstates the number of complaints because it does not take into account the effect of the IDEA Amendments of 1997, which, on balance, can be expected to result in better implementation of the law and higher parental satisfaction with the quality of services and compliance with IDEA.<br><br>Many of these complaints would have been resolved through mediation even without the statutory change. Over 39 States had mediation systems in place prior to the enactment of the IDEA Amendments of 1997. Data for 1992 indicate that, on average, States with mediation systems held mediations in about 60 percent of the cases in which hearings were requested. Nevertheless, the number of mediations is expected to increase even in States that already have mediation systems. Although most States report using mediation as a method of resolving disputes, there have been considerable differences in its implementation and use. In general, the extent to which mediation has been used in States probably depends on the extent to which parents and others were informed of its availability and possible benefits in resolving their complaints and the extent to which the mediator was perceived as a neutral third-party. The changes made by the IDEA Amendments of 1997 are expected to eliminate some of the differences in State mediation systems that have accounted for its variable use and effectiveness.<br><br>The benefits of making mediation more widely available are expected to be substantial, especially in relation to the costs. States with well-established mediation systems conduct considerably fewer due process hearings. For example, in California, hearings were held in only 5 and 7 percent of the cases in which they were requested in 1994 and 1995, respectively. The average mediation appears to cost between $350 and $1000, while a due process hearing can cost tens of thousands of dollars. Based on the experience that many different States have had with mediation, it is estimated that hundreds of additional complaints will be resolved through mediation. The benefits to school districts and benefits to families are expected to be substantial.</td></tr>
</table>

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.506 Mediation.**

(a) General. Each public agency shall ensure that procedures are established and implemented to allow parties to disputes involving any matter described in Sec 300 503(a)(1) to resolve the disputes through a mediation process that, at a minimum, must be available whenever a hearing is requested under Secs. 300.507 or 300 520-300.528.

(b) Requirements. The procedures must meet the following requirements:

(1) The procedures must ensure that the mediation process--

(i) Is voluntary on the part of the parties;

(ii) Is not used to deny or delay a parent's right to a due process hearing under Sec. 300 507, or to deny any other rights afforded under Part B of the Act; and

(iii) Is conducted by a qualified and impartial mediator who is trained in effective mediation techniques.

(2)(i) The State shall maintain a list of individuals who are qualified mediators and knowledgeable in laws and regulations relating to the provision of special education and related services.

(ii) If a mediator is not selected on a random (e.g., a rotation) basis from the list described in paragraph (b)(2)(i) of this section, both parties must be involved in selecting the mediator and agree with the selection of the individual who will mediate.

(3) The State shall bear the cost of the mediation process, including the costs of meetings described in paragraph (d) of this section.

(4) Each session in the mediation process must be scheduled in a timely manner and must be held in a location that is convenient to the parties to the dispute.

(5) An agreement reached by the parties to the dispute in the mediation process must be set forth in a written mediation agreement.

(6) Discussions that occur during the mediation process must be confidential and may not be used as evidence in any subsequent due process hearings or civil proceedings, and the parties to the mediation process may be required to sign a confidentiality pledge prior to the commencement of the process.

**Discussion:** Mediation is an important alternative system for resolution of disputes under Part B However, in order for mediation to be effective, it must be an attractive alternative to both public agencies and parents and it must be an impartial system which brings the proper parties into a confidential discussion of the issues and allows for a binding agreement that resolves the dispute.

The statute clearly states that the option of mediation must be available whenever a due process hearing is requested. No further requirement would be added to the regulations. However, States or other public agencies are strongly encouraged to offer mediation or other alternative systems of dispute resolution prior to the filing of a request for a due process hearing, and whenever a dispute arises

An expanded use of mediation should enable prompt resolution of disputes and lead to a decrease in the use of costly and divisive due process proceedings and civil litigation. Mediation may also be useful in resolving State complaints under Secs 300 660-300 662

The term "public agency" in the regulation appropriately includes State and local educational agencies as well as other agencies in the State that may have responsibility for the education of children with disabilities because it ensures access to the mediation process, regardless of the agency that provides educational services. The requirement that the State bear the cost of the mediation process is clearly set out in the regulation; however, the regulation should be revised to correctly refer to the meetings to encourage the use of mediation. In addition, the potential savings of mediation, when compared to litigation, make it an attractive, low-cost option for most public agencies.

While there is nothing in the Part B regulations that precludes parents and LEA employees from attempting to resolve disputes through an informal process, the use of current LEA employees as mediators would make mediation a much less attractive alternative to parents. The regulatory provisions regarding the impartiality of mediators and the requirement of specialized expertise in laws and regulations relating to the provision of special education and related services are intended to be more stringent than the Federal requirements for impartial hearing officers to ensure that mediation is a more attractive option for parents, and an effective option for both parties. The use of a single mediator in the mediation process is important for clear communication and accountability.

Paragraph (b)(1)(iii) of this section, which repeats statutory language, is clear that each mediation be conducted by one mediator, as opposed to a panel or multiple mediators

Another factor that will determine the success of mediation within a State is the selection process for mediators It is important to note that with respect to paragraph (b)(2) of this section, the Senate and House Committee Reports on Pub. L. 105-17 include the following statement:

** * * the bill provides that the State shall maintain a list of individuals who are qualified mediators. The Committee intends that whenever such a mediator is not selected on a random basis from that list, both the parents and the agency are involved in selecting the mediator, and are in agreement with the individual who is selected. (S. Rep. No. 105-17, p. 27 (1997); H. Rep. No 105-95, p. 106 (1997).)*

The success of a mediation system will be closely related to both parties' trust and commitment to the process. The first test of that process will be the selection of the mediator. Parties that mistrust the mediator selection process may be less likely to reach agreement on substantive issues. Therefore, reflecting the language of the Committees' reports on this topic, a change should be made to the regulation to specify that if a mediator is not selected on a random basis from the State-maintained list, both parties are involved in selecting the mediator and are in agreement with the selection of the individual who will mediate.

Like hearing officers, mediators must be able to be paid by the State, without impacting their impartiality. Language similar to that used for impartial hearing officers should be added to the regulation to clarify that even though a mediator is paid for his or her services as a mediator, such payment does not make that mediator an employee for purposes of impartiality.

The regulatory requirement for the use of a qualified mediator instructed in effective mediation techniques will ensure that decisions about the effectiveness of specific techniques, such as the need for face-to-face negotiations, telephone communications, or IEP implementation provisions, will be based upon the mediator's independent judgment and expertise. Therefore, it is not necessary to regulate on these issues.

Texas Education Agency - Special Education March 1999 177

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
|---|---|
| (c) Impartiality of mediator. (1) An individual who serves as a mediator under this part–<br>(i) May not be an employee of–<br>(A) Any LEA or any State agency described under Sec. 300.194; or<br>(B) An SEA that is providing direct services to a child who is the subject of the mediation process; and<br>(ii) Must not have a personal or professional conflict of interest.<br>(2) A person who otherwise qualifies as a mediator is not an employee of an LEA or State agency described under Sec. 300 194 solely because he or she is paid by the agency to serve as a mediator.<br>(d) Meeting to encourage mediation. (1) A public agency may establish procedures to require parents who elect not to use the mediation process to meet, at a time and location convenient to the parents, with a disinterested party--<br>(i) Who is under contract with a parent training and information center or community parent resource center in the State established under section 682 or 683 of the Act, or an appropriate alternative dispute resolution entity; and<br>(ii) Who would explain the benefits of the mediation process, and encourage the parents to use the process.<br>(2) A public agency may not deny or delay a parent's right to a due process hearing under Sec. 300.507 if the parent fails to participate in the meeting described in paragraph (d)(1) of this section.<br>(Authority: 20 U.S.C. 1415(e)) | The enforceability of a mediation agreement, like the enforceability of other binding agreements, including settlement agreements, will be based upon applicable State and Federal law. With regard to the provision in paragraph (b)(6) of this section that mediation discussions must be confidential and may not be used in any subsequent due process hearings or civil proceedings, the Senate and House Committee Reports on Pub. L. 105-17 note that "nothing in this bill shall supersede any parental access rights under the Family Educational Rights and Privacy Act of 1974 or foreclose access to information otherwise available to the parties." (S Rep. No 105-17, p 27 (1997); H. Rep No. 105-95, p. 107 (1997)). The Reports also include an example of a confidentiality pledge, which makes clear that the intent of this provision is to protect discussions that occur in the mediation process from use in subsequent due process hearings and civil proceedings under the Act, and not to exempt from discovery, because it was disclosed during mediation, information that otherwise would be subject to discovery<br><br>Regarding the perceived conflict between Sec. 300.506(d)(1) and (d)(2), the mediation process, including meetings to discuss the benefits of mediation, should not be used to deny or delay parents' due process hearing rights. The purpose behind Sec 300.506(d)(2) is to ensure that in situations where parents are unwilling or unable to cooperate with a public agency regarding a meeting to discuss the benefits of mediation, there is still a timely resolution of the due process hearing. In general, a hearing officer should not extend the timelines for a due process hearing based on the fact that there is a pending mediation in the case unless both parties have agreed to that extension If mediation is used in the resolution of a State complaint, it should not be viewed as creating, in and of itself, an exceptional circumstance justifying an extension of the 60 day time line. While the State or local educational agency may require that the parent attend the meeting to receive an explanation of the benefits of mediation and to encourage its use, a parent's failure to attend this meeting prior to the due process hearing should not be used to justify delay or denial of the hearing or the hearing decision.<br><br>It is not necessary to define the terms "parent training and information centers" or "community parent resource center" since they are established by statute. To allow flexibility with regard to the designation of a "disinterested party" by the parent organizations or an appropriate alternative dispute resolution entity, no definition would be provided. Consistent with the general decision to remove all notes from these final regulations, Notes 1 and 2 would be removed.<br><br>**Changes:** A new paragraph (b)(2)(ii) is added to specify that the mediator be selected from the list on a random basis, such as a rotation, or that both parties are involved in selecting the mediator and agree with the selection of the individual who will mediate. Notes 1 and 2 have been removed. Paragraph (b)(3) has been revised to refer to the meetings to encourage the use of mediation<br><br>Another new paragraph (c)(2) is added to clarify that payment for mediator services does not make the mediator an employee for purposes of impartiality. |

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.507 Impartial due process hearing; parent notice.**

(a) General (1) A parent or a public agency may initiate a hearing on any of the matters described in Sec. 300 503(a)(1) and (2) (relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child).

(2) When a hearing is initiated under paragraph (a)(1) of this section, the public agency shall inform the parents of the availability of mediation described in Sec. 300.506.

(3) The public agency shall inform the parent of any free or low-cost legal and other relevant services available in the area if--

(i) The parent requests the information; or

(ii) The parent or the agency initiates a hearing under this section.

(b) Agency responsible for conducting hearing. The hearing described in paragraph (a) of this section must be conducted by the SEA or the public agency directly responsible for the education of the child, as determined under State statute, State regulation, or a written policy of the SEA.

(c) Parent notice to the public agency. (1) General. The public agency must have procedures that require the parent of a child with a disability or the attorney representing the child, to provide notice (which must remain confidential) to the public agency in a request for a hearing under paragraph (a)(1) of this section.

(2) Content of parent notice. The notice required in paragraph (c)(1) of this section must include--

(i) The name of the child;

(ii) The address of the residence of the child;

(iii) The name of the school the child is attending;

(iv) A description of the nature of the problem of the child relating to the proposed or refused initiation or change, including facts relating to the problem; and

(v) A proposed resolution of the problem to the extent known and available to the parents at the time.

**Discussion:** The prior written notice requirement of Sec. 300.503 is sufficient to inform parents of what the public agency is proposing Therefore, any hearing request by the public agency on that proposal would not require an additional notice by the agency. Another notice would be repetitive and overly burdensome. Likewise, many public agencies already have existing model forms for hearing requests. Since the statute and regulation specify the information which parents must disclose in the hearing request, additional input from parent information and training centers or the general public is unnecessary and would create additional burdens without much benefit

The Senate and House Committee Reports on Pub. L. 105-17 note that attorneys' fees to prevailing parents may be reduced if the attorney representing the parents did not provide the public agency with specific information about the child and the basis of the dispute described in paragraphs (c)(1) and (2) of this section. With respect to the intent of the new notice provision, the Reports include the following statement:

* * * The Committee believes that the addition of this provision will facilitate an early opportunity for schools and parents to develop a common frame of reference about problems and potential problems that may remove the need to proceed to due process and instead foster a partnership to resolve problems. (S. Rep. No. 105-17, p. 25 (1997); H. R. Rep. No. 105-95, p. 105 (1997)).

The changes to Sec. 300.513 clarify the potential for reduction of attorneys' fees in cases where proper notice is not given by the parents' attorney. Therefore, a reference to attorneys' fees is not necessary here.

Matters such as what evidence should and should not be presented and requests for extensions of time, should be handled on a case-by-case basis by the impartial hearing officer presiding over the hearing. It has also been the Department's long-standing position that Part B of the Act and the regulations under Part B do not provide any authority for a public agency to deny a parent's request for an impartial due process hearing, even if the agency believes that the parent's issues are not new. Thus, the determination of whether or not a parent's request for a hearing is based on new issues can only be made by an impartial hearing officer.

The request for modification of the regulation at Sec. 300.507(c)(2)(iv) to include situations where the nature of the problem is the public agency's refusal to initiate or change the provision of a free appropriate public education, is consistent with the requirements of Sec. 300.507(a)(1). In light of the general decision to remove all notes from these final regulations, Notes 1 and 2 should be removed.

**Changes:** Section 300.507(c)(2)(iv) is amended to make clear that a problem may have arisen as a result of an agency's proposal or refusal to act. Notes 1 and 2 have been removed.

Texas Education Agency - Special Education March 1999 179

180

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(3) Model form to assist parents. Each SEA shall develop a model form to assist parents in filing a request for due process that includes the information required in paragraphs (c)(1) and (2) of this section.

(4) Right to due process hearing. A public agency may not deny or delay a parent's right to a due process hearing for failure to provide the notice required in paragraphs (c)(1) and (2) of this section.

(Authority: 20 U.S.C. 1415(b)(5), (b)(6), (b)(7), (b)(8), (e)(1) and (f)(1))

**Sec. 300.508 Impartial hearing officer.**

(a) A hearing may not be conducted--

(1) By a person who is an employee of the State agency or the LEA that is involved in the education or care of the child; or

(2) By any person having a personal or professional interest that would conflict with his or her objectivity in the hearing.

(b) A person who otherwise qualifies to conduct a hearing under paragraph (a) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer.

(c) Each public agency shall keep a list of the persons who serve as hearing officers. The list must include a statement of the qualifications of each of those persons.

(Authority: 20 U.S.C. 1415(f)(3))

**Discussion:** The regulation, in conjunction with State ethics requirements for attorneys and judges, are sufficient to address the concerns raised by commenters with regard to potential conflicts. In States where there are no formal ethical standards for administrative hearing officers, the issue should be addressed within the State. A prior employee of an LEA or SEA should not be barred from serving as a hearing officer where there is no personal or professional interest that would conflict with his or her objectivity in the hearing. Hearing officers, like judges, are capable of making independent determinations of potential conflicts of interest, including a determination of whether he or she has knowledge or information about a particular child derived from outside the hearing process which would impact upon his or her impartiality.

Although numerous commenters asked for national standards, training, and examinations for impartial hearing officers, decisions about training and hearing officer selection, including the use of sublists, should be left to States. Since hearing officers' decisions are subject to judicial review, there is a strong incentive for States to choose qualified hearing officers, conduct appropriate training and establish standards of expertise. Hearing decisions that are not soundly decided will lead to further litigation, be more likely to be reversed and create higher costs. In addition, reviewing courts are less likely to give judicial deference to a hearing officer where his or her qualifications show no expertise in the area of special education.

**Changes:** None.

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES |
|---|---|
| **Sec. 300.509 Hearing rights.**<br><br>(a) General Any party to a hearing conducted pursuant to Secs. 300 507 or 300.520-300 528, or an appeal conducted pursuant to Sec. 300.510, has the right to--<br><br>(1) Be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;<br><br>(2) Present evidence and confront, cross-examine, and compel the attendance of witnesses;<br><br>(3) Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least 5 business days before the hearing;<br><br>(4) Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; and<br><br>(5) Obtain written, or, at the option of the parents, electronic findings of fact and decisions.<br><br>(b) Additional disclosure of information. (1) At least 5 business days prior to a hearing conducted pursuant to Sec. 300.507(a), each party shall disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing.<br><br>(2) A hearing officer may bar any party that fails to comply with paragraph (b)(1) of this section from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.<br><br>(c) Parental rights at hearings. (1) Parents involved in hearings must be given the right to--<br><br>(i) Have the child who is the subject of the hearing present; and<br><br>(ii) Open the hearing to the public.<br><br>(2) The record of the hearing and the findings of fact and decisions described in paragraphs (a)(4) and (a)(5) of this section must be provided at no cost to parents. | **Discussion:** The establishment of two separate time frames for the prehearing disclosure of documents because the term "5 business days" is used in Sec. 300 509(b)(1) and the term "5 days" is used in paragraph (a)(3) of this section will lead to confusion and additional litigation and costs. In order to prevent this, the time frame for disclosure would be set to 5 business days prior to the hearing This change would be consistent with prior interpretations by the Department, which recognized that the intent of prehearing disclosure is to avoid surprise by either party at the hearing. The hearing officer has discretion to determine the consequences of not meeting the disclosure time line, and may prohibit the introduction of the evidence or may allow the rescheduling of the hearing so that timely disclosure is possible.<br><br>Some States chose to allow the use of other discovery procedures prior to a due process hearing. States should continue to have this discretion as they are not prohibited from doing so by Part B.<br><br>Access to a written verbatim record of the hearing is vital for parents to exercise their full due process rights. Although there are costs associated with the statutorily mandated shift of the choice between an electronic or written record of the hearing from the public agency, as newer technologies are better capable of generating accurate transcriptions, these costs will decrease.<br><br>Parents must continue to have the choice to have the child be present for all or part of the hearing, at their discretion For some youth with disabilities, observing and even participating in the hearing will be a self-empowering experience in which they can learn to advocate for themselves. This long-standing choice should not be taken away from parents. This choice takes on added significance in light of the new provisions that allow States to transfer parental rights to students at the age of majority. Under this new authority, there may be more situations where students will have to be present at and participate in due process hearings.<br><br>Implicit in the requirement that hearing decisions be made available to the public, is the requirement that they be made available within a reasonable amount of time. Therefore, no specific time requirement is needed in the regulation.<br><br>**Changes:** Paragraph (a)(3) of this section is changed to require disclosure at least 5 business days before the hearing |

182

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(d) Findings and decision to advisory panel and general public. The public agency, after deleting any personally identifiable information, shall --

(1) Transmit the findings and decisions referred to in paragraph (a)(5) of this section to the State advisory panel established under Sec. 300.650; and

(2) Make those findings and decisions available to the public.

(Authority: 20 U.S.C. 1415(f)(2) and (h))

**Sec. 300.510 Finality of decision; appeal; impartial review.**

(a) Finality of decision. A decision made in a hearing conducted pursuant to Secs. 300.507 or 300.520-300.528 is final, except that any party involved in the hearing may appeal the decision under the provisions of paragraph (b) of this section and Sec. 300.512.

(Authority: 20 U.S.C. 1415(i)(1)(A))

(b) Appeal of decisions; impartial review. (1) General. If the hearing required by Sec. 300.507 is conducted by a public agency other than the SEA, any party aggrieved by the findings and decision in the hearing may appeal to the SEA.

(2) SEA responsibility for review. If there is an appeal, the SEA shall conduct an impartial review of the hearing. The official conducting the review shall--

(i) Examine the entire hearing record;

(ii) Ensure that the procedures at the hearing were consistent with the requirements of due process;

(iii) Seek additional evidence if necessary. If a hearing is held to receive additional evidence, the rights in Sec. 300.509 apply;

(iv) Afford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official;

(v) Make an independent decision on completion of the review; and

(vi) Give a copy of the written, or, at the option of the parents, electronic findings of fact and decisions to the parties.

**Discussion:** There were two typographical errors in the proposed regulation with respect to references to other sections. In Sec. 300.510(b)(2)(iii) the reference to Sec. 300.508 should be to Sec. 300.509 consistent with the prior regulatory reference. In Sec. 300.510(d), the reference to Sec. 300 511 should be to Sec. 300.512, also consistent with the prior regulatory reference.

The reference in Sec. 300.510(b)(vi) to written findings and decision should be changed to be consistent with Sec. 300 509(a)(5) and allow the choice of electronic or written findings of fact and decision.

It is not necessary to regulate on whether hearing officers are allowed to amend their decisions for technical errors. This matter is left to the discretion of hearing officers and States; however, proper notice should be given to parents if State procedures allow for amendments and a reconsideration process may not delay or deny parents' right to a decision within the time periods specified for hearings and appeals

It has been the Department's position that the SEA may conduct its review either directly or through another State agency acting on its behalf. However, the SEA remains responsible for the final decision on review. In addition, all parties have the right to continue to be represented by counsel at the State administrative review level, whether or not the reviewing official determines that a further hearing is necessary. If the reviewing official decides to hold a hearing to receive additional evidence, the other rights in Sec. 300.509 relating to hearings also apply. However, in light of the general decision to remove all notes from these final regulations, Notes 1 and 2 would be removed.

**Changes:** In Sec. 300.510(b)(2)(iii) the reference to Sec. 300.508 has been changed to Sec. 300.509. In Sec. 300.510(d), the reference to Sec. 300.511 has been changed to Sec. 300.512. The reference in Sec. 300.510(b)(2)(vi) to written findings and decision has been changed to be consistent with Sec. 300.509(a)(5) and allow the choice of "electronic or written findings of fact and decision." Notes 1 and 2 have been removed.

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| (c) Findings and decision to advisory panel and general public. The SEA, after deleting any personally identifiable information, shall--<br><br>(1) Transmit the findings and decisions referred to in *paragraph* (b)(2)(vi) *of this section* to the State advisory panel established under Sec. 300.650; and<br><br>(2) Make those findings and decisions available to the public.<br><br>(d) *Finality of review decision*. *The decision made by the reviewing* official is final unless a party brings a civil action under Sec. 300.512.<br><br>(Authority: 20 U S C. 1415(g); H. R. Rep. No. 94-664, at p. 49 (1975)) | |

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES |
| --- | --- |
| **Sec. 300.511 Timelines and convenience of hearings and reviews.**<br><br>(a) The public agency shall ensure that not later than 45 days after the receipt of a request for a hearing–<br>(1) A final decision is reached in the hearing; and<br>(2) A copy of the decision is mailed to each of the parties.<br><br>(b) The SEA shall ensure that not later than 30 days after the receipt of a request for a review--<br>(1) A final decision is reached in the review; and<br>(2) A copy of the decision is mailed to each of the parties.<br><br>(c) A hearing or reviewing officer may grant specific extensions of time beyond the periods set out in paragraphs (a) and (b) of this section at the request of either party.<br><br>(d) Each hearing and each review involving oral arguments must be conducted at a time and place that is reasonably convenient to the parents and child involved.<br><br>(Authority: 20 U.S.C. 1415) | **Discussion:** There is not sufficient consensus or evidence of need to change the long-standing interpretation of the hearing and review timelines from calendar days to "school days." In addition, the potential impact of no "school days" during the summer months would make the delay in parents' access to due process hearings and decisions unreasonable.<br><br>The use of the word "may" instead of "shall" in Sec. 300.511(c), means that the granting of specific extensions of time are at the discretion of the hearing or review officer. It is not necessary to clarify that this discretion means that requests for extensions can be denied as well as granted since this is implicit in the regulation.<br><br>There is no need to change the regulation to reflect the State's responsibility for compliance with timelines because in addition to the language in this regulation, Sec. 300.600 continues to hold the State ultimately responsible for noncompliance.<br><br>**Changes:** None. |
| **Sec. 300.512 Civil action.**<br><br>(a) General. Any party aggrieved by the findings and decision made under Secs. 300.507 or 300.520-300.528 who does not have the right to an appeal under Sec. 300 510(b), and any party aggrieved by the findings and decision under Sec. 300.510(b), has the right to bring a civil action with respect to the complaint presented pursuant to Sec. 300.507. The action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.<br><br>(b) Additional requirements. In any action brought under paragraph (a) of this section, the court–<br>(1) Shall receive the records of the administrative proceedings;<br>(2) Shall hear additional evidence at the request of a party; and<br>(3) Basing its decision on the preponderance of the evidence, shall grant the relief that the court determines to be appropriate. | **Discussion:** There were typographical errors in this section in the NPRM, however the reference to Sec. 300.510(b)(2) should be to Sec. 300.510(b) and the reference to Sec. 300.510(e) should be to Sec. 300.510(b).<br><br>**Changes:** The reference to Sec. 300.510(b)(2) has been changed to Sec. 300.510(b) and the reference to Sec. 300 510(e) has been changed to Sec. 300.510(b). |

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(c) Jurisdiction of district courts. The district courts of the United States have jurisdiction of actions brought under section 615 of the Act without regard to the amount in controversy.

(d) Rule of construction. Nothing in this part restricts or limits the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under these laws seeking relief that is also available under section 615 of the Act, the procedures under Secs. 300.507 and 300.510 must be exhausted to the same extent as would be required had the action been brought under section 615 of the Act.

(Authority: 20 U.S.C. 1415(i)(2), (i)(3)(A), and 1415(l))

**Sec. 300.513 Attorneys' fees.**

(a) In any action or proceeding brought under section 615 of the Act, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.

(b)(1) Funds under Part B of the Act may not be used to pay attorneys' fees or costs of a party related to an action or proceeding under section 615 of the Act and subpart E of this part.

(2) Paragraph (b)(1) of this section does not preclude a public agency from using funds under Part B of the Act for conducting an action or proceeding under section 615 of the Act.

(c) A court awards reasonable attorney's fees under section 615(i)(3) of the Act consistent with the following:

(1) Determination of amount of attorneys' fees. Fees awarded under section 615(i)(3) of the Act must be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this subsection.

**Discussion:** By inserting all the statutory provisions regarding attorneys' fees into the regulations, most of the suggestions will be adequately addressed and additional clarity will be added.

Based upon the absence of consensus, the Department will continue to allow maximum flexibility to States for structuring the process by which parents who are prevailing parties under Part B of the Act may request attorneys' fees reimbursement.

It is important to maintain paragraph (b)(1) of this section, because the limited Federal resources under the Act should be used to provide special education and related services and not be used to promote litigation of disputes. Further, that paragraph has been modified to make it clear that the prohibition against using Part B funds for attorney's fees also applies to the related costs of a party in an action or proceeding, such as depositions, expert witnesses, settlements, and other related costs. In addition, a new paragraph (b)(2) of this section has been added to clarify that the prohibition in paragraph (b)(1) does not preclude a public agency from using funds under Part B of the Act to conduct an action or preceding under section 615 of the Act, such as the cost of paying a hearing officer and providing the place for conducting the action or proceeding.

In light of the general decision to remove all notes from the final regulations under the Act, the note following this section in the NPRM would be removed. The proposed note was merely intended to suggest that States could choose as a matter of State law to permit hearing officers to award attorneys' fees to parents who are prevailing parties under Part B of the Act, and not to require that they do so, or imply that IDEA would be the source of the authority for granting hearing officers that role. If a State allows hearing officer's to award attorney's fees, requirements regarding training on attorneys fees would be a State matter.

**Changes:** Paragraph (b) has been revised to prohibit use of funds provided under Part B for related costs. The regulation has been amended to include all of the provisions of section 615(i)(3)(C)-(G) of the Act. The note following this section has been removed.

Texas Education Agency - Special Education March 1999 185

186

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(2) Prohibition of attorneys' fees and related costs for certain services (i) Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under section 615 of the Act for services performed subsequent to the time of a written offer of settlement to a parent if--

(A) The offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;

(B) The offer is not accepted within 10 days; and

(C) The court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

(ii) Attorneys' fees may not be awarded relating to any meeting of the IEP team unless the meeting is convened as a result of an administrative proceeding or judicial action, or at the discretion of the State, for a mediation described in Sec. 300.506 that is conducted prior to the filing of a request for due process under Secs. 300.507 or 300.520-300.528.

(3) Exception to prohibition on attorneys' fees and related costs. Notwithstanding paragraph (c)(2) of this section, an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer.

(4) Reduction of amount of attorneys' fees. Except as provided in paragraph (c)(5) of this section, the court reduces, accordingly, the amount of the attorneys' fees awarded under section 615 of the Act, if the court finds that--

(i) The parent, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy;

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(ii) The amount of the attorneys' fees otherwise authorized to be warded unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience;

(iii) The time spent and legal services furnished were excessive considering the nature of the action or proceeding; or

(iv) The attorney representing the parent did not provide to the school district the appropriate information in the due process complaint in accordance with Sec. 300.507(c).

(5) Exception to reduction in amount of attorneys' fees. The provisions of paragraph (c)(4) of this section do not apply in any action or proceeding if the court finds that the State or local agency unreasonably protracted the final resolution of the action or proceeding or there was a violation of section 615 of the Act.

(Authority: 20 U.S.C. 1415(i)(3)(B)-(G))

**Sec. 300.514 Child's status during proceedings.**

(a) Except as provided in Sec. 300.526, during the pendency of any administrative or judicial proceeding regarding a complaint under Sec. 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.

(b) If the complaint involves an application for initial admission to public school, the child, with the consent of the parents, must be placed in the public school until the completion of all the proceedings.

(c) If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of paragraph (a) of this section.

(Authority: 20 U.S.C. 1415(j))

**Discussion:** The provisions maintaining the child's current educational placement pending proceedings regarding a complaint is a right afforded to parents to protect children with disabilities from being subjected to a new program that parents believe to be inappropriate. The provisions are intended to apply only to the due process proceedings and the subsequent civil action, if any, brought under section 615 of the Act, and not to the State complaint procedures in Secs. 300.660-300.662, which are authorized by the General Education Provisions Act. This position is consistent with the Department's prior interpretation.

It is important to note that these provisions would only apply where there is a dispute between the parent and the public agency that is the subject of administrative or judicial proceedings. If there is no such dispute that is the subject of a proceeding, then the placement may be changed and this section does not apply.

This section does not permit a child's placement to be changed by the public agency during proceedings regarding a complaint, unless the parents and agency agree otherwise. While the placement may not be changed unilaterally by the public agency, this does not preclude the parent from changing the placement at their own expense and risk. It is also important to note that this provision does not preclude the agency from using its normal procedures for dealing with children who are endangering themselves or others, including, as appropriate to the circumstances, seeking injunctive relief from a court of competent jurisdiction. In addition, even where there is disagreement between the parents and the public agency, the provisions of Sec. 300.521 still allow a hearing officer to change the placement of a child with a disability who is substantially likely to injure self or others to an appropriate interim alternative educational setting for not more than 45 days.

Texas Education Agency - Special Education March 1999 187

188

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

| | |
|---|---|
| | Paragraph (c) is based on long-standing judicial interpretation of the Act's pendency provision that when a State hearing officer's or State review official's decision is in agreement with parents that a change in placement is appropriate, that decision constitutes an agreement by the State agency and the parents for purposes of determining the child's current placement during subsequent appeals. See, e g , Burlington School Committee v. Dept. Of Educ , 471 U S. 359, 371 (1985); Susquentia School District v Raelee S , 96 F 3d 78, 84 (3rd Cir. 1996); Clovis Unified v. Office of Administrative Hearings, 903 F.2d 635, 641 (9th Cir. 1990) Paragraph (c) of this section incorporates this interpretation. However, this provision does not limit either party's right to seek appropriate judicial review under Sec 300.512, it only shifts responsibility for maintaining the parent's proposed placement to the public agency while an appeal is pending in those instances in which the State hearing officer or State review official determines that the parent's proposed change of placement is appropriate.<br><br>The term "current placement" is not readily defined. While it includes the IEP and the setting in which the IEP is implemented, such as a regular classroom or a self-contained classroom, the term is generally not considered to be location-specific In addition, it is not intended that a child with disabilities remain in a specific grade and class pending an appeal if he or she would be eligible to proceed to the next grade and the corresponding classroom within that grade.<br><br>There is no need to add a reference to children with disabilities who reach the age of majority in this regulation The transfer of parental rights at the age of majority is discussed in another section of the regulations, Sec. 300.517, and will not be referenced in every other section to which it applies.<br><br>There is also no need to address the parents' ability to change the child's placement unilaterally at their own expense since this issue is addressed in Sec. 300.403.<br><br>Consistent with the general decision to remove all notes from these regulations, the note would be removed.<br><br>**Changes:** The note has been removed. |

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.515 Surrogate parents.**

(a) General. Each public agency shall ensure that the rights of a child are protected if--

(1) No parent (as defined in Sec. 300.20) can be identified;

(2) The public agency, after reasonable efforts, cannot discover the whereabouts of a parent; or

(3) The child is a ward of the State under the laws of that State.

(b) Duty of public agency. The duty of a public agency under paragraph (a) of this section includes the assignment of an individual to act as a surrogate for the parents. This must include a method--

(1) For determining whether a child needs a surrogate parent; and

(2) For assigning a surrogate parent to the child.

(c) Criteria for selection of surrogates. (1) The public agency may select a surrogate parent in any way permitted under State law.

(2) Except as provided in paragraph (c)(3) of this section, public agencies shall ensure that a person selected as a surrogate--

(i) Is not an employee of the SEA, the LEA, or any other agency that is involved in the education or care of the child;

(ii) Has no interest that conflicts with the interest of the child he or she represents; and

(iii) Has knowledge and skills that ensure adequate representation of the child.

**Discussion:** There is insufficient evidence of a wide-spread problem of irresponsible surrogate parents which would require regulatory procedures for termination. Therefore, the issue of the need for procedures for termination of surrogates is left to the discretion of States There is also insufficient evidence of public agency retaliation against surrogate parents. Since there are other civil rights statutes and regulations that prohibit discrimination, including retaliation, against individuals who exercise their rights under Federal law, including the right of individuals to assist individuals with disabilities without retaliation or coercion, there is no need to address this issue in this regulation.

Proposed paragraph (c)(2)(i) of this section reflected the statutory requirement at section 615(b)(2) that a surrogate parent not be an employee of the SEA, LEA or any other agency that is involved in the education or care of the child. It is very important that the surrogate parent adequately represents the educational interest of the child, and not the interests of a particular agency. In the case of other governmental agencies, even agencies that are not involved in the education of the child, there is the possibility of a conflict between the interest of the child and those of the employee of the agency because some educational decisions will have an impact on whether an educational agency or some other governmental agency will be responsible for paying for services for the child. In situations where a child is in the care of a nonpublic agency that has no role in the education of the child, however, an employee of that agency may be the person best suited to serve as a surrogate for the child because of his or her knowledge of the child and concern for the child's well-being and would not, simply by virtue of his or her employment situation, have an interest that could conflict with the interest of the child. In such a case, that individual should not be prohibited from serving as a surrogate as long as he or she had no other interest that conflicts with the interest of the child and has knowledge and skills that will ensure adequate representation of the child.

Paragraph (a) of this section requires that the public agency ensure that the rights of the child are protected if the child is a ward of the State. Paragraph (b) sets out that the duty includes a determination of whether the child needs a surrogate parent and if so, the assignment of one. The proposed regulation at Sec. 300.19(b)(2) has been renumbered at Sec. 300.20 and now clarifies that the definition of a parent may include a foster parent unless State law prohibits it, and if certain other conditions are met. In situations where a child who is a ward of the State has a foster parent who meets the definition of parent in Sec. 300.20 and the foster parent is acting as the parent, the public agency should determine if there is a need for a surrogate parent, and whether further steps are necessary to ensure that the rights of the child are protected. In most cases where the foster parent meets the definition of a parent and is acting as the parent, there would be no need to appoint a surrogate, unless the agency determined that in the particular circumstances of the case a surrogate was necessary to ensure that the rights of the child were protected.

**Changes:** Paragraph (c) has been amended to permit a public agency to appoint as a surrogate an employee of a nonpublic agency that provides only non-educational care to the child. Paragraph (d)(1) has been deleted. Paragraph (d)(2) has been redesignated as paragraph (d) and the reference to paragraph (d)(1) is deleted.

Texas Education Agency - Special Education March 1999 189

190

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(3) A public agency may select as a surrogate a person who is an employee of a nonpublic agency that only provides non-educational care for the child and who meets the standards in paragraphs (c)(2)(ii) and (iii) of this section

(d) Non-employee requirement; compensation. A person who otherwise qualifies to be a surrogate parent under paragraph (c) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a surrogate parent.

(e) Responsibilities The surrogate parent may represent the child in all matters relating to–

(1) The identification, evaluation, and educational placement of the child; and

(2) The provision of FAPE to the child.

(Authority: 20 U S C. 1415(b)(2))

**Sec. 300.516 [Reserved].**

**Sec. 300.517 Transfer of parental rights at age of majority.**

(a) General. A State may provide that, when a student with a disability reaches the age of majority under State law that applies to all students (except for a student with a disability who has been determined to be incompetent under State law)–

(1)(i) The public agency shall provide any notice required by this part to both the individual and the parents; and

(ii) All other rights accorded to parents under Part B of the Act transfer to the student; and

(2) All rights accorded to parents under Part B of the Act transfer to students who are incarcerated in an adult or juvenile, State or local correctional institution.

(3) Whenever a State transfers rights under this part pursuant to paragraph (a)(1) or (a)(2) of this section, the agency shall notify the individual and the parents of the transfer of rights

**Discussion:** It is not necessary to delineate the specific parental rights that transfer under this section because the statute and regulations fully set out the rights afforded to parents under Part B. The statute and paragraph (a)(1) of this section allow States, under State law, to transfer all parental rights to children with disabilities who reach the age of majority, with the exception of the right to notice which is both retained by the parents and transfers to the student. For children with disabilities who are incarcerated in adult or juvenile Federal, State or local correctional institutions, the State, under State law, may transfer all parental rights, including the notice rights, at the age of majority.

The IEP provisions regarding notice prior to the age of majority, do not have to be explained or referenced in this section of the regulations. While the requirement in Sec. 300.347(c) that beginning at least one year before the student reaches the age of majority under State law the IEP must include a statement that the student has been informed of the rights that will transfer to him or her upon reaching the age of majority, does relate to this regulation, it is separate and distinct from the notice provisions in Sec. 300 517(a)(3) requiring notice to the parent and child at the time of transfer--when the child actually reaches the age of majority.

This regulation does not need to address specifically the right to parental participation in IEP meetings for youth with disabilities convicted as adult and incarcerated in adults prisons whose parental rights have not transferred at the age of majority. These individuals would have the same rights as other youth with disabilities whose parental rights have not transferred as set out in section Sec 300 345 There is also no further need to address IEP and placement requirements that do not apply to modifications of IEP or placement for youth with disabilities convicted as an adult and incarcerated in an adult prison because the provisions are already set out at Sec. 300.311(c)(2).

The requirement in paragraph (a) of this section regarding State provision for transfers of parental rights at the age of majority under State law generally does not require a statutory change if the State already has a State law regarding age of majority that applies to all children (except in cases of incompetency). A State may not transfer rights at age of majority in the absence of a State law on age of majority that applies to all children, except those children determined incompetent under State law

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| (b) Special rule. If, under State law, a State has a mechanism to determine that a student with a disability, who has reached the age of majority under State law that applies to all children and has not been determined incompetent under State law, does not have the ability to provide informed consent with respect to his or her educational program, the State shall establish procedures for appointing the parent, or, if the parent is not available another appropriate individual, to represent the educational interests of the student throughout the student's eligibility under Part B of the Act.<br><br>(Authority: 20 U.S.C. 1415(m)) | With regard to the transfer of rights in situations where the competency of an individual with a disability is challenged, currently, most States have laws, rules, and procedures that allow a general determination of incompetency for an individual with a disability who has reached the age of majority. These laws and procedures usually require a formal proceeding and provide for the appointment of a general guardianship where the individual is found not to be competent under the applicable legal standard. The transfer of the Part B parental rights under State law must be consistent with State competency laws, that is, where parental rights transfer to the individual at the age of majority, and the individual is found to be incompetent, the appointed guardian would exercise Part B rights pursuant to their guardianship. In some States, there may be additional laws and procedures that allow for a lesser determination of competency for specific purposes, such as competency for providing informed consent with respect to the individual's educational program.<br><br>The special rule at Sec. 300.517(b) only applies to States who, under State law, allow for this lesser determination of competency--a determination of the ability to provide informed consent with respect to the educational program of the student. Under the provision in the special rule that specifies appointing "the parent, or, if the parent is not available, another appropriate individual," a guardian or surrogate parent could be an appropriate individual to represent the educational interests of the student.<br><br>**Changes:** Paragraph (b) has been revised to make clear that it only applies if a State has a State mechanism lesser competency proceedings. |

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
|---|---|
| **Procedures for Evaluation and Determination of Eligibility**<br><br>**Sec. 300.530 General.**<br><br>Each SEA shall ensure that each public agency establishes and implements procedures that meet the requirements of Secs. 300 531-300.536.<br><br>(Authority: 20 U.S.C. 1414(b)(3); 1412(a)(7)) | |
| **Sec. 300.531 Initial evaluation.**<br><br>Each public agency shall conduct a full and individual initial evaluation, in accordance with Secs. 300.532 and 300.533, before the initial provision of special education and related services to a child with a disability under Part B of the Act.<br><br>(Authority: 20 U S C. 1414(a)(1)) | **Discussion:** The child find provisions of Sec. 300.125 require that a public agency ensure that any child that it suspects has a disability is evaluated. Under both prior law and these regulations, if a parent requests an initial evaluation, the public agency must either: (1) provide the parents with written notice of the agency's proposal to conduct an initial evaluation if the agency suspects that the child has a disability and needs special education and related services; or (2) provide the parents with written notice of the agency's refusal to conduct an initial evaluation if it does not suspect that the child has a disability. The parent may challenge such a proposal or refusal by requesting a due process hearing.<br><br>If a group decision is made under Sec. 300.533(a) that no additional data are needed as part of an initial evaluation, the public agency is not required to conduct additional assessment as part of the initial evaluation; however, the parents may challenge that decision by initiating a due process hearing.<br><br>The child find provisions in section 612(a)(3) and in these regulations at Sec. 300.125 require that all eligible children be identified, located and evaluated, and it is not necessary to establish additional requirements regarding specific circumstances that trigger an agency's responsibility to evaluate a child.<br><br>Any initial evaluation or reevaluation of a child with a disability must meet the requirements of Sec. 300.532; therefore, a child with a disability must, as part of any initial evaluation or reevaluation, be assessed in all areas of suspected disability (Sec. 300 532(g)). However, as provided in Sec. 300.533(a) and explained above, the public agency may not need to conduct assessment procedures to obtain additional data in one or more areas of suspected disability depending on what data are already available regarding the child.<br><br>**Changes:** None.<br><br>**Discussion:** This issue is addressed in the discussion regarding Sec. 300.342.<br><br>**Changes:** None. |

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.532 Evaluation procedures.**

Each public agency shall ensure, at a minimum, that the following requirements are met:

(a)(1) Tests and other evaluation materials used to assess a child under Part B of the Act--

(i) Are selected and administered so as not to be discriminatory on a racial or cultural basis; and

(ii) Are provided and administered in the child's native language or other mode of communication, unless it is clearly not feasible to do so; and

(2) Materials and procedures used to assess a child with limited English proficiency are selected and administered to ensure that they measure the extent to which the child has a disability and needs special education, rather than measuring the child's English language skills.

(b) A variety of assessment tools and strategies are used to gather relevant functional and developmental information about the child, including information provided by the parent, and information related to enabling the child to be involved in and progress in the general curriculum (or for a preschool child, to participate in appropriate activities), that may assist in determining--

(1) Whether the child is a child with a disability under Sec. 300.7; and

(2) The content of the child's IEP.

(c)(1) Any standardized tests that are given to a child--

(i) Have been validated for the specific purpose for which they are used; and

(ii) Are administered by trained and knowledgeable personnel in accordance with any instructions provided by the producer of the tests.

(2) If an assessment is not conducted under standard conditions, a description of the extent to which it varied from standard conditions (e.g., the qualifications of the person administering the test, or the method of test administration) must be included in the evaluation report.

(d) Tests and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

**Discussion:** The provisions of Sec. 300.532(c) regarding requirements for standardized tests are consistent with section 614(b)(3)(B), which limits applicability of those requirements to standardized tests. The selection of appropriate assessment instruments and methodologies is appropriately left to State and local discretion.

A public agency must ensure that: (1) the IEP team for each child with a disability has all of the evaluation information it needs to make required decisions regarding the educational program of the child, including the consideration of special factors required by Sec. 300.346(a)(2); and (2) the team determining a child's eligibility has all of the information it needs to ensure that the child is not determined to be a child with a disability if the determinant factor is a lack of instruction in reading or math, as required by Sec. 300.534(b)(1). It is not, therefore, necessary to establish an additional requirement that evaluations address the requirements of Sec. 300.346(a)(2) or Sec. 300.534(b)(1).

Paragraphs (d), (e), and (f) were all among the provisions included in the regulations as in effect on July 20, 1983, and are unaffected by the IDEA Amendments of 1997.

In evaluating each child with a disability, it is important for public agencies to ensure that the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, including any needs the child has that are commonly linked to a disability category other than the disability in which the child has been classified. Further, public agencies must ensure that the services provided to each child under this part are designed to meet all of the child's identified special education and related services needs, and not those resulting only from the disability area in which the child has been initially classified.

As proposed Note 1 indicated, under Title VI of the Civil Rights Act of 1964: (1) In order to properly evaluate a child who may be limited English proficient, a public agency should assess the child's proficiency in English as well as the child's native language to distinguish language proficiency from disability needs; and (2) an accurate assessment of the child's language proficiency should include objective assessment of reading, writing, speaking, and understanding.

Both Title VI and Part B require that a public agency ensure that children with limited English proficiency are not evaluated on the basis of criteria that essentially measure English language skills. Sections 300.532 and 300.534(b) require that information about the child's language proficiency must be considered in determining how to conduct the evaluation of the child to prevent misclassification. In keeping with the decision to eliminate all notes from the final regulations, however, Note 1 has been removed. The text of Sec. 300.532 has been revised to require that assessments of children with limited English proficiency must be selected and administered to ensure that they measure the extent to which a child has a disability and needs special education, and do not instead measure the child's English language skills.

Proposed Note 2 explained that paragraphs (a)(1)(i) and (2)(ii) when read together require that even in situations where it is clearly not feasible to provide and administer tests in the child's native language or mode of communication for a child with limited English proficiency, the public agency must still obtain and consider accurate and reliable information that will enable the agency to make an informed decision as to whether the child has a disability and the effects of the disability on the child's educational needs. In some situations, there may be no one on the staff of a public agency who is able to administer a test or other evaluation in a child's native language, as required under paragraph (a)(2) of this section, but an appropriate individual is available in the surrounding area. In that case a public agency could identify an individual in the surrounding area who is able to administer a test or other evaluation in the child's native language include contacting neighboring school districts, local universities, and professional organizations. This information will be useful to school districts in meeting the requirements of the regulations, but consistent with the general decision to remove all notes, Note 2 would be removed.

An assessment conducted under non standard conditions is not in and of itself a "substandard" assessment. As proposed Note 3 clarified, if an assessment is not conducted under standard conditions, information about the extent to which the assessment varied from standard conditions, such as the qualifications of the person administering the test or the method of test administration, needs to be included in the evaluation report. A provision has been added to the regulation to make this point.

Texas Education Agency - Special Education March 1999 217

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES |
|---|---|
| (e) Tests are selected and administered so as best to ensure that if a test is administered to a child with impaired sensory, manual, or speaking skills, the test results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (unless those skills are the factors that the test purports to measure).<br><br>(f) No single procedure is used as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child<br><br>(g) The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities<br><br>(h) In evaluating each child with a disability under Secs. 300 531-300 536, the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.<br><br>(i) The public agency uses technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors<br>(j) The public agency uses assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child.<br><br>(Authority 20 U S C 1412(a)(6)(B), 1414(b)(2) and (3)) | This information is needed so that the team of qualified professionals can evaluate the effects of these variances on the validity and reliability of the information reported and to determine whether additional assessments are needed. Again, while the proposed note provided clarifying information on the regulatory requirements, in keeping with the general decision to eliminate notes, Note 3 would be removed<br><br>The provisions of the Act and Sec. 300.532, as revised to include a provision regarding the use of nonstandard assessments, are sufficient to ensure that the provisions of the regulation are appropriately implemented for Navajo children, and no further changes are needed<br><br>**Changes:** Section 300.532 has been revised to require that assessments of children with limited English proficiency must be selected and administered to ensure that they measure the extent to which a child has a disability and needs special education, and do not, instead, measure the child's English language skills.<br><br>A provision has been added to Sec. 300.532 to require that if an assessment is not conducted under standard conditions, information about the extent to which the assessment varied from standard conditions, such as the qualifications of the person administering the test or the method of test administration, must be included in the evaluation report. Notes 1, 2, and 3 have been removed.<br><br>A provision has been added to Sec. 300.532 to require that the assessment be sufficiently comprehensive to identify all of a child's special education and related services needs. A change also has been made to Sec. 300.300 clarifying that services provided to each child must be designed to meet all the child's identified special education and related services needs. Paragraph (b) has been revised consistent with section 614(b)(2) of the Act, to clarify that information about enabling the child to be involved in and progress in the general curriculum or for a preschool child to participate in appropriate activities may assist in determining both whether the child has a disability and the content of the child's IEP. |

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
| --- | --- |
| **Triennial Evaluation** | **PB/C** The previously existing regulations required a school district to conduct an evaluation of each child served under IDEA every three years to determine, among other things, whether the child is still eligible for special education. The IDEA Amendments of 1997 change this requirement to reduce unnecessary testing and therefore reduce costs. Specifically, section 614(c) of IDEA, incorporated in Sec. 300.533, allows the evaluation team to dispense with additional tests to determine the child's continued eligibility if the team concludes this information is not needed. However, these tests must be conducted if the parents so request.<br><br>The savings resulting from this change will depend on the following factors: the number of children for whom an evaluation is conducted each year to comply with the requirement for a triennial evaluation, the cost of the evaluation, and an estimate of the extent to which testing will be reduced because it is determined by the IEP team to be unnecessary and is not requested by the parents.<br><br>Based on an analysis of State-reported data, it is estimated that approximately 1.5 million children will be eligible for triennial evaluations in school year 1998-1999 or roughly 25 percent of the children to be served.<br><br>The IDEA Amendments of 1997 make it clear that districts no longer need to conduct testing to determine whether a child still has a disability, if the evaluation team determines this information is not needed and the parent agrees. However, while the regulation permits the team to dispense with unneeded testing to determine whether the child still has a disability, the team still has an obligation to meet to review any existing evaluation data and to identify what additional data are needed to determine whether the child is still eligible for special education and related services, the present levels of performance of the child, and whether any modifications in the services are needed. In view of these requirements, it is assumed that there will be some cost associated with conducting the triennial evaluation even in those cases in which both the team and the parents agree to dispense with testing. It is estimated that the elimination of unnecessary testing could reduce the opportunity costs for the personnel involved in conducting the triennial evaluation by as much as 25 to 75 percent. While there is no national data on the average cost of conducting a triennial evaluation under the current regulations, it is assumed that a triennial evaluation would require the participation of several professionals for several hours and cost as much as $1000.<br><br>These savings would be somewhat mitigated by the increased costs associated with the new statutory requirement to obtain parental consent before conducting a reevaluation. Under the final regulations, parental consent would be required if a test is conducted as part of a reevaluation, for example, or when any assessment instrument is administered as part of a reevaluation.<br><br>If one assumes, for purposes of this analysis, that savings are achievable in roughly half of the triennial evaluations that will be conducted and that elimination of unnecessary testing could reduce personnel costs by at least 25 percent, one would project substantial savings for LEAs that are attributable to this change. |

220

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.533 Determination of needed evaluation data.**

(a) Review of existing evaluation data As part of an initial evaluation (if appropriate) and as part of any reevaluation under Part B of the Act, a group that includes the individuals described in Sec 300 344, and other qualified professionals, as appropriate, shall--

(1) Review existing evaluation data on the child, including--

(i) Evaluations and information provided by the parents of the child;

(ii) Current classroom-based assessments and observations, and

(iii) Observations by teachers and related services providers, and

(2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine--

(i) Whether the child has a particular category of disability, as described in Sec 300 7, or, in case of a reevaluation of a child, whether the child continues to have such a disability;

(ii) The present levels of performance and educational needs of the child;

(iii) Whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(iv) Whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general curriculum

(b) Conduct of review The group described in paragraph (a) of this section may conduct its review without a meeting

(c) Need for additional data The public agency shall administer tests and other evaluation materials as may be needed to produce the data identified under paragraph (a) of this section.

**Discussion:** Whether additional data are needed as part of an initial evaluation or reevaluation must be determined on a case-by-case basis, depending upon the needs of the child and the information available regarding the child, by a group that includes the individuals described in Sec 300 344 and other qualified professionals, as appropriate

It is intended that the group review all relevant existing evaluation data on a child, including that provided by the parents and, where appropriate, data from evaluations conducted by other agencies. A public agency must ensure that the group fulfilling these functions include individuals beyond those described in Sec. 300.344 if necessary to ensure that appropriate, informed decisions are made (see Sec 300 533).

Requiring public agencies to obtain informed written consent permitting them not to collect, as part of a reevaluation, additional data to determine whether a child continues to be a child with a disability, would exceed the requirements of the statute, as would requiring States to report on the number of children for whom a reevaluation does not include collecting additional data to determine whether they continue to be children with disabilities.

The provisions of Sec 300 533(c) apply only to the collection of additional data needed to determine whether a child continues to be a child with a disability.

It would not be consistent with the statute and these regulations to require that parents "justify" any request for additional assessment data Parents must be included in the group that reviews existing data and determines what additional data are needed, and, as part of that group, they have the right to identify additional assessment data that they believe are needed and to participate in the decision regarding the need for those data Both the statute and these regulations require that the determination regarding the need for additional data be based, in part, on input from the parents. Under both the statute and these regulations, parents also have the right to request an assessment, as part of a reevaluation, to determine whether their child continues to have a disability under IDEA. However, this right is limited to determinations of eligibility for services under Part B. If the group reviewing the existing data does not believe additional data are needed to determine a child's continued eligibility under IDEA, but the parents want additional testing for reasons other than continued eligibility under IDEA, such as admission to college, the denial of the parent's request would be subject to due process.

An additional requirement that parents be informed of their right to request additional assessment data is not needed, as it is already addressed by paragraph (c)(1)(iii).

The proposed note clarified that the requirement in Sec. 300.533(a) and Sec. 300.534(a)(1) that review of evaluation data and eligibility decisions be made by groups that include "qualified professionals," is intended to ensure that the group making these determinations include individuals with the knowledge and skills necessary to interpret the evaluation data and make an informed determination as to whether the child is a child with a disability under Sec. 300.7, and to determine whether the child needs special education and related services.

The composition of the group will vary depending upon the nature of the child's suspected disability and other relevant factors. For example, if a student is suspected of having a learning disability, a professional whose sole expertise is visual impairments would be an inappropriate choice. If a student is limited English proficient, it will be important to include a person in the group of qualified professionals who is knowledgeable about the identification, assessment, and education of limited English proficient students. While the proposed note provided clarifying information on the regulatory requirements, in keeping with the general decision to eliminate notes, the note would be removed.

**Changes:** The note has been removed. Paragraph (d) has been revised to clarify that the parent's right to request an evaluation regarding continued eligibility concerns services under Part B

**Discussion:** Section 300.533(a) requires that a group that includes the individuals described in Sec. 300 344 (regarding the IEP team) and other qualified professionals, as appropriate, review the existing evaluation data and determine what additional data are needed Although a public agency must ensure that the review of existing data and the determination of any needed additional data must be made by a group, including the parents, neither the statute nor these regulations require that the public agency conduct a meeting for this purpose A State may, however, require such meetings.

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| (d) Requirements if additional data are not needed. (1) If the determination under paragraph (a) of this section is that no additional data are needed to determine whether the child continues to be a child with a disability, the public agency shall notify the child's parents--<br>(i) Of that determination and the reasons for it; and<br>(ii) Of the right of the parents to request an assessment to determine whether, for purposes of services under this part, the child continues to be a child with a disability.<br>(2) The public agency is not required to conduct the assessment described in paragraph (d)(1)(ii) of this section unless requested to do so by the child's parents.<br>(Authority: 20 U.S.C. 1414(c)(1), (2) and (4)) | Section 300.501(a)(2)(i) requires that parents have an opportunity to participate in meetings with respect to the evaluation of their child with a disability. Therefore, if a public agency conducts a meeting, as defined in Sec. 300.501(b)(2), to meet its responsibilities under Sec. 300.533, the parents must have an opportunity to participate in the meeting.<br><br>Neither the statute nor these regulations requires that all individuals who were involved in the initial placement of a child with a disability be part of the group that, as part of a reevaluation of the child reviews existing data and determines what additional data are needed. Both the statute and the regulations require, however, that a group that includes all of the individuals described in Sec. 300.344 for an IEP meeting, and other qualified professionals, as appropriate, fulfill those functions.<br><br>**Changes:** Paragraph (a) has been revised to refer to the group that includes the individuals described in Sec. 300.344 and other qualified individuals. A new paragraph (b) has been added to make clear that a meeting is not required to review existing evaluation data. |

222

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.534 Determination of eligibility**

(a) Upon completing the administration of tests and other evaluation materials--

(1) A group of qualified professionals and the parent of the child must determine whether the child is a child with a disability, as defined in Sec 300.7; and

(2) The public agency must provide a copy of the evaluation report and the documentation of determination of eligibility to the parent.

(b) A child may not be determined to be eligible under this part if--

(1) The determinant factor for that eligibility determination is--

(i) Lack of instruction in reading or math; or

(ii) *Limited English proficiency; and*

(2) The child does not otherwise meet the eligibility criteria under Sec. 300 7(a).

(c)(1) A public agency must evaluate a child with a disability in accordance with Secs 300 532 and 300.533 before determining that the child is no longer a child with a disability.

(2) The evaluation described in paragraph (c)(1) of this section is not required before the termination of a student's eligibility under Part B of the Act due to graduation with a regular high school diploma, or exceeding the age eligibility for FAPE under State law

(Authority: 20 U.S.C. 1414(b)(4) and (5), (c)(5))

**Discussion:** The specific standards and process that public agencies use to ensure that lack of instruction in reading or math is not the determinant factor in determining that a child is a child with a disability, and the content of an evaluation report, are appropriately left by the statute to State and local discretion. However, a public agency must ensure that a child who has a disability, as defined in Sec. 300.7 (i.e., a child who has been evaluated in accordance with Secs. 300.530-300.536 as having one of the thirteen listed impairments, and who because of that impairment needs special education and related services) is not excluded from eligibility because that child also has limited English proficiency or has had a lack of instruction in reading or math. (See also Sec. 300.532, which has been revised to require that assessments of children with limited English proficiency must be selected and administered to ensure that they measure the extent to which a child has a disability and needs special education, and do not instead measure the child's English language skills.)

The specific content of an evaluation report is appropriately left by the statute to State and local discretion Both the statute and the regulations require that, upon completing the administration of tests and other evaluation materials, a public agency must provide a copy of the evaluation report and the documentation of determination of eligibility to the parent, but neither establishes a timeline for providing these documents to the parents; rather, this timeline is appropriately left to State and local discretion. *It is, however, important to ensure that* parents and other IEP team participants have all the information they need to participate meaningfully in IEP meetings. Indeed, Sec 300.562(a) requires that a public agency comply with a parent request to inspect and review existing educational records, including an evaluation report, without unnecessary delay and before any meeting regarding an IEP.

A public agency must evaluate a child with a disability before determining that the child is no longer a child with a disability, but such a reevaluation is, like other reevaluations, subject to the requirements of Sec. 300 533. Accordingly, if a group decision is made under Sec 300.533(a) that no additional data are needed to determine whether the child continues to be a child with a disability, the public agency must provide parents with the notice required by Sec. 300.533(d)(1), and must provide such additional assessment(s) upon parent request consistent with Sec. 300 533(d)(2).

**Changes:** *Paragraph* (b) *is revised to clarify* that children are not eligible if they need specialized instruction because of limited English proficiency or lack of instruction in reading or math, but do not need specialized instruction because of a disability, as defined in Sec 300.7 See discussion of comments received under Sec. 300.122 regarding a change to Sec. 300.534(c).

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| **Sec. 300.535 Procedures for determining eligibility and placement.**<br>(a) In interpreting evaluation data for the purpose of determining if a child is a child with a disability under Sec. 300.7, and the educational needs of the child, each public agency shall--<br>(1) Draw upon information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, physical condition, social or cultural background, and adaptive behavior; and<br>(2) Ensure that information obtained from all of these sources is documented and carefully considered.<br>(b) If a determination is made that a child has a disability and needs special education and related services, an IEP must be developed for the child in accordance with Secs. 300.340-300.350.<br>(Authority: 20 U.S.C. 1412(a)(6), 1414(b)(4)) | **Discussion:** The proposed change is consistent with section 614(b)(4)(A), which requires that the parent be part of the team that determines eligibility, and other provisions of the Act that stress the importance of information provided by the parents.<br>**Changes:** Section 300.535(a)(1) is revised to add "parent input" to the variety of sources from which the public agency will, under Sec. 300.535(a)(1), draw in interpreting evaluation data for the purpose of determining if a child is a child with a disability.<br>**Discussion:** Section 300.532 requires that a variety of assessment tools be used, that no single procedure be used as the sole criterion for determining the eligibility or needs of a child with a disability, and that the child be assessed in all areas of suspected disability. Section 300.534 requires that a team of professionals and the parent determine a child's eligibility.<br>The proposed note did not in any way diminish these requirements. It clarified that, consistent with the statute and these final regulations, the point of Sec. 300.535(a)(1) is to ensure that more than one source is used in interpreting evaluation data and in making these determinations, and that although that subsection includes a list of examples of sources that may be used by a public agency in determining whether a child is a child with a disability, as defined in Sec. 300.7, the agency would not have to use all the sources in every instance. While the proposed note provided clarifying information on the regulatory requirements, in keeping with the general decision to eliminate notes, the note would be removed.<br>**Changes:** The note has been removed. |
| **Sec. 300.536 Reevaluation.**<br>Each public agency shall ensure–<br>(a) That the IEP of each child with a disability is reviewed in accordance with Secs. 300 340-300.350; and<br>(b) That a reevaluation of each child, in accordance with Secs. 300.532-300 535, is conducted if conditions warrant a reevaluation, or if the child's parent or teacher requests a reevaluation, but at least once every three years.<br>(Authority: 20 U.S.C. 1414(a)(2)) | **Discussion:** Under both prior law and the current regulations, if a parent requests a reevaluation, the public agency must either: (1) provide the parents with written notice of the agency's proposal to conduct the reevaluation; or (2) provide the parents with written notice of the agency's refusal to conduct a reevaluation. The parent may challenge such a proposal or refusal by requesting a due process hearing. If the agency conducts a reevaluation and the evaluation group concludes that under Sec. 300.533(a) no additional data are needed to determine whether the child continues to be a child with a disability, the public agency must provide parents with the notice required by Sec. 300.533(c)(1), and must provide such assessment upon parent request.<br>The statute specifically requires at section 614(a)(2) that "a reevaluation of each child with a disability is conducted ... at least once every three years." However, in meeting this requirement, a group will, pursuant to Sec. 300.533, review existing data and determine what, if any, additional assessment data are needed. Parent consent is not required for a review of existing data; however, parent consent would be required before additional assessments are conducted.<br>**Changes:** None.<br>**Discussion:** The noted reference is a typographical error.<br>**Changes:** Section 300.536(b) has been revised to refer to Sec. 300.530 rather than Sec. 300.530(b). |

224

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Additional Procedures for Evaluating Children With Specific Learning Disabilities**

**Sec. 300.540 Additional team members.**

The determination of whether a child suspected of having a specific learning disability is a child with a disability as defined in Sec 300.7, must be made by the child's parents and a team of qualified professionals which must include–

(a)(1) The child's regular teacher; or

(2) If the child does not have a regular teacher, a regular classroom teacher qualified to teach a child of his or her age; or

(3) For a child of less than school age, an individual qualified by the SEA to teach a child of his or her age; and

(b) At least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher.

(Authority: Sec. 5(b), Pub. L. 94-142)

**Discussion:** As indicated in the preamble to the NPRM, the Department is planning to conduct a careful, comprehensive review of research, expert opinion and practical knowledge of evaluating and identifying children with a specific learning disability over the next several years to determine whether changes to the standards and process for identifying children with a specific learning disability should be proposed. Because that review has not been done, no further changes are made to the regulations.

**Changes:** None.

**Sec. 300.541 Criteria for determining the existence of a specific learning disability.**

(a) A team may determine that a child has a specific learning disability if--

(1) The child does not achieve commensurate with his or her age and ability levels in one or more of the areas listed in paragraph (a)(2) of this section, if provided with learning experiences appropriate for the child's age and ability levels; and

(2) The team finds that a child has a severe discrepancy between achievement and intellectual ability in one or more of the following areas:

(i) Oral expression.

(ii) Listening comprehension

(iii) Written expression

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

(iv) Basic reading skill.

(v) Reading comprehension.

(vi) Mathematics calculation.

(vii) Mathematics reasoning.

(b) The team may not identify a child as having a specific learning disability if the severe discrepancy between ability and achievement is primarily the result of--

(1) A visual, hearing, or motor impairment;

(2) Mental retardation;

(3) Emotional disturbance; or

(4) Environmental, cultural or economic disadvantage.

(Authority: Sec. 5(b), Pub. L. 94-142)

**Sec. 300.542 Observation.**

(a) At least one team member other than the child's regular teacher shall observe the child's academic performance in the regular classroom setting.

(b) In the case of a child of less than school age or out of school, a team member shall observe the child in an environment appropriate for a child of that age.

(Authority: Sec. 5(b), Pub. L. 94-142)

Texas Education Agency - Special Education March 1999 225

226

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.543 Written report.**

(a) For a child suspected of having a specific learning disability, the documentation of the team's determination of eligibility, as required by Sec. 300 534(a)(2), must include a statement of—

(1) Whether the child has a specific learning disability;

(2) The basis for making the determination;

(3) The relevant behavior noted during the observation of the child;

(4) The relationship of that behavior to the child's academic functioning;

(5) The educationally relevant medical findings, if any;

(6) Whether there is a severe discrepancy between achievement and ability that is not correctable without special education and related services; and

(7) The determination of the team concerning the effects of environmental, cultural, or economic disadvantage.

(b) Each team member shall certify in writing whether the report reflects his or her conclusion. If it does not reflect his or her conclusion, the team member must submit a separate statement presenting his or her conclusions.

(Authority: Sec. 5(b), Pub L. 94-142)

Texas Education Agency - Special Education March 1999

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Least Restrictive Environment (LRE)**

**Sec. 300.550 General LRE requirements.**

(a) Except as provided in Sec. 300.311(b) and (c), a State shall demonstrate to the satisfaction of the Secretary that the State has in effect policies and procedures to ensure that it meets the requirements of Secs. 300.550-300.556.

(b) Each public agency shall ensure--

(1) That to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and

(2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

(Authority: 20 U S.C. 1412(a)(5))

**Discussion:** Placement in the LRE requires an individual decision, based on each child's IEP, and based on the strong presumption of the IDEA that children with disabilities be educated in regular classes with appropriate aids and supports, as reflected in paragraph (b) of this section. The regulations always have required that placement decisions be based on the individual needs of each child with a disability and prohibited categorical decision-making.

In addition, the new statutory provisions regarding IEPs, reflected in the regulations at Sec. 300.347(a)(1) and (2) specify that IEPs must include a statement of how the child's present levels of educational performance affect the child's involvement and progress in the general curriculum and a statement of measurable annual goals, including benchmarks or short-term objectives for meeting the child's disability-related needs to enable the child to be involved in and progress in the general curriculum. These provisions apply regardless of the setting in which the services are provided.

Similarly, the IEP team, in developing the IEP under Sec. 300.346(a)(2)(i), is required to consider positive behavioral intervention, strategies and supports to address the behavior of a child with a disability whose behavior impedes his or her learning or that of others These provisions are designed to foster the increased participation of children with disabilities in regular education environments or other less restrictive environments, not to serve as a basis for placing children with disabilities in more restrictive settings.

The determination of appropriate placement for a child whose behavior is interfering with the education of others requires careful consideration of whether the child can appropriately function in the regular classroom if provided appropriate behavioral supports, strategies and interventions. If the child can appropriately function in the regular classroom with appropriate behavioral supports, strategies or interventions, placement in a more restrictive environment would be inconsistent with the least restrictive environment provisions of the IDEA. If the child's behavior in the regular classroom, even with the provision of appropriate behavioral supports, strategies or interventions, would significantly impair the learning of others, that placement would not meet his or her needs and would not be appropriate for that child.

The IDEA Amendments of 1997 place renewed emphasis on teaching children with disabilities to the general curriculum and ensuring that these children are included in State- and district-wide assessments of educational achievement. Because, as commenters noted, one consequence of heightened accountability expectations may be unwarranted decisions to remove children with disabilities from regular classrooms so as to avoid accountability for their educational performance, the regulations should make clear that the type or extent of the modifications that the child needs to the general curriculum not be used to inappropriately justify the child's removal from education in regular, age-appropriate classrooms. Therefore, a provision should be added to Sec. 300.552 to provide that a child not be denied education in age-appropriate regular classrooms solely because the child's education required modification to the general curriculum. Under this provision, for example, a child with significant cognitive disabilities could not be removed from education in age-appropriate regular classrooms merely because of the modifications he or she needs to the general curriculum. This provision should not be read to require the placement of a child with a disability in a particular regular classroom or course if more than one regular age-appropriate classroom or course is available in a particular grade or subject.

A cross-reference to the exceptions in Sec. 300.311(b) and (c), like that in Sec. 300.347(d), will make the regulations clearer and more complete.

As the discussion of Sec. 300.309 explains in more detail, while ESY services must be provided in the LRE, public agencies are not required to create new programs as a means of providing ESY services to students with disabilities in integrated settings if the public agency does not provide summer services for its nondisabled children.

While the commenters are correct that the reference to "special classes" in paragraph (b)(2) refers to special classes necessary to meet special education needs, and not classes that an LEA makes available to all children, such as remedial reading, or advanced placement, art or music classes, paragraph (b)(1) provides that the LRE provisions of the regulations are focused on educating children with disabilities with nondisabled children to the maximum extent appropriate. In that context, the reference to "special classes" is to classes organized on the basis of disability and not classes that are based on some other interest, need or ability of the students.

**Changes:** A cross-reference to the requirements of Sec. 300.311(b) and (c) has been added to paragraph (a)

A new paragraph has been added to Sec. 300.552 prohibiting removal of a child with a disability from an age-appropriate regular classroom solely because of needed modifications in the general curriculum.

Texas Education Agency - Special Education March 1999 227

NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

**Sec. 300.552 Placements.**

In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency shall ensure that--

(a) The placement decision--[1]

(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including Secs. 300.550-300.554;

(b) The child's placement--

(1) Is determined at least annually;

(2) Is based on the child's IEP; and

(3) Is as close as possible to the child's home;

(c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled;

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum.

(Authority: 20 U.S.C. 1412(a)(5))

**Discussion:** The discussion concerning Sec. 300.551 notes that the IEP provisions of the regulations already incorporate statutory language *concerning the need to consider the particular needs of children who are deaf or hard of hearing in developing appropriate IEPs.*

Since placements are determined based on the needs of individual children, and because the IDEA Amendments of 1997 provide that parents of children with disabilities are members of any group that makes decisions on the education placement of their child (section 614(f) of the Act) it would seem to be unnecessary and unreasonably burdensome to require LEAs to inform parents about the full range of placement options.

Under Sec. 300.501(c), parents must now be included in the group making decisions about the educational placement of their child. In view of the principle of regulating only if necessary, the regulations are not changed in the ways suggested by these commenters.

With respect to paragraph (a)(1) of this section, nothing in the regulations would prohibit a public agency from allowing the group of persons that makes the placement decision to also serve as the child's IEP team, so long as all individuals described in Sec. 300.344 are included. However, in the interest of limiting the use of notes in these regulations, Note 1 would be removed.

**Changes:** Note 1 has been removed. See discussion of comments received under Sec. 300.550 regarding the addition of a new Sec. 300.552(e) prohibiting removal of a child with a disability from an age-appropriate regular classroom solely because of needed modifications in the general curriculum.

**Discussion:** LEAs are strongly encouraged to place children with disabilities in the schools and classrooms they would attend if not disabled. However, the regulatory provision has always provided that each child with disabilities be educated in the school he or she would attend if not disabled unless their IEP required some other arrangement. (See, Sec. 300.552(c)). Physical accessibility of school facilities is covered more fully by section 504 of the Rehabilitation Act of 1973 (Section 504) and the Americans with Disabilities Act (ADA).

**Changes:** None.

**Discussion:** Paragraph (d) of this section does not impose paperwork burdens. Paragraph (d) of this section provides important protections for children with disabilities and helps ensure that they and their teachers have the supports to prevent any harmful effect of a placement on the child or on the quality of services that he or she needs. If the placement team determines that even with the provision of supplementary *aids and services, the child's IEP could not be implemented satisfactorily in the regular educational environment*, that placement would not be the LRE placement for that child at that time.

Generally, as the commenter suggests, achievement test performance of students in inclusive classes is the equivalent or better than achievement test performance of others in segregated setting and self-concept, social skills and problem solving skills improve for all students in inclusive settings. Placement decisions, however, need to consider the individual needs of each child.

**Changes:** None.

**Discussion:** Language has been added to the regulation to clarify that the requirements of Sec. 300.552, as well as the other requirements of Secs. 300.550-300.556, apply to all preschool children with disabilities who are entitled to receive FAPE. Note 2 to this section in the NPRM was intended to provide suggestions on how a public agency may meet the LRE requirements if it does not generally provide education to nondisabled preschool children. However, in light of the general decision to remove all notes from these final regulations, the note would be removed.

Public agencies that do not operate programs for nondisabled preschool children are not required to initiate those programs solely to satisfy the requirements regarding placement in the LRE. For those public agencies, the note provided some alternative methods for meeting the LRE requirements. The examples in the note of placing preschool children with disabilities in private preschool programs and locating classes for preschool children with disabilities in regular elementary schools as a means of meeting the LRE requirements were not intended to limit the placements options on the continuum which may be used to meet the LRE needs of preschool children The full continuum of alternative placements at 34 CFR 300.551, including integrated placement options, such as community-based settings with typically developing age peers, must be available to preschool children with disabilities.

Texas Education Agency - Special Education March 1999 229

230

NEW IDEA REGULATIONS
(34 CFR 300.1 – 300.756)

DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS

The overriding rule in this section is that placement decisions for all children with disabilities, including preschool children, must be made on an individual basis. The reference in the note to "private school programs for nondisabled children" was not intended to suggest that private schools are not required to comply with the ADA.

The second part of Note 2 to proposed Sec. 300.552 cited language from the 1976 published analysis of comments on the regulations implementing Section 504 of the Rehabilitation Act of 1973. The issues raised by that analysis (appropriate placement for a child with disabilities whose behavior in a regular classroom significantly impairs the education of other students, and placement of a child with disabilities as close to home as possible) are addressed elsewhere in this attachment.

**Changes:** A reference to preschool children with disabilities has been added to the introductory paragraph of Sec. 300.552. Note 2 has been removed.

**Discussion:** Section 300.130(b) incorporates into the regulations the new statutory provision that specifies that if a State has a funding mechanism that distributes State funds on the basis of the type of setting in which a child is served, that mechanism may not result in placements that violate the LRE requirements, and if the State does not have policies and procedures to ensure compliance with that obligation, it provides the Secretary with an assurance that it will revise the funding mechanism as soon as feasible. Given that requirement, no further change is necessary here.

A presumption of placement in a regular class is already embodied in Sec. 300.550. Note 3 to this section in the proposed regulations merely stated the reasonable conclusion that if behavioral interventions are incorporated into the IEPs of children with disabilities, many of these children, who without those services might be disruptive, can be successfully educated in regular classrooms. Note 3 added no requirements or services that exceed the statute, as the requirement to consider positive behavioral interventions, strategies, and supports to address the behavior of children with disabilities whose behavior impedes his or her learning or that of others, which is contained in Sec. 300.346(a)(2)(i), is taken directly from section 614(d)(3)(B)(i) of the Act. Nevertheless, in the interest of eliminating the use of notes in these regulations, Note 3 should be removed, as it was merely an observation, based on the requirements of the regulations.

**Changes:** Note 3 has been removed.

Texas Education Agency - Special Education March 1999

| NEW IDEA REGULATIONS (34 CFR 300.1 – 300.756) | DISCUSSION AND CHANGES (from the Analysis of Comments), APPENDIX A TO PART 300, DISCIPLINE Q&A, AND POTENTIAL BENEFIT/COST ANALYSIS |
|---|---|
| **Sec. 300.553 Nonacademic settings.**<br><br>In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in Sec. 300.306, each public agency shall ensure that each child with a disability participates with nondisabled children in those services and activities to the maximum extent appropriate to the needs of that child.<br><br>(Authority: 20 U.S.C. 1412(a)(5)) | **Discussion:** The note following this section in the NPRM pointed out that this provision is related to the requirement in the regulations for section 504 of the Rehabilitation Act of 1973, and emphasized the importance of providing nonacademic services in as integrated a setting as possible, especially for children whose educational needs necessitate their being solely with other disabled children during most of the day. Even children with disabilities in residential programs are to be provided opportunities for participation with other children to the maximum extent appropriate to their needs. However, in light of the decision to remove all notes from these final regulations, the note following this section would be removed.<br><br>**Changes:** The note following this section has been removed. |
| **Sec. 300.554 Children in public or private institutions.**<br><br>Except as provided in Sec. 300.600(d), an SEA must ensure that Sec 300.550 is effectively implemented, including, if necessary, making arrangements with public and private institutions (such as a memorandum of agreement or special implementation procedures).<br><br>(Authority: 20 U.S.C. 1412(a)(5)) | **Discussion:** This section was not intended to require memoranda of agreement or other special procedures that are not necessary to effectively implement Sec. 300.550. Requiring agreements to be developed that are not necessary for meeting the other LRE requirements would be overly prescriptive.<br><br>The requirement that disabled students be educated with nondisabled students does apply to students with disabilities who are in correctional facilities, to the extent that the requirement can be met consistent with the terms of their incarceration, except to the extent modified under the authority in Sec. 300.311. One way the LRE requirements could be met for students with disabilities in prisons would be to include them in the educational activities of nondisabled prisoners and provide appropriate services in that environment. If a State has transferred authority for the education of students with disabilities who are convicted as adults under State law and incarcerated in adult prisons to another agency, the other agency, not the SEA, would have to ensure that LRE requirements are met as to that class of students.<br><br>The note following this section in the NPRM reflected the important fact that, except as provided in Sec. 300.600(d) (regarding students with disabilities in adult correctional facilities), children with disabilities in public and private institutions are covered by the requirements of these regulations, and that the SEA has an obligation to ensure that each applicable agency and institution in the State meets these requirements. Whatever the reasons for the child's institutional placement, if he or she is capable of education in a regular class, the child may not be denied access to education in a regular class, consistent with Sec. 300.550(b). Timelines for development of memoranda of agreement or other special implementation procedures would be overly prescriptive. In light of the decision to remove notes from these final regulations, the note would be removed.<br><br>**Changes:** Section 300.554 has been reworded to clarify that special arrangements with public and private institutions are only required if needed to ensure that Sec. 300.550 is effectively implemented. A technical change has been made to the regulation to make clear that the SEA's responsibility does not include students with disabilities who are convicted as adults under State law and incarcerated in adult prisons. The note following this section has been removed and a new paragraph has been added to Sec. 300.300(a) to more generally make the point that services and placement decisions must be based on a child's individual needs and not category of disability. |

| NEW IDEA REGULATIONS | DISCUSSION AND CHANGES |
|---|---|
| **Sec. 300.555 Technical assistance and training activities.**<br><br>Each SEA shall carry out activities to ensure that teachers and administrators in all public agencies--<br><br>(a) Are fully informed about their responsibilities for implementing Sec. 300.550; and<br><br>(b) Are provided with technical assistance and training necessary to assist them in this effort.<br><br>(Authority: 20 U.S.C. 1412(a)(5)) | **Discussion:** As a matter of good practice, SEAs and LEAs are encouraged to develop opportunities for school personnel (including related service providers, bus drivers, cafeteria workers, etc.) and parents to learn together about all of the requirements under the Act because these experiences will improve cooperation among school personnel and between schools and parents and lead to improved services for children with disabilities. However, regulation on this point is not appropriate, as SEAs need the flexibility to respond to particular circumstances in their jurisdictions. For the same reason, additional specificity about the school personnel who need information and training or the subject matter of that training is not appropriate.<br><br>**Changes:** None. |
| **Sec. 300.556 Monitoring activities.**<br><br>(a) The SEA shall carry out activities to ensure that Sec. 300.550 is implemented by each public agency.<br><br>(b) If there is evidence that a public agency makes placements that are inconsistent with Sec. 300.550, the SEA shall--<br><br>(1) Review the public agency's justification for its actions; and<br><br>(2) Assist in planning and implementing any necessary corrective action.<br><br>(Authority: 20 U.S.C. 1412(a)(5)) | **Discussion:** SEAs, under their general supervisory responsibility, are charged with ensuring that the requirements of the Act are met. That responsibility includes monitoring LEA performance, providing technical assistance and information on best practices, and requiring corrective action and instituting enforcement actions when necessary. The provisions of this section reinforce the active role SEAs need to play in implementing the entire Act and emphasize the importance of the LRE requirements in meeting the goals of the Act The role of SEAs in implementing the requirements of the Act will be carefully reviewed by OSEP in its monitoring of States.<br><br>**Changes:** None. |

 Stetson and Associates, Inc.

Human Resource Development

September 16, 2002

Dr. Marla Guerra, Superintendent
South Texas Independent School District
100 Med High Drive
Mercedes, Texas 78570

Dear Dr. Guerra:

The purpose of this letter is to follow up on the meetings that were held last Spring with Superintendents representing the 28 school districts located in Cameron, Hidalgo, and Willacy Counties. During those meetings, we discussed in some detail the issues that have been raised with respect to the placement of students with disabilities at South Texas High School – San Benito and the degree to which such educational placements comply with the least restrictive environment (LRE) requirements of the Individuals with Disabilities Education Act (IDEA). The Superintendents who attended the meetings last Spring expressed a desire for additional information regarding the application and interpretation of the LRE provisions of IDEA. It is my understanding that the Superintendents felt that such information would be helpful to ARD Committee members in making appropriate educational placement decisions for students with disabilities residing in the 28 school districts in Cameron, Hidalgo, and Willacy Counties.

As we have discussed previously, my role in this situation is to function as a consultant acting on behalf of the Texas Education Agency to achieve assurances that the LRE requirements of IDEA are being met in regard to students who have been placed by their ARD Committees at South Texas High School - San Benito. Further, if changes are indicated, my role is to assist in planning and implementing appropriate "corrective actions" to ensure that any necessary changes occur in a manner that protects the rights afforded all parties, including students, parents and school districts.

The progress that has apparently been achieved in the past several years toward meeting the LRE requirements for students placed at the South Texas High School - San Benito campus speaks very well indeed of the commitment and efforts of the South Texas Independent School District, as well as many of the other school districts located in Cameron, Hidalgo and Willacy counties. I am confident that such progress can be continued and hope that the information outlined in this letter will be of assistance. I have organized this letter into four (4) sections, including:

EXHIBIT NO. B

13910 Champion Forest Drive, Suite 208 • Houston, Texas 77069

A. A brief overview of the LRE requirements;

B. A section regarding the "presumption" in IDEA that students with disabilities will benefit from being educated with students without disabilities;

C. A section regarding the duty of the ARD Committee to identify supplementary aids and services that, if implemented, would allow the student with disabilities to be educated with his/her nondisabled peers; and

D. A section discussing the factors that are considered "insufficient", "inadequate" or "impermissible" in justifying a removal of a student with a disability from a general education classroom to a more restrictive setting.

For your information, I have relied heavily upon documentation found in: a) "The Complete OSEP Handbook," edited by Vicki M. Pitasky and published by LRP Publications in 2000 (updated 2002); b) "The Individuals with Disabilities Education Act Amendments of 1997: Curriculum," edited by Lisa Kupper and published by the National Information Center for Children and Youth with Disabilities (NICHCY) and supported by the Office of Special Education Programs, U.S. Department of Education; and c) the District Effectiveness and Compliance (D.E.C.) Reference Guide, Part II, 2002-2003, published May 1, 2002 by the Texas Education Agency.

## A. Overview of LRE Requirements

The first issue addressed in this letter is just a brief review or background section regarding the State and Federal requirements concerning the LRE requirements in IDEA. I realize that you are very familiar with these requirements and I include them here just as a reference point.

Since the Education for All Handicapped Children Act—now known as the Individuals with Disabilities Education Act—was passed in 1975, States have been required to make available to students with disabilities a free appropriate public education (FAPE) in the least restrictive environment (LRE). The law requires each State to establish policies and procedures to ensure that:

> "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." [Individuals with Disabilities Education Act, Section §612(a)(5)(a); 20 U.S.C. §1412(a)(5)(A)]

The regulations promulgated under IDEA specifically extend LRE requirements to **individual school districts**. In this regard, Section 300.550(b) states that:

> Each **public agency** shall ensure
> (1) That to the maximum extent appropriate, children with disabilities . . are educated with children who are nondisabled; and
> (2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Since the term "public agency" includes school districts (*see* 34 C.F.R. §300.22), the regulations clarify that each school district has an independent obligation to comply with IDEA's LRE requirements. (The regulations also provide that if there is evidence that a public agency/school district has made placement decisions that are inconsistent with Section 300.550, then the State Education Agency shall review the agency's justification for its actions and assist in planning and implementing any necessary changes or corrective actions. *See 34 C.F.R. §300.556(b).* This may help explain my role and my involvement in the discussions and meetings that have been taking place over the course of the last several months.)

Basically, a child's LRE is the environment where the child can receive an appropriate education designed to meet his or her special educational needs, while still being educated with nondisabled peers to the maximum extent appropriate. Depending on the child's individual needs, the LRE could be the general education classroom, with or without supplementary aids and services; a pull-out program for part of the day with the remainder of the day being spent in the general education classroom or in activities with students who do not have disabilities; a special education class within the child's neighborhood school; or even a separate school. Thus, the appropriate educational setting for one student - the environment where that child can receive the educational services that are appropriate for him/her while still interacting with nondisabled peers - may be very different from another student's. The determining factor is the student's individual needs.

**B. The "Presumption" in IDEA that Students with Disabilities Will Benefit from Being Educated with Students without Disabilities**

The second section of this letter that I believe is especially relevant to the issues raised in connection with the placement of students with disabilities at South Texas High School - San Benito is the issue of "preference" or "presumption." In a November 23, 1994 memorandum to the Chief State School Officers, the U.S. Department of Education offered clarification regarding IDEA's LRE provisions. In that memorandum, the U.S. Department of Education pointed out and emphasized IDEA's "strong preference for educating students with disabilities in regular classes with appropriate aids and supports"

(Heumann & Hehir, 1994, p. 3). This memo made it clear that a student's placement in the general education classroom is the *first* option the ARD Committee must consider.

Further, according to the language contained in a report by the Committee on Labor and Human Resources, 1997, pp. 20-21: "prior to the enactment of P.L. 94-142 in 1975, the opportunity and inclination to educate children with disabilities was often in separate programs and schools away from children without disabilities. That law and this bill ('97 Amendments) contain a presumption that children with disabilities are to be educated in regular classes."

An integral part of deciding whether or not a student with a disability will be educated with students who are not disabled is an individualized inquiry into the possible range of supplementary aids and services that are needed to ensure that the student can be satisfactorily educated in that general education environment. If the ARD Committee determines that the student can be educated satisfactorily with students who are not disabled, with or without supplementary aids and services, "that placement is the LRE for that student" (Heumann, 1994, p. 2).

IDEA '97 maintains the presumption that children with disabilities are most appropriately educated with their nondisabled peers. That presumption is seen in IDEA's **mandate** that children with disabilities be served in regular education settings to the maximum extent appropriate. Further, IDEA **requires** that special classes, separate schools, or other removal of children with disabilities from the regular educational environment occurs "...only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved" [IDEA Section 612(a)(5)(A)]. I believe that this section requires that students with disabilities are to be educated in the same school that they would normally attend if they did not have a disability, unless the student's IEP cannot be implemented satisfactorily in that environment, even with the provision of supplementary aids and services, including program modifications and/or supports for school personnel.

**C. Duty of the ARD Committee To Identify Supplementary Aids and Services To Allow a Student with Disabilities To Be Educated with his/her Nondisabled Peers**

The use of the word "cannot" in the LRE regulations seems to me to raise a third issue: what is the "duty" of an ARD Committee to document that the student's IEP cannot be successfully implemented in a setting that includes students without disabilities, even with the provision of supplementary aids and services. I do not believe that this section of the regulations refers to a preference, a tradition, or even a request from a parent/student and/or educator, but rather a determination that it is impossible to implement the student's IEP, even with supplementary aids and services, in a manner that would not be detrimental to the student with disabilities or other students.

To pose the question differently, I believe that the ARD Committee must address: "What supplementary aids and services (including program modifications and/or

supports for school personnel) would ensure that the student's IEP can be appropriately implemented with students who are not disabled?" If such aids and services can be identified, then they must be provided and the student must be educated with students who are not disabled (this information is based on a memorandum written by the U.S. Department of Education to the Chief State School Officers and dated November 23, 1994).

Prior to the passage of the 1997 Amendments, the law did not include a specific definition of what constituted "supplementary aids and services," although clearly these aids and services can be a critical part of enabling students with disabilities to succeed within the general education setting. The IDEA '97 closes this gap by providing a definition of supplementary aids and services, as follows:

> "The term 'supplementary aids and services' means aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with section 612(a)(5)." [IDEA, Section 602(29)]

**D. Factors that are Considered "Insufficient", "Inadequate" or "Impermissible" in Justifying a Removal of a Student with a Disability from a General Education Classroom to a More Restrictive Setting**

The fourth issue addressed in this letter concerns the question - "What kinds of factors (perceived or actual) justify the removal of a student with disabilities from a setting with non-disabled students?". Several sources have pointed out that "educational discussions leading to the development of the IEP must be based only on a student's individual and unique needs." Educational decisions may not be based upon factors other than the student's individual needs, including administrative expediency, availability of services, or type or severity of disability (D.E.C. Reference Guide, Part II, 2002-2003, page 92, Texas Education Agency).

The D.E.C. Reference Guide also lists examples of "potentially discrepant situations," including:

- The ARD Committee determines that a student needs an instructional service, but it is not available to that student (page 89);
- The ARD Committee determines that a student needs an instructional service, but it is not available on an age/grade-level appropriate campus (page 89);
- The ARD Committee determines that a student will be removed from education in age-appropriate general education classrooms solely because of needed modification in the general curriculum (pages 83 and 85); and

- The ARD Committee determines that a student will not be referred to or considered for instructional or related services because the services are not available on a specific campus (page 90).

Other references to the duty of the ARD Committee to ensure that a student with disabilities is not removed from settings where students without disabilities are educated for reasons other than the individual needs of the student with disabilities include:

- "In particular, public agencies may not make educational placement decisions based on such factors as the category of disability, configuration of the delivery system, availability of educational or related services, availability of space, or administrative convenience" [Letter to Akaka, 20 IDELR 75 (OSERS 1993)].
- "Impermissible factors for determining placements may include category of disability, configuration of the delivery system, availability of educational or related services, availability of space and administrative convenience" [Letter to Van Wart, 20 IDELR 1217 (OSEP 1993)].
- "The lack of adequate personnel or resources cannot be used as an excuse by the district to relieve them of their obligations to make FAPE available to disabled students in the LRE. The Department instructed that districts cannot make placements based solely on the following factors: category of disability, severity of disability, configuration of the delivery system, availability of educational or related services, availability of space, or administrative convenience" [OSEP memorandum 95-9, 21 EDELR 1152, 2 ECLPR ¶ 81 (ED 1994)].

Dr. Guerra, if you will recall, my audit of student records (both those records maintained at the Texas Education Agency which were collected as part of past D.E.C. visits/corrective action activities and those maintained at the South Texas High School—San Benito campus) indicated that the predominant reasons given by ARD Committees in sending districts to justify removal of students with disabilities from their home campuses and placement at STHS had to do with one or more educational or related services not being provided or made available at the home campuses of the affected students. A few examples of these include:

- Smaller class sizes available at STHS than at the student's home campus;
- More classroom "structure" available at STHS than at the student's home campus;
- STHS has implemented one or more positive behavioral support and/or behavior intervention systems that have not been made available at the student's home campus;
- STHS provides the support necessary for students with disabilities to participate in "on job training" programs in the community and the student's home campus does not;

- STHS has special education teachers that are specially trained and the home campus does not;
- STHS has social/behavior modification classes and the student's home campus does not;
- STHS programs are geared toward students with lower level of independence and the student's home campus is "geared-toward students with higher level of independence";
- The home campus's "block schedule" system does not allow for short daily instructional periods needed by the student with disabilities;
- STHS provides more supervision than student's home campus;
- STHS provides an "age-appropriate curriculum" and the student's home campus does not; and
- Student with disabilities cannot function in most home campus general education classes without extensive modifications to the curriculum.

It appears to me that these reasons given by ARD Committees in various sending districts to justify decisions to remove students with disabilities from their home campuses and place them at South Texas High School - San Benito are not "sufficient" or "adequate" to justify such a restrictive educational placement.  It also appears to me that if ARD Committees were to appropriately apply IDEA's LRE requirements, then many of the concerns regarding the placement of students at South Texas High School – San Benito would be resolved.  The justifications that are considered "impermissible" that I am referring to include:

a) category of disability;
b) severity of disability;
c) configuration of the delivery system;
d) availability of educational or related services;
e) availability of space; and
f) administrative convenience.

For example, removal to South Texas High School - San Benito due to "smaller class sizes" would appear to be an example of an impermissible justification given the fact that, under the provisions of IDEA, removal from the general education setting cannot be justified based solely on the "availability of educational and related services" or the "availability of space."

As another example of an impermissible factor, the statement "home school's block schedule system does not allow for short daily instructional periods needed by students with disabilities" would not appear to be an adequate justification given the fact that the "configuration of the delivery system" cannot, by itself, justify the removal of a student to a more restrictive educational setting.

As we have discussed, I believe the next step is to assure that when the dates for annual Review ARD Committee meetings occur, starting in September/October, 2002, the following guidelines are followed:

1. Each ARD Committee meeting will clearly be the responsibility of and conducted by the school district in which the student resides (even if the meeting is conducted at STHS); and
2. Each ARD Committee is aware of and makes its placement decision in accordance with the concepts presented in this letter regarding adequate and sufficient justifications for removing a student from the general education classroom and/or his/her home campus.

While it is true that "ARD Committees get to decide," it is also true that ARD mmittees must act lawfully - which includes full compliance with the LRE provisions ntained in the law. It seems to me that if the Review ARD Committees faithfully follow spirit and letter of the LRE provisions, as described and discussed above, whatever sults we see from the 2002-2003 ARD Committee meetings will, by definition, resolve concerns regarding the placement of students with disabilities at South Texas High hool - San Benito.

If I can be of further assistance regarding the LRE guidelines, please call me at 81) 440-4220.

incerely,

Jerry Vlasak, Ph.D.

)r. Jerry W. Vlasak, Vice President
3tetson and Associates, Inc.

cc: Mr. John Fessenden, Director, Quality, Compliance and Accountability Review, TEA
Mr. Gene Lenz, Director, Special Education Division, TEA
Dr. Karen Case, Associate Commissioner

C AB- 02-122

IN-CAMERA
INSPECTION

EXHIBIT NO. C

'PARENT' DEFINED

"Parent" includes a person standing in parental relation, but does not include a person as to whom the parent-child relationship has been terminated or a person not entitled to possession of or access to a child under a court order. Except as provided by federal law, all rights of a parent under Education Code Title 2 and all educational rights under Family Code 151.003(a)(10) shall be exercised by a student who is 18 years of age or older or whose disabilities of minority have been removed for general purposes under Family Code Chapter 31 unless the student has been determined to be incompetent or the student's rights have been otherwise restricted by a court order. *Education Code 26.002*

Parents are partners with educators, administrators, and the Board in their children's education. Parents shall be encouraged to actively participate in creating and implementing educational programs for their children.

Unless otherwise provided by law, the Board, the District administrator, or an educator may not limit parental rights.

*Education Code 26.001(a),(c)*

COMPLAINT PROCEDURES

The Board shall establish procedures to consider complaints that a parent's right has been denied. *Education Code 26.001(d)*

The Board shall adopt a grievance procedure under which the Board shall address each complaint that the Board receives concerning a violation of Education Code Chapter 26 (Parental Rights). *Education Code 26.011*

PARENT–TEACHER ORGANIZATION

The Board shall cooperate in the establishment of ongoing operations of at least one parent-teacher organization at each school in the District to promote parental involvement in school activities. *Education Code 26.001(e)* [See GE(LEGAL)]

SCHOOL ASSIGNMENT

A parent is entitled to:

1. Petition the Board designating the school in the District that the parent's child will attend.
2. *Reasonable access to the school principal, or to a designated administrator with the authority to reassign a student, to request a change in the class or teacher to which the parent's child has been assigned, if the reassignment or change would not affect the assignment or reassignment of another student.

*Education Code 26.003(a)(1),(2)*

[See FDB(LEGAL)]

ACADEMIC PROGRAMS

A parent is entitled to:

1. Request, with the expectation that the request will not be unreasonably denied:

EXHIBIT NO. D

a. *The addition of a specific academic class in the course of study of the parent's child in keeping with the required curriculum if sufficient interest is shown in the addition of the class to make it economically practical to offer the class. [See EH(LEGAL)]

b. *That the parent's child be permitted to attend a class for credit above the child's grade level, whether in the child's school or another school, unless the Board or its designated representative expects that the child cannot perform satisfactorily in the class. The decision of the Board concerning such a request is final and may not be appealed. [See EH(LEGAL)]

c. *That the parent's child be permitted to graduate from high school earlier than the child would normally graduate, if the child completes each course required for graduation. [See EIF(LEGAL)]

d. Have a child who graduates early participate in graduation ceremonies at the time the child graduates. [See EIG(LEGAL)]

*The decision of the Board concerning these requests is final and may not be appealed.

*Education Code 26.003(a)(3)(4), (b)*

STUDENT RECORDS AND INFORMATION

A parent is entitled to full information regarding the school activities of a parent's child except as provided by state child abuse laws. A parent is entitled to access to all written records of the school District concerning the parent's child, including:

1. Attendance records.
2. Test scores.
3. Grades.
4. Disciplinary records.
5. Counseling records.
6. Psychological records.
7. Applications for admission.
8. Health and immunization information.
9. Teacher and counselor evaluations.
10. Reports of behavioral patterns.

*Education Code 26.004, 26.008(a)*

[See FL(LEGAL), FM(LEGAL)]

ASSESSMENTS

A parent is entitled to access to a copy of each state assessment instrument administered to the parent's child, but a parent is not entitled to access to copies of questions that are being field-tested by TEA and were not used to compute a student's score. *Education Code 26.005* [See EKB(LEGAL)]

TEACHING MATERIALS

A parent is entitled to:

1. Review all teaching materials, textbooks, and other teaching aids used in the classroom of the parent's child.
2. Review each test administered to the parent's child after the test is administered.

The District shall make teaching materials and tests readily available for review by parents and may specify reasonable hours for review.

A parent is entitled to request that the District allow the student to take home any textbook used by the student. Subject to the availability of a textbook, the District or school shall honor the request. A student who takes home a textbook must return the textbook to school at the beginning of the next school day if requested to do so by the student's teacher.

*Education Code 26.006*

BOARD MEETINGS

A parent is entitled to complete access to any meeting of the Board, other than a closed meeting held in compliance with the Open Meetings Act.

The Board must hold each public meeting within the boundaries of the District except as required by law or to hold a joint meeting with another district. All public meetings must comply with the Open Meetings Act. [See BE(LEGAL)]

*Education Code 26.007*

LIMITATIONS ON DISTRICT EMPLOYEES

An attempt by any District employee to encourage or coerce a child to withhold information from the child's parent is grounds for discharge or suspension without pay. *Education Code 26.008(b)* [See DF(LEGAL)]

PARENTAL CONSENT

A District employee must obtain the written consent of a child's parent before the employee may:

1. Conduct a psychological examination, test, or treatment, unless the examination, test, or treatment is required by state child abuse laws. [See FFE(LEGAL)]

2. Make or authorize the making of a videotape of a child or record or authorize the recording of a child's voice. [See EHA (LEGAL), FM(LEGAL)]

CONSENT NOT REQUIRED

A District employee is not required to obtain the consent of a child's parent before the employee makes a videotape or authorizes the recording of a child's voice if the videotape or voice recording is to be used only for:

1. Purposes of safety, including the maintenance of order and discipline in common areas of the school or on school buses. [See FO(LEGAL)]
2. A purpose related to a cocurricular or extracurricular activity. [See FM(LEGAL)]
3. A purpose related to a regular classroom instruction. [See EHA(LEGAL)]
4. Media coverage of the school.

*Education Code 26.009*

EXEMPTION FROM INSTRUCTION

A parent is entitled to remove the parent's child temporarily from a class or other school activity that conflicts with the parent's religious or moral beliefs if the parent presents or delivers to the teacher of the parent's child a written statement authorizing the removal of the child from the class or other school activity. A parent is not entitled to remove the parent's child from a class or other school activity to avoid a test or to prevent the child from taking a subject for an entire semester, nor is the child exempt from satisfying grade level or graduation requirements in a manner acceptable to the District and TEA. *Education Code 26.010* [See EMB(LEGAL)]

FEES

TEA or the District may charge a reasonable fee in accordance with the public information laws, for copies of materials described above provided to a parent. *Education Code 26.012* [See GBA (LEGAL)]

The purpose of this policy is to secure at the lowest possible administrative level, prompt and equitable resolution of student or parent complaints. Except as provided below, all student or parent complaints shall be presented in accordance with this policy.

**CERTAIN COMPLAINTS**

Complaints regarding certain topics are addressed by specific policies or other documents that modify this complaint process or require an alternative process:

1. Discrimination on the basis of gender: FB;
2. Sexual abuse or sexual harassment of a student: FNCJ;
3. Loss of credit on the basis of attendance: FDD;
4. Teacher removal of a student for disciplinary reasons: FOAA;
5. Removal of a student to a disciplinary alternative education program: FOAB;
6. Expulsion of a student: FOD and the Student Code of Conduct;
7. Identification, evaluation, or educational placement of a student with a disability within the scope of Section 504: FB;
8. Identification, evaluation, or educational placement of a student with a disability within the scope of IDEA: EHBA and the parents' rights handbook provided to parents of all students referred to special education;
9. Instructional materials: EFA;
10. On-campus distribution of nonschool materials to students: FMA; and
11. Complaints against District peace officers: CKE.

**GENERAL PROVISIONS**

Unless otherwise provided by a policy referenced above, students or parents shall be entitled to informal conferences with administrators to resolve their complaints. In most circumstances in which a complaint involves a problem with a teacher, the student or parent shall be expected to discuss the matter with the teacher before requesting a conference with the principal at Level One.

The student may be represented by an adult at any level of the complaint.

For purposes of this policy, "days" shall mean calendar days.

Announcement of a decision in the student's or parent's presence shall constitute communication of the decision.

LEVEL ONE

A student or parent who has a complaint shall request a conference with the principal within 15 days of the time the student or parent knew, or should have known, of the event or series of events causing the complaint. The principal shall hold a conference with the student or parent within seven days of the request. The principal shall have seven days following the conference within which to respond.

LEVEL TWO

If the outcome of the conference with the principal is not to the student's or parent's satisfaction or the time for a response has expired, the student or parent may request a conference with the Superintendent or designee. The request must be filed within seven days following receipt of a response or, if no response is received, within seven days of the response deadline. The Superintendent or designee shall hold the conference within seven days after receiving the request.

Prior to or at the time of the conference, the student or parent shall submit a written complaint that includes the student's or parent's signed statement of the complaint, any evidence in its support, the solution sought, and the date of the conference with the principal. The Superintendent or designee shall have seven days following the conference within which to respond.

LEVEL THREE

If the outcome of the conference with the Superintendent or designee is not to the student's or parent's satisfaction or if the time for a response has expired, the student or parent may submit to the Superintendent or designee a request to place the matter on the agenda of a future Board meeting. The request shall be in writing and must be filed within seven days of the response or, if no response is received, within seven days of the response deadline.

The Superintendent shall inform the student or parent of the date, time, and place of the meeting.

The presiding officer shall establish a reasonable time limit for complaint presentations. The District shall make an audiotape record of the Level Three proceeding before the Board. The Board shall hear the complaint and shall then make and communicate its decision orally or in writing at any time up to and including the next regularly scheduled Board meeting.

CLOSED MEETING

If the complaint involves concerns or charges regarding an employee, it shall be heard by the Board in closed meeting unless the employee to whom the complaint pertains requests that it be heard in public.

(9) direct and/or supportive services to preschool programs for children with disabilities.

(c) Each ESC shall maintain a child find/serve program including:

(1) referral and tracking of previously unserved students between birth and 21 years of age;

(2) follow-through of students referred;

(3) resource identification; and

(4) interagency coordination.

(d) Regional ESCs may serve as fiscal agents for those school districts which choose to receive such services through the ESCs.

(e) A minimum of one staff member certified in the education of students with visual impairments shall be employed by each ESC.

(f) The ESC shall not charge school districts for those services for which the ESC has been funded.

(g) Each ESC shall provide school districts with technical assistance and, based on identified needs, a comprehensive system of personnel development.

(h) For the purposes of this subchapter, ESCs shall be considered to be intermediate educational units as defined in federal regulations.

*Source: The provisions of this §89.1141 adopted to be effective September 1, 1996, 21 TexReg 7240.*

---

**Division 7. Resolution of Disputes Between Parents and School Districts**

**§89.1150. General Provisions.**

(a) From time to time, disputes may arise between a parent and a school district relating to the identification, evaluation, or educational placement of or the provision of a free appropriate public education (FAPE), to a student with a disability.

(b) It is the policy and intent of the Texas Education Agency (TEA) to encourage and support the resolution of any dispute described in subsection (a) of this section at the lowest level possible and in a prompt, efficient, and effective manner.

(c) The possible options for resolving disputes include, but are not limited to:

(1) meetings of the student's admission, review, and dismissal committee;

(2) meetings or conferences with the student's teachers;

(3) meetings or conferences, subject to local school district policies, with campus administrator(s), the special education director of the district (or the shared services arrangement to which the district may be a party), the superintendent of the district, or

EXHIBIT NO. E

the board of trustees of the district;

(4) requesting mediation through the TEA in accordance with the Individuals with Disabilities Education Act (IDEA), 20 United States Code (USC), §1415(e), and 34 Code of Federal Regulations (CFR), §300.506,

(5) filing a complaint with the TEA in accordance with 34 CFR, §§300.600-300.662; or

(6) requesting a due process hearing through the TEA in accordance with IDEA, 20 USC, §1415(f), and 34 CFR, §§300.507-300.514. Upon the filing of a request for a due process hearing, the parent and the school district shall also be provided with an opportunity to resolve the dispute through the mediation process established by TEA.

*Source: The provisions of this §89.1150 adopted to be effective March 6, 2001, 26 TexReg 1837.*

---

**§89.1151. Due Process Hearings.**

(a) A parent or public education agency may initiate a due process hearing as provided in the Individuals with Disabilities Education Act (IDEA), Part B, as amended, 20 United States Code (USC), §§1401 et seq., and the applicable federal regulations, 34 Code of Federal Regulations (CFR), §§300.1 et seq.

(b) The Texas Education (TEA) shall implement a one-tier system of due process hearings under the IDEA. The proceedings in due process hearings shall be governed by the provisions of 34 CFR, §§300.507-300.514, and 34 CFR, §300.528, if applicable, and §§89.1151, 89.1165, 89.1170, 89.1180, 89.1185 and 89.1191 of this subchapter.

(c) The issues presented in a due process hearing, and any relief requested, are limited to and may be based only upon facts alleged to have occurred not more than one year prior to the date that the request for due process hearing is received by TEA or since the date of the last admission, review, and dismissal committee meeting of the student who is the subject of the hearing, whichever period is longer, but in no event more than two years prior to the date that the request for due process hearing is received by TEA.

*Source: The provisions of this §89.1151 adopted to be effective March 6, 2001, 26 TexReg 1837.*

---

**§89.1165. Request for Hearing.**

(a) A request for a due process hearing must be in writing and must be filed with the Texas Education Agency, 1701 N. Congress Avenue, Austin, Texas 78701. The request for a due process hearing may be filed by mail, hand-delivery, or facsimile and shall be deemed filed only when actually received by the office responsible for legal services at the Texas Education Agency (TEA). The TEA has developed a model form which may be used by a parent to initiate a due process hearing. The form is available on request from TEA, all regional education service centers, and all school districts. The form is also available on TEA's website.

(b) If the request for a due process hearing does not specify the issues to be heard and the relief requested, the hearing officer shall require the complaining party to supplement the request, orally or in writing, to clarify the issues to be heard at the hearing and the relief sought by the complaining party.

*Source: The provisions of this §89.1165 adopted to be effective March 6, 2001, 26 TexReg 1837.*

---

**§89.1170. Impartial Hearing Officer.**

(a) Each due process hearing shall be conducted by an impartial hearing officer selected by the Texas Education Agency (TEA).

(b) The hearing officer has the authority to administer oaths, call and examine witnesses; rule on motions, including discovery and dispositive motions; determine admissibility of evidence and amendments to pleadings; maintain decorum; schedule and recess the proceedings from day to day; and make any other orders as justice requires, including the application of sanctions as necessary to maintain an orderly hearing process.

(c) If the hearing officer is removed, dies, becomes disabled, or withdraws from an appeal before the completion of duties, the TEA may designate a substitute hearing officer to complete the performance of duties without the necessity of repeating any previous proceedings.

*Source: The provisions of this §89.1170 adopted to be effective March 6, 2001, 26 TexReg 1837.*

---

**§89.1180. Prehearing Procedures.**

(a) Promptly upon being assigned to a hearing, the hearing officer will schedule a prehearing conference to be held at a time reasonably convenient to the parties to the hearing. The prehearing conference shall be held by telephone unless the hearing officer determines that circumstances require an in-person conference.

(b) The hearing officer shall ensure that a written, or, at the option of either party, an electronic, verbatim record of the prehearing conference is made.

(c) The purpose of the prehearing conference shall be to consider any of the following:

(1) specifying and simplifying issues;

(2) admitting certain assertions of fact or stipulations;

(3) establishing any limitation of the number of witnesses and the time allotted for presenting each party's case; and/or

(4) discussing other matters which may aid in simplifying the proceeding or disposing of matters in controversy, including settling matters in dispute.

(d) Promptly upon the conclusion of the prehearing conference, the hearing officer will issue and deliver to the parties, or their legal representatives, a written prehearing order which identifies:

(1) the time, place, and date of the hearing;

(2) the issues to be resolved at the hearing;

(3) the relief being sought at the hearing;

(4) the deadline for disclosure of evidence and identification of witnesses, which must be at least five business days prior to the scheduled date of the hearing (hereinafter referred to as the "Disclosure Deadline");

(5) the date by which the final decision of the hearing officer shall be issued; and

(6) other information determined to be relevant by the hearing officer.

(e) No pleadings, other than the request for hearing, are mandatory, unless ordered by the hearing officer. Any pleadings after the request for a due process hearing shall be filed with the hearing officer. Copies of all pleadings shall be sent to all parties of record in the hearing and to the hearing officer. If a party is represented by an attorney, all copies shall be sent to the attorney of record. Telephone facsimile copies may be substituted for copies sent by other means. An affirmative statement that a copy of the pleading has been sent to all parties and the hearing officer is sufficient to indicate compliance with this rule.

(f) Discovery methods shall be limited to those specified in the Administrative Procedure Act (APA), Texas Government Code, Chapter 2001, and may be further limited by order of the hearing officer. Upon a party's request to the hearing officer, the hearing officer may issue subpoenas and commissions to take depositions under the APA. Subpoenas and commissions to take depositions shall be issued in the name of the Texas Education Agency.

(g) On or before the Disclosure Deadline (which must be at least five business days prior to a scheduled due process hearing), each party must disclose and provide to all other parties and the hearing officer copies of all evidence (including, without limitation, all evaluations completed by that date and recommendations based on those evaluations) which the party intends to use at the hearing. An index of the documents disclosed must be included with and accompany the documents. Each party must also include with the documents disclosed a list of all witnesses (including their names, addresses, phone numbers, and professions) which the party anticipates calling to testify at the hearing.

(h) A party may request a dismissal or nonsuit of a due process hearing to the same extent that a plaintiff may dismiss or nonsuit a case under Texas Rules of Civil Procedure, Rule 162. However, if a party requests a dismissal or nonsuit of a due process hearing after the Disclosure Deadline has passed and, at any time within one year thereafter requests a subsequent due process hearing involving the same or substantially similar issues as those alleged in the hearing which was dismissed or nonsuited, then, absent good cause or unless the parties agree otherwise, the Disclosure Deadline for the subsequent due process hearing shall be the same date as was established for the hearing that was dismissed or nonsuited.

*Source: The provisions of this §89.1180 adopted to be effective March 6, 2001, 26 TexReg 1837.*

---

**§89.1185. Hearing.**

(a) The hearing officer shall afford the parties an opportunity for hearing after reasonable notice of not less than ten days, unless the parties agree otherwise.

(b) Each hearing shall be conducted at a time and place that are reasonably convenient to the parents and child involved.

(c) All persons in attendance shall comport themselves with the same dignity, courtesy, and respect required by the district courts of the State of Texas. All argument shall be made to the hearing officer

alone.

(d)  Except as modified or limited by the provisions of 34 Code of Federal Regulations (CFR), §§300.507-300.514, 300.521, or 300.528, or the provisions of §§89.1151-89.1191 of this subchapter, the Texas Rules of Civil Procedure shall govern the proceedings at the hearing and the Texas Rules of Evidence shall govern evidentiary issues.

(e)  Before a document may be offered or admitted into evidence, the document must be identified as an exhibit of the party offering the document. All pages within the exhibit must be numbered, and all personally identifiable information must be redacted from the exhibit.

(f)  The hearing officer may set reasonable time limits for presenting evidence at the hearing.

(g)  Upon request, the hearing officer, at his or her discretion, may permit testimony to be received by telephone.

(h)  Granting of a motion to exclude witnesses from the hearing room shall be at the hearing officer's discretion.

(i)  Hearings conducted under this subchapter shall be closed to the public, unless the parent requests that the hearing be open.

(j)  The hearing shall be recorded and transcribed by a reporter, who shall immediately prepare and transmit a transcript of the evidence to the hearing officer with copies to each of the parties. The hearing officer shall instruct the reporter to delete all personally identifiable information from the transcription of the hearing.

(k)  Filing of post-hearing briefs shall be permitted only upon order of the hearing officer and only upon a finding by the hearing officer that the legal issues involved in the hearing are novel or unsettled in the State of Texas or the Fifth Circuit. Any post-hearing briefs permitted by the hearing officer shall be limited to the legal issues specified by the hearing officer.

(l)  The hearing officer shall issue a final decision, signed and dated, no later than 45 days after a request for hearing is received by the Texas Education Agency, unless the deadline for a final decision has been extended by the hearing officer as provided in subsection (m) of this section. A final decision must be in writing and must include findings of fact and conclusions of law separately stated. Findings of fact must be based exclusively on the evidence presented at the hearing. The final decision shall be mailed to each party by the hearing officer. The hearing officer, at his or her discretion, may render his or her decision following the conclusion of the hearing, to be followed by written findings of fact and written decision.

(m)  At the request of either party, the hearing officer shall include, in the final decision, specific findings of fact regarding the following issues:

(1)  whether the parent or the school district unreasonably protracted the final resolution of the issues in controversy in the hearing; and

(2)  if the parent was represented by an attorney, whether the parent's attorney provided the school district the appropriate information in the due process complaint in accordance with 34 CFR, §300.507(c).

(n)  In making a finding regarding the issue described in subsection (m)(1) of this section, the hearing officer shall consider the extent to which each party had notice of, or the opportunity to resolve, the issues presented at the due process hearing prior to the date on which the due process hearing was

requested. If, after the date on which a request for a due process hearing is filed, either the parent or the school district requests that a meeting of the admission, review, and dismissal (ARD) committee of the student who is the subject of the due process hearing be convened to discuss the issues raised in the request for a due process hearing, the hearing officer shall also consider the extent to which each party participated in the ARD committee meeting in a good faith attempt to resolve the issue(s) in dispute prior to proceeding to a due process hearing.

(o) A hearing officer may grant extensions of time for good cause beyond the 45-day period specified in subsection (l) of this section at the request of either party. Any such extension shall be granted to a specific date and shall be stated in writing by the hearing officer to each of the parties.

(p) The decision issued by the hearing officer is final, except that any party aggrieved by the findings and decision made by the hearing officer, or the performance thereof by any other party, may bring a civil action with respect to the issues presented at the due process hearing in any state court of competent jurisdiction or in a district court of the United States, as provided in 20 United States Code (USC), §1415(i)(2), and 34 CFR, §300.512. A civil action brought in state or federal court under 20 USC, §1415(i)(2), and 34 CFR, §300.512, must be initiated no more than 45 days after the date the hearing officer issued his or her written decision in the due process hearing.

(q) In accordance with 34 CFR, §300.514(c), a school district shall implement any decision of the hearing officer that is, at least in part, adverse to the school district in a timely manner within ten school days after the date the decision was rendered. School districts must provide services ordered by the hearing officer, but may withhold reimbursement during the pendency of appeals.

*Source: The provisions of this §89.1185 adopted to be effective March 6, 2001, 26 TexReg 1837.*

---

**§89.1191. Special Rule for Expedited Due Process Hearings.**

An expedited due process hearing requested by a party under 34 Code of Federal Regulations (CFR), §300.528, shall be governed by the same rules as are applicable to due process hearings generally, except that the final decision of the hearing officer must be issued and mailed to each of the parties no later than 45 days after the date the request for the expedited hearing is received by the Texas Education Agency, without exceptions or extensions.

*Source: The provisions of this §89.1191 adopted to be effective March 6, 2001, 26 TexReg 1837.*