IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 0 5 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| ROSEMARY GUERRA INDIVIDUALLY § | |
| AND AS NEXT FRIEND OF § | |
| EDIBERTO GUERRA § | |
| *and all those similarly situated* § | |
| § | |
| VS. § | C. A. NO. B-02-207 |
| § | |
| SOUTH TEXAS HIGH SCHOOL- § | |
| SAN BENITO, SOUTH TEXAS § | |
| INDEPENDENT SCHOOL DISTRICT § | |
| AND MARLA M. GUERRA § | |

## MOTION TO DISMISS
## PURSUANT TO RULE 12 F.R.C.P.

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants **SOUTH TEXAS INDEPENDENT SCHOOL DISTRICT ("STISD") and Its Superintendent, MARLA M. GUERRA** file this motion requesting this cause be dismissed pursuant to the provisions of Rule 12, Federal Rules of Civil Procedure or, in the alternative, be abated pending Plaintiff exhausting her administrative remedies:

1.  This case is brought by Plaintiff complaining that Defendants are attempting to deprive her minor child of certain rights and protections under unspecified "Disability, Education and Due Process Laws". The appropriate legislation passed by the United States Congress is the Individuals with Disabilities Education Act (IDEA) made mandatorily applicable to STISD by regulation. 34 C.F.R. 300.2.

2.  The Congressional Act (IDEA) requires that all students with disabilities be educated to the maximum extent appropriate with children who are non-disabled.

20 U.S.C. 1412 (a)(5). The determination of appropriate placement must be made by "a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options" and "is made in conformity with the LRE provisions of this subpart". 34 C.F.R. 300.552(a).

3. In the event the parent does not agree to the decision of the committee established pursuant to 34 C.F.R. 300.552(a) or later determines to challenge such decision, that parent is required to request and be involved in a due process hearing conducted by the "State educational agency or local educational agency" pursuant to the requirements of state law or the state educational agency. 20 U.S.C. § 1415(f). Any decision made in the due process hearing "shall be final". 20 U.S.C. § 1415(1)(A). Thereafter, the aggrieved party may appeal to the local educational agency for an independent decision upon completion of a review. 20 U.S.C. 1415(g). After this appeal is final, a party who continues to be aggrieved may bring a civil action with respect to the complaint presented. 20 U.S.C. § 1415(i)(2).

4. For the reasons set out in IDEA, no court has jurisdiction of a complaint concerning the placement decision of the Admission, Review and Dismissal Committee (ARD Committee) until the administrative remedies provided by either the local school district or the state education agency are exhausted. Plaintiff herein has not pursued any of the administrative remedies provided by either South Texas Independent School District or the Texas Education Agency. Even after those procedures are exhausted, if Plaintiff is still dissatisfied, she must pursue the appeals process required by IDEA. Plaintiff has wholly failed to pursue any of the administrative remedies.

5. During the administrative process through appeal and judicial review, IDEA mandates that the disabled child remain in the placement considered then current. 20 U.S.C. 1415(j). The last placement of the child the subject of this litigation as determined by the ARD Committee and the integral IEP Team and agreed to by Plaintiff was one-half (½) day at South Texas High School-San Benito for Vocational Training, English IV, U. S. Government and Economics and one-half day (½) day at either San Benito High School or (at the parents' discretion) home schooling for Business Computer Systems, Science and an elective. The only entity which can revise this IEP is the IEP Team within the ARD Committee of the student's home district. 34 C.F.R. 300.343(c). (See page 8, letter of instruction from TEA consultant attached hereto as "Exhibit A").

Defendants pray this Court dismiss this cause under Rule 12(b)(1), F.R.C.P., for lack of jurisdiction or, in the alternative, abate this action until Plaintiff has exhausted the administrative remedies set out in 20 U.S.C. § 1415.

DATED: November 5, 2002.

                                        Respectfully submitted,

**FLEMING & HERNANDEZ, P.C.**
1650 Paredes Line Road, Suite 102
Brownsville, Texas  78521-1602
Telephone:  (956) 982-4404
Telecopier:  (956) 982-0943

by: _____
**Tom Fleming**
State Bar of Texas No. 07133000
Federal I. D. No. 1188

**Jeffrey G. Mathews**
State Bar of Texas No. 24013115
Federal I. D. No. 24499

**COUNSEL FOR DEFENDANTS:**
**SOUTH TEXAS HIGH SCHOOL - SAN BENITO;**
**SOUTH TEXAS INDEPENDENT SCHOOL DISTRICT;**
**and MARLA M. GUERRA.**

## CERTIFICATE OF CONFERENCE

No conference is necessary under Local Rule 5 for a motion made under Rule 12(b), F.R.C.P.

_____
Tom Fleming

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing **MOTION TO DISMISS PURSUANT TO RULE 12 F.R.C.P.** was served <u>November 5, 2002</u> in the manner(s) indicated below upon the following Counsel-of-record:

    **COUNSEL FOR PLAINTIFFS,**
    **ROSEMARY GUERRA INDIVIDUALLY**
    **AND AS NEXT FRIEND OF EDIBERTO GUERRA**
    **and all those similarly situated:**
    Ray R. Marchan
    WATTS LAW FIRM, L.L.P.
    1926 East Elizabeth Street
    Brownsville, Texas 78520
    *(PERSONAL DELIVERY)*

_____
Tom Fleming



# Stetson and Associates, Inc.

## Human Resource Development

September 16, 2002

Dr. Marla Guerra, Superintendent
South Texas Independent School District
100 Med High Drive
Mercedes, Texas 78570

Dear Dr. Guerra:

    The purpose of this letter is to follow up on the meetings that were held last Spring with Superintendents representing the 28 school districts located in Cameron, Hidalgo, and Willacy Counties. During those meetings, we discussed in some detail the issues that have been raised with respect to the placement of students with disabilities at South Texas High School – San Benito and the degree to which such educational placements comply with the least restrictive environment (LRE) requirements of the Individuals with Disabilities Education Act (IDEA). The Superintendents who attended the meetings last Spring expressed a desire for additional information regarding the application and interpretation of the LRE provisions of IDEA. It is my understanding that the Superintendents felt that such information would be helpful to ARD Committee members in making appropriate educational placement decisions for students with disabilities residing in the 28 school districts in Cameron, Hidalgo, and Willacy Counties.

    As we have discussed previously, my role in this situation is to function as a consultant acting on behalf of the Texas Education Agency to achieve assurances that the LRE requirements of IDEA are being met in regard to students who have been placed by their ARD Committees at South Texas High School - San Benito. Further, if changes are indicated, my role is to assist in planning and implementing appropriate "corrective actions" to ensure that any necessary changes occur in a manner that protects the rights afforded all parties, including students, parents and school districts.

    The progress that has apparently been achieved in the past several years toward meeting the LRE requirements for students placed at the South Texas High School - San Benito campus speaks very well indeed of the commitment and efforts of the South Texas Independent School District, as well as many of the other school districts located in Cameron, Hidalgo and Willacy counties. I am confident that such progress can be continued and hope that the information outlined in this letter will be of assistance. I have organized this letter into four (4) sections, including:

EXHIBIT NO. A

A. A brief overview of the LRE requirements;
B. A section regarding the "presumption" in IDEA that students with disabilities will benefit from being educated with students without disabilities;
C. A section regarding the duty of the ARD Committee to identify supplementary aids and services that, if implemented, would allow the student with disabilities to be educated with his/her nondisabled peers; and
D. A section discussing the factors that are considered "insufficient", "inadequate" or "impermissible" in justifying a removal of a student with a disability from a general education classroom to a more restrictive setting.

For your information, I have relied heavily upon documentation found in: a) "The Complete OSEP Handbook," edited by Vicki M. Pitasky and published by LRP Publications in 2000 (updated 2002); b) "The Individuals with Disabilities Education Act Amendments of 1997: Curriculum," edited by Lisa Kupper and published by the National Information Center for Children and Youth with Disabilities (NICHCY) and supported by the Office of Special Education Programs, U.S. Department of Education; and c) the District Effectiveness and Compliance (D.E.C.) Reference Guide, Part II, 2002-2003, published May 1, 2002 by the Texas Education Agency.

## A. Overview of LRE Requirements

The first issue addressed in this letter is just a brief review or background section regarding the State and Federal requirements concerning the LRE requirements in IDEA. I realize that you are very familiar with these requirements and I include them here just as a reference point.

Since the Education for All Handicapped Children Act—now known as the Individuals with Disabilities Education Act—was passed in 1975, States have been required to make available to students with disabilities a free appropriate public education (FAPE) in the least restrictive environment (LRE). The law requires each State to establish policies and procedures to ensure that:

> "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." [Individuals with Disabilities Education Act, Section §612(a)(5)(a); 20 U.S.C. §1412(a)(5)(A)]

The regulations promulgated under IDEA specifically extend LRE requirements to **individual school districts**. In this regard, Section 300.550(b) states that:

> Each **public agency** shall ensure
> (1) That to the maximum extent appropriate, children with disabilities . . are educated with children who are nondisabled; and
> (2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Since the term "public agency" includes school districts (see 34 C.F.R. §300.22), the regulations clarify that each school district has an independent obligation to comply with IDEA's LRE requirements. (The regulations also provide that if there is evidence that a public agency/school district has made placement decisions that are inconsistent with Section 300.550, then the State Education Agency shall review the agency's justification for its actions and assist in planning and implementing any necessary changes or corrective actions. *See 34 C.F.R. §300.556(b).* This may help explain my role and my involvement in the discussions and meetings that have been taking place over the course of the last several months.)

Basically, a child's LRE is the environment where the child can receive an appropriate education designed to meet his or her special educational needs, while still being educated with nondisabled peers to the maximum extent appropriate. Depending on the child's individual needs, the LRE could be the general education classroom, with or without supplementary aids and services; a pull-out program for part of the day with the remainder of the day being spent in the general education classroom or in activities with students who do not have disabilities; a special education class within the child's neighborhood school; or even a separate school. Thus, the appropriate educational setting for one student - the environment where that child can receive the educational services that are appropriate for him/her while still interacting with nondisabled peers - may be very different from another student's. The determining factor is the student's individual needs.

B.  **The "Presumption" in IDEA that Students with Disabilities Will Benefit from Being Educated with Students without Disabilities**

The second section of this letter that I believe is especially relevant to the issues raised in connection with the placement of students with disabilities at South Texas High School - San Benito is the issue of "preference" or "presumption." In a November 23, 1994 memorandum to the Chief State School Officers, the U.S. Department of Education offered clarification regarding IDEA's LRE provisions. In that memorandum, the U.S. Department of Education pointed out and emphasized IDEA's "strong <u>preference</u> for educating students with disabilities in regular classes with appropriate aids and supports"

3

(Heumann & Hehir, 1994, p. 3). This memo made it clear that a student's placement in the general education classroom is the *first* option the ARD Committee must consider.

Further, according to the language contained in a report by the Committee on Labor and Human Resources, 1997, pp. 20-21: "prior to the enactment of P.L. 94-142 in 1975, the opportunity and inclination to educate children with disabilities was often in separate programs and schools away from children without disabilities. That law and this bill ('97 Amendments) contain a presumption that children with disabilities are to be educated in regular classes."

An integral part of deciding whether or not a student with a disability will be educated with students who are not disabled is an individualized inquiry into the possible range of supplementary aids and services that are needed to ensure that the student can be satisfactorily educated in that general education environment. If the ARD Committee determines that the student can be educated satisfactorily with students who are not disabled, with or without supplementary aids and services, "that placement is the LRE for that student" (Heumann, 1994, p. 2).

IDEA '97 maintains the presumption that children with disabilities are most appropriately educated with their nondisabled peers. That presumption is seen in IDEA's **mandate** that children with disabilities be served in regular education settings to the maximum extent appropriate. Further, IDEA **requires** that special classes, separate schools, or other removal of children with disabilities from the regular educational environment occurs "...only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved" [IDEA Section 612(a)(5)(A)]. I believe that this section requires that students with disabilities are to be educated in the same school that they would normally attend if they did not have a disability, unless the student's IEP cannot be implemented satisfactorily in that environment, even with the provision of supplementary aids and services, including program modifications and/or supports for school personnel.

C.  **Duty of the ARD Committee To Identify Supplementary Aids and Services To Allow a Student with Disabilities To Be Educated with his/her Nondisabled Peers**

The use of the word "cannot" in the LRE regulations seems to me to raise a third issue: what is the "duty" of an ARD Committee to document that the student's IEP cannot be successfully implemented in a setting that includes students without disabilities, even with the provision of supplementary aids and services. I do not believe that this section of the regulations refers to a preference, a tradition, or even a request from a parent/student and/or educator, but rather a determination that it is impossible to implement the student's IEP, even with supplementary aids and services, in a manner that would not be detrimental to the student with disabilities or other students.

To pose the question differently, I believe that the ARD Committee must address: "What supplementary aids and services (including program modifications and/or

4

supports for school personnel) would ensure that the student's IEP <u>can</u> be appropriately implemented with students who are not disabled?" If such aids and services can be identified, then they <u>must</u> be provided and the student <u>must</u> be educated with students who are not disabled (this information is based on a memorandum written by the U.S. Department of Education to the Chief State School Officers and dated November 23, 1994).

Prior to the passage of the 1997 Amendments, the law did not include a specific definition of what constituted "supplementary aids and services," although clearly these aids and services can be a critical part of enabling students with disabilities to succeed within the general education setting. The IDEA '97 closes this gap by providing a definition of supplementary aids and services, as follows:

> "The term 'supplementary aids and services' means aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with section 612(a)(5)." [IDEA, Section 602(29)]

D.  **Factors that are Considered "Insufficient", "Inadequate" or "Impermissible" in Justifying a Removal of a Student with a Disability from a General Education Classroom to a More Restrictive Setting**

The fourth issue addressed in this letter concerns the question - "What kinds of factors (perceived or actual) justify the removal of a student with disabilities from a setting with non-disabled students?". Several sources have pointed out that "educational discussions leading to the development of the IEP must be based <u>only</u> on a student's individual and unique needs." Educational decisions may <u>not</u> be based upon factors other than the student's individual needs, including administrative expediency, availability of services, or type or severity of disability (D.E.C. Reference Guide, Part II, 2002-2003, page 92, Texas Education Agency).

The D.E.C. Reference Guide also lists examples of "potentially discrepant situations," including:

- The ARD Committee determines that a student needs an instructional service, but it is not available to that student (page 89);
- The ARD Committee determines that a student needs an instructional service, but it is not available on an age/grade-level appropriate campus (page 89);
- The ARD Committee determines that a student will be removed from education in age-appropriate general education classrooms solely because of needed modification in the general curriculum (pages 83 and 85); and

5

- The ARD Committee determines that a student will not be referred to or considered for instructional or related services because the services are not available on a specific campus (page 90).

Other references to the duty of the ARD Committee to ensure that a student with disabilities is not removed from settings where students without disabilities are educated for reasons other than the individual needs of the student with disabilities include:

- "In particular, public agencies may not make educational placement decisions based on such factors as the category of disability, configuration of the delivery system, availability of educational or related services, availability of space, or administrative convenience" [Letter to Akaka, 20 IDELR 75 (OSERS 1993)].
- "Impermissible factors for determining placements may include category of disability, configuration of the delivery system, availability of educational or related services, availability of space and administrative convenience" [Letter to Van Wart, 20 IDELR 1217 (OSEP 1993)].
- "The lack of adequate personnel or resources cannot be used as an excuse by the district to relieve them of their obligations to make FAPE available to disabled students in the LRE. The Department instructed that districts cannot make placements based solely on the following factors: category of disability, severity of disability, configuration of the delivery system, availability of educational or related services, availability of space, or administrative convenience" [OSEP memorandum 95-9, 21 EDELR 1152, 2 ECLPR ¶ 81 (ED 1994)].

Dr. Guerra, if you will recall, my audit of student records (both those records maintained at the Texas Education Agency which were collected as part of past D.E.C. visits/corrective action activities and those maintained at the South Texas High School—San Benito campus) indicated that the predominant reasons given by ARD Committees in sending districts to justify removal of students with disabilities from their home campuses and placement at STHS had to do with one or more educational or related services not being provided or made available at the home campuses of the affected students. A few examples of these include:

- Smaller class sizes available at STHS than at the student's home campus;
- More classroom "structure" available at STHS than at the student's home campus;
- STHS has implemented one or more positive behavioral support and/or behavior intervention systems that have not been made available at the student's home campus;
- STHS provides the support necessary for students with disabilities to participate in "on job training" programs in the community and the student's home campus does not;

6

- STHS has special education teachers that are specially trained and the home campus does not;
- STHS has social/behavior modification classes and the student's home campus does not;
- STHS programs are geared toward students with lower level of independence and the student's home campus is "geared toward students with higher level of independence";
- The home campus's "block schedule" system does not allow for short daily instructional periods needed by the student with disabilities;
- STHS provides more supervision than student's home campus;
- STHS provides an "age-appropriate curriculum" and the student's home campus does not; and
- Student with disabilities cannot function in most home campus general education classes without extensive modifications to the curriculum.

It appears to me that these reasons given by ARD Committees in various sending districts to justify decisions to remove students with disabilities from their home campuses and place them at South Texas High School - San Benito are not "sufficient" or "adequate" to justify such a restrictive educational placement. It also appears to me that if ARD Committees were to appropriately apply IDEA's LRE requirements, then many of the concerns regarding the placement of students at South Texas High School – San Benito would be resolved. The justifications that are considered "impermissible" that I am referring to include:

a) category of disability;
b) severity of disability;
c) configuration of the delivery system;
d) availability of educational or related services;
e) availability of space; and
f) administrative convenience.

For example, removal to South Texas High School - San Benito due to "smaller class sizes" would appear to be an example of an impermissible justification given the fact that, under the provisions of IDEA, removal from the general education setting cannot be justified based solely on the "availability of educational and related services" or the "availability of space."

As another example of an impermissible factor, the statement "home school's block schedule system does not allow for short daily instructional periods needed by students with disabilities" would not appear to be an adequate justification given the fact that the "configuration of the delivery system" cannot, by itself, justify the removal of a student to a more restrictive educational setting.

As we have discussed, I believe the next step is to assure that when the dates for annual Review ARD Committee meetings occur, starting in September/October, 2002, the following guidelines are followed:

7

1. Each ARD Committee meeting will clearly be the responsibility of and conducted by the school district in which the student resides (even if the meeting is conducted at STHS); and
2. Each ARD Committee is aware of and makes its placement decision in accordance with the concepts presented in this letter regarding adequate and sufficient justifications for removing a student from the general education classroom and/or his/her home campus.

While it is true that "ARD Committees get to decide," it is also true that ARD Committees must act lawfully - which includes full compliance with the LRE provisions contained in the law. It seems to me that if the Review ARD Committees faithfully follow the spirit and letter of the LRE provisions, as described and discussed above, whatever results we see from the 2002-2003 ARD Committee meetings will, by definition, resolve the concerns regarding the placement of students with disabilities at South Texas High School - San Benito.

If I can be of further assistance regarding the LRE guidelines, please call me at (281) 440-4220.

Sincerely,

Dr. Jerry W. Vlasak, Vice President
Stetson and Associates, Inc.

cc: Mr. John Fessenden, Director, Quality, Compliance and Accountability Review, TEA
    Mr. Gene Lenz, Director, Special Education Division, TEA
    Dr. Karen Case, Associate Commissioner

8